1                  IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3   WENDELL WEAVER,             )  Docket No. 15 C 02950
                          )
4            Plaintiff,    )  Chicago, Illinois
                          )  February 6, 2018
5           v.             )  11:10 a.m.
                          )
6   DR. JACQUELINE MITCHELL and   )
   RANDY PFISTER,           )
7                          )
            Defendants.   )
8

9                        VOLUME 1-A
             TRANSCRIPT OF PROCEEDINGS - Jury Trial
10      BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

11   APPEARANCES:

12
   For the Plaintiff:      MOLOLAMKEN LLP by
13                       MR. GERALD P. MEYER
                       MS. MICHELLE JOYCE PARTHUM
14                     300 North LaSalle Street
                     Chicago, Illinois  60654
15
   For the Defendants:     OFFICE OF ILLINOIS ATTORNEY GENERAL by
16                     MR. NICHOLAS SCOTT STALEY
                     MR. JOSEPH PETER LUPINACCI
17                     100 West Randolph Street, 13th Floor
                     Chicago, Illinois  60601
18

19

20

21

22   Court Reporter:        GAYLE A. McGUIGAN, CSR, RMR, CRR
                     Federal Official Court Reporter
23                     219 South Dearborn, Room 2318-A
                     Chicago, Illinois 60604
24                     (312) 435-6047
                     Gayle_McGuigan@ilnd.uscourts.gov
25

1                              I N D E X

2

3                                                          PAGE

4

5    Opening Statement by Ms. Parthum                        25

6    Opening Statement by Mr. Staley                         34

7

8                        *    *    *    *    *

9

10   WITNESS                                                PAGE

11   WENDELL WEAVER
         Direct By Mr. Meyer ........................ 43

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (In open court outside the presence of the plaintiff and

 2          the prospective jury:)

 3                    THE CLERK:  15 C 2950, Weaver versus Mitchell.

 4                    THE COURT:  Good morning, folks.

 5                    MR. MEYER:  Your Honor, Gerald Meyer.

 6                    MS. PARTHUM:  Michelle Parthum.

 7                    MR. MEYER:  On behalf of Mr. Weaver.

 8                    MR. LUPINACCI:  Joe Lupinacci, L-U-P-I-N-A-C-C-I, on

 9      behalf of the state.

10                    MR. STALEY:  Nick Staley on behalf of the State

11      defendants.

12                    THE COURT:  Good morning.

13                    Who are you?

14                    MS. SAUNDERS:  Emilee Saunders.  I'm their legal

15      assistant.

16                    THE COURT:  Okay.  Nice to meet you.

17                    MS. SAUNDERS:  Nice to meet you, too.

18                    THE COURT:  All right.  So let's make sure we're all

19      set to go.

20                    Do I have a statement of the case in here somewhere?

21                    MR. MEYER:  Yes, your Honor.

22                    THE COURT:  Here it is.  Agreed statement of the case,

23      Tab 3.  And my *voir dire*.

24                    All right.  So what we're going to do is we're going

25      to bring everybody up and we'll get started using the procedure

1    that I had.  I really think you'll be able to get your jury

2    today in the morning, maybe like by 1:30-ish, lunch break --

3    oops, sorry, Gayle -- lunch break, and then opening statements,

4    okay?

5            Do we still think we'll probably take just today and

6    tomorrow to wrap it up?  Is that still where we're at?

7            MR. MEYER:  Yes.

8            THE COURT:  So you might change a little bit in that I

9    teach at University of Chicago at 4:00 today, so we're going to

10   leave -- I'm going to leave at 3:30.  So today's day will end

11   at 3:30, so maybe you'll get openings, maybe one witness on,

12   I'm not sure, depending on our jury selection.  And then

13   tomorrow we end at 4:00.  So we'll see how it goes.

14           Did I give each of you three separate strikes, jury

15   strikes, peremptories?

16           MR. LUPINACCI:  I believe it was together, Judge.

17           THE COURT:  So just three and three.  Right?

18           MR. MEYER:  Yes.

19           THE COURT:  So we'll be able to get this jury quickly.

20           THE CLERK:  Mr. Weaver, he hasn't appeared yet.  He's

21   on his way from Stateville for certain.  I called.

22           THE COURT:  Can we possibly get a status of where he

23   might be?

24           THE CLERK:  Yes, I can call the marshals and see, and

25   maybe Stateville, and see where --

1          THE COURT:  Because if he's, like, 15 minutes away, I

2     would say we should probably start working on getting the jury

3     up, right?  But if he's an hour away --

4          THE CLERK:  Okay.

5          THE COURT:  -- he might have to --

6          THE CLERK:  I tried to email the marshals.  I didn't

7     get a response.

8          THE COURT:  So he's on his way.  The weather is lousy

9     out there.  The traffic is lousy.

10          Let's, before we bring the jury, just get an update

11     from the marshals and find out where he is.  I don't even know

12     if knowing that he's five miles away is helpful today.  So

13     let's get an update.

14          Go ahead and take a seat, and I'll let you know in a

15     minute.

16          THE CLERK:  All rise.  Court is in recess.

17     (Recess taken from 11:12 a.m. to 10:35 a.m.)

18     (In open court outside the presence of the prospective

19     jury:)

20          THE COURT:  Where is Mr. Weaver now?  Okay.

21     (Plaintiff enters courtroom.)

22          THE COURT:  Come on in.  Good morning, Mr. Weaver.

23          THE PLAINTIFF:  Good morning.

24          THE COURT:  Okay.  So, folks, here's the situation:

25     Your client was not cooperative with transportation guards this

1    morning in my courthouse, and it's not something that I can

2    permit.  So if he's not going to be cooperative, he's going to

3    have restrictions on him, and you need to have a conversation

4    with him to make sure he understands.

5              And, Mr. Weaver, you need to understand that you

6    cannot be in a situation where you're being disruptive in my

7    courtroom.

8              THE PLAINTIFF:  (Nods affirmatively.)

9              THE COURT:  Okay?  So right now the question is do we

10   remove his leg irons.  Of course we'll remove his handcuffs,

11   but he is a criminally convicted defendant who has a lot of

12   time left to serve.  And so I think you need to sit down and

13   have a discussion with him first.  Give me your position as to

14   whether it in any way hampers your case.  Not sure how it could

15   because everything about the case will be that he is an

16   incarcerated defendant, because this is about being

17   incarcerated.  And then the defense should address the issue

18   yourselves as to whether you think there's any issue.  I know

19   what the marshals' position is regarding it right now.

20             Normally, they would have removed your leg irons

21   except for your behavior with them this morning.

22             Don't look at me with any kind of puzzlement because I

23   don't care what happened this morning.  What I care about is

24   that justice takes place in my courtroom.  And those marshals

25   have my back.  So when they tell me anybody -- whether it's a

1    lawyer, a defendant, a plaintiff -- is not following their

2    rules, because they've got my back I listen to them.  So have

3    your conversations.  I'll come out and get your positions on

4    the record.

5              THE CLERK:  All rise.  Court is in recess.

6         (Recess taken from 10:38 a.m. to 10:44 a.m.)

7         (In open court outside the presence of the prospective

8         jury:)

9              THE COURT:  What is the situation, folks, from the

10   plaintiff?

11             MR. MEYER:  Your Honor, I've conferred with my client.

12   And the situation this morning was -- it actually relates to

13   another case that my client has in front of your Honor.  He has

14   shoulder problems so that when he's shackled, they tend to use

15   this box that holds his arms like this that cause Mr. Weaver a

16   lot of pain, and so he is able to use, instead, these weight

17   shackles, which is what you saw him walk in with today, which

18   allows him to keep his arms down at his sides and doesn't cause

19   him pain.  So the situation this morning was they had first

20   presented him with the arm shackles and they discussed it, and

21   they had a disagreement about which shackles --

22             THE COURT:  Sounds like more than a discussion.

23             MR. MEYER:  I agree, your Honor.  And I think from my

24   discussions with the marshal and with my client, it sounds like

25   they got a little bit heated.  There was a miscommunication

1    between security and the medical staff, but both sides were

2    able to de-escalate the situation and reach an understanding,

3    and I think he was able to get here without any, you know,

4    major incident other than just having that misunderstanding.

5                    THE COURT:  What's your position?  Anything at all?

6                    MR. STALEY:  Your Honor, we would defer to the

7    marshals.  Whatever --

8                    THE COURT:  Fair enough.  All right.  So I'll take off

9    your leg irons for now.  I've got a button here that I'm going

10   to push the instant there's anything out of control, and the

11   whole place will swarm with U.S. Marshals.  So do not get out

12   of line in this courtroom.  We've gone a long, long time

13   together, Mr. Weaver, on this case to get you to your day in

14   court, and today is the day.  Okay?

15                   I don't want him sitting with his back to the

16   prospective jurors, so he should sit on your side with you

17   or -- and maybe your staffer can sit at the end or something

18   similar so that he doesn't have his back to the prospective

19   jurors, which would be disrespectful.  Also that gives you an

20   opportunity to have him here in the middle of the table as

21   opposed to closer to the exit of the door.

22                   All right.  Who do I have staying with me?  You?  And

23   you.  Okay.

24                   So, marshals, then you can move on.  Thank you for

25   your help this morning.  I appreciate it.

1          Do you have paperwork you need me to sign?  Because

2   he's going to go back at the end of today at 3:30.  Okay?  Do

3   you want me to fill that out?

4       (Pause in proceedings.)

5          THE COURT:  So I know -- I don't mean to be giving you

6   Trial Practice 101, but it's really rare to have your back to

7   the judge as well.

8          So if she's your helper, she could be at the other

9   side of the table or maybe at the end of the table facing

10  forward.

11         I don't want your client with his back to prospective

12  jurors.  I'm helping you with that, and I'm helping you with

13  that.  So try to adjust yourself at the table differently,

14  okay?

15         MR. MEYER:  Thank you.

16         THE COURT:  On the other side maybe or something like

17  that?  Okay.

18         Are we finally ready?  Can you give me that, and I'll

19  give you the paperwork?

20         I take it they're taking him all the way back today,

21  right?

22      (No response.)

23         THE COURT:  Do I have -- 15 2950, correct?  Is that

24  the number, case number?

25         THE CLERK:  Yes, your Honor.

1          THE COURT:  And tomorrow's date?

2          THE CLERK:  2/7.  Almost got me there.

3          THE COURT:  Okay.  Gentlemen, for your benefit, we're

4     ending at 3:30 today, so you know exactly when to be back,

5     okay?

6          Thank you.

7          Let's get started and bring our jury back in.

8          THE CLERK:  I will, your Honor.

9          THE COURT:  Do you need to leave?  Are you sticking --

10    you're here -- he's here in custody with you, so you stay here.

11         All right.  Let's go.

12                        *    *    *    *    *

13    (Jury Selection was reported but not transcribed at this

14    time.)

15                         -    -    -    -    -

16    (In open court in the presence of the jury:)

17         THE COURT:  Okay.  Please be seated.

18         So welcome aboard.  I'm going to give you some initial

19    instructions before you take your lunch break, because now

20    you're a sworn-in jury, and so we have to make sure that you do

21    not have any outside influences that might impact you.  So

22    before you were just a regular person; now you're serving your

23    civic duty.  So congratulations.

24         First and foremost, from now on you're not going to go

25    back to the second floor.  You're going to go to

1    Judge Kendall's jury room.  It's behind me.  It's in a secure
2    hallway.  So I'm going to direct you to take the north elevator
3    banks.

4         It's a Mies van der Rohe building.  It's a beautiful
5    building, but nobody knows north or south because you're in a
6    big box.  Ask the court security officers which is the north
7    elevator banks.  It's the elevator banks that are closer to
8    Adams, okay?  Take that elevator bank up, because when you get
9    off those elevators, you'll see glass doors and four buttons.
10   One of those says "Judge Kendall."  Push the button.  My staff
11   will know who you are.  And say your name, say "I am," say the
12   name, they have the list of you, and then they'll buzz you back
13   into the jury room.

14        Before we go, I'll show you where that is.  It's nice.
15   It has a great view.  It has a refrigerator and a microwave.
16   So if you're someone who has a special dietary consideration,
17   bring your own food in in the morning, and during breaks you're
18   going to be able to take your own food and you don't have to
19   worry about what's, you know, being given to you downstairs in
20   the cafeteria or elsewhere.

21        So the day will be a 9:30 until 3:30 day today.  We're
22   stopping at 3:30 today.  And we're stopping at 4:00 p.m.
23   tomorrow.  If we go to Thursday, you're stopping at 5:00 p.m.
24   Okay?  A little graduated length of time.  You'll have an hour
25   at lunch today, and you'll have an hour at lunch tomorrow.

1    You'll have a break of about 10 to 15 minutes in the morning

2    and 10 to 15 minutes in the afternoon.  It's usually

3    approximately 10:45, 11:00, and approximately 2:00 to 2:30 in

4    the afternoon.  That helps you in case you have calls to make

5    or you need to talk with someone.

6            The reason that you need to know those breaks is

7    because while you're here in the courtroom, all cell phones are

8    turned off, and all my questions regarding your social media

9    and your internet use and all of the above was so that I also

10   knew what you were up to so I can make sure that you're not on

11   any of those things, because while you are a sworn-in juror,

12   you can't talk about the case.  And you can't talk about it

13   with anyone else either by, you know, posting something on

14   Facebook or Instagram, taking a picture in the courtroom or of

15   your fellow jurors in the back.  You cannot communicate about

16   the case at all with anyone.

17           It's the best order you're going to get.  You get to

18   go home to your loved one and say, "Sorry, can't talk to you

19   about what I'm doing today, I'll tell you when I'm all done."

20   And that is literally the order.  You can say, "I've been

21   selected as a juror, I'm in Judge Kendall's courtroom, and I

22   expect to be done in a couple days."  Okay?

23           Now, if any of you is missing work and you don't think

24   that your wonderful words to your boss is sufficient, I would

25   be very happy to pick up the phone or give you a letter to send

1    to your boss to remind your boss that you are serving your

2    civic duty and he has an obligation or she has an obligation to

3    protect that civic duty and they will make sure to let you have

4    the time off to do so.  Okay?

5            Now, a few things about serving.  I told you you can't

6    talk to others about the case.  You also can't talk to each

7    other about the case.  It's kind of an oddity.  You're going to

8    go back there in a few minutes, and you're going to have a

9    break, and you cannot talk at all about what is going on in

10   this courtroom.  So you can talk about your grandkids, you can

11   talk about how the Blackhawks aren't doing so great, you can

12   talk about how cold it is and how your car didn't start,

13   whatever you want, except the case.

14           That's very, very important, and I'll tell you why.

15   When we talk to people, we influence them.  Right?  We say,

16   Hey, what -- you know, you might make a comment about a

17   witness, and we want you to keep an open mind and not think

18   about anything until you deliberate as a group.  That's the way

19   this process works.

20           So you don't comment about what you saw or heard

21   because your comment can influence someone.  And the reason you

22   don't talk about the case with other people is because they can

23   influence you.  Right?

24           So if you were to say, "Oh, I'm sitting on a dental

25   care case for, you know, someone who had some -- is alleging

1    bad dental care," and "Oh, I had that condition, you know

2    what?"  And then they give you comments, right?  And that

3    influences you.  So that's the rule.  Everything has to come

4    from the four corners of this courtroom.

5            Now, over the course of the case, getting ready for

6    trial, I've made a lot of rulings about what can come in and

7    what cannot come in to you, because I'm like the referee.  I

8    have the rules of evidence, rather -- and the playbook, and I

9    say, "No, this can come in and that can't come in."  So what's

10   coming to you may be something very much decided long in

11   advance of you sitting here.  So that's why you can't be

12   discussing it.

13           Now, let me tell you what I will look like tonight at

14   about 8:00 p.m. at night.  I will be in my house with the TV on

15   watching the Blackhawks.  I will have my iPad open and I will

16   have my cell phone on the arm of the couch and I'll have my

17   laptop open.  All those devices will be on, I guarantee you,

18   because I will be working on work on my laptop while the

19   Blackhawks are on.  I like the iPad because I can check the

20   docket easier.  It's easier for me to read, and then I can have

21   two windows open.  And that phone is like the chat central for

22   every one of my children.  They don't talk to me; they only

23   text me.  Right?  And so all this is going on.  And while I'm

24   doing this, I'll be, like, "Wait, who did he play for before,

25   wasn't he with the Red Wings?"  And I'll grab that iPad and

1    I'll research it. Who was he playing for before? Or one of my

2    kids will say, "Did you see these cute shoes?" And I'll look

3    that up, right? All I do is grab -- I think it was you -- you

4    said you're on it all day long. That's me. Right?

5           You can't do that about this case. You can go on

6    Amazon all you want, you can go watch the Blackhawks all you

7    want, but you can't look up anything. You can't look up a word

8    for a definition. You know, even someone who is like a

9    professor who wants to like get to the bottom of it, you can't.

10    You can't get to the bottom of it. You've got to let them give

11    you what's left. Okay? So you can't look at a location, don't

12    Google a location and go satellite it, you know? Don't

13    research anybody's name, even the lawyers, none of that,

14    because I want you to be open-minded.

15           Mr. Weaver deserves you to be open-minded listening to

16    the case, and the doctor and the warden deserve you to be

17    open-minded and listen to the case.

18           When it's all done, then you go back and you talk.

19    You make your determination. And then when I let you go, you

20    go ahead and look up anything you want. But that's the way

21    that it works. Okay?

22           So a couple other things just to note while you take

23    your break. I would like the lawyers to take the south

24    elevator banks, the parties and the lawyers to take the south

25    elevator banks, because I don't want you to get in the elevator

 1    with them, not because they're nasty people at all, but

 2    elevators are small spaces and people say things and you might

 3    overhear something, right?  If you go down to the cafeteria and

 4    you see any of these people, any of these people that you know

 5    to have come to be associated with the case, don't talk to them

 6    because even if you were to say something like, "Wow, it's cold

 7    outside," and they were to say, "I know, my car didn't start,"

 8    and somebody else saw that, I'd have to stop everything, I'd

 9    have to have a little hearing to determine what was said,

10    whether it might have influenced you, because we don't know

11    what's said if we're seeing it from a distance.  So right now

12    just ignore them.  They know that you will -- you're not being

13    rude, and I know that you know they're not being rude if they

14    don't talk to you because that's what the rules are.  Okay?  So

15    that's the rules of the game for how we're going to proceed

16    going forward.

17           Now, if you are on the internet on something

18    completely different and suddenly you hear something about the

19    case -- I don't think that's going to happen, but, you know, we

20    have an active press core and they wander around and sometimes

21    something interests them and the next thing you know, it's on,

22    you know, Channel 9 news.  If that's the case, you immediately

23    turn the channel or turn it off or whatever, and then in the

24    morning you come in and you say, "Judge Kendall, this is what I

25    saw last night," and we'll talk about it and we'll make sure it

 1    wasn't something that might have influenced you.  So that's

 2    your obligation to me, so -- I don't think that's going to

 3    happen here.  But just in case, that's your duty, okay?

 4           Don't talk about it, don't communicate, don't

 5    research, et cetera.  It's a nice short one, so it won't be

 6    difficult.  All right?

 7           We're going to start at 2:15.  You've got a full

 8    hour -- oh, go ahead.

 9           JUROR:  We're on the 23rd floor.

10           THE COURT:  Yes, we are.

11           JUROR:   I can take any elevator to the 23rd floor?

12           THE COURT:  You have to take the north elevator banks.

13    And the elevators are -- they're divided -- they go only up to

14    12 or 13, and then they go 14 and above.  So you have to take

15    the ones that go to 23, and you have to take the north elevator

16    banks, the ones closest to Adams.

17           Now, it's really cold out, I understand, and I think

18    we're getting more snow later.  There is a cafeteria on the

19    second floor, and it's a really -- it's pretty good.  Back in

20    the day, not so much; now, it's not bad.  So you can just go

21    down there if you want.  You don't have to go outside of the

22    building, okay?

23           If you go out of the building, any place around the

24    building has a place to eat.  And there is a place called

25    Revival Hall, which is at Adams and Dearborn.  It's inside the

1    building.  It's a big food court with a lot of Chicago's

2    restaurants.  So it's like very, very close if you want a

3    variety of things.

4            Remember this, you're not going to be able to bring

5    your drinks from outside through the security.  It's like

6    you're in the airport.  You know, we have high security for the

7    courthouse.

8            If you want to bring a drink, you have to get it

9    downstairs in the cafeteria, coffee or whatever.  And here's

10   the good news:  I am not a persnickety judge.  I think that

11   it's hard to sit all day long listening to evidence, which is

12   why I'm constantly with a coffee cup, so you, too, can bring

13   coffee or whatever your caffeine-of-choice may be.  Just if you

14   bring it tomorrow, please try to bring it in a travel mug of

15   some kind so that the jury box stays nice for the next jury

16   that's coming through.

17           And, lawyers, same with you.  I don't really mind that

18   you have drinks at your table.  I think it's a hard enough job

19   to do, what we're doing.  Just make sure you clean up after

20   yourselves, okay?

21           So with those instructions, I'll give you more on the

22   trial when you get back.  Have a nice lunch.

23           Lynn will bring you back there to the jury room where

24   you can leave your coats and stuff if you want to stay in the

25   building, and we'll show you how to get in and out of this back

 1 | area.  Okay?

 2 |         Thank you.

 3 |         THE CLERK:  All rise.

 4 |         THE COURT:  I didn't realize you were there.  You can

 5 | bring them back.

 6 |         You have a court security officer who is going to help

 7 | you with that, okay?

 8 |         COURT SECURITY OFFICER:  Come on this way, folks.

 9 |     (Lunch recess taken from 1:18 p.m. to 2:23 p.m.)

```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    WENDELL WEAVER,                  )   Docket No. 15 C 02950
                                       )
 4                 Plaintiff,          )   Chicago, Illinois
                                       )   February 6, 2018
 5           v.                        )   2:23 p.m.
                                       )
 6    DR. JACQUELINE MITCHELL and      )
      RANDY PFISTER,                   )
 7                                     )
                   Defendants.         )
 8

 9                              VOLUME 1-B
                    TRANSCRIPT OF PROCEEDINGS - Jury Trial
10        BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

11
      APPEARANCES:
12
      For the Plaintiff:      MOLOLAMKEN LLP by
13                            MR. GERALD P. MEYER
                              MS. MICHELLE JOYCE PARTHUM
14                            300 North LaSalle Street
                              Chicago, Illinois  60654
15
      For the Defendants:     OFFICE OF ILLINOIS ATTORNEY GENERAL by
16                            MR. NICHOLAS SCOTT STALEY
                              MR. JOSEPH PETER LUPINACCI
17                            100 West Randolph Street, 13th Floor
                              Chicago, Illinois  60601
18

19

20

21

22    Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                              Federal Official Court Reporter
23                            219 South Dearborn, Room 2318-A
                              Chicago, Illinois 60604
24                            (312) 435-6047
                              Gayle_McGuigan@ilnd.uscourts.gov
25
```

1        (In open court outside the presence of the jury:)

2           THE COURT:  I understand there's an evidentiary issue

3  or something that needs to be raised?

4           MR. MEYER:  Yes, your Honor.

5           If you recall, the defendants filed a motion *in limine*

6  that's still pending regarding whether or not we can raise the

7  issue of lack of consent for the root canal, something we were

8  planning to mention in open.

9           THE COURT:  Okay.  And your issue?

10           MR. STALEY:  Judge, it was an issue that you reserved

11  your ruling, I think --

12           THE COURT:  You have to keep your voice up.  I can't

13  hear you well.

14           MR. STALEY:  It's an issue you reserved for ruling.  I

15  think plaintiff counsel is bringing it up now due to the fact

16  that he wants to use it in his opening statement.

17           Our objection that we made in our motion *in limine*

18  would stand.  We would stand on that objection.

19           THE COURT:  Well, I think that because I wanted to

20  hear how the testimony played out that you should stay away

21  from it in the opening statement.  And then when he gets on the

22  stand and we listen to the story, we can see.

23           As I've told you before in my preliminary rulings, I

24  do believe that there is an inconsistency in the fact that he's

25  talking about preserving the tooth and the doctor's decision as

1   to whether or not to do something when his desire is to

2   preserve the tooth and not pull it at an earlier stage, so

3   let's see how it plays out, okay?

4           And let me see if your microphones are on, because I

5   can't hear you too well, let's see, before we bring everybody

6   in.

7           You're not.  None of them are on.  So those two

8   microphones are going to be turned on, so if you're talking to

9   your clients, you want to make sure that you are, you know,

10  touching the tab or something, but now I can hear you better.

11          Let me just check on the prosecution's.  Yours are

12  off, too.  But they're on now because I hear you moving it.

13  There you go.

14          And we've got the witness on.  I'm clearly on.  And

15  let's try the evidence cart.  That's on.  Okay.

16          So you can bring the jury in now.  Thank you.

17          COURT SECURITY OFFICER:  All rise.

18      (Jury in at 2:28 p.m.)

19          THE COURT:  Okay.  Folks, please be seated and get

20  comfortable.

21          So the evidence at times may come through those

22  screens that you have.  When I rule on them, then I will touch

23  the little switch that will turn it on for you.

24          As far as the chairs you're in, there is a toggle on

25  the side.  I don't know if it's right or left.  One will let it

1    go backwards and others will keep it straight.  So if you're

2    someone who wants to move it, that's the way that it works,

3    okay?

4         We're going to start the trial.  The opening

5    statements are going to be the statements from the lawyers

6    about what they believe the evidence will show.

7         The lawyers' statements are not evidence.  They are

8    just what they believe the evidence will show.

9         Evidence comes in the form of the answers to the

10   questions by the lawyers.  So when a witness is on the witness

11   stand, it's the answer to the question that is the evidence,

12   not the question itself, okay?

13        Now, during the course of the proceedings, you might

14   hear somebody object, and then I'm going to rule on that

15   objection by either sustaining it or overruling it.  It's not

16   really complicated, because what's going to happen is this:  If

17   I sustain the objection, the witness will not be able to answer

18   the question and so you won't get the evidence; if I overrule

19   it, then the answer is allowed to be given and it's your

20   evidence.  Okay?

21        What you should not worry about are the objections

22   themselves, because the lawyers have an obligation to object if

23   they believe that evidence is, for example, in violation of one

24   of our Federal Rules of Evidence.  So don't hold objections

25   against the lawyers.

1              Occasionally, we may have to go to sidebar to discuss

2     one of those objections.  And that's because you're not allowed

3     to hear all of the ways that the evidence might be discussed

4     until I rule on it.  So I need to listen to it at sidebar.  And

5     when I go to sidebar, feel free to stretch and rest and

6     chitchat.  No worries about being formal during that time.  It

7     should take a very short period of time.  Okay?

8              Now, after the opening statements, the witnesses will

9     begin to testify.  Any answers to their questions will be for

10    your review.  You're the fact-finder.  I'm the one that gives

11    you the law.  Also any object or document or anything that I

12    admit as evidence will be yours to review.

13             At the end of the plaintiff's case, the defense can

14    put on a case if -- they can also call witnesses.  And then

15    there's a rebuttal case if they want by the plaintiff.  And

16    then we get to closing arguments.

17             Closing arguments are arguments of the jurors [sic.]

18    and they are not evidence.  So those are the arguments that the

19    lawyers make to show you what they believe are the reasonable

20    inferences that you can make from the evidence that was

21    admitted.  And they'll argue that to you at the end of the

22    case, okay?

23             So let's get started.  I will recognize, let's see,

24    it's Ms. Saunders, right?

25             MS. PARTHUM:  Parthum.

Opening Statement - Ms. Parthum

1          THE COURT:  Ms. Parthum, I'm sorry.  I mixed you up.

2          Ms. Parthum is going to represent the plaintiff and do

3    the opening statement for the plaintiff.

4          You may proceed.

5    OPENING STATEMENT BY MS. PARTHUM:

6          MS. PARTHUM:  May it please the Court.

7          THE COURT:  Yes.

8          MS. PARTHUM:  Counsel, members of the jury.

9          Treatment delayed is treatment denied.

10         Today you will hear the story of the plaintiff,

11   Mr. Wendell Weaver.  Mr. Weaver is an inmate at the Stateville

12   Correctional Center, a prison here in Illinois.  Because he is

13   an inmate at the prison, whenever he has a medical or a dental

14   issue, he has to see the medical or dental staff inside the

15   prison.  He doesn't get to choose his own dentist, and he can't

16   go somewhere else if he's unhappy with his treatment.  But even

17   though he doesn't get to select his dentist, Mr. Weaver still

18   has a constitutional right to reasonable dental care while at

19   Stateville.

20         Mr. Weaver places his trust in the dental staff at

21   Stateville, and he relies on them to keep him healthy and free

22   from pain.

23         Today you will hear how Mr. Weaver's trust was

24   violated by the dental staff at Stateville and specifically by

25   the defendants:  Dr. Mitchell, a dentist at the prison; and

Opening Statement - Ms. Parthum

1    Mr. Pfister, the warden of the prison.

2           You will hear how substantial delays in Mr. Weaver's

3    dental care, as well as Dr. Mitchell's failure to perform

4    necessary procedures, effectively denied Mr. Weaver treatment,

5    causing him to suffer substantial pain and ultimately causing

6    him to lose his tooth.

7           My name is Michelle Parthum.  Along with my co-counsel

8    Mr. Meyer, we represent Mr. Wendell Weaver, the plaintiff here.

9           Mr. Weaver's story begins back in June 2008.  He went

10   for a dental appointment at Stateville, and a root canal was

11   performed on one of his teeth.

12          After that root canal was performed, the defendant

13   Dr. Mitchell told him that he needed a post, core, and crown

14   procedure to prevent his tooth from breaking.

15          Now, you'll hear that a post is a device that

16   stabilizes the tooth.  And a crown, as you may know, is a

17   permanent restoration placed on top of the tooth to allow the

18   patient to chew normally, even if he lost a significant amount

19   of his original tooth structure.

20          Now, Dr. Mitchell explained to Mr. Weaver that a post,

21   core, and crown was necessary because after a root canal, the

22   tooth is no longer alive, it becomes brittle and weak and

23   subject to breaking.

24          And you'll see Mr. Weaver's dental records today, and

25   you'll see where Dr. Mitchell noted that he needed a post,

Opening Statement - Ms. Parthum

1    core, and crown procedure.

2         However, you'll also hear that Dr. Mitchell told him

3    that Stateville had a policy forbidding dentists from

4    performing a post, core, and crown procedure.

5         Instead, to save money, the only permanent restoration

6    a Stateville dentist would perform was a permanent filling of

7    the tooth, even if the patient had lost a significant amount of

8    tooth structure and there was a high risk of complications down

9    the road.  So even though Dr. Mitchell told Mr. Weaver he

10   needed a post, core, and crown, she did not perform that

11   procedure.

12        As Dr. Mitchell predicted, Mr. Weaver's tooth later

13   broke and eventually had to be extracted.  And this is

14   important because after Mr. Weaver's tooth broke, he complained

15   to Dr. Mitchell.  He complained about having a root canal

16   performed without the post, core, and crown procedure, leaving

17   his tooth brittle and weak.  He said that if it was an issue of

18   money, his family would be willing to pay for the post, core,

19   and crown procedure.  And he told Dr. Mitchell that he did not

20   want to lose any of his teeth.

21        Now, everything I've told you so far is background

22   that's important for you to keep in mind today.  But

23   Mr. Weaver's complaint in this case focuses on Dr. Mitchell's

24   later treatment of a different tooth.

25        Maybe you've heard dentists referring to teeth by

Opening Statement - Ms. Parthum

1   number.  Mr. Weaver's complaint in this case focuses on the

2   treatment of his Number 12 tooth, one of the top front teeth in

3   his mouth.  So you'll hear a lot of people talking about his

4   Number 12 tooth.  And it can be a little difficult to keep a

5   random number in your mind, so maybe it will help to think

6   about a dozen, like a dozen eggs.  So a dozen, Number 12, is

7   the tooth we're focused on here today.

8           To talk about that tooth, we need to fast-forward in

9   time to December of 2011.  Mr. Weaver was experiencing pain in

10  his Number 12 tooth, so he went for a dental appointment at

11  Stateville, again, with the defendant Dr. Mitchell.  And during

12  that appointment, Dr. Mitchell began a root canal on his Number

13  12 tooth.

14          Now, as some of you may know, a root canal can be an

15  extremely painful procedure.  It involves removing the nerve of

16  the tooth, filing and cleaning each of the canals of the tooth,

17  filling those canals, and then restoring the tooth with either

18  a filling or a crown.

19          So after beginning the root canal of Mr. Weaver's

20  tooth that day, Dr. Mitchell put a temporary filling on the

21  tooth and scheduled him to return about a week later for a

22  permanent filling on the tooth.  But when the date of that

23  appointment arrived, Dr. Mitchell cancelled that appointment

24  because she, quote, ran out of time.

25          The appointment was rescheduled.  And when the date of

Opening Statement - Ms. Parthum

1    the rescheduled appointment arrived, that appointment was

2    cancelled as well due to, quote, staff shortages.

3            And you'll see those explanations in Mr. Weaver's

4    dental records today.

5            So in January 2011, four weeks -- January 2012, excuse

6    me, four weeks after Dr. Mitchell began this root canal on

7    Mr. Weaver's tooth, his temporary filling fell out and he

8    requested an appointment.

9            So he saw Dr. Mitchell again, and she performed

10   another round of painful root canal therapy on his Number 12

11   tooth, put in another temporary filling, and sent him on his

12   way.

13           A few days later, however, Mr. Weaver began

14   experiencing pain, and he notified Dr. Mitchell.  But instead

15   of bringing him in for an appointment, Dr. Mitchell simply sent

16   him a pain medication.  She also sent him an antibiotic.  Now,

17   as you'll hear, antibiotics are used to fight infections.  So

18   as of January 2012, Dr. Mitchell knew that Mr. Weaver was in

19   pain and she believed that he might have an infection, but she

20   did not bring him in for an appointment.  In fact, she did not

21   bring him in for an appointment for months.

22           So two months goes by, and Mr. Weaver's temporary

23   filling falls out for a second time, so he requests another

24   appointment.

25           In late March 2012, Mr. Weaver finally gets to see

Opening Statement - Ms. Parthum

1   Dr. Mitchell, and that's two and a half months after she

2   learned that he was in pain.  She performed another round of

3   painful root canal therapy on his tooth and placed another

4   temporary filling in the tooth.

5          Over the next six weeks, Mr. Weaver had a number of

6   appointments with Dr. Mitchell.  And during each of those

7   appointments, she continued the painful root canal therapy on

8   his Number 12 tooth.

9          It wasn't until May of 2012 that she finally finished

10  filling each of the canals of his tooth, over five months after

11  she first began this root canal treatment.

12         But even then, the procedure still wasn't complete

13  because she still had to do a permanent restoration of his

14  tooth.

15         So she scheduled an appointment for him to return for

16  a permanent restoration, which, as she had told him, would be a

17  filling instead of a post, core, and crown.  When the date of

18  that appointment arrived, however, it was cancelled due to a

19  prison lockdown.

20         So, in total, three months goes by from the date that

21  she finishes filling his canals, and he still hasn't gotten an

22  appointment, and his temporary filling falls out for a third

23  time.

24         It isn't until August 2012 that Mr. Weaver finally

25  gets a permanent filling on his tooth, more than eight months

Opening Statement - Ms. Parthum

1    after Dr. Mitchell first started this root canal.  But even

2    then, as she told him, this was a root canaled tooth that was

3    weak, brittle, and subject to breaking without a post, core,

4    and crown, which he hadn't received.

5            Unfortunately, early the next year, Mr. Weaver's tooth

6    did break.  He suffered pain, bleeding, and difficulty eating.

7    He made a request for an appointment, but he wasn't seen.  The

8    situation got so bad that he filed a formal grievance.

9            Now, you may hear that there were instances that

10   Mr. Weaver had a scheduled dental appointment and did not

11   arrive for that appointment; but you'll also hear that inmates

12   at the Stateville Correctional Center sometimes will miss

13   scheduled appointments due to circumstances totally outside of

14   their control, such as when a security guard fails to take them

15   to an assigned appointment.

16           So at the beginning of 2013, Mr. Weaver's Number 12

17   tooth broke, and several years later it broke again.

18           And Mr. Weaver will testify during this trial, and

19   he'll tell you about the excruciating pain he suffered over

20   that multi-year period of time, the pain in his tooth, the

21   headaches he got as a result of that pain, the difficulty

22   sleeping, the difficulty eating.

23           Now, over that period of time, Mr. Weaver continued to

24   see Dr. Mitchell, his only option, and he told Dr. Mitchell

25   about pain in his tooth and numbness in his face near his

Opening Statement - Ms. Parthum

1    tooth, but Dr. Mitchell provided no solutions.

2         The last part of Mr. Weaver's story happened fairly

3    recently.  Last summer he was referred outside of Stateville to

4    have his wisdom teeth extracted.  You'll hear that there are

5    certain procedures for which Stateville will refer an inmate

6    outside to see a specialist, and removing wisdom teeth is one

7    of those procedures.

8         So Mr. Weaver had an appointment with Dr. Glen

9    Scheive, who will be testifying during this trial.  Dr. Scheive

10   has been a dentist for 37 years.  And he'll tell you that when

11   Mr. Weaver arrived for his appointment, he said that he had

12   been experiencing pain for months.  Dr. Scheive performed a

13   visual inspection of Mr. Weaver's mouth, and he saw that on

14   Mr. Weaver's Number 12 tooth, the same tooth we've been

15   discussing and on which Dr. Mitchell performed a root canal,

16   there was an abscess or an infection.  Dr. Scheive also

17   performed an x-ray of Mr. Weaver's mouth, and that x-ray

18   confirmed that there was an infection and that it had been

19   there for so long it had actually eaten away some of the bone

20   in Mr. Weaver's jaw.  Dr. Scheive offered to extract

21   Mr. Weaver's Number 12 tooth, and Mr. Weaver consented, signing

22   a consent form that you'll see today.

23        Mr. Weaver will testify that after that Number 12

24   tooth was pulled, many of the symptoms he had been

25   experiencing -- the pain and the numbness -- improved.

Opening Statement - Ms. Parthum

1    So not only will you hear today how the root canal

2 that Dr. Mitchell performed was unnecessarily prolonged and

3 delayed over a period of months causing him pain and suffering,

4 you'll also hear how her failure to perform the post, core, and

5 crown procedure, even though she determined it was necessary,

6 caused Mr. Weaver years of pain and suffering and ultimately

7 caused him to lose his tooth.

8    At the end of today's trial, my co-counsel, Mr. Meyer,

9 will speak with you about the evidence that you've heard and

10 how that evidence supports Mr. Weaver's claims.  And at that

11 time he'll ask you to return a verdict consistent with that

12 evidence, a verdict that recognizes that significant and

13 unjustified delays in Mr. Weaver's dental care caused him to

14 suffer excruciating pain for months and for years and

15 ultimately caused him to lose his tooth, a verdict that

16 recognizes that in Mr. Weaver's case treatment delayed really

17 did mean treatment denied, and that is a verdict in favor of

18 Mr. Weaver.

19    Thank you.

20    THE COURT:  Okay.  Thank you, Ms. Parthum.

21    Mr. Staley, are you doing it or Mr. Lupinacci?

22    MR. STALEY:  I'll be doing it, Judge.

23    THE COURT:  Okay.  Well, then let's recognize

24 Mr. Staley for the defendants.

25    Did you want that to be shown?

Opening Statement - Mr. Staley

1          MR. STALEY:  Yes, Judge.

2          THE COURT:  Because I don't have it turned on for you.

3    Hold on.

4          There you go.

5          MR. STALEY:  I'll be showing it in one second.

6          THE COURT:  Okay.  That's fine.

7    OPENING STATEMENT BY MR. STALEY:

8          MR. STALEY:  Ladies and Gentlemen of the Jury, after

9    you hear the evidence over the next day and a half in this

10   case, two things will be apparent:

11         One, Mr. Weaver received prompt medical treatment;

12         And, two, Mr. Weaver received adequate medical

13   treatment.

14         Now, counsel for plaintiff and plaintiff himself is

15   going to tell you that there were delays in his treatment, he

16   didn't receive what's called a post, core, and crown.  But what

17   you're going to hear from Dr. Mitchell, a doctor with almost 40

18   years of practicing in dentistry, is that a post, core, and

19   crown is not a necessary treatment for each and every tooth

20   after it received root canal treatment.

21         You'll hear Mr. Weaver talk about treatment he

22   received on a different tooth, a tooth that is not the subject

23   of this lawsuit.  And he's going to tell you that Dr. Mitchell

24   told him that he needed a post, core, and crown, or he would

25   benefit from a post, core, and crown on that tooth.  However,

Opening Statement - Mr. Staley

1   you'll hear Dr. Mitchell testify or see the medical records

2   that on this Number 12 tooth, the tooth that is subject to this

3   lawsuit, there was never any reference to a post, core, and

4   crown procedure.  Dr. Mitchell never told plaintiff that he

5   could benefit from a post, core, and crown procedure.  She

6   never told him that his tooth needed a post, core, and crown

7   procedure.

8           What she did was perform a root canal because

9   plaintiff was having pain in that tooth.  And after the root

10  canal, she performed an adequate, alternative, fully

11  restorative procedure in which she put a filling in the tooth.

12          Now, you'll hear testimony that Mr. Weaver's tooth

13  eventually broke, but you'll hear Dr. Mitchell testify that

14  that could have happened regardless of whether there was a

15  filling, whether there was a post, core, and crown.  That is an

16  anomaly that can happen regardless of which treatment option is

17  provided.

18          Now, before I go into the rest of the evidence, I want

19  to take some time to introduce our clients.  You guys spent

20  most of the morning introducing yourselves, so I think it's

21  only fair that you know who is involved in the lawsuit.

22          Once again, my name is Nick Staley.  My co-counsel is

23  Joe Lupinacci.  This is Dr. Weaver in the red, and Mr. Randy

24  Pfister in the dark suit.

25          Now, Mr. Pfister has over 30 years of correctional

Opening Statement - Mr. Staley

1   experience.  He was formerly the warden of Stateville

2   Correctional Center, and just this past week was promoted to

3   Deputy -- Acting Deputy Director of the Illinois Department of

4   Corrections.  He started his career in 1981 as a correctional

5   officer and has worked hard to work his way up the chain of

6   command and has done pretty well for himself.

7           Dr. Mitchell has been a licensed dentist for over 40

8   years.  She has worked in a plethora of genres.  She has worked

9   in the private sector.  She's worked in the public sector.  She

10  has even taught.  She no longer works in a correctional

11  facility.  She will tell you that her time in the correctional

12  facility was some of her best -- some of the best times in her

13  life.  She believes she gave her all to the patients that she

14  saw, and she believes that she takes a stance in which she

15  tries to provide treatment that the individual patient wants.

16  And that's important in this case, because what you'll see, the

17  medical records indicate what you'll hear from Mr. Weaver is

18  that he wanted to keep his tooth, his Number 12 tooth, he did

19  not want to lose it.  So what did Ms. -- Dr. Mitchell do?  She

20  gave him a root canal, the only option he had to keep his

21  tooth.  The other option was extraction, and Mr. Weaver was

22  clear he did not want that, so she did what she could for

23  Mr. Weaver given the circumstances.  She performed a root

24  canal, and she did a restorative filling.

25          Now, what happened subsequently, you'll see from the

Opening Statement - Mr. Staley

 1   medical records, was that Mr. Weaver was seen over 30 times for

 2   treatment on this individual tooth.  He was seen 30 times for

 3   treatment on one tooth.  You'll also see that throughout his

 4   treatment, for a grand total of 13 times, Mr. Weaver no-showed

 5   for his appointments.  He didn't show up.  Now, he'll say that

 6   those were circumstances which were out of his control:  Maybe

 7   the guard didn't bring him, maybe nobody told him of the

 8   appointment.  But that's not what happened.  You'll see

 9   testimony, you'll see evidence that Dr. Mitchell, upon learning

10   that Mr. Weaver had not shown for two consecutive appointments,

11   sent out what's called a refusal request.  That's a request

12   that Stateville Correctional Center, when an individual does

13   not show up for a particular appointment, the medical provider

14   sends out in order for the individual to sign off saying that

15   he does not want treatment.  She sent out this medical -- or

16   this refusal request and never got it back from Mr. Weaver.

17          So, again, subsequently he did not show up.

18          Dr. Mitchell sent out another refusal request.  He did

19   not show up.  He did not send it back.

20          You'll learn that Dr. Mitchell cared about

21   Mr. Weaver's tooth, and because of that she looked into why

22   Mr. Weaver was not at his appointment on one given day.  And

23   she learned that Mr. Weaver, in fact, didn't go to his

24   appointment, not because he wasn't told about the appointment

25   or not because a guard did not bring him to his appointment,

Opening Statement - Mr. Staley

1   but he decided to go on a visit instead of going and receiving

2   treatment on his root canal that he's going to claim was

3   extremely painful and was a source of much angst in his life.

4   But the evidence is not going to support that.

5           What you're going to see is that time and time again

6   Mr. Weaver came to Dr. Mitchell, Dr. Mitchell gave him all the

7   treatment that she could.  And while she did not give him a

8   post, core, and crown, she did give him a filling.  A post,

9   core, and crown, as Dr. Mitchell will tell you, was not

10  clinically indicated.  It wasn't medically necessary for this

11  Number 12 tooth.  And she's going to give you her mental -- or

12  her medical opinion about why that is the fact.

13          Now, Mr. Weaver can say that because he needed a post,

14  core, and crown or because he was told he needed a post, core,

15  and crown on his Number 5 tooth that he believed he needed on

16  the Number 12 tooth, but he has no expertise to back that up.

17          Now, there's one other thing I want to bring to your

18  attention.  As you heard the Court say earlier, the Court will

19  advise you on the law.  And your job is to take the facts -- or

20  take the evidence and apply that to the law that is given to

21  you.

22          Now, this is one of the instructions that you will be

23  given once the evidence closes and before you begin your

24  deliberations.  And what it is is basically a set of elements

25  that Mr. Weaver needs to meet -- needs to prove in order to

Opening Statement - Mr. Staley

1    succeed on his claims against Dr. Mitchell.

2          You'll see it starts off:  To succeed on his claim for

3    failure to provide medical care against defendant Jacqueline

4    Mitchell, plaintiff must prove each of the following things by

5    a preponderance of the evidence.

6          And then it goes on to list four separate elements.

7          What I want to do is bring your attention to the third

8    element, because it's going to be important throughout this

9    case when you hear the evidence from Dr. Mitchell, from

10   Mr. Weaver, from Dr. Scheive, it's going to be important when

11   you go back and deliberate in the jury room.

12         Number 3 says:  Plaintiff must prove that defendant

13   consciously failed to take reasonable measures to provide

14   treatment for the serious medical need.

15         "Consciously failed to take reasonable measures."  It

16   doesn't say "negligently."  It doesn't say "recklessly."  It

17   says "consciously."  That means Mr. Weaver has to prove that

18   Dr. Mitchell thought about it, she took steps that she knew

19   would not be beneficial for Mr. Weaver's Number 12 tooth.

20         Now, this goes on to state that:  If defendant

21   provided some care, plaintiff must show that defendant knew her

22   actions would likely be ineffective or that defendant's actions

23   were clearly inappropriate.  In deciding whether defendant

24   failed to take reasonable measures, you may consider the

25   seriousness of the plaintiff's medical need, how difficult it

Opening Statement - Mr. Staley

1   would be -- or how difficult it would have been for defendant

2   to provide treatment, and whether defendant had legitimate

3   reasons related to safety or security for failing to provide

4   treatment.

5           This is important because, as you heard in plaintiff's

6   counsel's opening statement, there were some delays in

7   plaintiff's treatment.  Mr. Weaver had his appointment

8   rescheduled once because there was a staff shortage.  He had

9   his treatment rescheduled because there were more than one

10  lockdown.

11          Now, Mr. Pfister will explain to you what a lockdown

12  is.  A lockdown is an instance where the prison has minimal

13  movement.  And this can happen for a variety of reasons.

14  Sometimes it's a staff assault.  Sometimes it's a breakout of

15  some -- of influenza.  Usually a lockdown's purpose is to

16  restrict movement so there can be proper precautions taken for

17  security reasons, for medical reasons.  The gist is movement is

18  limited.

19          Now, you'll hear Dr. Mitchell testify that that is out

20  of her control.  If there's a lockdown, she can't, you know,

21  physically bring a patient in.  Only under certain

22  circumstances can she do that.  But you will hear her testify

23  that on one of these occasions when there was a lockdown, as I

24  stated earlier, she actually did call for plaintiff to come in

25  and finish his root canal.  And what did she find out?  Well,

Opening Statement - Mr. Staley

1    again, he went on a visit.  He didn't show up to his

2    appointment when she specifically called to come get him

3    because he would rather go on a visit.

4           Finally, this says that:  You may infer that defendant

5    consciously failed to take reasonable measures if defendant's

6    action or failure to act was such a substantial departure from

7    accepted professional judgment, practice, or standards that it

8    showed a complete abandonment of medical judgment.

9           Now, when you hear Mr. Weaver testify, you'll learn

10   that he's not a dentist, doesn't have any dental training on

11   performing a root canal or extracting a tooth or providing a

12   post, core, and crown or any type of filling.  But Dr. Mitchell

13   does have that.  She has all -- she's done all of those

14   procedures.  So when you think about who knows what is

15   medically -- or what is medically necessary, what is the

16   standard of care, Dr. Mitchell is going to tell you that after

17   performing a root canal, if you get a filling, that is within

18   the standard of care.  There's nothing wrong with that

19   procedure.

20          At its core, Ladies and Gentlemen, this case is very

21   simple.  It's a case in which Mr. Weaver, unfortunately, had to

22   have a root canal.  Dr. Mitchell performed that root canal.

23   She did all she could to give what Mr. Weaver wanted:  His

24   tooth.  He didn't want it extracted.

25          What subsequently happened wasn't that he received

Opening Statement - Mr. Staley

1    inadequate treatment.  It was that he was unhappy with the

2    treatment he received because he believes in his opinion that

3    he should have had a different treatment.

4         I believe after you hear the evidence, you'll have no

5    doubt that that does not constitute a constitutional violation.

6    The fact that Mr. Weaver did not receive a post, core, and

7    crown -- a treatment that he believes, without any medical

8    expertise, was necessary -- that was not a constitutional

9    violation.

10        Tomorrow, at the close of evidence, you'll hear my

11   co-counsel Mr. Lupinacci stand before you and ask you that

12   because of that you should find Mr. Pfister and Dr. Mitchell

13   not liable.

14        Thank you.

15        THE COURT:  Okay, folks.  Thank you.  And let's get

16   started now with evidence.

17        So plaintiffs have the burden of proving the case, so

18   we'll have you call your first witness, please.

19        MR. MEYER:  Yes, your Honor.  The plaintiff calls

20   Mr. Weaver.

21        THE COURT:  Okay.  Up here, sir.

22        (Approaching.)

23        THE COURT:  Please raise your right hand.

24        (Witness duly sworn and takes the stand.)

25        THE COURT:  Okay.  Have a seat.

Weaver - Direct by Meyer

1    WENDELL WEAVER, PLAINTIFF'S WITNESS, SWORN

2    DIRECT EXAMINATION

3  BY MR. MEYER:

4  Q   Good afternoon.

5  A   Good afternoon.

6  Q   Would you please state your name and spell your last name

7  for the court reporter?

8  A   Wendell Edward Weaver.  W-E-A-V-E-R.

9  Q   And where do you currently live?

10 A   Now?

11 Q   Yes.

12 A   Stateville Correctional Center.

13 Q   What is Stateville?

14 A   Illinois Department of Correction prison.

15 Q   And where is it?

16 A   Joliet, Illinois.

17 Q   Were you convicted of a crime?

18 A   Yes.

19 Q   What year?

20 A   2003.

21 Q   And were you sentenced to a term of imprisonment for more

22 than one year?

23 A   Yes.

24 Q   Where did you live before Stateville?

25 A   3938 West Congress in Chicago, Illinois.

Weaver - Direct by Meyer

1    Q    Is that where you grew up?

2    A    Yes.

3    Q    Do you have a family?

4    A    Yes.

5    Q    Who are they?

6    A    My mother, my grandmother, my aunties, my kids.  Do you

7    want their name?

8    Q    Sure.

9    A    Wendy Sterling (phonetic), my mother.  Rosie Red

10   (phonetic), my grandmother.  My son, Wendell Weaver, Junior.

11   My daughter, Kianna (phonetic) Weaver.

12   Q    Where do they live?

13   A    They lived at 3938 West Congress, but now they live in the

14   south suburbs.

15   Q    What was your highest level of education?

16   A    11th grade.

17   Q    Are you currently working towards your GED?

18   A    Yes.

19            THE COURT:  Can you move the microphone closer to your

20   mouth?

21            MR. MEYER:  Sure.  I was afraid it was too loud.

22            THE COURT:  Was it too loud, folks?

23            THE JURY:  No.

24            MR. MEYER:  Just sounds loud to me.

25   BY MR. MEYER:

Weaver - Direct by Meyer

1   Q    Before you went to Stateville, did you see the dentist
2   regularly?
3   A    Yes.
4   Q    How often?
5   A    Maybe once a year.
6   Q    What kind of dental work did you receive?
7   A    A few cavities filled.
8   Q    Did you have teeth cleanings?
9   A    Yes.
10  Q    You mentioned you had a cavity filled.  What was that like?
11  A    They cleaned it, put a filling in it, and that was it.
12  Q    Did they explain to you what they were doing?
13  A    Yes.
14  Q    Do you brush your teeth?
15  A    Yes.
16  Q    How often?
17  A    Three times a day.
18  Q    Do you floss?
19  A    Yes.
20  Q    How often?
21  A    Three times a day when I brush.
22  Q    Has a dentist ever diagnosed you with any kind of dental
23  disorder?
24  A    No.
25  Q    Acute periodontitis?

46

Weaver - Direct by Meyer

1   A    No.

2   Q    Gingivitis?

3   A    No.

4   Q    Gum disease?

5   A    No.

6   Q    Vincent infection?

7   A    No.

8   Q    As an inmate at Stateville, do you receive dental care?

9   A    I don't understand.  Say it again.

10  Q    You currently reside at Stateville.

11  A    Yes.

12  Q    Do you receive dental care?

13  A    I think they got like an annual, every year or every two

14  years, when your birthday come around.

15  Q    Did you receive a dental evaluation when you first came to

16  the prison?

17  A    Yes.

18  Q    Did they tell you that you had any pre-existing problems

19  with your teeth?

20  A    I think they said I had a cavity in Tooth Number 5.

21  Q    Did they tell you you had gum disease?

22  A    No.

23  Q    How often did you receive dental treatment at the beginning

24  when you were first at Stateville?

25  A    When I was in the reception part, they just talked to me.

Weaver - Direct by Meyer

1    When I got in the population part, they told me about Number 5.

2    Then they told me to come -- they scheduled me for a filling,

3    to I guess cure that cavity in Number 5, and I came back and

4    they did the cavity.

5    Q    How often were you seeing the dentist?

6    A    Generally?  Generally?

7    Q    Generally.

8    A    Maybe once every two -- like I say, when your birthday come

9    around, I think the annual thing.  Unless you have a problem,

10   then you will put in a request to go over there.

11   Q    So we'll get to that in a second, and we'll talk about

12   those specific requests.  But, first, how were appointments

13   scheduled?  How do you come to see the dentist?

14   A    Oh, you put -- you filed -- you sign like a little paper,

15   piece of paper, and you put it in the bar.  It's different now.

16   Then you just signed a piece of paper requesting to see the

17   dentist and you put it in the bar, and they'd pick it up when

18   they collect the mail at 10:00 o'clock at night, and then they

19   scheduled you like that.

20   Q    So how has that changed?  How is that different now?

21   A    Oh, you got to fill -- when you exiting one of the

22   buildings, you got to write your name on the board now, and

23   then they'll come see you the next day now, Lisa, a med. tech,

24   and then she will schedule you for to see the dentist.

25   Q    So back in the first instance that you mentioned --

Weaver - Direct by Meyer

1    A    Right.

2    Q    -- you would -- that's how you would request an

3    appointment.

4    A    Right.

5    Q    How did you know that you received the appointment that you

6    requested?

7    A    I would receive something in the mail.

8    Q    What would you get in the mail?

9    A    Like a piece of paper that's saying appointment, and it got

10   multiple, like, hypertension, medical director, dental, and

11   they just have a little check by it telling you what you got to

12   go.

13   Q    Would it have a date and time?

14   A    Yes.

15   Q    When would you receive that piece of paper before your

16   appointment?

17   A    Then or now?

18   Q    Then.

19   A    You might have to put in about 30, 40 requests before you

20   even get that.

21   Q    So how -- how long before your appointment was scheduled

22   would you receive the paper notifying you of the appointment?

23   A    It's times you might be waiting two or three weeks.

24   Q    So you would receive the paper letting you know you had an

25   appointment two weeks before your appointment?

Weaver - Direct by Meyer

1    A    No, no, the day before.  You'll get it the day before.

2    Q    Always the day before?

3    A    Yes, when they finally scheduled you.  But I'm saying the

4    request might 3 -- 30 times, then it might get so serious you

5    got to tell one of the officers, "Please call the dentist for

6    me," and then sometimes it will come the next day, then

7    sometimes you'll still wait.

8    Q    So I'd like to make sure I understand your testimony.

9         When you would request an appointment, how long would

10   it take before you received the appointment confirmation?

11   A    It varies.

12   Q    Okay.  But once the appointment was scheduled --

13   A    You would get it the day before.

14   Q    You would get it the day before.  Thank you.

15        So once you receive your appointment, are you -- how

16   are you brought to the dental office?

17   A    When the correctional officers will come key you out.

18   Q    You said key you out?

19   A    Get you out the cell.

20   Q    And then what will they do?

21   A    Put you in the bullpen until a ride come, a movement

22   officer, that will transport you from the housing unit to the

23   hospital.

24   Q    Are those two different buildings?

25   A    Yes.

Weaver - Direct by Meyer

1    Q   About how far apart are they?

2    A   Not that far.  Maybe -- I can't -- I'll say 60 feet, 70

3    feet.  Not that -- it ain't that far.  You can just -- you

4    know, you -- it's right there.  It ain't that far.

5    Q   So you don't have to take a car.

6    A   Huh?

7    Q   You don't -- they don't have to drive you.

8    A   No, no, no.

9    Q   You just walk.

10   A   Yes.

11   Q   And so when you have an appointment, do you always get to

12   see the doctor?

13   A   No.

14   Q   Why not?

15   A   They left early.  Numerous reasons.  Somebody had to go

16   across the street.  It's not enough people here.  Or lockdown,

17   immediately, so everything stop, we lock down.  You could be in

18   the chair getting dental work done, and they will stop,

19   immediate, working on your mouth, on Level One lockdown and

20   send you back with tissue in your mouth, whatever.

21   Q   So you said go across the street, that somebody had to go

22   across the street.  What did you mean by that?

23   A   When?

24   Q   You said one of the reasons that you might not get to see a

25   doctor is that somebody had to go across the street.

Weaver - Direct by Meyer

1  A   NRC, the receptionist -- like, Stateville got two parts.

2  It got the orientation part, then it got the resident part.

3  And one of the dentists or two of the dentists or all the

4  dentists might leave Stateville to go across the street, which

5  is NRC.

6  Q   What is NRC, in your understanding?

7  A   Northern Receptionist Center or something like that.

8  Q   But you would not be able to see the dentist at NRC.

9  A   No, no.

10 Q   When you have an appointment, can you refuse to go?

11 A   I would -- yeah, I think you can.

12 Q   So what happens?

13 A   I don't know.  I never refused one.

14 Q   So have you ever refused to go to an appointment?

15 A   No.

16 Q   Why not?

17 A   Why I never refused to go to one?

18 Q   Uh-hum.

19 A   If I'm requesting to go see a doctor, it's a reason why I'm

20 requesting to go see a doctor, so it wouldn't make no sense for

21 me to refuse to go if I put a request in for it.  Clearly, I'm

22 having problems.

23 Q   How many dentists are there in Stateville?

24 A   Then or now?

25 Q   Then.

Weaver - Direct by Meyer

1   A    Maybe two or three.  Then I think they got like a dental

2   hygienist, the lady that clean the teeth.  I guess she the

3   dental hygienist.  And I think an assistant.  It don't be a lot

4   of them in there, like -- like right now, I think it's only

5   maybe two dentists in there now.

6   Q    So before there were --

7   A    Maybe three.

8   Q    Three?  And now there are?

9   A    Two, I think.

10  Q    Do you know Dr. Jacqueline Mitchell?

11  A    Yes.

12  Q    How?

13  A    Through Stateville dental.

14  Q    If you were to see her today, would you recognize her?

15  A    Yes.

16  Q    Do you recognize her in this courtroom?

17  A    Yes.

18  Q    Could you point her out?

19  A    With the red shirt on.

20  Q    Did you begin experiencing any dental problems after you

21  were in Stateville?

22  A    No.  When I first got there?

23  Q    Uh-hum.

24  A    No.

25  Q    How about a little bit later?

Weaver - Direct by Meyer

1    A    Until they started doing the work on my teeth.

2    Q    So when did that happen?

3    A    From Tooth Number 5, back in 2008, when they did that.  I

4    came in, they said I had a filling -- I mean, they see

5    cavities.  They did the cavity.  After they filled the cavity,

6    that's when my problem started.  I started experiencing hot and

7    cold.  And after that, I didn't understand that.  I went over

8    there, I had no problems; now all of a sudden, you fill a

9    cavity and now I'm experiencing hot and cold.  I didn't

10   understand that.

11   Q    So when you said you were experiencing hot and cold, what

12   do you mean by that?

13   A    If I drink something cold, I feel it; if I drink something

14   hot, I feel it.

15   Q    When you say you feel it, what are you feeling?

16   A    In my teeth like the sensation, the warmth, the hotness or

17   the coldness.  And if some wind hit it, I would feel it.

18   Q    Was it painful?

19   A    Yes, yes.  Yes.

20   Q    And so what did you do when you began having that

21   sensation?

22   A    I wrote them request slips again.

23   Q    So you mentioned the Number 5 tooth.

24   A    Yes.

25   Q    What do you mean when you say Number 5 tooth?

Weaver - Direct by Meyer

1    A    The tooth on my left.

2    Q    So when did you begin experiencing problems with that

3    tooth?

4    A    Wait.  Take that back.  I think that's the tooth on my

5    right.  The tooth on my right.

6    Q    So when you say the Number 5 tooth, the one that --

7    A    On my right side.  Sorry.

8    Q    So when did you begin experiencing problems with your

9    Number 5 tooth?

10   A    After they did the filling.

11   Q    After they -- so when did they perform a filling?

12   A    I think it will be around 2007 -- sometimes between -- I

13   got -- sometime in 2007.  Not sure of the date because --

14   before -- when I -- when I wrote the request complaining about

15   the hot and cold, that's when I guess they decided to do the

16   root canal, because they didn't do that at first, they only did

17   the filling.  So when I started complaining about the hot and

18   cold, they -- I guess they felt like, well, we going to just

19   get rid of the whole nerve.

20   Q    So I'd like to break that down just a little bit.

21         When did you -- you say -- I apologize.

22         You said that you received a filling in your Number 5

23   tooth sometime in 2007.

24   A    Yeah.

25   Q    And what happened after that?

Weaver - Direct by Meyer

1  A   I started experiencing hot and cold.

2  Q   And so what did you do about it?

3  A   Put the request in, explaining my problem.

4  Q   And then you saw the dentist?

5  A   Yes.

6  Q   What did they tell you?

7  A   To be honest with you, I don't think they told me nothing.

8  I think they just started working on my tooth, to be honest

9  with you.  I don't remember them telling me anything, to be

10 honest with you.

11 Q   Did you eventually receive a root canal on your Number 5

12 tooth?

13 A   Yes.

14 Q   Who started that root canal, do you recall?

15 A   I don't know her name.  I don't know her name, off the top

16 of my head.  Could have been for too -- I would have to see the

17 medical record.

18 Q   But it was not Dr. Mitchell.

19 A   No, not on 5.  Not the original start, no.

20 Q   Did Dr. Mitchell ever treat your Number 5 tooth?

21 A   I think later on when it started breaking or -- yeah, when

22 it start -- when it start cracking and breaking up.

23 Q   And so what did she do with your Number 5 tooth?

24 A   Try to cement it back together, put it back together, after

25 it cracked, trying to -- I don't know, cement it back together.

Weaver - Direct by Meyer

1   Q   What did she tell you about your tooth?

2   A   That I needed -- the reason it broke is because I need a

3   post and a crown for it, because whenever you have a root

4   canal, the tooth become like dead, it become like brittle, so

5   it's inevitable it's going to crack.  So she said you usually

6   put a post and crown in there to restrengthen the tooth to get

7   back that strength.

8   Q   And did she tell you why?

9   A   She just told me when you take the nerve out of the tooth,

10  the tooth become not really a tooth, it become just a shell, a

11  shell, and it's subject to break.

12  Q   Did your tooth break?

13  A   Yes.

14  Q   When?

15  A   Number 5, right?

16  Q   Correct.

17  A   2009, 2010, somewhere around that time, the first break.

18  It broke several times.

19  Q   How many times did it break?

20  A   Before end up extracted --

21          MR. STALEY:  Objection to relevance --

22  BY THE WITNESS:

23  A   -- about three.

24  Q   How did it feel?

25  A   Huh?

Weaver - Direct by Meyer

1    Q    How did it feel when your tooth broke?

2    A    It was terrible.  It was terrible.  Unbelievable.

3    Q    Was it painful?

4    A    Yes.  Because the tooth, when it break, it went into the

5    gum.  It was going into the gum when it broke.

6    Q    Did you discuss your tooth breaking with Dr. Mitchell?

7    A    Yes.

8    Q    What did she tell you?

9    A    About the post and the crown.

10    Q    Did Dr. Mitchell eventually extract that tooth?

11    A    Yes.

12    Q    When did that happen?

13    A    Was it 2011?  2011, something like that.  It was years

14    after the root canal was initially done, so I got a good year

15    or so out of it with piecing it back together, not really

16    eating on that side, just so I didn't lose the tooth.  I was

17    just trying to -- whatever I could do to it to -- until I get

18    home to get it fixed the right way.

19    Q    Did you discuss losing your tooth with Dr. Mitchell?

20    A    Yes.

21    Q    What did you tell her?

22    A    I had perfect teeth, and I didn't want to lose not one of

23    my teeth.

24    Q    Now I'd like to turn to the Number 12 tooth on your left

25    side.

Weaver - Direct by Meyer

1   A    Okay.

2   Q    Did Dr. Mitchell eventually treat your Number 12 tooth at

3   Stateville?

4   A    Yes.

5   Q    Would you point to your Number 12 tooth for the jury?

6   A    It's missing right there.  (Demonstrating.)

7   Q    When did Dr. Mitchell begin treatment of that tooth?

8   A    I'm not really good with those dates like that.  Was it

9   sometime in 2013?  Something like that.  2012, 2013.

10  Q    What kind of treatment did she perform at first?

11  A    I came in again for -- around my birthday.  She told me I

12  had a cavity.

13  Q    So when you say you came in around your birthday, did you

14  request that appointment?

15  A    No, no, that was an annual check-up.

16  Q    Had you been experiencing any problems --

17  A    No.

18  Q    -- before the appointment?

19  A    No.

20  Q    So did she recommend any course of treatment for that

21  tooth?

22  A    Filling the cavity.

23  Q    And so what happened?

24  A    Same thing with Number 5.  Started experiencing the hot and

25  cold.  I don't know was it the filling itself, the silver

Weaver - Direct by Meyer

1  filling, I don't know.  Was it temp -- I don't know, I just

2  know --

3          MR. STALEY:  Objection to speculation.  He's saying he

4  doesn't know.

5          THE COURT:  Okay.  Sustained.  But you don't need to

6  add the others.  I understand.

7  BY MR. MEYER:

8  Q   So, Mr. Weaver, just based on your experiences and what you

9  were -- what you were experiencing, what were you experiencing

10 once you received the filling in your Number 12 tooth?

11 A   I immediately started experiencing the hot and cold again.

12 Q   And what do you mean by that again?

13 A   The sensation, to drink something cold, oooh; drink

14 something hot, oooh.  You able to feel it.

15 Q   So what did you do about it?

16 A   Put another request in.

17 Q   And did you eventually receive an appointment to see the

18 dentist?

19 A   Excuse me?

20 Q   Did you eventually receive an appointment to see the

21 dentist?

22 A   Yes.

23 Q   And what happened once you went and saw the dentist?

24 A   Put me in the chair, pushed the chair back and just started

25 drilling.

Weaver - Direct by Meyer

1   Q   Did she tell you why?

2   A   No.

3   Q   Did she tell you what she was doing?

4   A   No.

5   Q   Did she give you a choice --

6   A   No.

7   Q   -- of treatment?

8           What did you do?

9   A   Once she started working on it?

10  Q   Yes.

11  A   I didn't know what she was doing.  I didn't know what she

12  was -- taking the old filling out to put another filling in or

13  what she was doing.  Then I caught on like maybe later on that

14  day, like, she was doing a root canal.

15  Q   So when did you learn she was doing or a performing a root

16  canal?

17  A   After the drill, because I kind of remembered Number 5, so

18  when I got to seeing these drills going in and out and -- I'm,

19  like, the same old -- the same thing they did in this other

20  one.  And then she's, like, Well, that's the only thing I can

21  do or you're going to lose the tooth.

22  Q   Did she give you a choice between a root canal --

23  A   No.

24  Q   -- or an extraction?

25  A   No.

Weaver - Direct by Meyer

1  Q   Did she ask for your consent --

2  A   No.

3  Q   -- before she began?

4       So when did she start the root canal?

5  A   When I came back in complaining about the hot and the cold.

6  Q   Did you have a sense of what time period that was?

7  A   It was -- it was quick.  It was -- it was probably I

8  wouldn't even say 60 days later.

9  Q   So was the root canal finished that same day that it was

10 begun?

11 A   No.  No.

12 Q   When was the root canal completed?

13 A   Maybe five, six months later.

14 Q   How many times were your teeth drilled?

15 A   Over 15 times.  Over 15 times.

16 Q   What was that like?

17 A   Terrible, uncomfortable, headache.  Just -- just -- I can't

18 even describe it in words, to be honest with you.

19 Excruciating, to say the least.

20 Q   Was that during the procedure?

21 A   And after.

22 Q   So when were you experiencing pain?

23 A   During it, after, the infections, just -- just throughout

24 the whole process of doing it.

25 Q   Did the pain stop once the root canal was completed?

Weaver - Direct by Meyer

1  A    That's when I started feeling that funny feeling like pain,
2  sort of like numbness, you know?
3  Q    So what do you mean by that?  Can you elaborate?
4  A    When I used to touch right here, it will sting a little
5  bit, but it will feel numb, it will feel funny, unlike this
6  one.  This one was feeling funny.
7  Q    Can you describe it for the jury?
8  A    It's in between like pain, like a numbness feeling, like a
9  tingling.  Like if you press down on it, you could feel
10  something, you could feel pain, like -- not so much sharp, but
11  you could tell something there.
12  Q    So was there pain?
13  A    Yes.
14  Q    Could you rate the pain on a scale of one to ten?
15  A    In the beginning, when it was -- it got better as we was
16  finishing it up.
17  Q    So let's break it down then.
18        When you were undergoing the root canal procedure, at
19  first what level of pain were you experiencing?
20  A    On a scale from one to ten, I would say about an eight.
21  Q    And once the root canal procedure had progressed a little
22  bit, but before it was completed, what level of pain were you
23  experiencing?
24  A    Started going down like seven, six.
25  Q    After the root canal was completed, what level of pain were

Weaver - Direct by Meyer

1  you experiencing?

2  A   Stayed probably about at like a five or four, something

3  like that, between five and four, back and forth.  It never got

4  all the way back up to the eight or the ten or nothing like

5  that.

6  Q   And how long were you experiencing that pain?

7  A   I think I'll have to say about 13, 14 months.

8  Q   Would you experience the pain when you woke up in the

9  morning?

10 A   Yes.

11 Q   Did you experience the pain when you went to bed at night?

12 A   Yes.

13 Q   When would the pain go away?

14 A   It wouldn't.

15 Q   Did you experience any other problems with your Number 5

16 tooth after the root canal?

17 A   12 or 5?

18 Q   12.

19 A   No, it just that -- that four, five pain with the tingling,

20 that's what it was at.  It just stayed like that, all the way.

21 Q   Did you -- did your tooth ever break?

22 A   Yes.

23 Q   So what happened?

24 A   I was eating some potato chips, and it cracked.

25 Q   How did it crack?

Weaver - Direct by Meyer

1   A    I don't know.  I bit down on a piece of nacho chip, and it
2   cracked.
3   Q    What did you do?
4   A    I called for the correctional officer, the officer, and he
5   was -- it was like 7:00 o'clock at night, so the dentist was
6   gone, so he just wrote something down in the logbook or
7   something to try to get me over there the next day.
8   Q    Did you see the dentist?
9   A    I don't think the next day.  I think the day after.  I
10  don't think it was the next day.
11  Q    Did you eventually see the dentist?
12  A    Yes.
13  Q    What happened?
14  A    They tried to glue it back together, cement it back
15  together again.
16  Q    Did it last?
17  A    No.  Probably about a week or two.
18  Q    What happened?
19  A    It end up cracking again.
20  Q    Was that the last time it cracked?
21  A    No.
22  Q    What else happened?
23  A    They put it back together again.  And now I caught myself,
24  because I don't want to be missing two teeth, I just stopped
25  chewing on this side altogether and start chewing on this side.

Weaver - Direct by Meyer

1    Q    Now, did you tell Dr. Mitchell about these problems you

2    were experiencing?

3    A    Yes.

4    Q    Did you tell Dr. Mitchell about the pain you were

5    experiencing?

6    A    Yes.

7    Q    Did you tell Dr. Mitchell about the numbness you were

8    experiencing?

9    A    Yes.

10   Q    When did you tell her?

11   A    I'll say about -- about maybe a year later.  I can't -- I

12   can't -- I can't really recall, like, because it, you know, it

13   been so long ago, but I was telling, like, everything that was

14   going on with the tooth, so whenever -- whatever the medical

15   records show, that's what I was doing -- the dates, that's not

16   popping into my head like the exact dates.

17   Q    And I'm not necessarily asking you for the exact dates.

18   But when you saw Dr. Mitchell, would you tell her about those

19   problems?

20   A    Every time I went in when the tooth broke, I was explaining

21   it to her.  So that's how I knew, like, it's the same thing

22   that happened to Number 5, so I kind of knew, like, you can't

23   do a root canal without a post and a crown.

24   Q    So what did Dr. Mitchell do when you told her about the

25   problems you were experiencing?

Weaver - Direct by Meyer

1  A    Nothing.  They just tried to kept glueing it together till
2  you couldn't glue it together no more.
3  Q    Did she prescribe you any medications that you recall?
4  A    They gave me some -- I think this later on, though.  You
5  saying around -- this is during that time?
6  Q    Just during the course of treatment for your Number 12
7  tooth.
8  A    Yeah, they gave me some antibiotics before, when I did --
9  they did an x-ray and saw some black stuff up here like that
10  looked like infection.  Gave me some antibiotics, about 20
11  pills, 30 pills of that.  She gave me some, I think some
12  Tylenol, I think.  She gave me some Tylenol.
13  Q    Did the Tylenol help?
14  A    No.
15  Q    Did you take the Tylenol?
16  A    Yes.
17  Q    Did you take the antibiotics?
18  A    Yes.
19  Q    Did the problems go away?
20  A    No.
21  Q    Did you tell Dr. Mitchell?
22  A    Yes.
23  Q    When?
24  A    During the process, during -- every time I went over there
25  to talk to her about Number 2 -- whenever she did any work with

Weaver - Direct by Meyer

1    Number 12, I mean, every time I went over there.  The dates,

2    I'm not accurate with the dates, but I kept her informed

3    because I was really upset, like, that -- like I done lost

4    another tooth.  So each time I went over there, in the

5    grievances, in the request slips, everything, I was putting it

6    down, very detailed, because of what was going on and what I

7    was experiencing.

8    Q   What did Dr. Mitchell do when you told her about your

9    problems?

10   A   She didn't do anything.  She didn't -- she didn't -- she --

11   the only thing they were doing is trying to put it back

12   together, put it back together.  It wouldn't lie.  It would

13   crack.  It would crack -- one time it crack.  At one point, it

14   fell off, and it was only the other piece hanging.  So I was,

15   like, ain't no sense in me keeping that in.  Pull that out,

16   too.

17          THE COURT:  I think that's going to be a place to stop

18   for tonight, okay?

19          MR. MEYER:  Okay.

20          THE COURT:  So, Ladies and Gentlemen, we're going to

21   stop right now with the evidence.  We're going to pick up

22   tomorrow at 9:45.  Okay?

23          And don't talk with each other about the case, and

24   don't talk with anyone else about the case.

25          Enjoy your evening.  Safe travels home.

68

                          Weaver - Direct by Meyer

1            COURT SECURITY OFFICER:  All rise.

2        (Jury out at 3:30 p.m.)

3            THE COURT:  If any trial issues arise, I'll address

4    them at 9:15 in the morning before the jury comes in, okay?

5            Have a nice night.

6            LAW CLERK:  All rise.  Court is adjourned.

7        (Proceedings concluded at 3:31 p.m.)

8                     C E R T I F I C A T E

9        I certify that the foregoing is a correct transcript of the

10   record of proceedings in the above-entitled matter.

11

12

13   /s/ GAYLE A. McGUIGAN                    March 7, 2018
     Gayle A. McGuigan, CSR, RMR, CRR               Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2         EASTERN DIVISION

3 WENDELL WEAVER,     ) Docket No. 15 C 02950
             )
4     Plaintiff,  ) Chicago, Illinois
             ) February 7, 2018
5    v.      ) 9:58 a.m.
             )
6 DR. JACQUELINE MITCHELL and  )
  RANDY PFISTER,      )
7          )
     Defendants.  )
8

9           VOLUME 2-A
     TRANSCRIPT OF PROCEEDINGS - Jury Trial
10  BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

11

  APPEARANCES:
12

  For the Plaintiff:  MOLOLAMKEN LLP by
13          MR. GERALD P. MEYER
          MS. MICHELLE JOYCE PARTHUM
14          300 North LaSalle Street
          Chicago, Illinois 60654
15

  For the Defendants:  OFFICE OF ILLINOIS ATTORNEY GENERAL by
16          MR. NICHOLAS SCOTT STALEY
          MR. JOSEPH PETER LUPINACCI
17          100 West Randolph Street, 13th Floor
          Chicago, Illinois 60601
18

19

20

21

22 Court Reporter:   GAYLE A. McGUIGAN, CSR, RMR, CRR
          Federal Official Court Reporter
23          219 South Dearborn, Room 2318-A
          Chicago, Illinois 60604
24          (312) 435-6047
          Gayle_McGuigan@ilnd.uscourts.gov
25

1                         I N D E X

2   WITNESS                                        PAGE

3   WENDELL WEAVER
        Direct (Resumed) By Mr. Meyer ............. 75
4       Cross By Mr. Staley ....................... 92
        Redirect By Mr. Meyer .................... 110
5       Recross By Mr. Staley ....................118

6   DR. GLEN SCHEIVE
        Direct By Ms. Parthum .................... 120
7       Cross By Mr. Lupinacci ................... 146

8   DR. JACQUELINE MITCHELL
        Direct By Mr. Meyer ...................... 153
9       Direct (Resumed)  ........................ 189

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (In open court outside the presence of the plaintiff and
 2       the jury:)
 3              THE COURT:  Let's hear from the lawyers in the case,
 4    please, the trial.
 5              THE CLERK:  15 C 2950, Weaver versus Mitchell.
 6              THE COURT:  Good morning, folks.
 7              MR. MEYER:  Good morning, your Honor.  Gerald Meyer
 8    and Michelle Parthum on behalf of plaintiff.
 9              THE COURT:  Okay.  Good morning.
10              MR. LUPINACCI:  Good morning, Judge.  Joseph Lupinacci
11    from the Attorney General's Office.
12              THE COURT:  Is your client here yet, do you know?  No
13    word yet?
14              THE CLERK:  I received a call from the deputy, but --
15              THE COURT:  Okay.  We'll find out.
16              Any issues that we need to address before we bring him
17    out and start our jury trial up again?
18              MR. LUPINACCI:  No.
19              THE COURT:  You did a real nice job on your opening
20    statement.
21              Was it your first federal trial?
22              MS. PARTHUM:  It is, your Honor.
23              THE COURT:  Nice job.  So there we go.  We recruit
24    people and we bring them in, and you got all that experience to
25    do an opening in a federal civil rights trial.  So I thought it
```

1     was really good for a first opening statement.

2           MS. PARTHUM:  Thank you.

3           THE COURT:  All right.  Let's find out where he is and

4     we'll get started.

5           Can we do -- you guys can sit down and get ready.

6     (Judge Kendall attends to other matters.)

7     (In open court outside the presence of the plaintiff and

8     the jury:)

9           THE COURT:  Let me tell the trial attorneys:  I have a

10    large criminal case where there were 13 -- 11 arrests.

11          THE CLERK:  There's 11, yeah.

12          THE COURT:  So throughout the day, I will probably be

13    doing arraignments on those arrests.

14          So my first question is, if I do continue on past

15    4:00, even though I told you I wasn't going to, is that going

16    to cause anyone harm?

17          MR. STALEY:  Not from us.

18          THE COURT:  I'll just see if the -- the jury might

19    have made plans, because I told them we were only going until

20    4:00.

21          But during my breaks, I will probably be doing

22    arraignments on these various arrests.  It's not a seriously

23    long period of time, but it may be sporadic.  And I'll work

24    with the jury on it as well, but the marshals were out -- or

25    the FBI --

1        THE CLERK:  I believe it's the FBI.

2        THE COURT:  -- FBI was out early this morning, and so

3  they've got initial appearances on all of these men that were

4  arrested, okay?

5        All right.  Where is he?

6        THE CLERK:  They're pulling in right now.

7        THE COURT:  They're pulling in.  Famous "pulling in."

8        I'll go tell the jury we're going to start in 10

9  minutes.

10        MR. MEYER:  May I address the Court?

11        THE COURT:  Sure, you can.

12        MR. MEYER:  Mr. Weaver yesterday, before he left, he

13  did want me to apologize to your Honor on his behalf --

14        THE COURT:  Oh, that's nice.

15        MR. MEYER:  -- for the issue yesterday.

16        THE COURT:  Okay.  No problem.  He was a gentleman

17  yesterday.  I'm going to assume he will remain one today.

18        MR. MEYER:  Great.  Thank you.

19        THE COURT:  Thank you.

20        THE CLERK:  All rise.  Court is in recess.

21     (Recess taken at 10:04 a.m.)

22     (Judge Kendall attends to other matters.)

23     (In open court outside the presence of the jury:)

24        THE COURT:  Is everyone ready?

25     (No response.)

1    THE COURT:  Oh, you should jump up and say "Yes, your

2  Honor, we are ready to proceed."

3    MR. MEYER:  Yes, your Honor.  We are ready to proceed.

4    THE COURT:  There you go.  Then let's call the jury

5  in, please.

6    COURT SECURITY OFFICER:  All rise.

7  (Jury in at 10:24 a.m.)

8    THE COURT:  Please be seated and get comfortable.

9    I hope you all had a nice night.  And thank you for

10  being here on time.  We were slightly delayed, and I appreciate

11  your patience with that delay.  It had nothing to do with

12  either of the parties but, rather, logistics.  And so we are

13  all set to begin, however.

14    I have one question for the group of you.  Is there

15  anyone, since I told you that we were going to end at 4:00, is

16  there anyone that absolutely must leave at 4:00?

17  (A showing of a hand.)

18    THE COURT:  You must.  Okay, then we will.

19    There was a possibility that we might be able to go a

20  little bit longer today, but no worries, we'll leave at 4:00.

21    All right.  Let us get started.  And we were on --

22  Mr. Weaver, you were on the witness stand.  If you could come

23  back up, sir, and we'll finish your testimony.

24  (Witness resumes the stand.)

25    THE COURT:  Now, Mr. Weaver, I want to remind you that

Weaver - Direct (Resumed) by Meyer

1    you are still under oath.

2            Do you understand that?

3            THE PLAINTIFF:  Yes, ma'am.

4            THE COURT:  Go ahead and have a seat.

5                    DIRECT EXAMINATION (Resumed)

6    BY MR. MEYER:

7    Q    Good morning.

8    A    Good morning.

9    Q    So, Mr. Weaver, you mentioned yesterday that you began

10   receiving treatment on the Number 5 tooth on your right side

11   sometime in 2008.

12   A    Yes.

13   Q    And a Stateville dentist performed a root canal on that

14   tooth?

15   A    Yes.

16   Q    Dr. Mitchell later examined that tooth after it started

17   breaking.

18   A    Yes.

19   Q    She told you you needed a post and crown on that tooth or

20   it would continue to break.

21   A    Yes.

22   Q    It eventually broke, was completely extracted.

23   A    Yes.

24   Q    Sometime later you began receiving dental treatment on your

25   Number 12 tooth, which is on your left side.

Weaver - Direct (Resumed) by Meyer

1    A    Yes.

2    Q    You received a filling?

3    A    Yes.

4    Q    Did they tell you what type of filling it was?

5    A    No.

6    Q    Did you ever look at it in the mirror?

7    A    No.

8    Q    But you were experiencing hot and cold sensitivity.

9              MR. STALEY:  Objection.  Leading.

10             THE COURT:  That's true, so sustained.  You'll have

11   to -- I know you're kind of reviewing, but go back to

12   non-leading questions, please.

13             MR. MEYER:  Yes, your Honor.

14   BY MR. MEYER:

15   Q    And what was your experience, just briefly, with the

16   filling?

17   A    The hot and cold.  I want to say this:  Before that

18   two-year, I guess, review, like around your birthday, I wasn't

19   experiencing no problems with Number 12.  When they reviewed

20   it, that's when she told me I had a cavity.  Then she set me up

21   about a month later and said that they going to fill the

22   cavity.

23   Q    And so --

24   A    That's when I started experiencing the hot and cold

25   sensitivity.

Weaver - Direct (Resumed) by Meyer

1    Q    After they filled the cavity.

2    A    Yes.

3    Q    And so when you experienced the hot and cold sensitivity,

4    what did you do?

5    A    I put in a request to go back to the dentist.

6    Q    And did you go see the dentist?

7    A    Yes.

8    Q    What happened?

9    A    I was assuming they was correcting the problem.  They just

10   put me in the chair, put the thing on me, and started going

11   back into my mouth.

12   Q    And when you say go back into your mouth --

13   A    Start drilling, drilling and doing whatever they do.  I

14   don't know exactly what they was doing, but I was assuming they

15   was correcting the hot and cold problem.

16   Q    Did they later tell you what they were doing?

17   A    No.

18   Q    How did you find out what they were doing?

19   A    I think I asked her.

20   Q    When did you ask her?

21   A    Maybe that same day.  If not, the next time I came in,

22   because it was a consistent procedure.  And it remind me so

23   much of teeth Number 5, so I'm like what is this here?  So

24   eventually she told me she was doing a root canal.  Then she

25   say either you going to do the root canal or you're going to

Weaver - Direct (Resumed) by Meyer

1     loose the tooth.

2     Q    She did not get your consent?

3     A    No.

4     Q    Did she give you any choice of treatment?

5     A    No.

6     Q    She just started the root canal.

7     A    When I came back for the hot and cold, when they started

8     doing the work in the chair, I'm assuming that's when she

9     started working on the root canal right then and there.

10    Q    How long did it take to finish?

11    A    Took -- it took some months.  The dates I'm not really sure

12    on, but it took a while.  It wasn't overnight, two months, or

13    nothing like that, because we started having a lot of problems

14    with it, too.  Infections, bleeding --

15            MR. STALEY:  Objection --

16    BY THE WITNESS:

17    A    -- stuff that was going on.

18            THE COURT:  First of all, remember the rule:  Stand.

19    Thank you.

20            MR. STALEY:  Apologies, Judge.

21            He's stating expert testimony.  There's nothing in

22    evidence --

23            THE COURT:  Okay.  It's just one word.  Remember the

24    rule.  So expert testimony objection.

25            So, Ladies and Gentlemen, he can give us his symptoms.

Weaver - Direct (Resumed) by Meyer

1    He can tell us how he felt.  But not being a dentist or medical

2    person, he can't give you a medical conclusion.

3          So I'm going to sustain the objection.

4          And see if you can rephrase the question and go -- and

5    I'm going to strike his portion of the statement where he gave

6    what was essentially a medical opinion.  All right?

7          Go ahead.

8    BY MR. MEYER:

9    Q    So, Mr. Weaver, can you describe the symptoms that you were

10   experiencing in your tooth?

11   A    When I came back to the cell, I started drinking some water

12   'cuz it was some stuff still in my mouth.  I tried to gargle it

13   out, like whatever left over, whatever they was doing,

14   fragments, whatever.  And right then and there, I sensed the

15   cold and the hot.

16   Q    And was this during your root canal treatment?

17   A    No, this is after -- I mean, this -- yeah, yeah, during the

18   procedures, not -- yeah, right, right.

19   Q    So we'll follow up on that.

20          Before -- I'd like to understand.  It took a period of

21   time to complete the root canal treatment.

22   A    Yes.

23   Q    About how many visits did the -- to the dentist did you

24   have to have before the root canal treatment was completed?

25   A    It was numerous.  It was numerous times.  If I had to

Weaver - Direct (Resumed) by Meyer

1    estimate, I'd probably say -- before it was all the way done?

2    Q    Uh-hum.

3    A    Maybe 10 times, 15 times, something like that.

4    Q    What happened during each visit?

5    A    They did different stuff.  She'd open it back up, drill it,

6    (indicating) and see always still bleeding, still bleeding, let

7    me put this back in there, I'm going to reschedule you to come

8    back.

9    Q    Did she drill your tooth on each visit?

10   A    Yes.  Yes.

11   Q    Did she say why?

12   A    No.

13   Q    Did she explain to you what was going on?

14   A    No.

15   Q    How did your tooth feel during those -- that period of

16   months while the root canal was in process?

17   A    Funny.  Different.

18   Q    Were you in pain?

19   A    Sort of, 'cuz they was numbing it a little bit.  They was

20   numbing it, but it was -- I was still able to feel through the

21   numbness.  So I don't know was it enough, whatever, numbing,

22   but -- I don't know.

23   Q    Once the root canal was completed, were you still feeling

24   pain and sensation in your tooth?

25   A    No.  It was more so like numbness and that slight

Weaver - Direct (Resumed) by Meyer

1  uncomfortable feeling.

2  Q   So your Number 12 tooth was the one on your left side.  It

3  eventually began to crack and break also; is that right?

4  A   Yes.

5  Q   Were you experiencing pain in your tooth at that time?

6  A   When it crack, yes; but not during the procedure, just the

7  numb, tingling feeling.

8  Q   Sure.

9  A   But it wasn't paining like that.

10  Q   So did you have sensitivity to hot and cold in your tooth?

11  A   No, no, no.  After the root canal?

12  Q   After the root canal?

13  A   No, no.

14  Q   So after the period -- so in the period of time after the

15  root canal was completed, did you ever have -- experience more

16  pain in your tooth?

17  A   No.  Just that numbness.  I wouldn't really call it pain.

18  It was something there, but it wasn't really paining like that.

19  Q   Was there pressure?

20  A   That's what -- that's the better word for it.

21  Q   Did you have sensitivity while chewing?

22  A   No.

23  Q   Now, you said you had kind of a funny feeling in your face,

24  just described it as pressure.  Can you point on your face to

25  where that feeling was?

Weaver - Direct (Resumed) by Meyer

1   A   Right about here.  All right here.  (Indicating.)

2   Q   Is that right above the tooth?

3   A   Yes.  Like the root of that tooth.

4   Q   Did you ever describe this to Dr. Mitchell?

5   A   Yes.

6   Q   What did she say?

7   A   She seemed like she was confused on why I was having those

8   kind of symptoms.  I think a few times I went in, she wouldn't

9   even deal with me.  She'll let Dr. Saffold, I think his name

10  is, and that's the one that did the x-ray, and he said -- he

11  didn't even come out and tell me it was an infection.  He just

12  told me it's black in the gum area, but here's some penicillin,

13  take that, and put me out of the dental office.

14  Q   So just to unpack that a little bit, Dr. Mitchell

15  prescribed you penicillin?

16  A   At one time.

17  Q   Did she ever tell you why your tooth was breaking?

18  A   Yes.

19  Q   What did she say?

20  A   I need a root -- a post and a crown.

21  Q   And she said that with respect to your Number 12 tooth.

22  A   Yes.  After -- after going back in, because the teeth --

23  each time they was -- she was going back in it, it was making

24  the tooth weak.  It was getting weaker.  And that's when she

25  mentioned the post and crown --

Weaver - Direct (Resumed) by Meyer

1      MR. STALEY:  Objection.  Again, he's giving an expert

2   opinion.

3      THE COURT:  I think on that one I'm going to say

4   overruled in the sense that he must have some personal sense of

5   what was making it weak.  He has a sense of whether it felt

6   weaker, okay?  Overruled.

7      Go ahead.

8   BY MR. MEYER:

9   Q   Did Dr. Mitchell explain to you that your tooth had become

10  weaker --

11  A   Yes.

12  Q   -- following the root canal?

13  A   Yes.

14  Q   What did she explain to you?

15  A   This, like on several different times I was going in there,

16  because I was wondering why you constantly got to drill in

17  there to go back and forth, you know, in that area, because

18  from this -- from the experience from this (indicating), I know

19  you didn't -- they didn't go in this one that many times, and

20  this one got real weak.  They went in this so many times, it

21  was crazy, so I knew for a fact this was going to be weak.

22  Q   So what did she tell you about types of dental treatments

23  that would have prevented your tooth from breaking?

24  A   Just about the post and the crown.  I didn't know nothing

25  about a post and a crown.  I didn't even know the -- know what

Weaver - Direct (Resumed) by Meyer

1    that is even right to this day.

2    Q    Had you ever heard of it before?

3    A    No.  Until --

4    Q    Did she explain to you?

5    A    Yeah, about it would strengthen it.

6    Q    And did she explain to you what a post and a core -- a post

7    and a crown was?

8    A    No.

9    Q    Did she explain to you its purpose?

10   A    Yes.

11   Q    What did she say?

12   A    It will strengthen it.  It will give the tooth support so I

13   wouldn't experience those breaking -- or them breakages that I

14   was having, because it broke on more than one occasion before

15   it eventually got extracted.

16   Q    Now, did she explain to you that the post and the crown

17   would have strengthened your tooth, prevented it from breaking?

18   A    Yes.

19   Q    Did she ever say that your tooth breaking was an anomaly?

20   A    I don't --

21        MR. STALEY:  Objection.  Leading.

22   BY THE WITNESS:

23   A    I don't know what that means.

24        THE COURT:  Sustained.

25   BY MR. MEYER:

Weaver - Direct (Resumed) by Meyer

1  Q   How many times did you discuss a post, core, and crown with
2  Dr. Mitchell?
3  A   A couple times with Tooth Number 5, and probably about a
4  couple times with this tooth, too.  But once I knew about it, I
5  knew about it.  But -- go ahead.
6  Q   And did she ever perform that procedure?
7  A   No.
8  Q   Did she tell you why?
9  A   Yes.
10 Q   Why?
11 A   Stateville wouldn't allow her to do it.
12 Q   Did she tell you why Stateville wouldn't allow it?
13 A   No.
14 Q   You mentioned yesterday generally the process of making
15 appointments to see the dentist.  Do you recall that?
16 A   Yeah.
17 Q   So while you were experiencing these issues with your
18 Number 12 tooth, did you make appointment requests?
19 A   Yes.
20 Q   When would you make these appointment requests?
21 A   All the time, whenever I start experience what I was
22 experience.  Sometimes it was worser than others, and that's
23 why I had to go to the officer one day and tell her and she
24 called for me.
25 Q   How would you make the appointment requests?

Weaver - Direct (Resumed) by Meyer

1  A    I would just write it out on a piece of paper and put it in

2  the bars.  And when they come around to pick up the mail at

3  10:00 o'clock at night, they'll take that request as well.

4  Q    Would you ever make the same request back-to-back?

5  A    Yes.

6  Q    So just to -- could you unpack that a little bit?  How

7  often would you make a request?

8  A    One time I put like ten requests in the bars at one time,

9  just hoping one will make it to wherever it need to make it to.

10  Q    Did you have any reason to think that they wouldn't make

11  it?

12  A    Yes.

13  Q    What?

14  A    Because I done put requests in there before and never was

15  called.

16  Q    Once you requested these appointments -- and this is during

17  the treatment of your Number 12 tooth -- how long would it take

18  before they confirmed an appointment?

19  A    It depend.  It varies.  Like some times you could put one

20  request in and they'll get in touch with you right away.  Then

21  there's other times, you can put it in there and you going to

22  get nothing.

23  Q    And so when you were making these requests to have your

24  Number 12 tooth examined, how long would it take between the

25  time you made the request and the time you saw the dentist?

Weaver - Direct (Resumed) by Meyer

1    A    On what occasion?  Like some times was faster than others;

2    some times was slower than others.

3    Q    So on the shortest turn-around, what was your experience?

4    A    Maybe three days, two days, something like that, when it

5    was breaking, because I put it broke, so I guess it was like a

6    little more urgent, so I get over there a little faster during

7    the breaks.

8    Q    And when you were requesting it, on the long end, what was

9    your experience?

10   A    Anywhere from three months -- I mean three weeks to a

11   month.

12   Q    So anywhere from two days to a month.

13   A    Yeah.

14   Q    You mentioned yesterday you wouldn't know about the

15   appointment until the night before; is that correct?

16   A    Yes.  The day before.

17   Q    You also mentioned before that you have children?

18   A    Yes.

19   Q    What are their ages?

20   A    22 and 18.

21   Q    Do your family members come and visit you?

22   A    Yes.

23   Q    How far in advance do they have to plan their visits?

24   A    They doesn't.

25   Q    You came today to Chicago from Joliet, correct?

Weaver - Direct (Resumed) by Meyer

1   A   Yes.

2   Q   About how long did it take you to get here?

3   A   We on the road about 7:45 or 7:00, something like that,

4   7:30, something -- it was early.

5   Q   And what time did you arrive?

6   A   Maybe 10 minutes ago.

7   Q   So it took at least a couple hours.

8   A   Yes.

9   Q   So if your children were coming to visit you from Chicago

10   and they drove almost two hours to come and see you, the dental

11   office might tell you the day before that you have an

12   appointment the very -- just at the very same time, correct?

13   A   Yes.  I would have an appointment the day before.  And I

14   don't know if the visit come because the visit come

15   spontaneous.  I don't -- some visit be planned and some

16   doesn't.  Sometimes they just come.

17   Q   So then you would have to make a choice between seeing your

18   kids and going to the dentist.

19   A   Yes.

20   Q   Now, I'd like to talk a little bit about the appointment

21   card you would get the day before your appointment.

22         Have you ever been told by the dentist's office that

23   you missed an appointment?

24   A   No.

25   Q   Have you ever been told that you missed an appointment

Weaver - Direct (Resumed) by Meyer

1    card?

2    A    No.   What are those?   I never even seen them --

3    Q    Excuse me.   Perhaps I misunderstood.

4              How are you informed that you have the appointment?

5    A    Oh.   Through appointment -- it come on a piece of paper,

6    like a sheet of paper.

7    Q    I was referring to it as a card.   That's why --

8    A    Okay, okay.

9    Q    So have you ever not gotten an appointment card when you

10   had an appointment, to your knowledge?

11   A    No.

12   Q    Do you know what a refusal request is?

13   A    Yes.

14   Q    Have you ever received a refusal request?

15   A    No.

16   Q    Have you ever received a refusal request from Dr. Mitchell?

17   A    No.

18   Q    What is a refusal request?

19   A    When you don't -- when you refuse to go to health care or

20   medical treatment, refusing medical treatment.

21   Q    You've never filled one of those out.

22   A    Never.

23   Q    I'd like to fast-forward a little bit and go back to your

24   Number 12 tooth.

25             Were you eventually examined by a dentist outside of

Weaver - Direct (Resumed) by Meyer

1    Stateville?

2    A    Yes.

3    Q    For what reason?

4    A    To get my two wisdom tooth in the back pulled out.

5    Q    Do you remember who that dentist was?

6    A    I believe he from Joliet Oral Surgeon.  I don't remember

7    his name.  Start with an S.  I don't remember his name, though.

8    Q    When did you see him?

9    A    July of last year.

10   Q    Did Dr. -- did the doctor from Joliet Oral Surgeons, did he

11   examine you?

12   A    Yes.

13   Q    What did he tell you when he examined you?

14   A    Number 12 tooth --

15           MR. STALEY:  Objection.  Hearsay.

16           THE COURT:  For what the doctor said to him?  No, so

17   it's not hearsay for purposes of medical treatment.  Those

18   discussions come in.  It's an exception to the hearsay rule.

19           Go ahead.

20   BY MR. MEYER:

21   Q    I'll put the question again.

22           What did Dr. Scheive say to you when -- excuse me, the

23   doctor from Joliet Oral Surgeons, what did he say to you when

24   he was examining you before removing your wisdom teeth?

25   A    He did a whole scan of my mouth, and he told me that Number

Weaver - Direct (Resumed) by Meyer

1    12 is infected, because I was explaining to him about the
2    problems about the numbness and the tingling feeling, and he
3    said it was infected.
4    Q    Let's unpack that a little bit.
5         You said he did a scan of your mouth.
6    A    Yeah, I was standing up, and they put something, and it
7    went around.
8    Q    Was it an x-ray machine?
9    A    Yeah, like an x-ray machine.
10   Q    Did you describe to him the symptoms you were experiencing,
11   the sensations you were experiencing in your Number 12 tooth?
12   A    Yes.
13   Q    What did you describe to him?
14   A    The tingling, numbness, uncomfortability, you know, the
15   funny feeling that was in that area, because I -- I noticing
16   that.
17   Q    And he diagnosed you with an abscess.
18   A    Yes.
19   Q    Did he recommend a course of treatment?
20   A    Yes.
21   Q    What did he recommend?
22   A    Pulling it out, the root, taking the root out.
23   Q    Did you consent to that course of treatment?
24   A    Yes.
25   Q    Did you sign a consent form?

Weaver - Cross by Staley

1   A    Yes.

2   Q    Did he then remove the tooth?

3   A    Yes.

4   Q    Did those symptoms you were experiencing go away --

5   A    Yes.

6   Q    -- after the removal of the tooth?

7   A    Immediately.

8   Q    Thank you.

9            MR. MEYER:  Your Honor, no more questions.

10           THE COURT:  Okay.  Cross-examination.

11           MR. STALEY:  Yes, Judge.

12                        CROSS-EXAMINATION

13  BY MR. STALEY:

14  Q    Good morning, Mr. Weaver.

15  A    Good morning, sir.

16  Q    Mr. Weaver, starting at the beginning, at the time of the

17  allegations that are the subject of this lawsuit, you were

18  incarcerated at Stateville for a 2003 felony conviction,

19  correct?

20  A    Yeah.  It was more 2005.

21  Q    2005?

22  A    Yes.

23  Q    And, Mr. Weaver, you're not a licensed dentist, are you?

24  A    No.

25  Q    Do you have any dental training at all?

Weaver - Cross by Staley

1   A    No.

2   Q    Any training on how to fill a cavity?

3   A    No.

4   Q    Or extract a tooth?

5   A    No.

6   Q    How to perform a root canal?

7   A    No.

8   Q    And before the root canal on your Number 5 tooth, I believe

9   you stated you had never had a root canal before, right?

10  A    True, correct.

11  Q    Focusing on your Number 12 tooth, I believe you stated

12  yesterday and again today that after you received a filling in

13  this tooth due to a cavity, you started having temperature

14  sensitivity?

15  A    Yes.

16  Q    And you said after you started experiencing this, you put

17  in a request slip to be seen by the dental department, correct?

18  A    Yes.

19  Q    Just to be clear, the filling that you got in reference to

20  this cavity, Dr. Mitchell did not perform that procedure,

21  correct?

22  A    On Number 5?

23  Q    On the Number 12.

24  A    No, Number 12 she did every -- no, no, no.  I'm sorry, I'm

25  sorry.  No, she did not.  I'm sorry.

Weaver - Cross by Staley

1   Q    But after you started experiencing this sensitivity and you

2   were -- you put in the request, you did see Dr. Mitchell,

3   correct?

4   A    Yes.

5   Q    And on this date that you saw Dr. Mitchell, it's your

6   testimony that she didn't explain to you anything about a root

7   canal; is that correct?

8   A    Correct.

9   Q    I believe you stated almost verbatim that she just put you

10  in the chair and started drilling?

11  A    Yes.

12  Q    And there was no discussion at all until you asked after

13  the fact; is that correct?

14  A    Yes, yes.

15  Q    Mr. Weaver, do you recall your deposition being taken --

16  A    Yes.

17  Q    -- in relation to this lawsuit?

18  A    Yes.

19  Q    Would that be around August 18th of 2016?

20  A    Around that time.

21  Q    And during that deposition, do you recall being asked the

22  question:

23          "Question:  Did anybody tell you that as a result of

24  the fillings, that's why you needed a root canal?

25          "Answer:  Ms. Mitchell.  After the cavity you're

Weaver - Cross by Staley

1   speaking of, right?"

2   A   Yes.

3   Q   "Question:  Yeah."

4           I believe you then elaborated on your answer and said:

5           "Because the cavity was done, this filling was done

6   completely, then I start with the hot and cold and it's

7   painful.  So when I went and put it again to go up there, I

8   went to Dr. Mitchell.  Dr. Mitchell examined my mouth, and she

9   said this is your problem."

10          The question was:  "And she -- and she said your

11  pulpa?"

12          And you answered:  "Was exposed to the drill.  I guess

13  she went too far and exposed and put the cavity and filling

14  right on top of the nerve.  That's what gave me the

15  sensitivity, so that's why she said I needed the root canal."

16          Do you recall giving that answer?

17  A   Yes, but you left some of the things out, though.  You

18  can't say the other dentist's name?  Because she told me the

19  other dentist name.

20  Q   The other dentist's name wasn't Dr. Mitchell, correct?

21  A   Correct.  So she was telling me like she was correcting the

22  problem that a previous dentist did.

23  Q   But according to this testimony, Dr. Mitchell did tell you

24  why you needed a root canal, correct?

25  A   No.  I don't recall that.  I don't recall that.

Weaver - Cross by Staley

1    Q    Isn't that what you said in your deposition?

2    A    That's what you saying it said, but I don't have it in

3    front of me.  I would -- you know, can you refresh my memory?

4    Because I don't -- I don't -- I don't remember saying that

5    verbatim.

6    Q    Would your memory be refreshed if you saw a transcript of

7    your deposition?

8    A    Yes, yes.  That might have been misspoke.

9         (Tendered.)

10   BY MR. STALEY:

11   Q    Read it to yourself and let me know when you're finished.

12   A    Yeah.  I mean, I don't -- I don't -- to this -- right now,

13   I only knew what a pulpa is, but -- I was just going off what

14   her expertise of what she was telling me.

15   Q    Did that refresh your recollection?

16   A    Yes.

17   Q    So you recall in your deposition saying that Dr. Mitchell

18   examined your mouth and then told you that because of the

19   procedure that had gone on with the filling, you needed a root

20   canal.

21   A    I think that was misspoken.  That wasn't said to me.

22   Q    You misspoke at your deposition?

23   A    I had to, because my recollection, no, she didn't say that

24   she was doing a root canal, because I wouldn't have allowed

25   that, because she already told me they don't do the full root

97

1    canal at Stateville, so I knew what that was going to lead to.

2    So if she would have told me, "Hey, I'm going to do a root

3    canal," I would have said, "No, I'm straight, I'm going to deal

4    with the pain," because I didn't want to loose another tooth.

5    So I -- ain't no way in the world I would have let her do a

6    root canal when I already know she can't do the full procedure.

7    And I learned that from Number 5.  So either I misspoke then

8    or -- I don't know what was going on, because they did that

9    deposition in the jail, and I don't know what I was doing in

10    the process of that.

11    Q    How do we know you're not misspeaking today?

12    A    I mean, you got to tell from my demeanor.  I mean, I don't

13    know how to -- I'm not a -- I don't know.

14    Q    Okay.  Mr. Weaver, so it's your testimony that you were

15    given the root canal, and you did not want the root canal; is

16    that correct?

17    A    Yes, that's exactly what I'm saying.

18    Q    But you wanted to keep your tooth, correct?

19    A    Yes.

20    Q    Are you aware that in order to keep your tooth, a root

21    canal was necessary?

22    A    No.  Not at that time.  I didn't had cavities before.  I

23    got a cavity that was filled about back in 1992 that I'm not --

24    I have no problem with to this very day.  And it didn't require

25    a root canal and all that.

Weaver - Cross by Staley

1   Q   But that was a cavity, correct?

2   A   Yes.

3   Q   Not a root canal --

4   A   The same thing they told me -- that was a cavity.

5           COURT REPORTER:  Would you repeat that?

6   BY THE WITNESS:

7   A   The same thing the dentist at Stateville told me I had in

8   Tooth Number 12 was a cavity.  That's it.  Nothing more,

9   nothing less.

10  BY MR. STALEY:

11  Q   I believe you also testified earlier that you had never

12  refused dental services?

13  A   That's true.

14  Q   Is that correct?

15  A   Yes.

16  Q   Do you recall anybody at the dental department in

17  Stateville ever informing you that your tooth needed to be

18  extracted, your Number 12 tooth?

19  A   No.

20  Q   Never?

21  A   After the fact, after it got to breaking up 15 different

22  times, when the tooth was no longer able to be cemented back

23  together, of course it was -- as a matter of fact, I lost a

24  whole piece of it, so I only had one piece flapping, so --

25  Q   And at that time they told you it needed to be extracted?

Weaver - Cross by Staley

1   A   Yes.

2   Q   Did you refuse that treatment?

3   A   Why would I?  I mean, it was irritating.  It was painful at

4   that point, so it was no more tooth left, so why would I keep

5   it in my mouth?

6   Q   So is it your testimony that when they -- "they" being the

7   dental department at Stateville -- advised you that your tooth

8   needed to be extracted, you immediately agreed to that?

9   A   Not the whole -- it was the broken part.  They didn't

10  extract the tooth at Stateville.  The teeth broke, and they

11  just took the pieces of the broke tooth out.  The root stayed

12  in.

13  Q   I understand the tooth was not extracted at Stateville.

14  A   Okay.

15  Q   My question is a little more specific.

16          If you agree that you were told that that tooth needed

17  to be extracted, is it your testimony that you immediately

18  agreed that you would have it extracted?

19  A   I'm kind of confused when you say that because I was never

20  told that until after the tooth had broken up so many times.

21  That's when the extraction word came about.  Before the tooth

22  was broken, I was never informed that it need to be extracted.

23  Q   Okay.  Once it broke and you were informed, is it your

24  testimony that you agreed to that extraction?

25  A   Yeah, the pieces that was hanging?  Yes.

Weaver - Cross by Staley

1  Q   Only the pieces that were hanging?

2  A   Yes.

3  Q   Not the root.

4  A   Not -- right.

5  Q   So you refused to have the root extracted?

6  A   I didn't refuse to do nothing.  I did what they wanted --

7  what she said she was going to do, pull -- take whatever was

8  bothering me out of the way.

9  Q   So it's your testimony that you were never informed that

10  the entire tooth, root and all, needed to be extracted?

11  A   Not at that time.

12  Q   At any time.

13  A   No.  No.

14  Q   You were never informed by anyone at Stateville Dental

15  Department that that's the procedure you needed to have done?

16  A   To have the root took out?

17  Q   Yes.

18  A   No, nobody has ever told me that because, as a matter of

19  fact, Number 5 still got the root in it right now.

20  Q   I'm just referring to Number 12.

21  A   Okay.

22  Q   Mr. Weaver, at some point in 2017, did you not inform

23  Stateville's Dental Department that you wanted dentures for

24  your Number 12 tooth?

25  A   No dentures.  Implants.

Weaver - Cross by Staley

1   Q    You never informed anyone of dentures.

2   A    I didn't want no dentures.

3   Q    Were you ever approved for dentures?

4   A    Yes, but I didn't want no dentures.  I mean, no, a few

5   times it was denied.  After I filed this suit, now they started

6   bringing me dentures and different things like that.

7   Q    So they just --

8   A    But before the suit, no, no dentures.

9   Q    Who is "they"?

10  A    Stateville, the dentist.

11  Q    So they just brought you dentures without you asking at

12  all?

13  A    I don't -- I don't -- when they asked me -- they didn't --

14  I don't -- when they -- they was telling me that if I don't

15  have something in that space, my teeth will start shifting.

16  And I didn't want that because I didn't want to have a crooked

17  smile or none of that.  So they said with dentures or this --

18  on Number 5, Number 5, they gave me a little thing that hold

19  the space.  It's like a, I guess if you want to call that a

20  denture, to hold that space so it wouldn't shift.

21  Q    Is that --

22  A    So that's what made me get the denture, yes.

23  Q    Is that also referred to as a partial?

24  A    Yes.

25  Q    Is that what you're familiar with?

Weaver - Cross by Staley

1  A   Partial, partial.

2  Q   And did you receive a partial for your Number 12 tooth?

3  A   Yeah, later -- later on -- actually, they put both of them

4  back together.  They say they don't do the single ones no more,

5  so they made like a mouth-guard that had a tooth for this one

6  and a tooth for that one.

7  Q   And you said that you were informed by Stateville Dental

8  that you needed this in order for your teeth not to move.

9  A   Yes.

10  Q   Are you wearing that partial today?

11  A   No.

12  Q   So you were informed of a course of treatment in order to

13  help your dental well-being, but you're not following that

14  treatment?

15  A   Because I can't talk with it.  You wouldn't even be able to

16  understand what I'm saying if I had it in right now.  And it

17  falls out.

18  Q   Now, going back to having the Number 12 tooth extracted,

19  you stated earlier that you were never informed that you needed

20  to have the entire root taken out of the Number 12; is that

21  correct?

22  A   That's correct.

23  Q   Didn't you have to have the entire root of the Number 12

24  taken out before you got that denture --

25  A   No.

Weaver - Cross by Staley

1    Q    -- or that partial?

2    A    No.

3    Q    You did not.

4    A    No.

5    Q    Did you receive that partial before the root was taken out?

6    A    Which one you talking about?

7    Q    Either.

8    A    Yeah, I got a partial -- the root still in 5.  I got the

9    partial with that.  I guess they came up with another rule

10   saying we can't give you that partial unless you get that root

11   took out.

12   Q    They came up with that rule?

13   A    I guess it was a rule, because they was denying me for a

14   partial for that side.

15   Q    Because you still had your root?

16   A    Yeah.  That's what they said.

17   Q    So you were told that you needed the root taken out.

18   A    This later on.  This maybe about right before I went out in

19   July of 2017, I was told around May, maybe April, like right

20   around that time, they were telling me I had to get it took out

21   in order to get the partial, so that was recently.  That wasn't

22   back in 2012, 2013, 2014, while all this stuff was going on.

23   Q    I understand the time frame, Mr. Weaver.  But I previously

24   asked if you had ever been told that you needed to take the

25   root out.

Weaver - Cross by Staley

1    A    Oh, okay.  I didn't hear you correctly on that.

2    Q    Now, Mr. Weaver, you explained earlier that before you

3    started having these problems in Stateville, you had no idea

4    what a post, core, and crown is; is that correct?

5    A    That's correct.

6    Q    And I believe you stated that though Dr. Mitchell told you

7    what the purpose is, you're still unclear as to what exactly

8    the procedure is; is that correct?

9    A    That's correct.

10   Q    So, Mr. Weaver, if you're unfamiliar with the

11   procedure -- strike that.

12        Mr. Weaver, do you know what a regular filling is?

13   A    Yes.

14   Q    Because you received that before?

15   A    Yes.

16   Q    Do you know that that is a restorative procedure?

17   A    I'm assuming so, because when you get a cavity filled, it's

18   to keep the tooth in -- healthy.

19   Q    So you agree that a filling that's put in a tooth, that's

20   to restore the tooth.

21   A    Yes.

22   Q    Mr. Weaver, you also testified that throughout the course

23   of your treatment on your Number 12 tooth, that you put in

24   several requests to be seen by the dental department; is that

25   correct?

Weaver - Cross by Staley

1    A    Yes.

2    Q    I believe you stated that sometimes it was 30 or 40

3    requests, sometimes 10 at a time; is that correct?

4    A    That's true.

5    Q    You don't have any copies of those requests; is that

6    correct?

7    A    Yes, I got some, a few.

8    Q    Did you bring them with you here today?

9    A    I think they was actually in the medical records.

10   Q    They're in the medical records?

11   A    I'm thinking.  I don't know.  I got some in my cell,

12   though, that I made a copy of.  I actually think some was filed

13   with my complaint, if I'm not mistaken.  I'm not sure, though.

14   Q    Are you aware that Stateville records requests that come

15   into the dental department?

16   A    They should.  I would hope so.

17   Q    You also stated during the course of your treatment on your

18   Number 12 tooth that it eventually broke; is that correct?

19   A    Yes.

20   Q    How many times did it break?

21   A    Before it was extracted?

22   Q    Just in general.

23   A    I want to say about four.

24   Q    Four different times?

25   A    Yes.

Weaver - Cross by Staley

1   Q    Did you see the dental department when it broke these four

2   times?

3   A    Yes.

4   Q    Each time?

5   A    Yes.

6   Q    Do you know the dates of these breaks?

7   A    Not off the top of my head.

8   Q    Do you know general time spans?

9   A    It had to be after the root canal that was done on Number

10  12.  So maybe 2013-ish, something like that, 2012, something

11  like that.  It was after the process had been completed.

12  Q    Do you know how long you went with your root canal before

13  the first break?  Do you know if it was a while?  Months?

14  Weeks?

15  A    Yeah, I got -- I got a -- I got a few months out of it.

16  Q    Okay.  So would it be fair to state that you didn't start

17  having these problems that you allege until late 2012?

18  A    That could be accurate.

19  Q    And is that the time that you started putting in these

20  requests that you're testifying to?

21  A    Yes, once it broke for the first time.

22  Q    Mr. Weaver, you've had several procedures on this Number 12

23  tooth at this point.

24          I believe you testified earlier that you received

25  bi-annual cleanings?  Once every two years, your teeth are

Weaver - Cross by Staley

1  cleaned, correct?

2  A    Yes.

3  Q    You received partial or a denture for this Number 12 tooth?

4  A    That didn't fit, yes.

5  Q    You received a root canal?

6  A    In 12, yes.

7  Q    You got fillings before that root canal?

8  A    One filling.

9  Q    You only had one filling on the Number 12 tooth?

10 A    Yes.  And after the filling, that's when they started doing

11 root canal.

12 Q    Do you know how many cavities you had in the Number 12

13 tooth?

14 A    They say that just that one cavity, whatever it was.

15 That's why they did the filling to begin with to start it off.

16 Q    So all these procedures we just discussed, have you been

17 billed for any of those procedures?

18 A    No, sir.

19 Q    The last thing I want to talk about, Mr. Weaver, is the

20 pain you testified to.

21       I believe you said that after the root canal procedure

22 was finished, you no longer had pain, but you said it was a

23 numbing sensation?

24 A    Yes.  An uncomfortable feeling, like in between -- I want

25 to say it wasn't no -- no pain there.  It was tolerable.  I was

Weaver - Cross by Staley

1    able to tolerate it.

2    Q    Now, when you had these sensations, this numbing feeling,

3    you were seen by Stateville Dental, correct?

4    A    Yes.

5    Q    Throughout this time period?

6    A    Yes.

7    Q    Dr. Mitchell is not the only doctor that you saw, correct?

8    A    When dealing with Number 12, she was.  After the first

9    dentist did the cavity, and she started doing everything else,

10   yes.  She primary dealing with Number 12.

11   Q    Primarily?  Or was she the only doctor?

12   A    I mean, doing the work, yes.  Yes.  Ain't nobody else go in

13   that canal but her.  Saffold, he end up doing something.  A

14   piece might have -- no, he end up doing some of the cement.  He

15   end up doing some of the cement work.  When it was cracking,

16   when she wasn't in, he would try to fix it, too.

17   Q    So let me -- I'm afraid my question may be confusing.  Let

18   me be a little bit more specific.

19        I'm not talking about just the root canal, but just

20   treatment on your Number 12 tooth at all.

21   A    Oh, no, I think somebody else.

22   Q    Dr. Mitchell is not the only doctor you saw, correct?

23   A    That's true.

24   Q    And when you were having these feelings of numbness, you

25   only saw Dr. Mitchell?  Is that your testimony?  Or did you see

Weaver - Cross by Staley

1   these other doctors as well?

2   A   One, there was -- I think Dr. Saffold, between them two --

3   he -- I just remember him telling me he doing an x-ray.  She

4   was busy that day.  I came in, she -- she told me to sit at a

5   certain chair, but he came over there and he the one did an

6   x-ray.  And that's when he gave me the penicillin.  But this

7   later on.

8   Q   Okay.

9   A   This is later on.

10  Q   Mr. Weaver, the dental records from Stateville, your dental

11  records from Stateville, would you have any reason to disagree

12  that they would accurately reflect who you saw on any given

13  day?

14  A   No, I think they would show who I saw on that day.

15          MR. STALEY:  Nothing further, Judge.

16          THE COURT:  Okay.  Any redirect?

17          MR. MEYER:  Yes, your Honor.

18          May we address a small evidentiary issue at sidebar?

19          THE COURT:  Sure.

20      (At sidebar outside the hearing of the jury:)

21          MR. MEYER:  This is Mr. Weaver's prior grievance, a

22  subject of a motion *in limine*.  You ruled that it would be

23  admissible as a prior consistent statement if his credibility

24  were attacked on the other ground.  So Mr. Weaver's credibility

25  has now been attacked, and I've highlighted the prior

Weaver - Redirect by Meyer

 1    consistent statements that he made that the root canal on his

 2    Number 12 tooth was performed without his consent.

 3            THE COURT:  Okay.  So the problem -- I don't mind it

 4    coming in as a prior consistent statement, but it's going to

 5    have to be cleared up with the jury instructions because it

 6    isn't a medical malpractice case and his consent or not is

 7    irrelevant in a deliberate indifference case.  So if it's just

 8    to show that he was truthfully saying that that's what he

 9    alleged before, it can come in for that limited purpose.  But

10    we're going to need a limiting instruction, and we're going to

11    need a jury instruction.

12            MR. MEYER:  May I confer with my co-counsel for just a

13    moment?

14            THE COURT:  Okay.

15        (Counsel conferring.)

16            MR. MEYER:  That's fine.

17            THE COURT:  Okay.  Very well then.

18            MR. STALEY:  We would just request that we have a

19    chance to question Mr. Weaver on this document only after they

20    have --

21            THE COURT:  Oh, sure.  You can get another cross, no

22    problem.

23        (Sidebar proceedings concluded.)

24                        REDIRECT EXAMINATION

25    BY MR. MEYER:

Weaver - Redirect by Meyer

1  Q   Mr. Weaver, I'm going to hand you a document that we've
2  marked as Exhibit 4.
3      (Tendered.)
4  BY MR. MEYER:
5  Q   You were just asked some questions on cross about your
6  deposition testimony.
7          Do you remember those questions?
8  A   Yes.
9  Q   And the questions focused on the issue of whether or not
10 you discussed the root canal with Dr. Mitchell before she began
11 performing it and before you gave consent to that procedure,
12 correct?
13 A   Correct.
14 Q   Do you recognize the document I just handed you?
15 A   Yes.
16 Q   What is it?
17 A   The grievance I wrote.
18 Q   You wrote this document?
19 A   Yes.
20         MR. MEYER:  Move to admit, your Honor.
21         THE COURT:  Well, it's being offered for a prior
22 consistent statement, so it's actually not admitted.  You can
23 display it, and then we'll discuss about whether it's admitted,
24 okay?
25         MR. MEYER:  Thank you, your Honor.

Weaver - Redirect by Meyer

1            THE COURT:  Do you want to use the camera?

2            MR. MEYER:  Yes, if I may publish.

3            THE COURT:  All right.  Sure.

4    BY MR. MEYER:

5    Q   So, Mr. Weaver, if you could read along with me.  You have

6    it in your hands, but I've also highlighted the portion of the

7    language.

8            Could you read the highlighted language for me,

9    please?

10           Can you see it there on your screen?

11   A   Yes.

12           "Dr. Mitchell inform me after she had started the

13   second root canal, without my consent, that the reason my first

14   tooth cracked and broke was because I needed a post and a crown

15   after all root canals because the tooth, the root canal one,

16   becomes weak and brittle."

17   Q   And it says "without my consent" there, it's over the line,

18   but that says "without," correct?

19   A   Yes.

20   Q   And she informed you at that time that you needed a post

21   and a crown.

22   A   Yes.

23   Q   Because your tooth would become weak and brittle.

24   A   Yes.

25   Q   Okay.  And that line continues on the next page, so if we

Weaver - Redirect by Meyer

1   can pick that up.  "It becomes weak and brittle," arrow -- if

2   you would read along, please?

3   A    "Due to the fact the root canal surgery kills the nerve in

4   the tooth, so the tooth" --

5   Q    And we'll stop there.  But is that what Dr. Mitchell told

6   you?

7   A    Yes.

8   Q    I'd like to turn to the next page of the document.  It's

9   the third page, if you have it in your hand.  I've highlighted

10  it again.

11         Could you please read the highlighted language for me

12  again?

13  A    "Dr. Mitchell recommended a root canal on the first one,

14  the right side of my mouth, and Dr. Mitchell just done the one

15  on my left side without asking me or telling me what she was

16  doing or getting my permission or consent."

17  Q    Thank you.

18         Mr. Weaver, I'm also going to hand you a copy of your

19  deposition testimony.

20  A    Okay.

21       (Tendered.)

22  BY MR. MEYER:

23  Q    And --

24              THE COURT:  Why are you doing that?

25              MR. MEYER:  Excuse me, your Honor.  For the same

Weaver - Redirect by Meyer

1    purpose.

2              THE COURT:  Okay.

3    BY MR. MEYER:

4    Q    Mr. Weaver --

5              MR. MEYER:  And, Counsel, if you would like to follow

6    along, I'm on page 120 of the deposition testimony.

7              Your Honor, may I publish this as well?

8              THE COURT:  I hope so.  I hope it's the same thing,

9    but I don't --

10             MR. MEYER:  It's the same thing.

11             THE COURT:  I wasn't given a copy.

12             MR. MEYER:  I have a copy for you.

13             THE COURT:  Okay.

14        (Tendered.)

15             THE COURT:  Thank you.

16             MR. MEYER:  Excuse me.

17        I'll give the Court a moment to review.  It's page

18   120, line 16.

19             THE COURT:  Okay.  Go ahead.

20             MR. MEYER:  Thank you, your Honor.

21             MR. STALEY:  We would have an objection.  We would

22   request a sidebar.

23             THE COURT:  Yes, I know what your objection is, and

24   I'll make an instruction regarding it.  I think I'm -- I think

25   I can preview it.

Weaver - Redirect by Meyer

1          Go ahead.

2          MR. MEYER:  Thank you, your Honor.  May I publish?

3          THE COURT:  You may.

4     BY MR. MEYER:

5     Q    Mr. Weaver, this is the same deposition that you were

6     describing before on cross, correct?

7     A    Yes.

8     Q    And beginning at line 16, were you asked:

9          "What specifically about that root canal" -- this is

10    the root canal of the Number 12 tooth, "was deliberately

11    indifferent to your serious medical needs?"

12         And what was your answer?

13    A    "This is the beginning of the root canal.  That's the first

14    time they started performing it.  She done it without my

15    consent and before when I realized what she was doing, she had

16    already went off in it and drilled up in it -- because it was a

17    cavity at first, the filling of a cavity, so she had to go in

18    and take the cavity out that was placed in there and then

19    started doing what she was doing.  Like she really wasn't

20    informing me of what she was doing at that moment."

21    Q    All right.  And then I'll interrupt here.

22         That was your testimony.

23    A    Yes.

24    Q    And then you were asked a follow-up question, which was:

25         "Was anything about the quality of the root canal and

Weaver - Redirect by Meyer

1    how it was done, is that -- that doesn't form the basis of your

2    complaint, it's just the fact that you were not informed?"

3          And what was your answer?

4    A    "Both, it's both.  It was both because when they started

5    drilling, I was upset that she was doing it without my consent,

6    and then she start -- she actually had to shoot me again with

7    some numbness because it was hurting me, so she had to shoot me

8    again for numbness and start -- and she started going there."

9    Q    And that was your testimony at that same deposition you

10   read on cross, correct?

11   A    Yes.

12   Q    Thank you.

13         THE COURT:  Okay, folks, let me give you a little bit

14   of direction on that, what you just heard.

15         The back and forth there was to go to the credibility

16   of what Mr. Weaver said to you.

17         First, they used the term "deliberate indifference,"

18   which is a legal term.  I'm the one who is going to tell you

19   what it means, so his definition of what it means about lack of

20   consent and how she performed it is not -- you can't accept

21   that.  You're the finder of fact.  You're going to look at the

22   law that I give you.  You're going to listen to what he said

23   and what happened, and you're going to make your own

24   independent determination.

25         Secondly, I'll give you an instruction at the end

Weaver - Redirect by Meyer

1   regarding consent, because we're not in a situation talking

2   about medical malpractice; we're in a deliberately indifferent

3   situation, which is entirely different.  I'll give you the law

4   on that later.  Okay?

5           Go ahead.

6           MR. MEYER:  Thank you, your Honor.

7   BY MR. MEYER:

8   Q   Mr. Weaver, you were also asked some questions on cross

9   about other dentists at Stateville.

10  A   Yes.

11  Q   There are other dentists at Stateville.

12  A   Yes.

13  Q   Who performed a root canal on your Number 12 tooth?

14  A   Dr. Mitchell.

15  Q   Who started the root canal?

16  A   Dr. Mitchell.

17  Q   Who started the root canal without your consent?

18  A   Dr. Mitchell.

19  Q   Who told you that that tooth required a post and a crown?

20  A   Dr. Mitchell.

21  Q   Who told you it would break without one?

22  A   Dr. Mitchell.

23  Q   Who told you that the tooth was no longer restorable once

24  it broke?

25  A   Dr. Mitchell.  Wait, I want to back up.

Weaver - Recross by Staley

1          When it broke, in the beginning, they didn't say it

2     wasn't salvageable when it broke in the beginning.

3     Q    So when did you learn that?

4     A    When it kept breaking.

5     Q    And who told you that?

6     A    Saffold and Dr. Mitchell.

7     Q    Thank you.  No more questions.

8               THE COURT:  Recross.

9               Oh, I take it that was your objection, right?

10              MR. STALEY:  It was, Judge.

11              THE COURT:  Go ahead.

12                       RECROSS-EXAMINATION

13    BY MR. STALEY:

14    Q    Mr. Weaver, I want to turn back to the grievance that

15    counsel had showed to you.

16              Are you able to see that in front of you, sir?

17    A    Yes.

18    Q    Can you tell me the date of this grievance?

19    A    February 4th, 2013.

20    Q    And you wrote this on February 4th?

21    A    Yes.

22    Q    I want to turn to the second page.

23              As part of this grievance, the highlighted portion

24    here, you state that this is one of the instances in which your

25    tooth cracked and broke; is that correct?

119

Weaver - Recross by Staley

1    A    Yes.

2    Q    Is that what is noted in the highlighted portion?

3    A    Yes.

4    Q    And you also state that during this time, you've written 10

5    to 15 request slips, but nothing has been done; is that

6    correct?

7    A    Correct.

8    Q    And you say it's been three weeks since your tooth has

9    broke?

10   A    That was true.

11   Q    So if this is dated February 4th of 2013, that would put

12   the time frame in which you allege your tooth to break sometime

13   in early January; is that correct?

14   A    This was more like an estimate, though.  I don't think the

15   dates was accurate.  I didn't pinpoint the dates like -- okay,

16   I'm just saying roughly it been three weeks, I wrote 10 to 15

17   request slips.

18   Q    And that's all I'm attempting to do, Mr. Weaver.  If you

19   said it's been roughly three weeks, that would mean sometime in

20   probably early January is when you're referring to.  Would that

21   be a correct statement?

22   A    Yeah.

23        MR. STALEY:  Nothing further, Judge.

24        THE COURT:  Okay.  Anything on that?

25        MR. MEYER:  No, your Honor.  Thank you.

Dr. Scheive - Direct by Parthum

1      THE COURT:  Then you can step down, Mr. Weaver, and
2  rejoin the table.
3      (Witness excused.)
4      THE COURT:  And then you can call your next witness.
5      How are you doing?  Does anyone need a break?
6      (Shaking of heads.)
7      THE COURT:  We'll go a little bit longer before the
8  break.
9      MS. PARTHUM:  Your Honor, the plaintiff calls Dr. Glen
10  Scheive.
11      THE COURT:  Okay.
12      (Witness enters courtroom.)
13      THE COURT:  Please raise your right hand.
14      (Witness duly sworn and takes the stand.)
15      THE COURT:  All right.  Have a seat.
16      And you may proceed.
17       DR. GLEN SCHEIVE, PLAINTIFF'S WITNESS, SWORN
18                    DIRECT EXAMINATION
19  BY MS. PARTHUM:
20  Q   Good morning, Dr. Scheive.
21  A   Good morning.
22  Q   Can you hear me okay?
23  A   Very well.
24  Q   Would you please introduce yourself to the jury?
25  A   My name is Dr. Glen Scheive.  I'm an oral and maxillofacial

Dr. Scheive - Direct by Parthum

1    surgeon in the State of Illinois, and I have a practice in

2    Joliet, Illinois.

3    Q    Dr. Scheive, are you acquainted with Mr. Wendell Weaver?

4    A    Yes, I am.

5    Q    How did you become acquainted with him?

6    A    We have a contract with the state penal system that we

7    perform procedures that are beyond the capability of the

8    dentists at the penal areas or at the different prisons.

9    Q    So you saw Mr. Weaver as a patient?

10   A    I did get to see Mr. Weaver as a patient, correct.

11   Q    I'd like to back up for a moment and talk about your

12   education and training.

13   A    Sure.

14   Q    Would you please tell the jury about any educational

15   degrees you received after high school?

16   A    Yes.  I went to Loyola University on the north side here in

17   Chicago and got my B.S. Degree.

18        After that, I went to Maywood, Illinois, Loyola, and

19   received a D.D.S., Doctor of Dental Surgery.

20        And then I went onto specialty for oral and

21   maxillofacial surgery at Loyola also under a four-year program.

22   Q    And was that specialty you were just referring to, was that

23   your residency?

24   A    Correct.  Residency is part of that.

25   Q    What type of work did you do during your residency?

Dr. Scheive - Direct by Parthum

1   A    We do oral and maxillofacial, so it means everything in the

2   mouth, everything on your cheeks, everything basically between

3   your eyeballs and your neck.

4   Q    Does that include dental surgery?

5   A    Yes, it does.

6   Q    What did you do after you completed your residency?

7   A    After I completed my residency, I taught at Loyola for ten

8   years in the oral and maxillofacial surgery department, and

9   then set up a private practice in the western suburbs with a

10  partner.

11  Q    Are you still practicing in private practice?

12  A    Yes, I am.

13  Q    So how long have you been a practicing dentist?

14  A    37 years.

15  Q    So I'd like to turn back now to your treatment of

16  Mr. Weaver.

17          How did Mr. Weaver come to be a patient of yours?

18  A    We have a contract at that facility with the jail.  And if

19  a patient is deemed to have work that is beyond their

20  capability or that they want to tackle, they will refer it out

21  to us on an as-needed basis.  Mr. Weaver came to us --

22  Q    If you're looking for a date, I can refresh you on that --

23  A    I am looking --

24  Q    -- in just a moment.  You can set that down, and I'll bring

25  you over an exhibit in just a moment.  Thank you.

Dr. Scheive - Direct by Parthum

1    When a prison inmate comes to you as a patient, do

2    they typically bring some type of referral paperwork with them?

3    A   Yes.  The referral paperwork comes to us maybe a day early,

4    faxed over, so that we can set up -- or they can set up

5    transportation and we can set up time.  And then that paperwork

6    will also be repeated when the inmate shows up at our location.

7    Q   Did you get any type of paperwork in connection with your

8    treatment of Mr. Weaver?

9    A   Yes, I did.

10   (Tendered.)

11   BY MS. PARTHUM:

12   Q   Dr. Scheive, I'm handing you what has been previously

13   marked Exhibit 2.  Do you recognize this?

14   A   Yes.

15   Q   What is it?

16   A   It's a compilation of paperwork that we either generated at

17   our office or that came to us from the prison.

18   Q   What patient does this paperwork pertain to?

19   A   Wendell Weaver and his inmate number on it.

20   Q   Dr. Scheive, are you responsible for making and maintaining

21   dental records at Joliet Oral Surgeons?

22   A   Yes, I am.

23   Q   Are those records made and kept as part of the regular

24   business of Joliet Oral Surgeons?

25   A   Yes, they are.

Dr. Scheive - Direct by Parthum

1  Q   Are those records made at or near the time of the events
2  that are recorded in them?
3  A   Yes, they have been.
4  Q   Are the records made by a person with firsthand knowledge
5  of the information recorded in them?
6  A   Yes.
7  Q   Is Exhibit 2 an example of such a record?
8  A   Yes, I would say so.
9  Q   Is this in the same or substantially the same condition as
10 maintained at your office?
11 A   Yes.
12         MS. PARTHUM:  Your Honor, the parties have stipulated
13 to the admissibility of this exhibit, and we move it into
14 evidence.
15         THE COURT:  Okay.  It will be admitted then.
16      (Said exhibit received in evidence.)
17 BY MS. PARTHUM:
18 Q   Dr. Scheive, you were just talking about a referral form
19 that you received for Mr. Weaver.  Do you see that form in this
20 packet?
21 A   Yes.
22 Q   Which page is it?
23 A   Of course, the last page.  Page 12.
24         MS. PARTHUM:  Permission to publish, your Honor?
25         THE COURT:  You may.

125

Dr. Scheive - Direct by Parthum

1   BY MS. PARTHUM:

2   Q   Dr. Scheive, can you tell from this form the date of

3   Mr. Weaver's appointment with you?

4   A   7/18/2017.

5   Q   Focusing just on the top third of this form, do you know

6   who filled that out?

7   A   That was probably filled out at the prison system.

8   Q   So that wasn't completed by someone within your office.

9   A   No.

10  Q   What information was conveyed by that top third portion of

11  the form?

12  A   It states Mr. Weaver's name; his ID; reason for the

13  procedure, which were extraction of teeth 17 and 32.  Referred

14  to us, Joliet Oral Surgeons.  And then it states:  Already

15  approved -- oh, on the date 4/3/17, on-site, needs off-site --

16  Q   I understand.  It's a little bit --

17  A   Patient, yeah, suffering pain, some swelling, partially

18  impacted 17 and 32, both -- something -- distally inclined.

19  Patient given penicillin -- oh, and acetaminophen, a pain

20  medication.

21  Q   Thank you.

22          Now, you mentioned that the reason Mr. Weaver was

23  referred to you was for the extraction of Numbers 17 and 32.

24  Which teeth are those?

25  A   They're lower wisdom teeth, the last teeth in the lower

Dr. Scheive - Direct by Parthum

1   right part of your jaw and the lower left part of your jaw.

2   Q   Would you please turn now to the page that's marked 7 in

3   the upper right-hand corner?

4        And I'll put that up on the screen in just a moment.

5        What is the general purpose of this form?

6   A   This is a form that's generated by Joliet Oral Surgeons to

7   keep track as to what the patient tells us, what we deem the

8   patient needs to have done, and then the actual procedures.

9   Q   So this is a form that would be completed by you or others

10  in your office?

11  A   Yes.

12  Q   Please look at the first handwritten line on this form at

13  the top.

14  A   Okay.

15  Q   What does that say?

16  A   It says SX, short for surgery, 17 and 32 with IV sedation.

17  That was probably entered by one of the staff in the office.

18  Then that's my writing that says Number 12 lost crown way back.

19  That's what Mr. Weaver related to me.  Appears abscessed.

20  Discussed its removal also.

21  Q   Okay.  So going back just to that first line, so surgery on

22  Numbers 17 and 32, that tracks the reason for referral that we

23  spoke about from the previous form --

24  A   Yes.

25  Q   -- is that right?

Dr. Scheive - Direct by Parthum

1    A    Yes.

2    Q    And then referring to the next line that you were just

3    reading about Number 12, how did that information come up

4    during the appointment?

5    A    After that first line and then approximately where it

6    states pain, medication, allergies, the assistant ascertained

7    that information and wrote it down.  They came back and told me

8    what Mr. Weaver was there to have done.  Then they took an

9    x-ray, and I then went to introduce myself to Mr. Weaver.

10   Q    And at that time did Mr. Weaver mention anything about his

11   Number 12 tooth?

12   A    Actually, I brought it up first.  I said what about that

13   tooth on the upper left side.  And that's when he said it used

14   to have a crown on it, but he lost it a long time back.

15   Q    So what caused you to bring it up first?

16   A    I noticed that the tooth was missing a crown and that it

17   appeared abscessing on the x-ray.

18   Q    What is an abscess?

19   A    Abscess is an infection in or about a structure.  In the

20   mouth, you typically would find it in and about teeth.

21   Q    Now, you mentioned that you detected the abscess by looking

22   at Mr. Weaver's x-ray?

23   A    Yes.

24   Q    Were you also able to detect anything when you performed a

25   visual inspection of his mouth?

Dr. Scheive - Direct by Parthum

1    A    Yes.

2    Q    What were you able to detect?

3    A    It was missing the crown on Tooth Number 12, and he said it

4    bothered him.

5    Q    Were there any other visual indications within his mouth

6    that there was an abscess on the Number 12 tooth?

7    A    I don't have any other clinical information as to typically

8    swelling, pus formation, things of that nature.

9    Q    So those are symptoms that a patient might experience as

10   the result of an abscess?

11   A    Yes.

12   Q    You mentioned that Mr. Weaver said the tooth was giving him

13   problems; is that right?

14   A    Yes.

15   Q    Do you remember anything else that he said about what type

16   of problems he was having?

17   A    Not anything more than -- I said how long have you lost the

18   crown?  And he said he lost it just a way back, he said for a

19   long time.

20   Q    Did Mr. Weaver complain of pain during the visit?

21   A    He said that tooth had bothered him.

22   Q    Did he give you a sense of how long he had been in pain?

23   A    I can only say three months, which is what's stated.  But I

24   don't know if the three months is for Tooth 17 and 32 or Tooth

25   Number 12.

Dr. Scheive - Direct by Parthum

1  Q    You also mentioned that you were able to identify the

2  abscess based on Mr. Weaver's x-rays; is that right?

3  A    Yes.

4  Q    How were you able to identify the abscess from an x-ray?

5  A    When an abscess forms -- or to form an abscess, typically

6  bone is melted away by the infection.  The longer it stays

7  there, the more bone it melts away, so you see a darker area

8  about the tooth.  So that's what I picked up on Mr. Weaver's

9  x-ray was this darker area about the tooth itself.

10  Q    Dr. Scheive, I've just handed you what has been marked

11  Exhibit 7.  Do you recognize this?

12  A    Yes.

13  Q    What is it?

14  A    It's a panorex x-ray of Mr. Weaver's mouth that we took on

15  7/18/2017.

16  Q    Does that x-ray fairly and accurately depict the condition

17  of Mr. Weaver's teeth as of the date of his appointment in July

18  2017?

19  A    Yes, it does.

20  Q    Is that x-ray in the same or substantially the same

21  condition as maintained at your office?

22  A    Yes.

23         MS. PARTHUM:  Your Honor, at this time we move

24  Exhibit 7 into evidence.

25         THE COURT:  Okay.  It will be admitted.

Dr. Scheive - Direct by Parthum

1          No objection, right?

2               MR. STALEY:  No.

3               THE COURT:  Okay.

4          (Said exhibit received in evidence.)

5               MS. PARTHUM:  Permission to publish, your Honor?

6               THE COURT:  You may.

7    BY MS. PARTHUM:

8    Q   Dr. Scheive, bear with me for just one second while I try

9    to get this --

10              THE COURT:  So --

11   BY MS. PARTHUM:

12   Q   -- visible for you.

13              THE COURT:  I think there's a way that you're only

14   using the light underneath, isn't there?  You can use an

15   overhead light, and then I think you can use just the camera on

16   the -- you know, which might show it better.

17              MS. PARTHUM:  Okay.

18              THE COURT:  Is there -- take a look at the top.  No?

19              MR. MEYER:  There's -- your Honor, there's the light

20   button, but I think that that --

21              THE COURT:  Yeah.  Okay, it was my thought -- it was

22   my brilliant thought, but it doesn't look too brilliant right

23   now.

24          Okay, go ahead.

25   BY MS. PARTHUM:

Dr. Scheive - Direct by Parthum

1    Q   Is this okay for you if I leave it like this or would you

2    like it --

3    A   That's fine for me.

4            THE COURT:  Okay.

5    BY MS. PARTHUM:

6    Q   Okay, great.

7            Would you please explain to the jury generally what

8    portion of Mr. Weaver's mouth is reflected in this x-ray?

9    A   That just shows his entire upper jaw and his entire lower

10   jaw.  You can see all of his dentition.  You can see all the

11   way back to his condyles.  That's that jaw joint.  You can also

12   see his sinuses and his nasal apertures.

13   Q   Now, Dr. Scheive, I believe if you touch the lower right

14   corner of your screen, you'll be able to make a marking on

15   this, if you choose to.

16           Could you point out for us which is the Number 12

17   tooth?

18   A   (Demonstrating.)

19   Q   Thank you.

20           You said you were able to identify an abscess on the

21   tooth from this x-ray.

22           Would you please indicate to the jury what you

23   identified on the x-ray that caused you to conclude that the

24   tooth was abscessed?

25   A   If we had a little better resolution, you would look right

Dr. Scheive - Direct by Parthum

1  at the top of the tooth, and you would see it's a little

2  darker.  Consequently, this tooth is in the form of forming an

3  abscess, and it's melting away the bone around it.

4  Q   So it's a bit difficult for me to see the darker portion of

5  the tooth; but based on your experience, you saw something

6  sufficient to indicate to you that there was an abscess?

7  A   Yes.

8  Q   You mentioned -- could you just explain again why darkness

9  in an x-ray would be indicative of a bone -- bone loss?

10  A   Could you restate that?

11  Q   Sure, of course.

12        You mentioned that it was the darkness in the x-ray

13  that indicated to you that there was an abscess in this tooth;

14  is that right?

15  A   Yes.

16  Q   Could you just explain for us again the connection between

17  those two things:  The darkness in the x-ray and the abscess?

18  A   Okay.  The darkness in the x-ray just differentiates the

19  quality of the bone or the density of the bone.  When the bone

20  is being melted away or being removed, it tends to start losing

21  density, so it turns out to be a little darker than these very

22  white areas.

23        If you look at the x-ray, those white areas are

24  actually metal fillings, so they turn out to be very white,

25  very dense, whereas around Tooth 12, as well as this tooth down

133

Dr. Scheive - Direct by Parthum

1  here, Number 32, you see that black area behind the tooth.

2  That is bone loss from that cyst around Tooth 32.

3  Q    Now, how can an abscess cause bone loss?

4  A    An abscess causes bone --

5           MR. LUPINACCI:  Objection, Judge.  Motion *in limine*.

6           THE COURT:  Oh, we're going -- you're going to have to

7  remind me of it because for some reason it's not clicking in.

8  Sometimes that happens, too.  I have a few hundred cases.

9           So let's find that out.  Sidebar, please.

10     (At sidebar outside the hearing of the jury:)

11           THE COURT:  What was the motion?

12           MR. LUPINACCI:  We filed a motion *in limine* to bar any

13  expert opinions on the basis of failure to disclose under

14  Rule 26.

15           THE COURT:  Oh, because he's a treating doctor and not

16  a 702 witness, he wasn't disclosed.  That's right, that's

17  right.

18           MR. LUPINACCI:  He's done great so far in just being

19  factual and sticking to his treatment --

20           THE COURT:  You're right.

21           MR. LUPINACCI:  -- but when it comes to cause --

22           THE COURT:  You're absolutely right.  Thank you for

23  reminding me.  It's been a while.  I forgot.  That's true.

24           So go back -- back off from that -- sorry, it's you.

25           Look at your shoes from the weather.

Dr. Scheive - Direct by Parthum

1      MR. MEYER:  I tried to get them in the bathroom, and
2  it reappears.
3      THE COURT:  I'll give -- my law clerk will give you
4  one of these wonderful little things that we buy at Walgreens
5  to spiff ourselves up.
6      Okay.  So that's granted, that motion.
7      All right.  Thank you.
8  (Sidebar proceedings concluded.)
9      THE COURT:  So the objection is sustained, so please
10  do not answer that question.
11      And to the extent -- was there anything on the record?
12  Let me check.
13      Okay.  So there was an answer that says, "An abscess
14  causes bone loss," and I'm striking that from your review.
15      And you may continue.
16  BY MS. PARTHUM:
17  Q   Dr. Scheive, after you discovered Mr. Weaver's abscess,
18  what did you do?
19  A   I talked to Mr. Weaver about removing Tooth Number 12, as
20  well as 17 and 32.
21  Q   Did he agree with the removal of those teeth?
22  A   Yes, he did.
23  Q   I'm going to put back up the records that we were looking
24  at a moment ago and clear this marking.
25      So looking back at your notes from the visit, about

Dr. Scheive - Direct by Parthum

1   halfway down the page, the writing, the handwriting changes, so

2   about right around here.  Is that your handwriting?

3   A   Yes, it is.

4   Q   Would you read that, please?

5   A   It says temperature 98.6, so his temperature is normal.  He

6   was on an antibiotic for the abscess, so we could proceed

7   without much fear of spreading the infection.  Patient

8   requested 12, 17, and 32.  We discussed the surgery post-op.

9   possibilities and complications, and the consent was reviewed

10  and signed by Mr. Weaver.

11  Q   Is it your standard practice to have patients sign a

12  consent form for dental surgery?

13  A   Yes, it is.

14  Q   Why?

15  A   We want to get --

16          MR. LUPINACCI:  Objection, Judge.  Motion *in limine*.

17          THE COURT:  Right.  So I think this is going to go to

18  this other issue.

19          I think what we're going to do as a result of it being

20  a more complicated issue is let's take a morning break right

21  now.  Okay?  So 10 or 15 minutes.  And then we'll come back

22  out.  And we'll go about another hour and have lunch then, all

23  right?

24          COURT SECURITY OFFICER:  All rise.

25      (Jury out at 11:40 a.m.)

Dr. Scheive - Direct by Parthum

1          THE COURT:  You can step down, sir.

2          Why don't you step out of the courtroom so we can have

3     this discussion, to not influence you.

4          The rest of you can be seated.  And you can come over

5     to the lectern to argue this point.

6     (Witness exits courtroom.)

7          THE COURT:  Okay.  So the big issue we had was whether

8     or not we're kind of going down this medical malpractice claim

9     and what my jury instructions are going to say regarding it.

10         So do you -- is your objection that his consent can

11    never be considered by this jury at all, or his lack of

12    consent, because it's a deliberate indifference claim?

13         MR. LUPINACCI:  That's right.  That's the source of

14    the motion *in limine* with respect to informed consent.  This is

15    not a negligence case, it's confusing, it's deliberate

16    indifference, and it's a different standard.

17         The objection made right now is really for two

18    reasons:  One, that motion *in limine*; and the other one barring

19    expert opinions.

20         THE COURT:  Like a standard of care.

21         MR. LUPINACCI:  Exactly.

22         THE COURT:  Okay, yeah.

23         MR. LUPINACCI:  So with Dr. Scheive, according to

24    motion *in limine* Number 8 --

25         THE COURT:  Oh, yeah.

Dr. Scheive - Direct by Parthum

 1          MR. LUPINACCI:  -- can't take the stand and say what

 2   informed consent process should be given.

 3          THE COURT:  Okay.  All right.  And response?

 4          MS. PARTHUM:  The question wasn't directed to

 5   eliciting a standard of care, but simply to asking him for his

 6   own practice why that was his general practice to obtain

 7   consent.

 8          THE COURT:  No, I think that -- that's not the way it

 9   came out.  The way the practice -- the way the question was

10   phrased -- let's see.  Is your -- okay, your standard practice

11   to have patients -- it definitely gives the implication that

12   the standard of care for him as a good dentist is that he gets

13   consent.

14          But this whole consent issue really keeps coming up as

15   a red herring, and I'm worried that you're going to be -- I

16   mean, they're very capable of responding to it under the law,

17   but you -- I'm worried about where you're going to head with it

18   in your closing arguments as far as argument is concerned.

19          Are you going to argue to this jury that Dr. Mitchell

20   was deliberately indifferent to him in part because she never

21   sought his consent and that that is somehow a violation of his

22   constitutional rights?

23          And if so, where is the case law on that?  Where do

24   you find that in any of the literature that we've been

25   discussing regarding the case?

Dr. Scheive - Direct by Parthum

1      MR. MEYER:  Your Honor --

2      THE COURT:  I was asking her because it's her witness,

3  but then you can come in if you want.

4      MR. MEYER:  I'll be delivering the closing, so I can

5  probably better address the --

6      THE COURT:  Okay.  Let's give her a shot first, okay?

7      MS. PARTHUM:  Your Honor, we do believe that the issue

8  of consent is important and is relevant for the jury to

9  consider.  I'm not exactly sure how Mr. Meyer plans to argue it

10 in closing argument, but --

11     THE COURT:  Okay.  Very well.

12     Now go ahead.

13     MR. MEYER:  So the issue of lack of consent by itself

14 does not support a deliberate indifference claim.  But what

15 we're going to show later on in the case is that the defendants

16 had reason to believe not only that Mr. Weaver would have

17 consented to the -- knowing that he didn't consent in the

18 moment, but the defendants had reason to believe and to know

19 that Mr. Weaver would have refused treatment had he been given

20 the option.  And so there is recent Seventh Circuit --

21     THE COURT:  Wait, say that again.  Say that again.

22     MR. MEYER:  That Mr. Weaver would have refused this

23 course of treatment had he been given the opportunity.  And

24 that to me is a different scenario than just your standard

25 medical malpractice, something was done without my consent.

Dr. Scheive - Direct by Parthum

1   This is more something was done against my will, which to me is

2   a much different claim.  And there's recent Seventh Circuit

3   case law -- *Johnson v. Tinwalla* is the case, and I can provide

4   the Court the citation if that would be helpful -- where it is

5   a different scenario because it's dealing with certain

6   psychotic medications when a patient is given this medication

7   against his will.

8           THE COURT:  I know during the final pretrial

9   conference that the reason that I even allowed any of this to

10  come in is because it's such a fact dispute as well in the fact

11  that Mr. Weaver had said he wanted to preserve the tooth and he

12  didn't want the tooth pulled originally, and so the inference

13  is that you do the treatment that you would do if you don't

14  pull the tooth, which is -- which I think is important for the

15  jury to hear if that is going to be part of your case as well.

16  I don't know what is going to come out with the testimony,

17  but -- and I know what case you're referring to because we

18  raised this in the final pretrial conference.  But the case

19  that you're referring to and the cases that support a

20  constitutional violation are cases where it's, you know,

21  usually the injection of a drug or some procedure against an

22  individual's will where they're literally, like, strapped down,

23  you know?  And that's I think the case that you're referring

24  to.

25          MR. MEYER:  So, your Honor, we actually represented --

Dr. Scheive - Direct by Parthum

1          THE COURT:  Oh, good.  So that's helpful.  Was he?

2          MR. MEYER:  And so, no, he was not.  It was something

3    where the doctor wrote an order.  After the patient had refused

4    medication, the doctor wrote the order anyway, and it was put

5    into his nightly little cup that he would take.

6          THE COURT:  Interesting.  Okay.  I'll take a look at

7    the case again, but go ahead and say anything else.  Did you

8    want to add anything else?

9          MR. LUPINACCI:  Sure.  The two main issues are raising

10   an informed consent in a deliberate indifference case is

11   reserved for instances of medical battery where there is a

12   complete lack of consent, not in a case such as this where the

13   jury has already heard testimony that two treatment options

14   were portrayed before Mr. Weaver and he elected for one rather

15   than the other because he wanted to keep the tooth.

16         THE COURT:  Well, that's your factual version, though.

17         MR. LUPINACCI:  That's right.

18         THE COURT:  And I think that's -- that's how I kept --

19   kept it in because that's your factual version and their

20   factual version is different.

21         MR. LUPINACCI:  Now it's being twisted a little bit.

22   Now what we're having is we're having a comparative dentist.

23   We're having a dentist take the stand that's been built up as

24   an expert where he read his C.V. off to the jury and the jury

25   now understands and appreciates him as an expert in the field,

Dr. Scheive - Direct by Parthum

1      and we're getting to know how he does informed consent --

2             THE COURT:  Oh, no, I have no problem about that.  I

3      was going to the broader picture.

4             Your objection regarding his how -- what he would do

5      is sustained.  That does encroach upon my ruling on 702.

6             But I'm trying to get back to how we're going to let

7      this whole issue of consent play out in the closing argument.

8             And your position has always been factually that it's

9      not supported, but he has this -- and Mr. Weaver testified,

10     Well, I didn't let her -- I didn't say I would do this, and

11     you've impeached him on that, and now I assume we're going to

12     hear from the doctor later, Dr. Mitchell, about what she's

13     going to say, and I think that's going to be a fact dispute as

14     to whether it's a battery, right?

15            MR. LUPINACCI:  But I think that the fact that we're

16     having this fact dispute as to did he get informed consent or

17     did he give informed consent is exactly the reason why it

18     shouldn't be included in this trial, because it's very

19     confusing to a jury who is trying to understand and wrap their

20     head around a deliberate indifference jury instruction, but

21     they've heard so much testimony about whether or not there was

22     this informed consent --

23            THE COURT:  But it can be a constitutional violation

24     is what he's saying under a constitutional battery.  So if it

25     can be a constitutional violation and we're here on the

Dr. Scheive - Direct by Parthum

1   constitutional violation of deliberate indifference, how are

2   you saying that we don't -- it's confusing?  I mean, that's the

3   fact dispute that goes to the core of the issues for the case,

4   right?

5           MR. LUPINACCI:  Perhaps the issue would be better

6   addressed through future testimony.  When the case starts to

7   take shape with some of the party witnesses, then this issue

8   can be addressed as to whether or not informed consent would go

9   to the jury.  But as far as the testimony is right now --

10          THE COURT:  So there's not going to be an instruction

11  on informed consent.  That's not going to be the issue.

12          The issue is going to be under the totality of

13  circumstances whether or not deliberate indifference has

14  occurred here and they're allowed to take into account whatever

15  factors.

16          What instruction have you provided to me about consent

17  at all?

18          MR. MEYER:  None at this time, your Honor.

19          THE COURT:  Right.  So, I mean, so maybe this is a

20  jury instruction issue, and that's what I said to you yesterday

21  and what I mentioned today at sidebar is that it may be a jury

22  instruction issue, but then you might need to have a jury

23  instruction based upon the Seventh Circuit case law.

24          So the objection is sustained.  We'll pick up when we

25  get back after break, and we'll talk about what is the

Dr. Scheive - Direct by Parthum

1    appropriate argument at closing based upon what the jury has

2    heard so far.

3         And I'm sticking with my ruling that there's a factual

4    dispute about the interaction between the doctor and the

5    patient here.  Okay?

6         MR. LUPINACCI:  Okay, Judge.  Thank you.

7         LAW CLERK:  All rise.  Court is in recess.

8    (Recess taken from 11:49 a.m. to 11:55 a.m.)

9    (In open court outside the presence of the plaintiff and

10       jury:)

11        THE COURT:  He's your client.  You get strong and go

12   over and knock on the door.

13        MR. MEYER:  I wasn't sure if that's okay.

14        THE COURT:  Absolutely.  That's your guy.  It's time

15   to go.  Knock.

16        MR. MEYER:  I --

17        THE COURT:  Knock.

18        MS. PARTHUM:  May Dr. Scheive retake the stand?

19        THE COURT:  I didn't hear what you said.

20        MS. PARTHUM:  May Dr. Scheive retake the stand?

21        THE COURT:  Sure.  Please do.

22   (Witness resumes the stand.)

23   (Plaintiff enters courtroom.)

24        THE COURT:  Tell them we're ready.

25        COURT SECURITY OFFICER:  All rise.

Dr. Scheive - Direct by Parthum

1      (Jury in at 11:56 a.m.)

2           THE COURT:  Be seated, and we'll pick up where we left

3      off.

4           And, Doctor, you are still under oath.  Do you

5      understand that?

6           THE WITNESS:  Yes, I do.

7           THE COURT:  Okay.  Go ahead.

8      BY MS. PARTHUM:

9      Q   Dr. Scheive, after discussing the options with Mr. Weaver,

10     what happened next in the appointment?

11     A   We took him back to a surgical suite, sedated him, and

12     removed teeth 12, 17, and 32.

13     Q   I'm going to show again the form that we were looking at

14     earlier.

15          Is the extraction of Tooth Number 12 reflected on this

16     form anywhere?

17     A   Yes, it is.

18     Q   Would you please read out to us where that appears?

19     A   Well, about the middle of the page there, it says, right

20     under "Consent reviewed," and then "extract 12, 17, and 32."

21     Q   So that's right here?  (Indicating.)

22     A   Yes.

23     Q   Okay.  Did you do anything else with Tooth Number 12 after

24     extracting the tooth?

25     A   Not anything more than throwing it in the garbage.

Dr. Scheive - Cross by Lupinacci

1    Q    Was there anything else that you had to do to treat the

2    abscess?

3    A    We cleaned out the abscess material, and we made a note

4    that we were going to biopsy that material, but unfortunately

5    it was removed by our suction tip so it became not useful to

6    the pathologist.

7    Q    When you say "clean out the abscess material," what does

8    that mean?

9    A    Typically abscesses have either a lining, a soft tissue

10   lining, or they might have some debris within that darkened

11   area on the x-ray.

12   Q    And did Mr. Weaver's tooth have either that lining or

13   debris?

14   A    Yes.  He did have debris above Tooth 18 that we curetted,

15   cleaned out, and were ready to send to the pathologist.

16   Q    And when you say "debris," what does that mean?

17   A    Debris could be anything from the infection itself or dead

18   and dying tissue or dead and dying bone.

19   Q    And, Dr. Scheive, have you seen Mr. Weaver as a patient

20   since the date of this appointment in July of 2017?

21   A    I do not believe so.

22   Q    Thank you.

23          MS. PARTHUM:  No further questions, your Honor.

24          THE COURT:  Okay.  Cross-examination then.

25                        CROSS-EXAMINATION

Dr. Scheive - Cross by Lupinacci

1   BY MR. LUPINACCI:

2   Q    Three more minutes left.  Good morning.

3   A    Good morning.

4   Q    How are you?

5        The first and only time you ever gave treatment to

6   Mr. Weaver was on this July 18th, 2017 date; is that right?

7   A    Yes, correct.

8   Q    And how long did the visit take with you?

9   A    I'm going to guess Mr. Weaver was probably in the office

10  two hours.

11  Q    And when were you initially consulted by the institution

12  for your services for Mr. Weaver?

13  A    Well, my contact with him was right on that 7/18/17, but I

14  did notice that there was paperwork back and forth with a prior

15  date.

16  Q    And can you tell what that prior date was?

17  A    If we go back to the referral from the prison, I think it

18  says either 4/3/17 or 4/8/17.

19  Q    What was the scope of the referral?

20  A    I would assume still for taking Teeth 17 and 32 out.

21  Q    Those you said were the bottom two wisdom teeth?

22  A    Those are the bottom two wisdom teeth, correct.

23  Q    All the way in the back?

24  A    All the way in the back.

25  Q    And Dr. Orenstein is the one who sent this referral over to

Dr. Scheive - Cross by Lupinacci

1   you; is that correct?

2   A   Orenstein's name is on there, yes.

3   Q   Dr. Orenstein is a dentist at Stateville?

4   A   If you say so.  I'm not familiar.

5   Q   Okay.

6   A   But his signature is on there, so I would assume.

7   Q   That's a better question.  Do you know who Dr. Orenstein

8   is?

9   A   I do not.

10  Q   Do you know who Dr. Jacqueline Mitchell is?

11  A   I've only talked to her on the phone.  I've never met her.

12  Until today.

13  Q   Dr. Jacqueline Mitchell didn't send this scope of the

14  referral for 17 and 32, correct?

15  A   I don't see her signature on there.  No, I don't believe

16  so.

17  Q   If she did, it -- most likely the referral would have had

18  her signature on it; is that fair?

19  A   I would hope, yes --

20      MS. PARTHUM:  Objection.  Calls for speculation.

21      THE COURT:  Okay.  Sustained.  Jump up.

22  BY MR. LUPINACCI:

23  Q   So you took x-rays, and you showed the x-ray that we marked

24  previously as an exhibit.  And if I can put it back on the

25  overhead display.

Dr. Scheive - Cross by Lupinacci

1    MR. LUPINACCI:  Judge, with your permission, can I

2    publish this to the jury?

3    THE COURT:  It's there.  If -- it's already admitted.

4    And if you see it on that screen, they are seeing it.  That's

5    how you know what they've got.

6    BY MR. LUPINACCI:

7    Q    So these bottom wisdom teeth on the bottom of his mouth, on

8    the outside, all the way in the back, these are the 17 and 32?

9    A    Correct.

10   Q    And I can see that they're pointed out.  Is that distally

11   inclined?

12   A    Yes, they are.

13   Q    And can you tell me the significance of -- what does that

14   mean, "distally inclined"?

15   A    Just means it's pointing toward the back of your mouth as

16   compared to pointing toward the front of your mouth.

17   Q    You didn't -- you didn't take this x-ray to see the Number

18   12 tooth, right?

19   A    We did not, no.

20   Q    The purpose of this x-ray was to see the 17 and 32 distal

21   inclination and the impaction of the teeth.

22   A    Correct.

23   Q    And when you spotted the abscess in the Number 12 space

24   that we pointed out earlier, the top of that Number 12 tooth,

25   so the upper left-hand side, right behind that pointed canine

Dr. Scheive - Cross by Lupinacci

1   one, when you spotted that, would you refer to that as an

2   incidental finding?

3   A    Incidental finding?  What's your definition of

4   "incidental"?

5   Q    That's a better question for you.

6         If -- the purpose of the radiographic exam was for 17

7   and 32; but on the radiographic exam, this x-ray, you saw an

8   abscess above the Number 12 spot.  Would that be considered an

9   incidental finding?

10  A    Yes.

11  Q    And on the notes that you wrote for Mr. Weaver's visit to

12  you -- and I know your staff wrote some of the notes.  And do

13  you still have that packet of your chart in front of you?

14  A    Yes.

15  Q    It's page 7 is that office chart note.  This was previously

16  admitted.  This is Plaintiff's Exhibit 2.

17        That top paragraph there, in the general layout of

18  this note, would you refer to it as a SOAP note?  Is that fair?

19  A    Sure.

20  Q    And is that where SOAP stands for Subjective, Objective,

21  Assessment, and Plan?

22  A    Correct.

23  Q    It's a general way that you chart things in your office?

24  A    Yes.

25  Q    And the first portion of it is the subjective portion.

Dr. Scheive - Cross by Lupinacci

1    A    What the patient tells us, correct.

2    Q    So that top part, that Number 12, lost crown way back,

3    that's what Mr. Weaver told your office.

4    A    Right.  That's why I put parentheses around "way back,"

5    Those are his words.

6    Q    Just to make it clear that those -- that wasn't your

7    office's finding; that was what he told you.

8    A    Correct.

9    Q    We'll just go back to it real quick.  On the same note,

10   when you examined Mr. Weaver's Number 12 space, did you see any

11   pus or drainage?

12   A    No.

13   Q    Those would be signs of infection; is that correct?

14   A    Yes.

15   Q    If you saw pus and drainage, would you have charted it?

16   A    Yes.

17   Q    Is it fair to conclude that because you didn't chart pus or

18   drainage from the Number 12 space, that there wasn't any?

19   A    Not that I could see visually looking at him, no.

20   Q    So that's correct.

21   A    Doesn't mean that it's not there.

22   Q    Okay.  That's fair.  But you didn't chart it.

23   A    Correct.

24   Q    And if it was there, you would have charted it.

25   A    Yes.

Dr. Scheive - Cross by Lupinacci

1    Q    Okay.  And earlier we talked about that Mr. Weaver was

2    already on antibiotics when he came to see you.

3    A    Yes.

4    Q    Do you know why he was already on antibiotics?

5    A    I would assume, when I put patients on antibiotics, they

6    typically have an infection, and we're trying to bring that

7    infection under control.

8    Q    Now, do you know what infection the antibiotics were

9    prescribed for?  Or would you just be speculating?

10   A    I would only be speculating based on the referrals for

11   Tooth 17 and 32.

12   Q    So he also had a cyst.

13   A    And a cyst.

14   Q    And so the cyst we charted -- and it's part of the record,

15   you noted it as well -- and could the antibiotics have been

16   prescribed for his cyst?

17   A    Yes.

18   Q    So you wouldn't be able to tell, as you sit here today and

19   tell the jury, whether or not the antibiotics that he was on

20   were prescribed to treat an abscess or a cyst or for some other

21   reason that you might not know; is that correct?

22   A    Yes.

23   Q    In fact, you did not prescribe antibiotics for Mr. Weaver's

24   abscess, true?

25   A    Correct.

Dr. Mitchell - Direct by Meyer

 1    Q    And that's because he was already on antibiotics.

 2    A    Correct.

 3    Q    Did you schedule any follow-up treatment with him?

 4    A    No.  That is not part of our follow-up because it's -- the

 5    follow-ups are done at the prison, I guess, to facilitate, have

 6    the prisoner leaving the prison coming to our office for

 7    something that can be done in-house at the prison.

 8    Q    Were you ever asked to see Mr. Weaver again?

 9    A    I don't believe so.

10    Q    I don't have any other questions for you.  Thank you.

11    A    Okay.

12              THE COURT:  Okay.  Any redirect?

13              MS. PARTHUM:  No redirect, your Honor.

14              THE COURT:  Well, then you can step down.  Thank you.

15         (Witness excused.)

16              THE COURT:  And you may call your next witness.

17              MR. MEYER:  Your Honor, the plaintiff calls

18    Dr. Mitchell.

19              THE COURT:  Okay.  Dr. Mitchell.

20         (Approaching.)

21              THE COURT:  Please raise your right hand.

22         (Witness duly sworn and takes the stand.)

23              THE COURT:  Okay.  Have a seat.

24         DR. JACQUELINE MITCHELL, PLAINTIFF'S WITNESS, SWORN

25                        DIRECT EXAMINATION

Dr. Mitchell - Direct by Meyer

1   BY MR. MEYER:

2   Q    Good morning.

3   A    Good morning.  How are you?

4   Q    I'm fine.  How are you?

5   A    I'm -- I'm okay.

6   Q    Would you please state your name, first and last, and spell

7   your last name for the court reporter?

8   A    Yes.  It's Jacqueline Mitchell-Lawshea.  It's a hyphenated

9   last name.

10          THE COURT:  Can you move your microphone towards --

11  just -- yes, there you go.  Thank you.

12  BY THE WITNESS:

13  A    Jacqueline Mitchell-Lawshea.  Mitchell is M-I-T-C-H-E-L-L,

14  dash, L-A-W-S-H-E-A.

15  BY MR. MEYER:

16  Q    You're a dentist?

17  A    Yes.

18  Q    And until recently you were a dentist at the Stateville

19  Correctional Center?

20  A    Yes.

21  Q    And are you -- do you continue to practice?

22  A    Yes.

23  Q    Just in private practice?

24  A    No.

25  Q    What is your practice?

Dr. Mitchell - Direct by Meyer

1    A    I didn't understand your question.

2    Q    What is your present dental practice?

3    A    I currently practice in Hyde Park in my private office, and

4    I also work for the Department of Human Service at the

5    Treatment and Detention facility in Rushville, Illinois.

6    Q    You no longer work at Stateville.

7    A    No.

8    Q    So how long had you worked as a dentist at Stateville?

9    A    We came to Stateville February 18th, 2002.

10   Q    And when did you stop working at Stateville?

11   A    July 31st, 19 -- 2017.

12   Q    So what were your responsibilities at Stateville?  Did

13   those change over time?

14   A    Yes.

15   Q    So then I'll focus on the time around 2005, if you can

16   remember that period.  It was a while ago.

17          What were your responsibilities around the time of

18   2005?

19   A    In 2005, I became the lead dentist.

20   Q    What is the lead dentist?

21   A    Just responsible for making sure supplies are in, the

22   equipment, making sure that the clinic runs smoothly.

23   Q    Did other dentists in the office report to you?

24   A    The Dentist I's.

25   Q    And who were the Dentist -- so Dentist I, is that a title?

Dr. Mitchell - Direct by Meyer

1   A    Yes.

2   Q    Can you describe what a Dentist I is?

3   A    A Dentist I is a state doctor that is not the lead doctor.

4   Q    Is there a Dentist II?

5   A    That would be me.

6   Q    Is that the same thing as a lead dentist?  Is that

7   interchangeable?

8   A    Yes.

9   Q    Did your responsibilities then change over time after 2005?

10  A    No.  It actually diminished in 2005.

11  Q    How did they diminish?

12  A    Well, in 2004, the Dentist II position, which used to be an

13  administrative position, was switched to a union position; and

14  as a result, when you became a member of the union, then you

15  could not be an administrator.

16  Q    And so could you explain to me how that affected your

17  practice?

18  A    I continued to do clinical services.  Generally speaking,

19  I -- a lead dentist performs the more complicated procedures.

20  And that's the same as the dentist director that I used to be.

21  I did not necessarily write policies anymore.  I did not have

22  the authority to approve people's time off any longer.  The

23  evaluations were no longer done by me.  It was done by the

24  health care unit administrator.  So anything that was

25  administrative was no longer my function.

Dr. Mitchell - Direct by Meyer

1  Q    So would it be fair to say that your functions as a dentist

2  remained the same, whereas your functions as an administrator

3  went away?

4  A    Yes.

5  Q    So what were your functions as a dentist?

6  A    I would do dental exams, fillings, extractions, any

7  clinical services, prosthetics, removable prosthetics.

8  Q    Did you have any role in scheduling appointments?

9  A    All of the staff schedules appointments.  So if a doctor

10  sees a patient, then that doctor would -- pretty much knows

11  when they want that patient brought back, and they actually put

12  their appointments into the appointment book.

13  Q    What was your role in scheduling appointments?

14  A    I scheduled my own patients.  At the end of every day, we

15  have to have our schedules ready for the next day by

16  10:00 o'clock.  So once the hygienist has put the schedule

17  together, I basically put in the times for the appointments.

18  Q    So you would review the final schedule; is that correct?

19  A    Yes.

20  Q    Would you make any changes to it?

21  A    No.  No patients were ever taken off.  The only thing --

22  the changes would be -- I would put in the times so that it

23  would not conflict with what the inmates were doing.

24        So let's say there's a segregation person that's on a

25  Tuesday.  That person cannot mix with a population person.  So

Dr. Mitchell - Direct by Meyer

1    I may move that appointment to Monday, because that's a seg.

2    time.  But, generally speaking, it was a matter of putting in

3    times that were more conducive with the inmates' schedules.

4    Q   So as an administrator at the prison, did you have a sense

5    of how the visitation worked?

6    A   I know that they get visits; but, generally speaking, we

7    don't have a lot to do with visits and things like that.  The

8    visiting room, we pass it coming in, but we don't have anything

9    to do with that, per se.

10   Q   Do you have a sense of whether or not visits need to be

11   scheduled in advance?

12   A   I really -- like I said, I don't know very much about how

13   their visits work, whether they're scheduled in advance or

14   things like that because we don't have anything to do with the

15   visits.

16   Q   So you wouldn't have a log of incoming visitors that you

17   would cross-check with the schedule when you're choosing times

18   for patient appointments.

19   A   No, because we don't know anything about their visits.  The

20   only thing that we can accommodate in terms of scheduling is we

21   try to schedule around their yard times.  That's important to

22   them because they don't get but two days a week on the yard.

23   We try to schedule to accommodate their lunch schedule, it

24   rotates, or when they're eating, because, again, they're moving

25   a whole house to feed and back.  And if I schedule them during

Dr. Mitchell - Direct by Meyer

1    their feed times or when they're getting ready to have their

2    lunch, then they don't necessarily get to eat.  It's things

3    like that.  We try to accommodate as much as possible in order

4    so that they don't miss out on the things that are important to

5    them.  But in terms of visits and things like that, I can't

6    tell you when someone has a visit.  I don't know anything about

7    it.

8    Q    You mentioned yard time?

9    A    Yes.

10   Q    What is yard time?

11   A    That's when they actually get to go outside, and that's

12   important.  I mean, if you're cooped up inside a building all

13   the time, you need some fresh air.  And that's important to the

14   inmates at the facility.  So when you only have yard -- like,

15   if it's C House, they may have it at -- from 9:00 in the

16   morning until 12:00 on one day, and then the next time they'll

17   have it from 1:00 to 4:00, so you look at those schedules and

18   say, well, if I have a C person, I'm -- if it's a day that he

19   has it in the morning, I schedule him in the afternoon to make

20   sure that he doesn't have to miss, because that's important to

21   him.  I don't want him to have to make a choice of I can go to

22   yard or go to the dentist.  If I can.  Now, most of the time, I

23   can accommodate things like that, and that's what we try to do.

24   Q    So why -- why are you accommodating patients in this way?

25   A    Because I'm a human being, and they are, too.

Dr. Mitchell - Direct by Meyer

1   Q    Thank you.

2         Would you say that they would also be less likely to

3   show up for their appointments if they're forced to make these

4   choices?

5   A    Some.  Some people won't because -- they also -- I think

6   they have phones out there they can call their families from

7   the yard.  And, I mean, it's -- it's a time for them.  And so,

8   yeah, they're less likely to come.  Some.  Some people come

9   irrespective.  They're going to come anyway.  But some people

10  won't.

11  Q    So going back to your responsibilities as a dentist, once

12  your administrative responsibilities changed, were you still a

13  lead, a supervisor over the other dentists and their medical

14  work?

15  A    No.  Never.  Even as an administrator, all of us are

16  licensed dentists with the State of Illinois.  We have all

17  passed our boards.  So I can't tell another dentist how to

18  practice dentistry.

19  Q    Would you address problems raised by the other dentists?

20  A    What kind of problems?

21  Q    Any kind of problems.  Would they see you as somebody to

22  come to to help address situations?

23  A    Occasionally.  I mean, if -- if you had a difficult case or

24  sometimes if they had a difficult time with a particular

25  patient, then we would all discuss, and that person would

Dr. Mitchell - Direct by Meyer

1    decide that maybe that's not the right dentist for that

2    particular person.  So you would -- somebody else would say,

3    Well, I'll just work on him next time.  You know, sometimes

4    people can get very rude with us in the clinic, and

5    occasionally we've had some guys who have exposed themselves,

6    so I'll put -- make sure Dennis sees that person from now on.

7    A male dentist.

8    Q    Not Mr. Weaver.

9    A    No.  But I'm just saying --

10   Q    Sure.

11   A    -- you asked me any time that there's an intervention like

12   that.  Again, if that occurs, it's easier for us to make sure

13   that person sees a male as opposed to a female dentist.

14   Q    Sure.

15        You never had that situation with Mr. Weaver, just to

16   be clear.

17   A    No.

18   Q    So you mentioned that the dentists would work out who would

19   see what patient on occasion?

20   A    Not exactly.  The way it works is our schedule runs

21   anywhere from 40 to 50 people a lot of times during the day.

22   We have so many annual exams that we have to do, so the

23   hygienist will schedule, because she does the scheduling for

24   them, she'll schedule a minimum of ten per day so that we can

25   get everybody done within that month's time.

Dr. Mitchell - Direct by Meyer

1          We have so many prosthetic cases that we do.  Those
2     people are also added to the schedule.
3          You have so many fillings that you know that you can
4     reasonably do within the eight hours that we're working.
5          And that's how it works.  I mean, if you have
6     emergencies, they also have to be factored into the scheduling.
7     So emergencies have to be seen within 24 hours, so that
8     schedule accommodates how many emergencies we can actually put
9     into the schedule.  Since they have to be seen, you can't
10    necessarily over overbook because they take priority over a
11    person scheduled for just a regular procedure.
12    Q    Okay.
13    A    Okay.
14    Q    So I'd like to talk a little bit about appointments and
15    scheduling and how the patients come to see you in the dental
16    office.
17    A    Okay.
18    Q    Now, is the dental office in a separate building?
19    A    No.  It's in the hospital or the health care unit.
20    Q    Is that a wing of the main building of Stateville?
21    A    Yeah.  You walk down the hall, and then there's a turn in,
22    and you're in the health care unit.
23    Q    It's all connected?
24    A    Yeah, there's a big hallway that runs, like, super wide.
25    And if you keep past us, you'll go down to where the cell

Dr. Mitchell - Direct by Meyer

1    houses are, so it's like that.

2    Q    So it's right there.

3    A    Yes.

4    Q    So we've heard that patients have these routine visits,

5    sounds like they'll be once a year; is that correct?

6    A    No.

7    Q    So --

8    A    Routine visits -- what do you mean?  For the dentist --

9    Q    So, yeah, what I mean is like for a teeth cleaning for a

10   check-up.

11   A    They can always put a request in at any time that they feel

12   they need to be seen.

13          In terms of the routine visits, every two years, the

14   state -- every two years, the state requires us to do a

15   bi-annual exam.  That exam includes x-rays and an examination

16   of the patient's mouth to determine if they have any dental

17   needs.

18          The patient is informed at that time that you have the

19   following things that we see, would you like to put in a

20   request or would you like to be seen.

21          It's their choice.  Everything is their choice.  I

22   can't make them get in the chair; but if they say, yes, I'd

23   like to be scheduled, then whoever the doctor that is doing

24   that bi-annual exam will actually schedule the person.

25   Q    Thank you.

Dr. Mitchell - Direct by Meyer

1              I'd like to unpack that bi-annual exam a little bit.

2      A    Sure.

3      Q    So you mentioned there would be x-rays?

4      A    Yes.

5      Q    What kind of x-rays?

6      A    We take bitewing x-rays, in general, unless the person is

7      saying that he has a particular problem.  Bitewing x-rays are a

8      film that actually show us whether or not they have any

9      interproximal lesions, et cetera.  If a person says that I'm

10     having a problem with this area, the assistants will also take

11     periapical x-rays.  If it's been a while, I'll have the

12     hygienist actually take a full mouth set of x-rays for us to

13     determine if he's having any problems.  If I see on the

14     bitewings some periodontal issues, per se, then generally I

15     will schedule that person back for a full mouth set of x-rays,

16     perio charting, for us to determine the problems he's having.

17     We always do a consultation with the patient.  Once we assess

18     that he's having some periodontal problems, he's given a

19     treatment plan of what the recommendations would be, and then

20     he's scheduled.

21     Q    So there were some big words in there, and I'd like to

22     unpack a few of those.

23     A    Sure.

24     Q    You said "periodontal."

25     A    Yes.

Dr. Mitchell - Direct by Meyer

1    Q    What does that mean?

2    A    Gum, where people are losing the bone around their teeth,

3    the supporting structure, and it's -- it's something that can,

4    if you don't look at it early enough, can cause you to lose all

5    of your teeth.

6    Q    Then you mentioned a couple different kinds of x-rays.  The

7    first I think was a bitewing?

8    A    Bitewings are the x-rays.  They're like miniature film that

9    go in, and we actually shoot midway between the two teeth.  And

10   it actually gives just the crown shot, just the top and bottom

11   crowns.

12   Q    And then what was the other type of x-ray you mentioned?

13   A    Periapical shows the entire length of the tooth.

14   Q    So that second type -- you were here in the courtroom just

15   a moment ago, correct, when Dr. Scheive was testifying?

16   A    Yes.

17   Q    What type of x-ray is this?

18   A    That's a panorex.  When they enter into the Department of

19   Corrections, we take panorex x-rays on everyone that comes in.

20   So we don't take that in the regular clinics.  That's done at

21   reception.

22   Q    Okay.  So this would not be taken at a bi-annual exam.

23   A    No.  That's taken only when they enter into the Department

24   of Corrections.

25   Q    So this is a third type of x-ray in addition to the two

Dr. Mitchell - Direct by Meyer

1    that you discussed.

2    A    Yes.  That's a panorex.

3    Q    Thank you.

4         So, typically, a patient would be able to request a

5    dental cleaning once every two years?

6    A    No, that's not correct.  Every nine months they can put in

7    their request for their cleanings.  And, generally, the

8    hygienist will see them at least once a year.

9         Prior to my leaving, we actually had got it down to

10   every six months.  So after six months, they can put in their

11   next request to be seen for a cleaning.

12   Q    So how does the cleaning differ from the bi-annual exam?

13   A    And I assume you've been to the dentist and had your teeth

14   cleaned.  The hygienist generally --

15         THE COURT:  Should we assume that?

16         THE WITNESS:  I'm going to assume it.  I hope you

17   have.

18         MR. MEYER:  I have.

19        (Laughter.)

20   BY THE WITNESS:

21   A    Okay.  So the hygienist basically will see them, if it's in

22   the off year from their bi-annual exam -- because we only do

23   that every two years -- the hygienist will actually take

24   bitewings during their cleaning appointment.  She does an exam.

25   If she finds anything that hasn't been picked up in the

Dr. Mitchell - Direct by Meyer

1   previous bi-annual exam, then the dentist is called over.  We

2   actually document that.  Then she actually cleans their teeth.

3           Now, some people get deep cleanings and then other

4   people just get the routine cleaning that you get with a

5   Cavitron where it cleans all the tartar off.  She'll go back

6   and scale any areas that she finds that there's excessive

7   tartar, et cetera.  She polishes the teeth.  And that's it.

8           Did I explain it okay to you?

9   Q   Yeah.

10  A   Okay.

11  Q   Absolutely.  Thank you.

12          So getting back to appointments and scheduling, in

13  addition to the bi-annual exams and the cleanings, patients can

14  request to be seen for specific issues; is that correct?

15  A   Yes.

16  Q   How does that process work?

17  A   Okay.  We have an Administrative Directive Dental Care for

18  Inmates.  And according to the Administrative Directive, which

19  we follow, inmates can put in a request.  If it's a

20  non-specific request, he has to be seen within 14 days.

21          Let's say you say that I think my tooth is -- I feel

22  like something is going on with my tooth.  That's not specific.

23          Does that make sense to you?

24  Q   So what would a specific request be?

25  A   I would like to have my teeth cleaned.  I need a filling on

Dr. Mitchell - Direct by Meyer

1   Tooth Number so-and-so-and-so.  I need my tooth extracted.  I
2   need my partials adjusted.  I broke my partials and I need a
3   repair.  Those are specific.  Okay?
4   Q    So how does the dental office keep track of these
5   appointment requests?
6   A    We actually have a logbook.  The logbook actually logs in
7   the inmate's name, his number, his specific request, the date
8   we receive the request, and then the date that he's scheduled.
9   It's also documented in his record.
10          Lastly, all requests that we receive are actually
11  dated the date that we received it, the date that he's
12  scheduled.  And my department, when I was department head,
13  actually files the dental request in the back of the medical
14  record in the Miscellaneous section.
15  Q    Has that been the process from 2005 until the time you left
16  Stateville?
17  A    The requests were not initially filed into the medical
18  records.  They were put into the actual dental jacket.
19  Probably around 2009, I actually moved us a little step further
20  and said all requests should actually be -- they come in on a
21  little paper like this.  (Indicating.)  They're taped to a
22  white sheet of paper so they fit into the medical record, and
23  it's dated, et cetera, and then it's filed in the back of the
24  medical records.
25          And, oh, by the way, the request log, we have logs

168

Dr. Mitchell - Direct by Meyer

1   that go all the way back to 2002.  We use a big binder.  It's a
2   legal binder.  And you're welcome to get that.  But any request
3   that we received from 2002 to the present is logged in those
4   legal binding -- binders, the dates, names, et cetera.
5   Q   And so who records that?
6   A   All of the different doctors, the assistant of the
7   hygienists -- the way -- well, I'm talking too much, so go
8   ahead.  Do you want me to keep talking?
9   Q   Not at all.
10          So how would the appointment request, like, physically
11  be delivered to the dental office?
12  A   What happens is there is boxes in each cell houses --
13  house.  The inmates, when they go out to eat, when they go out
14  to yard, can always drop their request directly into that box.
15          The other ways requests can be received, we have med.
16  techs that circulate the cell houses.  They're out there twice
17  a day.  And there used to be a med. tech that was assigned
18  specifically that stayed in the house all day, but now they go
19  out in the mornings.
20          If you put your request on your bars, the med. techs
21  will pull it.  That's one way.
22          The second way is our nurses deliver meds twice a day,
23  they walk the cell houses, and you can give them a request, and
24  they will bring it back.
25          Your third way, you can always go through the

Dr. Mitchell - Direct by Meyer

1   correctional officers.  There's correctional officers,

2   sergeants, lieutenants, and even majors that are in those cell

3   houses.  If you have a request, you can do that.

4         Some guys send it up by another resident that's coming

5   up for an appointment.

6         I mean, there's numerous avenues that -- if you want

7   to access care.

8         Once the requests come up, they actually put them in

9   our box.  We have a box in medical records.  Each service does.

10  Your requests are slid in there.  In the mornings, we pull

11  everything that has come in from that previous evening and

12  whatever.  And my assistants take the request, they tape them

13  to the paper, they actually go and actually pull the person's

14  medical record so we have a way of looking at what he's saying,

15  if there's something that hasn't been documented in the record

16  previously, and the doctors actually review the requests at

17  that point and decide when the person is going to be scheduled.

18  Q   So when a patient makes multiple requests for the same kind

19  of treatment, would you log those multiple times in the

20  logbook?

21  A   Yes.

22  Q   So even if the patient makes the same request multiple days

23  in a row, those requests would all receive individual entries.

24  A   Yes.  One of the things that the system -- we're audited on

25  our requests, how we process requests, et cetera.  There is an

Dr. Mitchell - Direct by Meyer

1    audit team.  We have an internal audit team.  And then we have

2    external auditors that come in once a year.  So everything is

3    audited.  If our requests have not been handled properly -- and

4    what they do is they pull a sampling of records.  I can't tell

5    them who to pull or whatever, but what they will do is go to my

6    request book, pull out so many names, and go and actually check

7    to make sure the process is working.  So we're audited so much

8    sometimes you get tired, but that's what their job is is to

9    audit.  So, generally speaking, if the request made it to

10   Dental, it was addressed.

11   Q    So you said if the request made it to Dental.  Did the

12   requests ever not make it to Dental?

13   A    If it didn't, I don't know anything about it.  I mean -- do

14   you understand what I'm saying?  I can only address things that

15   actually make it to me.  Generally speaking, residents -- I

16   don't have any complaints that somebody did not get a request

17   acknowledged or -- et cetera, because everybody comes up.

18   Q    So you mentioned audits.

19   A    Yes.

20   Q    Do those audits consider the process of requesting

21   appointments and being scheduled?

22   A    Yeah.  They look at the entire process.  Generally, it's

23   people from -- the external auditors come up from Springfield,

24   and it's different people from other facilities, et cetera, who

25   understand the process who are auditing us, but we also have

Dr. Mitchell - Direct by Meyer

1    internal auditors where it could be a counselor whose job is to

2    audit Dental.  They have the parameters that they have to look

3    at.  And like I said, I can't give them and say, "Here, look at

4    just these records."  They do a sampling of everybody.  For

5    instance, the bi-annual exams, they will take my book that

6    we -- we get a print-out of everybody that's scheduled for --

7    that needs one.  They take that print-out and they pick random

8    people, and they check to see if it's been done or not.  So

9    everything is kind of mechanical.

10   Q    You provided deposition testimony in this case --

11   A    Yes.

12   Q    -- is that correct?

13   A    Yes.

14   Q    I'm going to hand you a copy of your testimony.

15   A    Sure.

16        (Tendered.)

17   BY MR. MEYER:

18   Q    If you could turn with me to page 94.

19   A    Okay.

20   Q    If you see line -- on line -- I'm going to start reading on

21   line 12.  And the question you were asked was:

22        "If an individual makes the same type of dental

23   request for multiple days in a row, all of them -- are all of

24   them recorded?"

25        Your answer was:  "No.  Our administration basically

Dr. Mitchell - Direct by Meyer

1    says if it's the exact same request, sometimes you'll get --

2    they may put a request in let's say on the 10th, the 11th, and

3    the 12th, all of them come in on the same day.  They basically

4    told us we only have to file one of them since they are all the

5    same.  Now, it depends if it's the same request tomorrow and

6    the next day, I file them all in the back."

7            Were you asked that question and did you give that

8    answer?

9    A    Yes, I did.  I guess.

10   Q    Moving on, I would like to ask you a few more questions

11   about how the logbooks actually log appointments.

12           The requests are logged and the appointments are

13   scheduled separately; is that correct?  Or is it all one thing?

14   A    Could you clarify your question?

15   Q    Sure.  I'll break it up.

16           The logbook is separate from the appointment book; is

17   that correct?

18   A    Yes.

19   Q    So the logbook logs requests for appointments?

20   A    The logbook logs requests that the residents have made,

21   that if -- the request -- let's say a person says I would like

22   to have my teeth cleaned.  The logbook logs that the person is

23   asking for a cleaning.  At the end of that line for that

24   particular person, there's an appointment date given.  And that

25   appointment date is also put into the appointment book.

Dr. Mitchell - Direct by Meyer

1   Q   The appointment book is a separate book.

2   A   It's a separate book, yes.

3   Q   So are all of the appointments that are scheduled, do those

4   all come from the logbook?

5   A   No.

6   Q   How else are appointments scheduled?

7   A   If, let's say, you were in the clinic and you had fillings

8   on Tooth Number 12 and 13, and you also had some fillings --

9   what we do is we pick the worst cavities first.  And as long as

10  you say that you would like an appointment, then we schedule

11  you directly for that appointment, for an appointment for that.

12          When we're finished with that particular appointment

13  on that date, you're given the option, would you like to be

14  scheduled for your next appointment?  If they say yes, then we

15  go ahead and make the appointment.

16          Requests are only done if the person doesn't have any

17  standing appointments, et cetera, et cetera, but patients are

18  automatically rescheduled for the next treatment if they're

19  interested.

20          Now, some people will say no.  We used to charge like

21  $2 a visit.  That was the charge.  And sometimes they would

22  say, Hey, could you give me an appointment in four or five

23  months when I have $2 on the books?  So that would be

24  scheduled.  Or sometimes people would just say I don't want

25  anything right now, I'll let you know when I'm ready for my

174

Dr. Mitchell - Direct by Meyer

1    next appointment.

2    Q    Okay.

3    A    That's when they would put a request in.

4    Q    Okay.

5    A    Oh, and can I say something?  I read this thing that you

6    said right here?  And you're correct.  We log -- let me say if

7    I get 10 requests, we log that 10 we received for the same item

8    on the appointment book.  But because medical records are

9    paper, we don't put all 10 or 12 of those in if we receive them

10   on the same day.

11           Now, if we receive it on a different day, all of them

12   go in.

13           Does that make sense to you?

14   Q    Sure.

15   A    Okay.

16   Q    So when a patient is receiving treatment, and let's say

17   they need follow-up treatment, are they still given that option

18   to come back another time?  Or to not come back for a follow-up

19   appointment?

20   A    Yeah.  I mean, again, although they are incarcerated,

21   they're still free to make choices, and those choices are

22   theirs.  If you don't want to come for a filling, I can't make

23   you come.  I can only tell you what you need and go over what

24   specifically is the issue.  You can make the choice.  I mean --

25   and they make the decision.

Dr. Mitchell - Direct by Meyer

1    Again, we used to charge $2 a visit.  And if you're

2    only getting $10 a month and you need to buy your toiletries,

3    things like that, you're not necessarily going to come to

4    dental.  You'll say, Well, I can't come right now or I'll let

5    you know.  That's their choice.  That's when they put a request

6    in.

7    Q    So when is a patient notified about their appointment?

8    A    All our call lines are put out the day before.  We have to

9    have them ready by 10:00 o'clock, in to medical records.  So

10   our passes are completed by the dental staff.  Times are all

11   put on them.  By 10:00 o'clock, we take them to medical

12   records.  Medical records types a roadmap.  The roadmap

13   basically is everybody who is coming up to the hospital from

14   all of the services.  So if that's -- somebody is seeing the

15   eye doctor, somebody is seeing nurse sick call, or let's say

16   the physician assistant, somebody is seeing the doctor, all of

17   those lists are put together, and that's why they call it a

18   roadmap.

19         That then, once all of that is done, she's typed it,

20   the health care unit administrator signs off on it saying that

21   this is an okay schedule, she then takes it up, and I believe

22   it goes to the mailroom or to one of them, and they put it in

23   the box -- the passes in the boxes of the sergeant for each

24   cell house.

25         The list is also then sent to the assistant warden of

Dr. Mitchell - Direct by Meyer

1   programs, operations, and different other people so they at

2   least know who all is coming, the times, et cetera.

3           At night, the passes are then passed, I believe, by

4   the sergeant that works that house at night.  Their passes are

5   delivered to them like when they come on, so they're put into

6   their bars so they know that they have an appointment the next

7   day.

8   Q   So they wouldn't be notified in advance of their

9   appointment, like, beyond that first day.  They get one day's

10  notice.

11  A   They get a one-day notice.  And you understand that, right?

12  Q   Yes.  Yes.

13          And so even -- that's true even if the patient is

14  being scheduled for a follow-up appointment there in the dental

15  office.

16  A   Yes.  There's a reason --

17  Q   I understand.

18  A   -- they try not to give a whole lot of notification.

19  Q   I understand.  I'm just trying to understand how much

20  notice they're given and when they're given notice, if there's

21  any difference between one situation or the other.  We'll break

22  it out, just so it's clear.

23  A   Okay.

24  Q   If the patient is scheduling the bi-annual exam, they would

25  be notified the day before their appointment of their

Dr. Mitchell - Direct by Meyer

1    appointment time.

2    A    Correct.

3    Q    If the patient has made a request for a specific treatment,

4    they would be notified the day before their exam.

5    A    Yes.

6    Q    If the patient requests a non-specific treatment, they'll

7    be notified the day before their appointment.

8    A    Correct.

9    Q    And if the patient is in the dental office receiving

10   treatment and they're scheduling a follow-up appointment,

11   they'll still be notified of the date and time of the

12   appointment the day before the appointment.

13   A    Correct.

14   Q    Thank you.

15   A    Okay.

16            THE COURT:  Okay.  I think that's a good place for you

17   to stop and have lunch.  Okay?  So we'll take a break.

18            Don't talk about the case.

19            And we'll start back here at 20 minutes to 2:00.  All

20   right?

21            Have a nice lunch.

22            COURT SECURITY OFFICER:  All rise.

23        (Jury out at 12:43 p.m.)

24            THE COURT:  Okay.  You can step down.

25            THE WITNESS:  Do you want me to leave this up here?

Dr. Mitchell - Direct by Meyer

1      MR. MEYER:  Sure.

2      THE COURT:  That's fine.

3      I'd like to see the lawyers back at 1:30 so I can

4  discuss this consent -- informed consent issue with you.  Okay?

5  I'll see you then.

6      LAW CLERK:  Court is in recess until 1:30.

7      (Lunch recess taken at 12:44 p.m.)

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    WENDELL WEAVER,                    )   Docket No. 15 C 02950
                                        )
 4                    Plaintiff,        )   Chicago, Illinois
                                        )   February 7, 2018
 5             v.                       )   1:38 p.m.
                                        )
 6    DR. JACQUELINE MITCHELL and       )
      RANDY PFISTER,                    )
 7                                      )
                      Defendants.       )
 8

 9                              VOLUME 2-B
                  TRANSCRIPT OF PROCEEDINGS - Jury Trial
10        BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

11
      APPEARANCES:
12
      For the Plaintiff:       MOLOLAMKEN LLP by
13                             MR. GERALD P. MEYER
                               MS. MICHELLE JOYCE PARTHUM
14                             300 North LaSalle Street
                               Chicago, Illinois  60654
15
      For the Defendants:      OFFICE OF ILLINOIS ATTORNEY GENERAL by
16                             MR. NICHOLAS SCOTT STALEY
                               MR. JOSEPH PETER LUPINACCI
17                             100 West Randolph Street, 13th Floor
                               Chicago, Illinois  60601
18

19

20

21

22    Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                               Federal Official Court Reporter
23                             219 South Dearborn, Room 2318-A
                               Chicago, Illinois 60604
24                             (312) 435-6047
                               Gayle_McGuigan@ilnd.uscourts.gov
25
```

1          (In open court outside the presence of the jury:)

2          THE COURT:  Please be seated except those who are

3    going to be arguing this issue regarding the consent.

4          Okay.  So, first and foremost, I don't know if in your

5    original complaint or your amended complaint that you took over

6    that you alleged the Fourteenth Amendment violation.  Did you?

7          MR. MEYER:  No, your Honor.

8          THE COURT:  So that's the big issue.  That's why we're

9    seeing -- that's why we're not seeing eye to eye, because under

10   the Eighth Amendment you're correct, and under the Fourteenth

11   Amendment you're correct, but you didn't allege a Fourteenth

12   Amendment violation.

13         So the Fourteenth Amendment violation, however, I'm

14   pretty sure gets the same jury instruction.  And it's the

15   plaintiff had a serious medical need, they were aware of the

16   serious medical need, consciously failed to take reasonable

17   measures, blah, blah, blah.

18         So the way that I've been trying to find anything on

19   this -- because the case, of course, that you were working on

20   was a civilly committed individual, and that's a due process

21   claim as opposed to an Eighth Amendment claim.  So we can look

22   at this in a few different ways.

23         We can look at it in the harsh way and say you never

24   pled it and we're here in the middle of trial and you can't

25   alter your theory during trial, or we can say the same facts

1    that we've all dealt with throughout the course of the case are

2    the same facts that apply to either one and so there's no harm,

3    no foul, and certainly you asked these questions and it's part

4    of the record.

5            And then the question is how do we instruct.

6            So the closest that we can find regarding this is --

7    there's a pretty good discussion out of a district court

8    opinion, believe it or not, where they're just adopting a

9    magistrate judge's report.  I think that I'll read it to you,

10   just so you have a sense of how this -- this is not even our

11   circuit, but the analysis is correct, okay?

12           So even assuming that Hutchison was not, as he

13   alleges, actually advised of the risks and alternatives, he

14   nevertheless cannot prevail.  It is true that convicted

15   prisoners retain a limited right to refuse treatment and a

16   related right to be informed of the proposed treatment and

17   viable alternatives, which is citing a Third Circuit case, such

18   information is necessary for the prisoner to make an informed

19   decision whether to accept or reject prescribed treatment.

20   However, the courts have not held that lack of informed consent

21   by a prisoner to medical treatment in and of itself rises to

22   the level of a constitutional violation, which is your point.

23   A claim regarding lack of informed consent without more is one

24   of medical negligence, not deliberate indifference, and as

25   indicated herein negligent conduct by prison officials does not

1    rise to the level of a constitutional violation.

2           And that's just citing to a district court, which does

3    not have precedence, in Washington, holding that the

4    defendant's failure to make disclosures necessary to the

5    informed consent process in an experimental therapeutic setting

6    does not implicate rights that are so rooted in the tradition

7    and conscience of our people as to be ranked as fundamental in

8    that a doctor's tortious failure to obtain informed consent is

9    not a threat to our citizens' enjoyment of ordered liberty,

10   even when the doctor is employed by the state.

11          And there's some other district court cases similarly

12   citing to that.

13          So the failure to advise of the risks and alternatives

14   cannot ordinarily form the basis of a constitutional claim.

15          So even where the lack of informed consent has been

16   found to be actionable as a constitutional violation,

17   inadvertent failures to impart medical information cannot form

18   the basis of a constitutional violation.

19          This is a Second Circuit case, *Pabon versus Wright*,

20   459 F.3d 241.  In *Pabon*, the Court went on to hold that in

21   order to incur liability, a prison official's failure to

22   adequately inform a patient regarding that patient's proposed

23   medical treatment must be done with, at a minimum, deliberate

24   indifference to the prisoner's right to refuse treatment and

25   that simple negligence will not suffice.

1          So the deliberate indifference is expanded, not simply

2     deliberate indifference to his medical need, but deliberate

3     indifference to the prisoner's right to refuse treatment.

4          And then it would have to be something more than

5     simply, you know, something negligent, which is what we're

6     fighting over.

7          The case on the Eighth Amendment that is a little bit

8     helpful for us is *Philips versus Wexford*, and that's a 2013

9     case, where the state prisoners allege that the defendants were

10    deliberately indifferent to his medical needs in violation of

11    the Eighth Amendment in that they failed to disclose possible

12    adverse effects of medication.

13         And that one I think is a little helpful in that one

14    could say, you know, the doctor's failure to inform the

15    difference between the root canal versus the extraction and

16    what that would do to his decision-making process.

17         Now, this is our Seventh Circuit.  Here.  His related

18    and more substantial contention is that the defendants were

19    deliberately indifferent to his serious medical needs because

20    they failed to warn him about the possible side effects to

21    Bactrim.  And as a result, he suffered three of them:  Fatigue,

22    decreased urination, and stomach cramps.  So some circuits have

23    held that prisoners have a right to such information as is

24    reasonably necessary to make an informed decision to accept or

25    reject proposed treatment.

1          And what cases do we have?  The two I just mentioned

2     to you, *Pabon* from the Second Circuit, and *White* from the Third

3     Circuit.  Okay?

4          But a doctor should not be required to provide each

5     prisoner patient with an exhaustive list of possible adverse

6     effects of each aspect of his treatment.  Instead, a doctor

7     simply must provide a prisoner with such information as a

8     reasonable patient would find necessary.  That's *Pabon* that the

9     Seventh Circuit is citing.  Otherwise, after receiving

10    appropriate treatment that proved to have unpleasant side

11    effects, a prisoner might claim that he had not received

12    sufficient information to allow him to decide whether to refuse

13    that treatment.  Although we have not had occasion to comment

14    on this precise standard, we have adopted a general rule that

15    is consistent with these circuits.  The Eighth Amendment

16    protects inmates from deliberate indifference to substantial

17    risks of serious damage to their health.  Under these

18    principles, viewed through the lens of the plausibility

19    standard -- and we were in a complaint stage here -- the

20    complaint is deficient.  Phillips alleged only that without

21    warning he experienced side effects, 3 among 32 was listed in

22    the complaint, but he has not alleged that the risks of

23    developing them were substantial or substantial enough that a

24    reasonable patient would expect to be apprised of them.

25         So that's our Circuit's analysis.

1    So all of that nice discussion I actually think brings

2  us right back to my original ruling, which is that the factual

3  dispute about this information and whether it was a serious

4  enough situation for him to decide, yes or no, I don't want to

5  do this, is something that the jury should be able to address

6  as far as his credibility, as far as the seriousness of his

7  condition, and then apply what is the proposed jury instruction

8  that we have, with the parameters being you could never argue

9  alone, ever, that failure to get his consent is deliberate

10 indifference, and you could never argue that the failure to

11 give him those options was deliberate indifference.  It would

12 need to be something more than that.

13    MR. MEYER:  Yes.

14    THE COURT:  And then you would never be -- and you

15 would appropriately be able to say in your closing argument

16 that this isn't a medical malpractice case, and you could even

17 use the language from the cases which says, you know, that

18 prisoners, as we mentioned earlier, may have a limited right to

19 refuse treatment and may be informed of viable alternatives.

20 But under the circumstances, this was something that he had

21 been discussing for weeks and months, and there had been lots

22 of discussions about what was going on.  And he was making

23 decisions earlier, don't pull the tooth or pull the tooth --

24 which is why, by the way, this essentially went to trial,

25 because of this disputed issue regarding that.  And I think

1    both of you have your arguments.

2         You have more of a risk of crossing the line, but I

3    think -- I mean, I can give you these case cites, if you want

4    to read them --

5         MR. MEYER:  I have them, your Honor, and we're

6    completely on the same page.

7         THE COURT:  So with that in mind, I think that your

8    objections that you've made so far that I've sustained have

9    been appropriate.  And your questioning so far has been right

10   at the line, which is appropriate.  And as long as you don't

11   argue that that in and of itself, which you're correct in

12   arguing, would not be deliberate indifference can't be said,

13   we're on the same page that we were on when we discussed this

14   last time.

15        MR. LUPINACCI:  Okay.

16        MR. MEYER:  Thank you.

17        THE COURT:  Okay?  I thought at first maybe there

18   would be a different instruction, and that made me nervous for

19   both of you, that we were going to have to regroup on what you

20   asked in your deps or something, but I don't think so.  I think

21   we're fine.

22        Does everyone agree with that?

23        MR. MEYER:  I think the existing instruction is

24   appropriate.

25        THE COURT:  Right.  But do you agree with this

1   analysis --

2           MR. MEYER:  Yes, your Honor.

3           THE COURT:  -- regarding your parameters?

4           MR. MEYER:  Absolutely.

5           THE COURT:  Are you still objecting that it shouldn't

6   be an issue at all for the jury to take into account?

7           MR. LUPINACCI:  Well, I agree that informed consent

8   can be an issue that fits under the umbrella of deliberate

9   indifference.  And to that, in that regard, evidence of

10  conversations regarding informed consent process before

11  operations or lack thereof take place, I agree that that

12  information is relevant, and it's probably helpful for the

13  trier of fact.

14          I also find that it's confusing to them.  And I'm

15  grateful for the opportunity to cite to them the law in which

16  they'll hear from this Court before they deliberate on the fact

17  that this isn't a medical negligence case.

18          I think, as I previously stated in the pretrial

19  conference with your Honor, informed consent is thrown around

20  so much now as medical malpractice cases are filed so much more

21  frequently, and I think that the risk is high that jurors may

22  be confused --

23          THE COURT:  But that's your job then.

24          MR. LUPINACCI:  That's right.

25          THE COURT:  Yes, so your job will be to get them on

1   the right track and make sure that the instructions that we

2   discuss are the right ones that you need to keep them on that

3   track.  Okay?

4           All right.  Are we ready to proceed?

5           MR. MEYER:  Absolutely.

6           THE COURT:  Okay.  Who did I have here?  I had --

7           THE WITNESS:  Me.

8           THE COURT:  Oh, thank you.  Thank you.

9           Dr. Mitchell, you come on back up.

10          And, please, Kathleen, would you get the jury for me?

11          MR. MEYER:  Your Honor, if I may --

12          THE COURT:  Yes.

13          MR. MEYER:  Excuse me.  You know, we did have -- you

14  mentioned you had those arraignments earlier.  We did have an

15  attorney in here representing a defendant during the lunch

16  break who was kind of looking around.  I just wanted to make

17  you aware of that.

18          THE COURT:  Well, they know who Lynn is.  She's our

19  go-to person for all -- all crazy scheduling attorneys who she

20  deals with on a regular basis, so they know how to find her.

21  Okay?

22          Oh, I saw him.  I thought maybe he came just to watch

23  you do your work.  Sometimes -- you know, in the old days when

24  I was a young trial attorney, there was a lot more buffing

25  where trial attorneys would come and they would watch other

189

1    attorneys, and it really was great because you learned an awful

2    lot from watching those who did more trials.  Nowadays, it

3    seems like everyone is so busy, probably billing in the private

4    sector.  And in the public sector, I don't know if it's just a

5    cultural change or what, but they don't really come up, except

6    for arguments.  But what's really helpful is watching cross and

7    expert testimony, things like that.  We don't see it too often.

8    That's what I thought Mr. Camarena was doing.  Obviously not.

9            Okay.  I'm all set.  Thank you.

10           COURT SECURITY OFFICER:  All rise.

11       (Jury in at 1:52 p.m.)

12           THE COURT:  Okay, folks.  Please be seated and get

13   comfortable.

14           We have a few hours to go.  I'll probably take a short

15   break after an hour or so, just so you are not going to get too

16   uncomfortable in there, but we're only going to go until 4:00.

17           And you can pick up where you left off.

18           And, Doctor, you understand you're still under oath.

19           THE WITNESS:  Yes.  Yes, ma'am.

20           THE COURT:  Thank you.

21           MR. MEYER:  Thank you, your Honor.

22                   DIRECT EXAMINATION (Resumed)

23

24   BY MR. MEYER:

25   Q   Good afternoon, Dr. Mitchell.  I hope you had a nice lunch.

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    I did.  Thank you.

2   Q    So when we left off, we were talking about scheduling

3   appointments.

4          How does a patient come to be brought to the dentist's

5   office when they have an appointment?

6   A    Basically, again, I mentioned to you that there's a roadmap

7   that the cell house actually receives that has a list of all of

8   the patients, their cells, the times, and the different

9   services they're being brought up for.

10         The officers, I guess, in the cell house -- because I

11  don't work cell houses -- they will go through and if there's

12  9:00 o'clock people or whatever, they start bringing them up,

13  usually patients come up about 8:30, but they'll start bringing

14  up the individuals from their house.  So they have a person

15  that actually escorts them up to the actual cell -- to the

16  actual health care unit.

17  Q    So they're escorted by someone who works there in

18  Stateville.

19  A    By a correctional officer.  Everybody can't escort.  I

20  can't escort.  I don't have a security title.

21  Q    Sure.  So it's by security officer.

22  A    Yes.

23  Q    So what happens when a patient does not arrive at the

24  scheduled time?

25  A    Generally speaking, we're instructed at 15 minutes after

Dr. Mitchell - Direct (Resumed) by Meyer

1   their scheduled appointment, we start calling the cell house

2   for the patients.  Normally, I'll contact the sergeant of the

3   house to find out where Mr. So-and-So is located.  Again,

4   because you're running a pretty tight schedule, it's important

5   to find out what happened to the patient, et cetera.  The

6   sergeant will send up the security person that has that

7   gallery, and that person will come back and say either the

8   patient refused, he decided to go someplace else.  They do run

9   like commissary, so they -- commissary is where they shop for

10  their items, like candy, chips, things like that.  They run

11  commissary.  And, again, I can't schedule around all of that,

12  so sometimes they'll decide I'm going to commissary or

13  whatever.  Usually, the officers will call back and say, Hey,

14  he left, he's not in his cell, et cetera.  If they know

15  specifically where the person went, they'll tell us and we

16  write it down.  If they don't know and just say he's not there,

17  then we'll write that he's a no-show.  After a no-show,

18  generally we reschedule their -- the appointment, again,

19  because I don't want them to not have services, so we try to

20  fit them into the next available scheduled date.

21          Is that what you wanted to know?

22  Q   Yes.

23  A   Okay.

24  Q   And so just to unpack that a little bit, when the security

25  officer tells you a patient is in commissary and doesn't want

Dr. Mitchell - Direct (Resumed) by Meyer

 1    to come to the appointment, do you log that in the medical

 2    records?

 3    A    When we have a specific answer to where the person is,

 4    then, yes, we do write that down.  If the officer can't tell us

 5    where he's at, just that he's not coming because he's not here

 6    or whatever, a lot of times we'll call their door officer

 7    because the door officer kind of knows where they've signed

 8    people out.  If we can get that person, they'll say, Well,

 9    Mr. So-and-So went on a visit, or Mr. So-and-So went to

10    commissary, et cetera.  So, again, we're on the phone calling

11    to see where that particular patient is.  When we can get an

12    answer, we put that into our medical record -- or into the

13    dental chart.

14    Q    Is it possible for a patient to not show up to an

15    appointment for circumstances beyond his control?

16    A    I'm sure it is.

17    Q    Is it possible that the guard could fail to notify the

18    dental staff that the prisoner is waiting?

19    A    You mean the people in the hospital?

20    Q    Yeah.  So let's say the security officer has escorted the

21    patient up to the dental office and -- there's a waiting area

22    in the dental office that's separate from where you do actual

23    treatment, correct?

24    A    Yes.

25    Q    And so is it possible that the guard would bring the

Dr. Mitchell - Direct (Resumed) by Meyer

1   patient up to the waiting area and fail to inform dental staff?
2   A   The way that actually works is when they come up, they have
3   passes.  We have a door officer who logs them into his thing to
4   say that they're actually there and in the holding area.  Then
5   they actually send us back the passes.  If, in fact, there's an
6   error in that, when I call the cell house and I speak directly
7   to somebody in the cell house and they say Mr. So-and-So is up
8   there, we walk up to the front and say, Is Mr. So-and-So here?
9   And then we get the patient if he's there.  If he's not there,
10  then everybody is, like -- then we've now got to figure out
11  where he went.  But there's a communication between the door
12  person and Dental and the sergeant.  There's like in the
13  hospital, we have a sergeant that runs the actual hospital.
14  That person and his staff bring back passes, because, again,
15  you have to realize it's not like one or two people are coming
16  up.  You have people for the physician assistant, eye doctor,
17  M.D., you have lab people, you have people for dental.  All of
18  these services -- and you have people for psychology, like
19  there might be three or four psychologists working.  Passes are
20  coming for all of those people.
21          So once that door officer has logged them all in and
22  sort it out, whatever, they then pass it to the sergeant who
23  then starts walking and giving all of our different services
24  the passes.
25          So it usually works pretty -- pretty well that if the

194

Dr. Mitchell - Direct (Resumed) by Meyer

1   person has come up, we've gotten their pass.

2          Again, now, sometimes there could be an error.

3   Sometimes a person comes and doesn't remember to bring his pass

4   with him.  Then that person could be sitting out there because

5   the door officer is just taking passes as they come in and

6   locking them up.  And, you know, we have like bullpens there.

7   They put them in the bullpen, and then he's logging in, because

8   he has to account for everybody that's in the actual hospital.

9   So, again, before they start moving anywhere, he's logging

10  everybody in on his roster -- I mean, he has that roadmap I

11  told you about.  He's logging them in to say this person is

12  here, that person is here, et cetera.  Okay?

13  Q    Sorry.  Just so I understand, if the person is brought up

14  and is there in the waiting area, as long as somebody in the

15  dental staff follows up on it, they'll find him.

16  A    We do our best to find him, yes, sir, because, again, those

17  are audit things, too.  So we're constantly -- I'm calling

18  every place to find the particular patient.  So we call the

19  door person.  If the door person says he's not there, I'm

20  calling the cell house.  If I don't get a reasonable response

21  from the cell house -- and sometimes people say I can be a

22  little nasty, but I'll call the lieutenant over the radio and

23  say, you know, I'm looking for -- Could you call me?  And they

24  will call me back.  And I'll say, I'm looking for Mr. So-and-So

25  and So-and-So.  He's not here.

Dr. Mitchell - Direct (Resumed) by Meyer

1      Again, we've been instructed that if we don't get

2  satisfaction from that service, then we go to their boss in the

3  actual cell house, which is the major.  You call the major.  If

4  that person is anywhere living anywhere in that facility, he's

5  going to call you back and tell you where that man is at.

6      So, again, there's a tracking system.  We're doing our

7  best to provide services to everybody because, again, we don't

8  have that many spots that we can afford to have people miss or

9  not come when they're scheduled.

10 Q   And it sounds like from your description that dental,

11 medical, psych, those things are all in the same area?

12 A   Yes.  We're all in one building, the health care unit.

13 Again, it has -- when you come in, there's three holding areas.

14 And, again, just to explain it so people understand, we have a

15 holding area for general population, we have a holding area for

16 protective custody, and then a holding area for segregation

17 inmates because they can't be mixed.

18     The guy that's signing them in is logging them in and

19 shooting them into whatever area they have to go to, and from

20 there we get our passes from what they have up front, and then

21 we start bringing them back to the actual clinic.

22 Q   Okay.  And so do those all share a waiting area as well?

23 Is there one kind of bullpen I think you described it --

24 A   There's three separate bullpens.  The general population

25 people are in one big one.  And then on the side, across the

Dr. Mitchell - Direct (Resumed) by Meyer

1   hall, it's a hallway --

2   Q   Sure.

3   A   -- on this side, there's protective custody and

4   segregation.

5           The bullpens are like when you first walk into the

6   health care unit, and then there's a gate that -- actually,

7   they open, and that's when we start bringing the inmates back

8   to us.

9   Q   So the patients -- the patients are segregated.

10  A   Based upon the particular classification they are.

11  Q   Right.

12  A   Segregation people don't go into a bullpen with general

13  pop.

14  Q   Right.

15  A   Protective custody doesn't go in with either of them.  They

16  are all separate.

17  Q   Sure.

18  A   General pop. can all go together, though.

19  Q   Yeah, and just -- and I may have phrased that poorly.

20          So the -- it's the patients, there are three separate

21  bullpens, but there's not a separate one for each different

22  medical classification, so if you're --

23  A   No, not all of our patients all go into the -- one of them

24  bullpens.  I mean, so if the P.A. has two people scheduled, her

25  two is in there at 9:00 o'clock, my four is in there at

Dr. Mitchell - Direct (Resumed) by Meyer

1    9:00 o'clock.  Every -- I mean, all of our services are in a --
2    one of the bullpens.
3    Q    Thank you.  That was my question.  Thank you.
4          So going back to the appointments, even if a patient
5    has an appointment, that doesn't necessarily guarantee that
6    they're going to be seen by the dentist; is that correct?
7    A    99 percent of the time, we do see the patients.  The only
8    time that patients, if they come up --
9    Q    I'm not talking about just if they come up.  Just
10   generally.
11         So let's say they have a patient -- they have an
12   appointment -- the patient has an appointment.  That doesn't
13   necessarily guarantee that they will actually see the dentist.
14   A    For the most part, it does guarantee they're going to see
15   the patient -- I mean see the dentist, with a few exceptions.
16   And I don't know if --
17   Q    Sure.  What are the exceptions?
18   A    Okay.  The exceptions are let's say we have people who are
19   administrative detainees, and that sounds -- these are people
20   who used to be at what we call Tams (phonetic), and they're
21   brought up.  They can't be mixed with anybody.  Let's say I
22   have some 9:00 o'clock patients, but I have one of those guys
23   on my schedule.  When he comes up, he can't go in the bullpen.
24   He can't be mixed with anybody else.  Nobody else can come into
25   the dental clinic but him when he's in there.  And he has to

Dr. Mitchell - Direct (Resumed) by Meyer

1    have so many officers, like a lieutenant and another officer,

2    on him because of his status.  All of the patients wait until

3    he's done because, again, his movement requires so many extra

4    people, extra whatever, and his security level is so high that

5    I can't mix anybody with him.

6            In those cases, you get an administrative detainee who

7    has a problem, I got to bring him up, that may affect my

8    schedule down the road because, again, whatever that person

9    needs I got to do before I can go to the next person.

10           So, generally, maybe by the end of the day, we've run

11   out of time, which means I don't have any more time.  The staff

12   has a specific time that they get off before they go into

13   overtime.  The state does not want to pay overtime, so we may

14   have to cut a person short in that event.

15           But 99 percent of the time, that's not what happens.

16   If a person has an appointment, I've allocated time and a

17   staff -- I mean, there's time and staff for us to get everybody

18   done.

19           And for the most part, my call lines, we mark off

20   people when they're there.  You might have one or two people

21   who were a no-show or something that did not come and we

22   couldn't find.  Everybody else was seen.  It's just important

23   for us to see all the patients when they come.

24   Q    So what happens when there's a lockdown?

25   A    When there's a lockdown, we're not allowed to bring anybody

Dr. Mitchell - Direct (Resumed) by Meyer

1    up.  So then the staff has to change modes.  The mode then

2    becomes finding a location for all of these patients in a

3    schedule that is already pretty well booked.  So the staff

4    starts documenting in the record that we're in a lockdown.  The

5    first couple of days of a lockdown, we're not allowed to bring

6    anybody up.  In four or five days, when whatever the situation

7    has started calming down, we can get special permission.  And

8    you have to go to the shift commander, sometimes the assistant

9    warden, to get permission to bring a person up.

10             And, again, a lockdown is not nice, and usually

11   something major has happened for them to lock the whole

12   facility down.

13   Q    So you mentioned special permission.

14             What do you have to show to get special permission to

15   bring somebody up during a lockdown?

16   A    I have to show a need that it's an emergency.

17   Q    And what would you show for an emergency?

18   A    Let's say a patient says that they're in excruciating pain,

19   their face is swollen, things like that.  If a person says --

20   and this has happened in the past -- that I'm no longer able to

21   close my mouth, da-da-da-da-da, because he might have been in

22   an altercation and broke his jaw or something, then I have to

23   say I have to see this man because of the following reasons.

24             Again, it goes to a higher power than me.  They make

25   the decision yay or nay.  And then when they bring somebody up,

Dr. Mitchell - Direct (Resumed) by Meyer

1    security has to bring them up.  You know, people are standing

2    there while you're working on them because they're, like, how

3    long, because we got to get these people back.  It's just -- it

4    can be a very inconvenient time.  But, again, the goal for us

5    is if that person needs to be seen, I need to get him up there,

6    so ...

7    Q    So when you can, you'll bring somebody up during a

8    lockdown.

9    A    Yeah, but the first couple of days, they're not even going

10   to entertain me.  I mean, I can call and say Mr. So-and-So has

11   a problem and I really need to see him, and they'll say, Not

12   today, call back tomorrow.  And, again, that's a security

13   issue.

14   Q    I understand.

15   A    Okay.

16   Q    One of the other things you mentioned was staff shortage.

17   You said that a lot of times you have ample staff, but on

18   occasion you might have a staff shortage.  That might be

19   another reason why a patient can't be seen in a particular day.

20   A    That's correct.

21   Q    The equipment could fail?

22   A    Every now and then, yes, we've had a major shutdown where

23   the equipment -- or our compressor, which runs the drills and

24   stuff, went down.  I can take x-rays.  I can't do a whole lot

25   because the compression -- and most people that go to the

Dr. Mitchell - Direct (Resumed) by Meyer

1    dentist's office never know that that equipment is in the back

2    that actually runs everything.  No compressor is no work.  So

3    our compressor has gone down, and we've had to have it

4    replaced, so ...

5    Q   And you also mentioned that the staff could run out of

6    time.

7    A   Yes.  I told you that on rare occasions, but we can run out

8    of time, again, based upon what other problems have impacted

9    our schedule.  Generally, if we run out of time, we try to

10   schedule that person back at the earliest available appointment

11   that I can get that person back in.

12   Q   So you mentioned that certain of the staff can't be paid

13   overtime.

14        What time is the cut-off?

15   A   We start at 8:00 o'clock, and we are done at 4:00 o'clock.

16   Normally, about 3:30 to a quarter to 4:00, we have to do a

17   count.  Because we work in a correctional facility, our

18   instruments could be used as weapons.  So at about a quarter to

19   4:00, at the absolute latest, the staff has to count every

20   instrument.  We have to account for all the needles.  We have

21   to count all the medication to make sure our drug count checks

22   before anybody can go home.  If there's an instrument missing,

23   it's a major concern because it can be used as a weapon.

24   Q   So you try to complete all your dental work by 4:00 p.m.

25   A   Yep, you try to -- yes, by 4:00.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   And you had certain administrative responsibilities -- I'll

2  call them "administrative" loosely.  I don't mean as an

3  administrator of the prison.  But you had certain

4  responsibilities that you had to wrap up before you could leave

5  for the day.  Counting your equipment, for example.

6  A   Right.  All of our records, any patient that has not come

7  up, all of those patients are rescheduled, et cetera, before we

8  leave because all medical records have to be back in medical

9  records before we can go home.  So everything -- all

10 documentation is done.  Charts are taken back.  And, again, the

11 staff is doing what I just told you.  They got to count all the

12 instruments, and that means everything, all the drugs, to make

13 sure we have a good count.  All the needles have to be counted

14 because, again, that's on the count.  So generally it's taking

15 two people 15 to 20 minutes to hit all of the drawers and count

16 everything and make sure we got a good count --

17 Q   So based on that, would you actually stop seeing patients

18 closer to 3:30?

19 A   May I say this?  Sometimes I and other doctors are still

20 working, counting the instruments that we're using as we're

21 working; but, generally speaking, by 3:15 -- I mean a quarter

22 to 4:00 at the latest, the staff -- because they've got to bag

23 everything and get it ready.

24       Now, if they don't, then if I'm working over, I have

25 to make sure my count is correct, bag it, secure everything

Dr. Mitchell - Direct (Resumed) by Meyer

1  before I can go home.  And at 4:00 o'clock, we don't get paid.

2  So I can work as long as I want to, but at 4:00 o'clock we're

3  off the clock.

4  Q    I hear you.

5         So I'd like to take a shift --

6  A    Sure.

7  Q    -- now to the policies that apply to the provision of

8  dental care at Stateville.

9         And I'm going to take just a minute and take a sip of

10  water.  Excuse me.

11  A    No problem.

12  Q    So Stateville has certain policies that apply, that apply

13  to the provision of dental care, correct?

14  A    Yes.  It's the Administrative Directive Dental Care For

15  Inmates.

16  Q    I'm going to hand you what I have marked as Exhibit 5.

17       (Tendered.)

18  BY MR. MEYER:

19  Q    Can you take a quick look at this document?

20  A    Yes.

21  Q    Do you recognize it?

22  A    Yes.

23  Q    What is it?

24  A    It is the specific administrative directive that we utilize

25  in providing dental care to the inmates.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    So this tells you how to do your job.

2    A    Pretty much, yes.

3              MR. MEYER:  Your Honor, I move to admit.

4              THE COURT:  Any objection?

5              MR. STALEY:  No objection, Judge.

6              THE COURT:  Okay.  It will be admitted.

7        (Said exhibit received in evidence.)

8    BY MR. MEYER:

9    Q    So would you say that your primary responsibility as a

10   dentist at Stateville is to make sure that patients receive

11   care in accordance with these policies?

12   A    Yes.

13   Q    And you're familiar with the policies in this document?

14   A    Yes.

15   Q    Does this document specify any particular procedures that

16   are allowed or disallowed at Stateville?

17   A    Not specifically, no.

18             MR. MEYER:  I'm going to publish this to the jury, if

19   I may.

20             THE COURT:  You can.

21   BY MR. MEYER:

22   Q    So this is the document that we've been discussing,

23   correct?

24   A    Yes.

25   Q    And you can see it there on your screen?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    Yes.

2    Q    Great.

3    A    Ah-ha.

4    Q    I'd like you -- to direct you to page 4 -- well, first,

5    just for the benefit of the jury, we've been looking at the

6    document and they haven't.

7         Could you tell me what this document is again one more

8    time, please?

9    A    Again, it's the administrative directive.  It tells us that

10   dental care is under the Program and Services.  The subsection

11   is Medical and Health Care.  And the subject is Dental Care for

12   Offenders.  So our directives are written like that.  So you

13   know that if it's a business policy, it will be under the

14   business office, et cetera.  So each policy, they give it three

15   different titles so you know what area it's specifically under.

16   Q    Right.  And so it's broken up into paragraphs.

17   A    Yes.

18   Q    And it's a relatively short document.  Up here, you can see

19   it's about six pages long; is that right?

20   A    Yes.

21   Q    There's an attachment at the end, which is the sixth page.

22   A    Yes.

23   Q    So I'd like to talk about some of the procedures in this

24   document.

25        First, could we turn to page 4, paragraph 8?

Dr. Mitchell - Direct (Resumed) by Meyer

1        What is this paragraph?

2  A   That basically is giving you an indication of what

3  specialty services you may encounter and you may have to

4  consider.

5  Q   So here in subparagraph A, it says that certain

6  "specialties of dentistry such as oral surgery shall be

7  available and utiliized as clinically indicated and subject to

8  utilization review."  Is that right?

9  A   Yes.

10  Q   What does the phrase "clinically indicated" mean?

11  A   I think what the oral surgeon explained to you and I will

12  reiterate.  When we look at oral surgery procedures, some are

13  procedures that require special drills and for a person to have

14  IV sedation, we don't have any of those options, so the person

15  would then have to go out for that particular service.

16        Is that what you're asking me?

17  Q   So I'm asking you when it says "clinically indicated," I

18  don't know what that means.  That doesn't mean anything to me.

19        So when you see the phrase "clinically indicated,"

20  what does that mean to you as you're trying to follow this

21  policy?

22  A   Based on, for instance, specific problems.  If a wisdom

23  tooth, for instance, is impacted, there are problems with that

24  particular wisdom tooth, et cetera, that we can't handle within

25  the actual facility, then he's sent out for that particular

                    Dr. Mitchell - Direct (Resumed) by Meyer

1    service.

2    Q    So does it mean that it's something that you as the

3    clinician, as a dentist, or any of the other dentists in

4    Stateville have identified as a problem that needs addressing?

5    A    We've identified -- I guess.  I'm not quite sure of your

6    question.

7    Q    Well, you know, so really my question -- and maybe we can

8    break it up into parts.  So it's clinically indicated.

9         So clinically, you know, tells me that this is

10   something that happened within the dental office, that happened

11   within the clinic.  Is that a fair characterization?

12   A    No.

13   Q    So what does it mean to you?

14   A    Okay.  You said it happened in the dental clinic.

15   Q    So --

16   A    No.  That's -- I'm saying it's a service for something that

17   the dental department has identified that would be indicated

18   for that particular person in a specialty service.  So I don't

19   know -- when you say it happened in the dental clinic, that

20   doesn't make sense.

21   Q    Yeah, so I'm talking about the word "clinically" broadly,

22   in a broad sense.  So I'm not saying that they injured their

23   tooth in the clinic.

24        What I'm saying is that if it's clinically indicated,

25   then whatever is being indicated is something that was

Dr. Mitchell - Direct (Resumed) by Meyer

1   identified by a clinician, by a dentist.

2   A    I'm going to say I guess, okay.  I'm not quite sure where

3   you're going, but okay.

4   Q    Okay.  I'm just trying to understand the phrase, because on

5   paper it doesn't really mean a whole lot to me as an attorney

6   who doesn't provide medical care.

7   A    Okay.

8   Q    And so clinically indicated.  And so when it says

9   "indicated," does that mean that this is something that's

10  written in the medical records?  Does it mean that it's

11  something that the dentist has identified a procedure that

12  needs to be performed?  What does it mean to be clinically --

13  for the specialty to be available and utilized as clinically

14  indicated?

15  A    I guess it's a service that needs to go out for a

16  specialist, I guess.

17  Q    Okay.  At the determination of a dentist at Stateville.

18  A    A dentist and -- whenever there is a specialty referral

19  like that, we have to send it to the agency medical director

20  for them to decide -- and also utilization.  The company that

21  pays the bills for this, it goes to them as well.  So Wexford

22  Health Source is the medical vendor who provides the funds

23  for -- who pays the bill for this.  If we think it's something

24  that needs to be done, then I have to write up a referral, like

25  you saw with the oral surgeon --

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    Sure.

2    A    -- where we write a referral to them.  Utilization reviews

3    it and says yay or nay.

4    Q    That's a good example.  So Mr. Weaver having his wisdom

5    tooth removed by Dr. Scheive was a procedure that was

6    clinically indicated --

7    A    Right.

8    Q    -- under subparagraph A.

9    A    It was approved by the utilization review, so yes.

10   Q    Right.

11        And so then subparagraph B is talking about other

12   services that can be provided, correct?

13   A    Yes.

14   Q    And so it says that certain services and procedures -- so

15   endodontics -- what are endodontics?

16   A    Root canals.

17   Q    Periodontics.

18   A    Those are cleanings, people who have periodontal disease.

19   Q    And the continuation of orthodontic care.

20   A    Generally, if you have a young person that comes into

21   juvenile justice, and, again, and they have braces on their

22   teeth and stuff, they can consider sending that person out to

23   an orthodontist to finish his orthodontic treatment.

24   Q    So these procedures "may be available as determined

25   clinically necessary by the facility dentist or dental

Dr. Mitchell - Direct (Resumed) by Meyer

1    director, if applicable."  Is that right?

2    A    Yes.

3    Q    So who is the facility dentist in this paragraph?

4    A    That would be the people in the dental department.

5    Q    So whoever is treating the patient.

6    A    Yes.

7    Q    And so on occasion that would be you --

8    A    Yes.

9    Q    -- when you're treating the patient.

10   A    Correct.

11   Q    Who is the dental director?

12   A    We don't have one.

13   Q    Okay.  Were you ever the dental director?  Was that your

14   role when we talked about back in 2005?

15   A    Yes.  2004 is when I no longer was the dental director.

16   Q    Okay.  And then you joined the union, and you were no

17   longer dental director.

18   A    Became the lead dentist.

19   Q    Okay.  So subparagraph B also says -- it provides a list of

20   factors that you would consider in making the determination of

21   whether a procedure was clinically necessary.  Is that correct?

22   A    Yes.

23   Q    And so those factors are here.  "Priority of the dental

24   need."  Correct?

25   A    Yes.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    "The availability of staff."  Correct?

2    A    Yes.

3    Q    "Time."

4    A    Yes.

5    Q    "And equipment."

6    A    Correct.

7    Q    So is it fair to say that cost is not a factor that's

8    listed here in subparagraph 8(b)?

9    A    It doesn't say cost, no.

10   Q    So under this policy, subparagraph 8(a) and 8(b), when you

11   as the dentist, as the treating dentist, or any other treating

12   dentist in the facility, when you decide that a certain

13   treatment is clinically indicated or clinically necessary, do

14   you always have to get approval before performing it?

15            And I'm talking about upward approval, not approval

16   from the patient.

17   A    Yes.

18   Q    So any clinically necessary procedure you'd have to get

19   approval for?

20   A    Yes.  Again, I told you you fill out a referral form.  You

21   do -- it goes to utilization review.  Utilization review

22   decides whether or not it's a yay or a nay.  That's --

23   Q    So are all of these -- it sounds like to me like the way

24   you're describing this paragraph is that these procedures is

25   what's -- what applies -- or these paragraphs is what applies

Dr. Mitchell - Direct (Resumed) by Meyer

1  when you're sending somebody out of Stateville to receive

2  treatment elsewhere.

3  A   Some of it, but some of it also would be if you were trying

4  to provide services inside.

5          Can I give you an example?

6  Q   Yes, I would love it.

7  A   One of the things that you pointed out is the priority of

8  need and the availability of staff, time, and equipment.

9          We don't necessarily have the equipment to do

10 everything that I can do in my private office.  So if you don't

11 have the equipment, you can't do it.

12 Q   Sure.

13         So my question was do these paragraphs both apply

14 within Stateville to procedures that are performed within

15 Stateville as well?

16 A   In some cases, yes, ah-ha.

17 Q   So now I'd like to go up one paragraph to "Dental

18 Emergencies."

19         So this paragraph says that whenever someone, a

20 patient at Stateville, for example, is experiencing a dental

21 emergency as defined by the staff dentist, that they'll receive

22 an examination no later than the next working day after the

23 emergency occurs.  Is that correct?

24 A   That's correct.

25 Q   The dental staff works Monday through Friday?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    Yes.

2    Q    So Saturday and Sunday would not be working days.

3    A    That's why it says the next working day.

4    Q    That was my question.

5    A    Yes.

6    Q    So it says, "Dental emergency as defined by the staff

7    dentist."

8          So who is the staff dentist?  Would that be the same

9    person as the facility dentist in 8(b)?  Would those be the

10   same people?

11   A    Yeah, because those are the people that are inside the

12   facility, so yeah.

13   Q    So how would a staff dentist go about defining what a

14   dental emergency is?

15   A    Actually, your AD gives you specific information.

16   Q    Your what?

17   A    Your Administrative Directive.

18   Q    Okay.

19   A    Category I.

20   Q    So where is that?

21   A    Page 6.

22   Q    Let's turn to page 6.

23          So when you say AD, Administrative Directive, you're

24   referring to this full document?

25   A    Yes.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q    So this is Attachment A, page 6 of the Administrative

2  Directive.  What is this?

3  A    That is the American Public Health Association.  It's the

4  base categorization of dental patients.  And it's a -- Public

5  Health will categorize dental needs according to this

6  particular document.  So this is their actual categorization.

7  It's not something we made up.  They basically look at all the

8  conditions that you could have in your mouth, and they're

9  giving you a code to say this is a one, which is an emergency,

10  this is a two, which isn't an emergency but a higher priority,

11  et cetera.  So it's how they prioritize care and treatment.

12  Q    So is it fair to say that different situations a patient

13  could be experiencing, they're broken into three or four, five,

14  and six categories?

15  A    Yes.

16  Q    And Category I is emergencies.

17  A    Yes.

18  Q    So when a staff dentist is defining what an emergency is,

19  this is where they would go to understand it.

20  A    They're looking at what the reported symptoms are and

21  seeing if it fits into any of these categories.

22  Q    So these categories, some of them are symptoms themselves,

23  right?  Like bleeding and pain, those are symptoms.  Correct?

24        And then some of these other categories are diagnoses,

25  correct?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    Yes.

2    Q    So acute -- could you say this word for me?

3    A    Periapical.

4    Q    Thank you.

5    A    You're welcome.

6    Q    Abscess.  That would be a condition.

7    A    Yes.

8    Q    Not a symptom necessarily.

9    A    There's a symptom that goes along with it, but yes.

10   Q    And so what would be the symptom that goes along with this?

11   A    Generally speaking, a person, when they have an acute

12   periapical abscess, it's swelling underneath the tooth that,

13   when they bite down on it, it gives them excruciating pain.

14   Q    Are there any other symptoms associated with that?

15   A    That's the most common one.

16   Q    Would they feel any kind of pain, just generally?

17   A    They can feel some acute pain.

18   Q    But not necessarily.

19   A    But not necessarily.  But a lot of times the way it's

20   actually diagnosed is, because radiographically you haven't

21   seen any changes, but the person will say that when I bite on

22   the tooth, it hurts.

23   Q    Is it something that would be identifiable in an x-ray?

24   A    Not at this point, no.

25   Q    At what point would it be identifiable in an x-ray?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    When it's chronic, that it's been there for a little while.

2    Q    How long is a little while?

3    A    It just depends on the source of the infection.  Some

4    people will have a chronic abscess.  If they have a periodontal

5    problem and they've gotten ingress of bacteria around the

6    actual tooth and it's going down underneath the tooth, because

7    in your tooth you -- your tooth is like sitting like this, and

8    then there's little spaces that run around the side of it.

9    When bacteria gets between the tooth and that tissue, it's an

10   intraligamentary space, then you can develop an acute

11   periapical abscess.  And that can come from periodontal, it can

12   come from caries, et cetera, dental care.

13   Q    Another category is periodontitis?

14   A    Yes.

15   Q    What is that?

16   A    That's when you have a lot of inflammation in your gums.

17   Q    What is a Vincent's infection?

18   A    About the same thing, where they're starting to show that

19   the gums are actually receding.  The mouth does not look very

20   good.

21   Q    Gingivitis is also a gum disease?

22   A    Yes.

23   Q    What is stomatitis?

24   A    I'm not quite sure.

25   Q    The next category is fracture of teeth.  Right?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    Yes.

2    Q    So that means the tooth broke?

3    A    Yeah, it depends on the actual tooth.  For instance, if you

4    had a child, let's say the child was out playing and he falls

5    and he cracks his front tooth in half or something or breaks a

6    big chip off of it, that's what they're talking about when the

7    tooth fractures like that.

8         Sometimes you can have a fracture where a person has

9    an underlying cavity that's eating away and then the enamel

10   will just break.  That's not an acute fracture.  That's just

11   the enamel broke because the decay was eating away at it.

12   Q    I'm assuming that chipping your tooth also is not counted

13   under this category as an emergency.

14   A    No.

15   Q    And then jaw fracture is the next category?

16   A    Yeah, broken jaw is usually one of the ones that's kind of

17   obvious.

18   Q    Sure.

19   A    If a person has a break in their jaw, it is a total

20   displacement.  You have nerve endings running through your jaw.

21   You break it, it's going to hurt.  And usually we have to try

22   to send that person out within the day, next day or so.

23   Q    And then the last one is gaping wounds.

24   A    Yes.  Sometimes when -- you know, you've seen your child

25   when they fall and they get a big cut and it's a major

Dr. Mitchell - Direct (Resumed) by Meyer

1    laceration, it's bleeding, we can't stop the bleeding,

2    et cetera, that's a major.

3    Q    So I would like to go back and ask you a few more questions

4    about category B, the -- I'm just going to say abscess.  I'm

5    still not sure I can pronounce that middle word --

6    A    Periapical.  That's fine.

7    Q    I'll try next time.

8             So we talked about some of the symptoms.  What are

9    some of the consequences?

10   A    What -- like what?  I don't -- I'm not --

11   Q    So if left untreated, what could happen?

12   A    The abscess can get larger.  Sometimes if it's in the lower

13   jaw, it can spread and can block off your airway, et cetera.

14   Q    Could it cause bone loss?

15   A    Yeah.  Some bone loss, yes.

16   Q    How long -- would it start causing bone loss immediately

17   or --

18   A    No.

19   Q    Have to be there a while?

20   A    That's why you feel, when you're biting on it, the

21   pressure, I mean, because there is no place for it to go.

22   There is no bone loss, because there's no place -- the bone is

23   still intact.  There's no place for it to go, so that's why --

24   it's raising kind of out of the mouth, so when you bite on it,

25   it's pushing on that.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q    So you would feel pressure in your jaw.

2  A    Yeah, usually pain.

3  Q    What is the treatment?

4  A    If it's periodontal, normally what we will do is clean the

5  tooth, put them on an antibiotic, give them pain medication.

6  And depending on how much bone loss the person has had, you

7  make a decision whether the tooth can be saved or it needs to

8  be extracted.

9  Q    And so what happens if it's not responsive to an

10 antibiotic, if the symptoms continue?

11 A    I'll do an intraligamentary injection where I inject around

12 the ligaments and take the tooth out and then debride the area.

13 Q    Might you try a different antibiotic first?

14 A    You can do that.  A lot of times we put them on a broad

15 spectrum antibiotic.  Azithromycin basically knocks out the

16 infection and pretty much all of the microbials that you're

17 going to have in your mouth.  So, again, it depends on the

18 symptoms.  You can change.  It depends on how much that patient

19 can tolerate the pain.  I mean, if I'm uncomfortable and I put

20 you on a broad spectrum antibiotic and I'm still having the

21 same symptoms, most patients don't want to go another regimen

22 of seven to ten days to decide, you know, I really need this

23 tooth out now.  So, again, we can do that.

24        The other option is you can do a root canal on the

25 tooth.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   So I'm going to move to a different category.  I'm going to

2   take this document down.

3              We've mentioned a few times that you also have a

4   private practice --

5   A   Uh-hum.

6   Q   -- is that correct?

7              So that means you have a dental office where anyone

8   can make an appointment and come and see you.

9   A   Yes, with the exception of inmates or individuals who have

10  been incarcerated.  We're not allowed to actually see those

11  patients.

12  Q   So you don't have a contract with the prison like

13  Dr. Scheive where people will come in.

14  A   No.  When you work for them, you're not -- that is

15  considered fraternization, and we're not allowed to do that.

16  Q   Self-dealing?

17  A   Huh?

18  Q   You mean self-dealing?  You said fraternization --

19  A   Well, there are strict rules in terms of your behavior.

20  And if you are seeing a family member or an inmate, that's a

21  conflict.  That ain't going to work.

22  Q   So is that a conflict for dental?  Or is that a conflict

23  from Stateville?  Whose rule is that?

24  A   That is the State's rule.  You can lose your job.

25  Q   Okay.

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    Okay.

2    Q    So what type of dental treatments do you provide in private

3    practice?

4    A    I do crown and bridge.  We do individual crowns.  I restore

5    implants.  I don't do implants personally.  I send them out to

6    the periodontist, but then I restore it.  I do removable

7    prosthetics.  We do root canals, clean teeth, fillings,

8    composites.

9    Q    General practice.

10   A    General practice, yes.

11   Q    So did you -- is that the same type of practice you

12   performed at Stateville?

13   A    No, because I'm not doing a general community -- general

14   practice at Stateville.  I'm doing a community-based practice,

15   community-based services, so -- no.

16   Q    So your practice -- is it fair to say that your practice at

17   Stateville was more limited than your practice in private

18   practice?

19   A    Yes.

20   Q    So are you also limited in your ability to provide services

21   to the patients inside Stateville in comparison to your private

22   practice?

23   A    Correct.

24   Q    So, for example, you can't do implants in Stateville.

25   A    No.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   What are implants?

2  A   Implants are actually inserted into the actual bone in your

3  mouth.  And, like I said, I send it out to a periodontist.  It

4  takes a lot of equipment for you to do implants.  Once the

5  implant is in, they put a healing cap on it.  It sits for four

6  months.  After it's healed, et cetera, then I actually load it

7  with a post that goes on top of the implant, and then we take

8  an impression and send it out and do the actual crown.  Or if

9  it's a bridge and they have two implants, once I put the post

10 on, take an impression, send it out to the lab, they fabricate

11 the bridge, I deliver it.

12 Q   So it's a prosthetic tooth that's actually --

13 A   Yeah, it's a fixed prosthetic as opposed to a removable

14 prosthetic.

15 Q   Thank you.

16         And you mentioned bridges.  Can you do bridges in

17 Stateville?

18 A   No.

19 Q   What is a bridge?

20 A   When a person is missing, let's say, a tooth, you can cut

21 down the tooth in front and behind the missing space and then

22 put a permanent -- it's like two crowns and a connector, which

23 is an abutment together, and you cement that in place.

24 Q   Does your dental office provide implants in your private

25 practice?

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    I don't do implants.  I do the restoration of the implants.

2   Q    Does the office that you work for provide them?

3   A    No, I send them out to the periodontist.

4   Q    Do you know how much they charge?

5   A    2,000 a -- 2,000 per implant.

6   Q    You don't do periodontal surgery at Stateville.

7   A    I don't do periodontal surgery at Stateville, no.

8   Q    What is periodontal surgery?

9   A    It's actually where they go in, lay a flap, push the tissue

10  back.  If a person has some defective bone, they can actually

11  smooth that out.  You cut the gingiva down, re-suture it back

12  together.  Basically your teeth are going to look a lot longer

13  because of the fact that you've actually taken bone and tissue

14  down.  But -- that's -- that's one of the surgeries that they

15  do.

16  Q    You also don't do crowns at Stateville.

17  A    No.

18  Q    And that's policy.

19  A    It's also we don't have the equipment.  When you start

20  saying you're going to do a crown -- and, again, I know you're

21  not a dentist -- you have to have diamond burs.  You have to be

22  able to take impressions.  You have to be able to send it out

23  to the lab for it to be fabricated and then have it brought

24  back for delivery.  We don't have those supplies or equipment,

25  so we don't do crowns.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   Why doesn't Stateville have that equipment?

2   A   I don't know.  I think it's just not a service that we

3   provide.  I don't know.

4   Q   It would be costly?

5            MR. STALEY:  Objection.  Leading.

6            THE COURT:  Well, he's permitted to, so -- for a party

7   opponent.  Overruled.

8   BY THE WITNESS:

9   A   Because it's too costly?

10  BY MR. MEYER:

11  Q   Would that be a reason that they wouldn't provide it?

12  A   That might be one of the reasons.  I don't know.  I mean,

13  we just don't do crowns.

14  Q   So I'd like now to talk about specifically the dental

15  treatment that you performed on Mr. Weaver.

16  A   Okay.

17  Q   I'm going to hand you a document that we've marked as

18  Exhibit 1.

19      (Tendered.)

20  BY MR. MEYER:

21  Q   Would you take a moment and familiarize yourself with the

22  document?

23  A   I have.  I'm good.

24  Q   Great.

25           Do you recognize this document?

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    Yes.

2   Q    What is it?

3   A    It's Mr. Weaver's dental chart.

4   Q    And so this records the dental treatment that has been

5   provided to Mr. Weaver at Stateville.

6   A    Yes.

7   Q    And the treating dentist makes these records shortly after

8   treating the patient?

9   A    Yes.

10  Q    Was this document kept in the regular course of the

11  practice in the dental office at Stateville?

12  A    Yes.

13  Q    Is keeping this record part of the dental office's regular

14  practice?

15  A    Yes.

16          MR. MEYER:  Your Honor, I move to admit.

17          MR. STALEY:  No objection.

18          THE COURT:  It will be admitted.

19      (Said exhibit received in evidence.)

20  BY MR. MEYER:

21  Q    When a patient starts seeing a dentist at Stateville, are

22  they assigned a particular dentist?

23  A    No.

24  Q    So they may come and see a different dentist for their next

25  appointment and then see even a different -- a third dentist

Dr. Mitchell - Direct (Resumed) by Meyer

1   for a third appointment, even if they saw a completely

2   different dentist for a first appointment.

3   A   Yes, that can happen.

4   Q   I'm sorry for the wording of that.

5   A   Okay.

6   Q   But each time that they go to the dental office, they may

7   see a different dentist.

8   A   They can, yes.

9   Q   And so each time the doctor is treating the patient, they

10  have to review the medical record before they can provide

11  treatment.

12  A   Yes.

13  Q   Because this is the only way for a treating dentist to

14  really understand what's been done before.

15  A   Correct.

16  Q   So when you began your treatment of Mr. Weaver, did you go

17  back and review his prior treatment in these medical records?

18  A   I went back and reviewed his treatment in reference --

19  okay.  Well, in reference to what exactly?

20  Q   Well, so the first time you saw Mr. Weaver, and if you

21  recall, did you review his medical record?

22  A   Yes, I did look at his medical record.

23  Q   And is this the document that you reviewed?

24  A   Yes, this would be the document.

25  Q   So when Mr. Weaver first came to Stateville, did he receive

Dr. Mitchell - Direct (Resumed) by Meyer

1   a dental evaluation?

2   A   Yes.

3   Q   Is that reflected in the medical record?

4   A   Yes.

5   Q   Could you point me to it?

6   A   It's the very first entry.

7   Q   So this is the first page.  This is the medical record.

8   And so the first entry would be the next page?

9   A   Yes.  That's the first -- yes.  If you had a better copy,

10  it would say that he had an intake exam, panorex, oral hygiene

11  instructions given, and then he saw a different dentist,

12  another dentist.

13  Q   So that would be this first entry right here.

14  A   Yes, October the 11th, 2005.

15  Q   And so whatever the results of this evaluation were, if

16  there was some kind of problem that needed to be addressed,

17  would it be recorded here?

18  A   It would have been -- it should have been recorded on the

19  front of the actual chart.

20  Q   Is there any issue with Mr. Weaver's Number 12 tooth

21  recorded on the front of the chart?

22  A   Right now it's -- there's marks, they're black and -- so

23  the problem with this document, it's a copy.  If Mr. Weaver had

24  cavities, it would be in red.  And I can't tell you whether it

25  was in red or not because it's a copy.  You'd have to have the

Dr. Mitchell - Direct (Resumed) by Meyer

1    original chart.  Sorry.

2    Q    The Number 12 tooth does not appear to be colored in,

3    though, does it?

4    A    The interproximals on 12 and 13 are colored in.  The

5    interproximals on Number 5 is colored in.  Number 2 has an

6    indication.  And, again, I can't tell you if that's a cavity,

7    filling, or whatever because of the way it's marked.  The only

8    indication that I have that that might be cavities -- and I

9    don't know -- is that if you look over here, existing

10   restorations, at the bottom in the corner, it's showing that he

11   had a filling on Number 3 already, he has a filling in his

12   mouth already on Number 14, he had fillings on 18, 19, 30, and

13   31, because we mark anything that he has existing when he walks

14   in the door.  And on the other document, it marks anything that

15   is cavities.

16   Q    Okay.  Thank you.

17   A    Okay.  You're welcome.

18   Q    So what is the first time that -- could you review the

19   pages quickly and try to determine the first time that you

20   treated Mr. Weaver?

21   A    I think initially -- I didn't see him -- for treatment or

22   the first entry on my name?

23   Q    Where is your first entry?

24   A    On 7/10/2008 I had a rescheduled two-year exam.  And then I

25   rescheduled the two-year, and I also picked up the appointment

Dr. Mitchell - Direct (Resumed) by Meyer

1    that the dentist had given him for his root canal fill also, so

2    I scheduled him at the same time as -- that parentheses that

3    say next visit, NV, and in parentheses it says two-year exam,

4    root canal fill, 7/23/2008.  That's the first time I did any

5    entry on his chart, so it wasn't until July 23rd of 2008.  I

6    think that's like almost three years after he came in.

7    Q    Is this your signature?

8    A    Yeah.  I'm sorry.  It may be a little tacky, but I was

9    writing fast.

10   Q    No, that's okay.

11   A    Okay.

12   Q    So we can use this signature to identify your markings in

13   this document.

14   A    Yes, you can.

15   Q    Is this also your signature?

16   A    Yes.

17   Q    So when we turn to this page, we turned past another one of

18   these.

19           So what is this page, and what is the difference

20   between this page and the next one where there are handwritten

21   notes?

22   A    I'm sorry.  What happens is, because we have a limited

23   amount of space to really document the services, that's why

24   when you look at his chart, like for the entry on the first

25   page, 4/9/2008 --

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   Can you direct me to it on the screen to what you're
2   talking about?
3   A   Oh, I'm sorry.  I was telling you -- go back a page.
4   Q   I'm on the second page, so tell me where to go --
5   A   Right there.  Can you see my hand?
6   Q   No.
7   A   You can't?
8   Q   I cannot.
9   A   What do I have to do --
10          THE COURT:  Yes, usually she's able to do that.  I
11   don't -- oh, there you go.
12          THE WITNESS:  Right here.
13          THE COURT:  She just made --
14   BY THE WITNESS:
15   A   I just made a little purple mark right there.  If you look
16   at that whole section, the dentist there wrote everywhere
17   because, technically, when we get to that bottom line, you're
18   supposed to start a new chart, if that makes sense.
19   BY MR. MEYER:
20   Q   So are we talking about everything that's --
21   A   All of that, yeah, that should have been made into a new
22   chart, a new record.
23   Q   Okay.
24   A   So what you saw here is he's now getting a new chart.
25   There's no more room for us to write anything on it.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q    Right.

2   A    So --

3   Q    So then this page is the beginning of a new chart.

4   A    This is the beginning of a new chart, because our records

5   are only so much writing space.

6   Q    Okay.  So what would be recorded on this -- this is a cover

7   sheet, so what would be recorded on this page when you start a

8   new chart?

9   A    The hygienist who did this should have written -- and,

10  again, let me look, hold on -- she just basically -- sorry.

11  She marked in his existing fillings.  And, again, she marked in

12  Number 3, 14, 18, 19, 30, and 31.  She said it's an update, and

13  she put the date that she updated the medical record --

14  Q    So, I'm sorry, I think we're on a different page again.

15  A    Oh, goodness.  I'm on this page you're looking at.  I'm

16  saying go over to existing restorations in the corner.

17  Q    Okay.  I see it.

18  A    That's where I see it.

19  Q    Down here?

20  A    Yes.

21  Q    Okay.

22  A    She marked in -- all of those have darkened areas.  Can you

23  see that?

24  Q    Somewhat.

25  A    Oh, okay.  I'm sorry.  Anyway --

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q    So --

2   A    Then you go --

3              THE COURT:  There you go.

4   BY MR. MEYER:

5   Q    Maybe if you slow down a little bit --

6              THE COURT:  Why don't you just --

7   BY THE WITNESS:

8   A    Okay.  That's Number 3 --

9              THE COURT:  Hold on, everybody.  I really want my jury

10  to be able to -- there you go.  Bring it up.

11             Thank you.

12  BY THE WITNESS:

13  A    Number 3, she colored in that, right there.  She colored in

14  Number 14.  She colored in Number 18, 19, 30, and 31.  So when

15  she -- she moved over everything that was existing.

16  BY MR. MEYER:

17  Q    So this is existing restorations, so that means there's

18  been work done to this teeth --

19  A    No.

20  Q    -- previously.  What does it mean --

21  A    From his first chart, those were existing -- from that

22  first chart.  If you go to the first one?

23  Q    Ah-huh.

24  A    Those are still the same fillings.  They're -- they're

25  right there.  Number 3, 14, 18, 19, 30, and 31.  They're still

Dr. Mitchell - Direct (Resumed) by Meyer

1    there.

2    Q    So it's -- so if we turn the page, we have this marked --

3    and it's not quite lining up.  Let me try to line it up.

4         So when we turn the page and line it up over the

5    teeth, it's just the same teeth being marked.

6    A    It's the same teeth.  Yes, sir.

7    Q    So this would be done by a dental assistant?  Who would be

8    doing -- who would be marking --

9    A    The hygienist made his new record, so -- because I know her

10   writing.  She did the update, and she basically was saying you

11   need a new chart, so she moved over all of his existing

12   restorations.

13   Q    Okay.

14   A    Okay?

15   Q    So she recorded what had previously been done.

16   A    She recorded everything that was existing.  So at this

17   point, whenever she did this update --

18   Q    Right.

19   A    -- there had not been any additional, according to this,

20   additional updated fillings, other than it looks like something

21   has happened on Number 15.

22   Q    So let's have some, like, more concrete examples, because I

23   think that will help me understand and follow you a little bit

24   more.

25   A    Okay.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    So if I had a filling, and let's say my Number 15 tooth,

2    when I first had my chart started --

3    A    Okay.

4    Q    -- then there would be a marking here.

5    A    Yes.

6    Q    And if that filling is still there, when my next chart is

7    started, then the marking would still be there.

8    A    Yes.

9    Q    If the filling fell out, how would that be recorded?

10   A    That's going to move over to treatment needed, to the big

11   chart.

12   Q    So that's -- that's this here.

13   A    Yes.

14   Q    So when the new chart is started -- and it looks like this

15   was started in 2008?

16   A    Yes.

17   Q    So when the new chart started, when there's treatment that

18   needs to be performed, that would be then recorded in this

19   section.

20   A    Yes.

21   Q    And so this is where it would be colored in or marked?

22   A    It should have been colored in, yes, with colors.

23   Q    And so what does this marking mean?

24   A    I was trying to see if she was identifying that there was

25   an additional cavity that had been picked up.  That's what I'm

235

Dr. Mitchell - Direct (Resumed) by Meyer

1    looking for.  I'm sorry.

2    Q    Okay.

3    A    Okay.  And -- I don't know.  I'd have to look at the chart.

4    Q    Okay.  So --

5    A    Have to look at the real one that has the colors on it.

6    Q    Sure.  But as the dentist, this -- this is where you would

7    look?

8    A    For exist -- anything that needs to be done, yes.

9    Q    For whatever needs to be done in the future.

10   A    Yes.

11   Q    And then this document, is it safe to say that this really

12   applies only until there's a new chart formed?

13   A    Yes.

14   Q    And then there's a new document.

15   A    Yes.

16   Q    So -- excuse me, a new chart started.

17   A    Yes.

18   Q    So if we flip through this document, we can kind of see

19   that each page starts with one of these that has the existing

20   restorations and the treatment needed --

21   A    Yes.

22   Q    -- and then we flip to -- is it fair to call these doctor

23   notes?

24   A    Yeah, it's the services rendered notes.

25   Q    Services rendered notes.

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    That means that that's the service that the person either

2   had or -- it's giving you some information about what's going

3   on with his particular care.

4   Q    Okay.  Are these notes comprehensive?

5   A    I don't know what you mean by that.

6   Q    So do they record every interaction between the doctor and

7   the patient?  Do they record every single thing the doctor did?

8   Or is it more of a brief summary?

9   A    A lot of times they're summarizing, but they're also -- it

10  depends on, you know, what's said, et cetera.

11          If you look, some of them will say rescheduled due to

12  Dr. Vittori (phonetic) called off.  They're giving you a

13  complete and accurate assessment of why that appointment was

14  rescheduled.

15  Q    Sure.

16  A    Okay.

17  Q    So then we turn to the next page, and we get another one of

18  these cover sheets.

19  A    I think that's the same one.  I'm sorry.  You need --

20  Q    So I'm going to keep going.

21          So then we have more services rendered notes.  And so

22  as we go through, you can see that every other page -- what

23  would you call this cover page?

24  A    That's -- that's the front of the dental chart.  Charts are

25  jackets.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    Right.  So what would you call this?  I mean, it's this

2    page as opposed to this page.  We can call this services

3    rendered notes.  What would you call this?

4    A    The front of the chart.  I don't know a technical name.

5    Q    So I'll call it -- I'll call it the front of the chart.

6            So every other page, you'll have the front of the

7    chart?

8    A    Right.

9    Q    And then the services rendered notes.

10   A    Right.  Can I give you just -- our charts are a jacket.

11   It's --

12   Q    Sure, it's like a folder --

13   A    Put together -- it's like a sleeve.  It has -- yeah, it's

14   like a folder with -- all the ends are closed --

15   Q    So it's --

16   A    -- except for the part that you insert your x-rays and

17   stuff --

18   Q    Right.

19   A    But that's the front of the jacket, and the other side is

20   where we write on.  And this whole document, the two pages, are

21   connected together where the front is this chart, and then on

22   the back side of it is where you can write.

23   Q    Sure.

24   A    So it's a jacket.  I mean --

25   Q    So it's almost like a folder --

Dr. Mitchell - Direct (Resumed) by Meyer

1   A   Except for that top part --

2   Q   -- the front page --

3           THE COURT:  You can't talk over each other.  And I'll

4   tell you, boy, when I'm the one that's talking, guess whose

5   words get on the record?

6           THE WITNESS:  Huh-oh.

7           THE COURT:  Mine, right?  Because she's with me every

8   day.

9           So please wait for an answer.  Don't ask a question

10  until the answer is complete.

11          MR. MEYER:  Yes, your Honor.

12  BY MR. MEYER:

13  Q   So we'll slow it down.

14  A   Okay.

15  Q   It would kind of look like this.  It would be a folder, and

16  then the other -- the flip-side of the folder would look like

17  this.

18  A   That's correct.

19  Q   But it's sealed on the ends.

20  A   With one opening at the end.

21  Q   Just one opening on the top or --

22  A   On the side --

23  Q   -- one of the ends -- on the side.

24  A   Yes.

25          THE COURT:  Okay.  Let's take an afternoon break for

Dr. Mitchell - Direct (Resumed) by Meyer

1    you.  15 minutes.  All right?  And then we'll come back, and

2    you'll go until 4:00 o'clock.  Thanks.

3              COURT SECURITY OFFICER:  All rise.

4        (Jury out at 2:57 p.m.)

5              THE COURT:  You can step down, Doctor.

6              THE WITNESS:  Can I go to the bathroom?

7              THE COURT:  Oh, please, yes, you have 15 minutes also.

8    Take a 15-minute break.

9              You know, there was a court reporter in the building

10   named Tony Lisanti.  He used to work for Judge Alesia.  And if

11   that happened in court, he would go like this (indicating)

12   right in the middle as if to say I'm not -- that's it, I'm not

13   typing anymore.  He was -- he let us know he had it.

14             All right.  15 minutes.

15             Those on the criminal case, I know you're hovering

16   around.  So I'm waiting for some Pre-Trial Services' reports,

17   and I intend to get -- go forward around 4:00 o'clock, just if

18   that gives you some sense, okay?

19             LAW CLERK:  All rise.  Court is in recess.

20             COURT SECURITY OFFICER:  All rise.

21        (Recess taken from 2:58 p.m. to 3:17 p.m.)

22        (In open court in the presence of the jury:)

23             THE COURT:  Okay.  Please be seated.

24             Did you get a little snack back there?

25             JUROR:  Yes.

Dr. Mitchell - Direct (Resumed) by Meyer

1          THE COURT:  I try to give you a little caffeine and

2    sugar or something to keep you going for the day.

3          When you're serving your civic duty, calories don't

4    count.  Do you know?

5       (Laughter.)

6          THE COURT:  All right.  So whatever is -- I know.  I

7    was told that I rushed their afternoon break because there was

8    a snack.

9          Please take home whatever you want.  You know, if

10   you've got kids or something and you want to bring cookies

11   back, we don't mind.  Because if you don't, then the law clerks

12   will go in there at night and scrounge for things.

13          All right.  Go ahead.

14          MR. MEYER:  Thank you, your Honor.

15   BY MR. MEYER:

16   Q   So we were just talking about Mr. Weaver's medical records.

17   A   Yes.

18   Q   And so to get back on track, we were talking about the

19   first time that you wrote in the services rendered notes.  And

20   that's July 10, 2008.

21   A   Yes.  Yes.

22   Q   And you said you didn't actually treat Mr. Weaver on

23   July 10, 2008.  You just rescheduled an appointment.  You

24   recorded that here in the medical chart.

25   A   Yes.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   So can you tell what -- if Mr. Weaver was undergoing any
2  kind of procedure at this time?

3           MR. STALEY:  Objection to relevance.

4           THE COURT:  Whether he was undergoing a procedure at
5  this time?  Is that what the question -- whether he was in the
6  middle of undergoing a procedure?

7           MR. MEYER:  Yes.

8           THE COURT:  What's the relevance issue?

9           MR. STALEY:  Judge, this case is about treatment that
10  happened in 2011 due to the Number 12 tooth.  Quite honestly,
11  this has been going on for several minutes.  I'm not sure where
12  we're going with treatment way back in 2008.

13           THE COURT:  Okay.  Can you respond to that?

14           MR. MEYER:  Yes, your Honor.  I believe this was
15  addressed.  And this is all background, and it goes to the
16  conversations and the treatment that Dr. Mitchell provided to
17  Mr. Weaver after -- after she began treating him here, she
18  appears again here.  And this goes to the conversations they
19  had about his Number 5 tooth that then become relevant for his
20  Number 12 tooth.

21           THE COURT:  How do they become relevant for the Number
22  12 tooth?

23           MR. MEYER:  Well, your Honor, as we heard Mr. Weaver
24  testify, Dr. Mitchell told him he needed a post, core, and
25  crown after -- for his Number 5 tooth after it had been root

Dr. Mitchell - Direct (Resumed) by Meyer

1  canaled, and so that's what's reflected here in the medical

2  records.

3      THE COURT:  Okay.  So no one is using the rules of

4  evidence.  Yours would be relevance, which you did use

5  appropriately, that it's outside of the time frame of the

6  allegations in the case.  And if it is outside -- which it

7  is -- then the only way that it can come in would be, in a

8  relevance way, is whether it gives some insight into her intent

9  or his state of mind.  And so if it goes to your client's

10  understanding of what treatments were available, that aspect of

11  it can come in.  If it goes to her understanding of the

12  treatment she provided over time, that aspect can come in, and

13  that's relevant.  It's also relevant just to show all of the

14  work that was being done, and maybe you can both argue that in

15  closing.  All right?

16      So if you -- so this question, the objection is

17  sustained.

18      You can't just randomly go through the whole pile of

19  treatment.  You have to go to the one that is part of your

20  case.

21      MR. MEYER:  I understand.  Thank you.

22  BY MR. MEYER:

23  Q    So we'll skip ahead a couple pages then.  But, you know, we

24  just had a conversation about Number 5 tooth, Number 12 tooth.

25  So when dentists refer to patients' teeth, they refer to them

Dr. Mitchell - Direct (Resumed) by Meyer

1  by numbers; is that right?

2  A    Yes.

3  Q    And so can you tell me, where is the Number 5 tooth?

4  A    It's the fifth tooth on the upper right, going from the

5  back -- you know, your wisdom tooth is 1, the next -- the

6  second molar is 2, the third molar is 3.  Then it's Number 4

7  and 5.  It's next to the canine.  Like the canine is in front

8  of it.  That's your kind of dog fangy tooth.  The tooth behind

9  that.  But if you had a wisdom tooth, it would be the fifth

10  tooth coming from the back in the upper right.

11  Q    And so is the Number 12 tooth the same tooth, but on the

12  other side of the mouth?

13  A    Correct.

14  Q    So can you point to where the Number 12 tooth would be?

15  A    If you went on the left side, you would go -- again, that

16  would be 16, 15, 14, 13, 12.  Next to the long fangy tooth,

17  distal of it, behind it, is Number 12.

18  Q    Thank you.

19  A    Ah-ha.

20  Q    And --

21       THE COURT:  Is that the technical term, the long fangy

22  tooth?

23       THE WITNESS:  It's the canine, I'm sorry.

24       THE COURT:  No, no, I just was teasing.

25       THE WITNESS:  Most people look at that as the dog

Dr. Mitchell - Direct (Resumed) by Meyer

1    tooth or something.

2           THE COURT:  Thank you.

3    BY MR. MEYER:

4    Q    And I was going to ask if there's a proper name for the

5    Number 12 tooth.

6    A    Canine.

7    Q    The Number 12 is a canine?

8    A    Yes -- no, Number 12 is premolar.  Number 11 is a canine.

9    Number 6 is a canine.  Canines are the long fangy tooth.  I

10   thought that's what you were asking me.  12 and 5 are first

11   premolars.

12   Q    First premolars.

13   A    Yes, sir.

14   Q    Okay.  So you began treating Mr. Weaver sometime in 2008.

15   A    Yes.

16   Q    And this is after he had had a root canal procedure

17   performed on his Number 5 tooth.

18   A    No.

19   Q    So what kind of treatment was he undergoing when you first

20   started treating him?

21   A    He was in the process of having a root canal done on Number

22   5.  Based upon the record, apparently he came in, the dentist

23   that was seeing him, who cancelled --

24   Q    We don't need the details on that.  I was just curious.

25   A    But, anyway, I saw him as a intermediary step on Number 5

Dr. Mitchell - Direct (Resumed) by Meyer

1    because his dentist that was doing the actual root canal was

2    not there.

3    Q    So I was incorrect to say that it was completed.

4    A    No, it was not completed.

5    Q    Okay.  But then if we can turn to October 10, 2008.  And I

6    have it here on the screen.

7    A    Okay.

8    Q    Is this your signature here?

9    A    Yes.

10   Q    And so this is your service note?

11   A    Yes.

12   Q    And so is this happening after the root canal is performed

13   on Number 5 or during the procedure?

14   A    The root canal was completed on September the 10th, 2008,

15   by Dr. Vittori.

16   Q    So this is after it was completed.

17   A    Yes.

18   Q    And so can you read what this note says, since it's in your

19   handwriting?

20   A    Yes.  It says:  Fill Number 5.  DO amalgam.  Tooth has

21   limited support after RCT.  Patient advised he needs a post and

22   core and crown -- and I'm not quite sure what the rest of that

23   said.

24   Q    So what is RCT?

25   A    Root canal.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   In this note you advised Mr. Weaver that after the root

2  canal on his Number 5 tooth, the tooth had limited support; is

3  that correct?

4  A   With that particular tooth, yes.

5  Q   Right.  And that was due to the root canal that was

6  performed.

7  A   No.

8  Q   Why did the tooth have limited support?

9  A   Because on Number 5 -- and, again, I can't refer to those

10 notes because I guess that discussion was about not talking

11 about it.  He apparently had a humongous cavity on that

12 particular tooth when they did Number 5.  That goes back to

13 notes several pages back.  And so when it was time to restore

14 it, because he had had a humongous hole on that particular

15 tooth, he didn't have a lot of support when they ended up --

16 when they did the root canal.

17       So I'm saying that the tooth structure -- if you got a

18 big cavity under there, it's eating away at the inside of the

19 tooth.  When it's time to actually do a restoration or restore

20 the tooth, he didn't have a whole lot of tooth left.  And so

21 I'm advising him that that's -- you know, we're going to do the

22 filling, but he just doesn't have a lot of tooth structure

23 left.

24 Q   But the note itself says that the tooth has a limited

25 support after RCT, which is root canal.

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    The root canal is done, yes.

2    Q    And so that's what the note says.

3    A    Yes.  Okay.

4    Q    And then the next line on the note says PT.  That's

5    patient, correct?

6    A    Patient advised.  Is that what you're asking me?

7    Q    So this is PT.  That's an abbreviation for patient?

8    A    Yes.

9    Q    Patient advised he needs post and core and crown.  Is that

10   right?

11   A    That's what I said, yes.

12   Q    Thank you.

13        Excuse me just a moment.

14        So going down on the same page, it looks like

15   Mr. Weaver was then treated by a different dentist, is that

16   correct, here in March of 2009.

17   A    Yes.

18   Q    Okay.  And can you tell if anything had happened to his

19   Number 5 tooth that caused him to see the dentist here in

20   March 2009?

21   A    Yes.

22   Q    What happened?

23   A    Do you want me to read the note or --

24   Q    No, just tell me.

25   A    It says that his lingual cusp fractured.

248

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    So that means the tooth broke?

2    A    Part of it.  Yes, sir.

3    Q    And that would be the Number 5 tooth?

4    A    Yes.

5    Q    So then you didn't see Mr. Weaver again, looks like for a

6    few visits.  Is that fair to say?  None of these is your

7    signature?

8    A    No.

9    Q    And you saw him a couple times here, but we're not going to

10   talk about those.  And then these others are generally not you.

11   Correct?

12   A    I didn't see him.  That's a reschedule appointment.

13   Q    Okay.

14   A    And then -- let me see.  Then the last document on that

15   page is my wonderful --

16   Q    So this -- is this your handwriting?

17   A    Yes.

18   Q    That's your note?

19   A    Yes.

20   Q    Okay.  So this is when you -- you saw Mr. Weaver again --

21   and can you read that date for me?

22   A    It's 1/25/2011.

23   Q    Okay.  And so what happened at this appointment, according

24   to your note?

25   A    He was seen as an emergency.  Patient has a broken cusp of

Dr. Mitchell - Direct (Resumed) by Meyer

1    the lingual Number 5.  He does not want extraction.  Same

2    tooth -- since tooth is endodontically treated, I removed the

3    crown.  I had him to sign for that, and then -- because he

4    didn't want it extracted.  So the lingual cusp, I don't know --

5    in the previous notes -- and I know I'm not supposed to say

6    that -- but the previous notes, the doctors are saying that it

7    broke but it's still intact, previously.  This time it broke

8    and it wasn't intact, so I took the cusp off of the tooth

9    because he didn't want the roots and stuff taken out.

10   Q   But my understanding of this note -- so did you -- was the

11   tooth removed at this time or no?

12   A   I just removed the crown part of it where --

13   Q   So it was partially removed.

14   A   Partially removed, yes.  That's why it's still in his

15   mouth.

16   Q   Got it.  So let's unpack that, actually.

17        So that means that you took off the part of the tooth

18   that we would see, but the root is still there; is that

19   accurate?

20   A   Yes.

21   Q   Okay.  Is that still called an extraction?

22   A   We extracted the portion that was loose, et cetera, so yes.

23   But, again, respecting the guy's wishes that he didn't want it

24   out, then I took out what would give him problems in the

25   future.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    So then let's fast-forward a little bit to November 2011.

2    A    You know my signature is in there for another one right

3    there.

4    Q    Yes.  I don't believe it's relevant.

5    A    Oh, okay.

6    Q    So looks like here you saw Mr. Weaver on November 25th,

7    2011.  Am I reading that correctly?

8    A    Yes.

9    Q    And it looks like you examined the Number 12 tooth?

10   A    Correct.

11   Q    Is that right?

12   A    Yes.

13   Q    And can you just describe to us what was performed on

14   Mr. Weaver at this appointment?

15   A    At that time he was seen, he had made requests.  And I

16   wrote that exam, patient has pain in Number 12.  I removed the

17   filling.  It was the filling that was placed that you don't

18   want to talk about, previously.  It was very close to the pulp.

19   And at that time, again, when I see something that's very close

20   to the pulp, it was discussed with Mr. Weaver what I was

21   seeing, and I kind of think he said that.

22           Anyway, the pulp was extirpated -- again, because he

23   was having pain and all kinds of problems -- and formocresol,

24   which is a medicament that kind of kills any active pulp in the

25   tooth, and I placed -- I irrigated it out, and I used sodium

Dr. Mitchell - Direct (Resumed) by Meyer

1   hypochlorite and Cavit, which is a material that we use to
2   close the tooth off so bacteria and food and stuff doesn't get
3   into it.
4   Q    Sure.  And just to clarify, it's not that I don't want to
5   talk about it.
6   A    Okay.
7   Q    It's just that we're trying to focus everybody on what's
8   relevant and make this go as quickly as possible.
9            But just to confirm, you said that there was a filling
10  in the Number 12 tooth.
11  A    Yeah, that was put in on 8/29/2011.
12  Q    Okay.  So another -- and another dentist had performed that
13  filling.
14  A    Correct.
15  Q    Okay.  And so you were then going back over this other
16  dentist's work.
17  A    I was dealing with a patient who had a particular problem
18  and assessing where the problem was and what needed to be done
19  to resolve the problem.
20  Q    Okay.  Can you tell, based on the notes, whether or not
21  this was an appointment that was requested by Mr. Weaver or
22  whether or not this was something that was scheduled by a
23  dentist?
24  A    If you look at the note, 11/3/2011, above that, it says
25  request received.  Toothache exam, 11/28/2011.  And prior to

Dr. Mitchell - Direct (Resumed) by Meyer

1    that -- and, again, maybe it's not relevant, but it is

2    relevant -- that he had put in a similar request, if you go

3    further up, on 9/13 to evaluate that same tooth.  On 9/19 we

4    got another request.  He was a no-show on 9/23, 9/29, 10/19.

5    And then, because after three no-shows, then we assume the

6    person is okay, we move to the next request.  So this was a

7    requested service by Mr. Weaver to be seen.

8    Q    So what I'd like to understand is what is this date here?

9    A    That's the date that that particular doctor scheduled him

10   for.

11   Q    So this is the date it was recorded?

12   A    That's the date it was received.  That's the date that

13   doctor scheduled him for.

14   Q    And then this is the date of the appointment, scheduled

15   appointment, this 11/28.

16   A    Yes.

17   Q    Okay.  So you said you performed a pulp extirpation --

18   A    Right.

19   Q    -- here on November -- is this 25th or 28th?

20   A    That's November the 28th, the date that she indicated.

21   Q    I just -- I think I may have said 25th earlier, so I just

22   wanted to correct the record --

23   A    It's November the 28th, 2011.

24   Q    Thank you.

25            What is a pulp extirpation?

253

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    When you're sitting there looking at the pulp canal, then

2   what we basically do is take out -- your tooth is divided into

3   the chamber, which is the crown part that you can see when you

4   look at your mouth with your teeth, and then there's a root

5   portion.  I took out the part that was giving him problems,

6   which was the crown portion, and basically put medication in it

7   to kind of deaden the rest of the nerves.  So it's a pulp

8   extirpation.

9   Q    And so what goes into that?  What are you physically doing

10  when you perform the pulp extirpation?

11  A    You clean out the pulp chamber, and you take out as much

12  nerve as you can.  And then, again, the formocresol is designed

13  to kill whatever active pulp that he may have, problems that he

14  may have in the actual tooth.  So, again, it's a partial start

15  of a root canal.

16  Q    Okay.  So this is where you began a root canal procedure on

17  the Number 12 tooth; is that fair to say?

18  A    Correct.

19  Q    And the pulp, is that like the interior of the tooth?

20  A    Yes.  That's where your nerve, blood supply, nutrients to

21  the tooth exist.

22  Q    Okay.

23  A    So it's in the center.  Okay.

24  Q    You then saw Mr. Weaver again on December 7th, 2011,

25  correct?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    Yes.

2    Q    And this is the very next appointment, the very next entry

3    here.

4    A    Yes.

5    Q    So he was scheduled for this appointment after you began

6    the root canal therapy on November 28th?

7    A    Yes.

8    Q    So what happened on December 7th?

9    A    On December 7th, he reported that he was still having some

10   pain, so I gave him, number one, an intrapulpal injection,

11   which means in lieu of giving him an injection on the outside

12   of his mouth like most people get it between your cheek and

13   your mouth, I gave him an intrapulpal, which is an injection

14   directly into where the pulp chamber is at, to try to numb up

15   the tooth so we could finish extirpating all the pulp.

16        I noted in here that intrapulpal injection, and he

17   will need an infiltration.

18        So, again, because he was still having problems, I

19   also gave him the infiltration, which is the injection that

20   most people know about, the one outside.

21   Q    Okay.  So what are these?  It says like L hyphen 17.  What

22   is that?

23   A    When you're performing a root canal, you initially try to

24   get a measurement of the actual length of the root from the top

25   of the crown -- that's the part that you see, the edge -- all

255

Dr. Mitchell - Direct (Resumed) by Meyer

1    the way down to the end of the tooth.  We take a preliminary

2    x-ray.  So my initial length was a 17.  I use a real small file

3    so I can make sure I can get down as far as possible, which is

4    a size 20.  Files start -- they can start as low as an 8, but

5    we usually start at a 10.  They can go all the way up to 140,

6    depending on the size of the actual canal.  We start with a low

7    file, which is a 20.  And I got a final length on him of a

8    length of 20.  So basically my initial file said 17.  I did an

9    adjustment based upon what I saw on the x-ray, and I

10   recalibrated to a length of 20.  Make sense?

11   Q    Yeah.

12   A    He had two canals in the tooth:  Buccal for the outer

13   surface one, and lingual for the part that's closest to your

14   tongue.

15   Q    Okay.

16   A    Okay.  Anything else -- I mean, I gave him -- I irrigated

17   the tooth at the end of that.  And I did put CPCP, which is a

18   medicament to kill the bacteria and stuff in the tooth.  And I

19   placed Cavit, which is a temporary filling, again, to close the

20   tooth so food, different things, cannot get into it.  So that's

21   important for your benefit.

22   Q    Sure.  So when you're talking about the two canals in the

23   tooth, I'd like to understand, when you said canals, are those

24   like holes?

25   A    No.  If you look at your x-ray, for instance, if you put

Dr. Mitchell - Direct (Resumed) by Meyer

1   your x-ray on the viewer, the part that's under the gums is the

2   root.  On this particular tooth, which is a first premolar --

3   first premolars always have two canals.  So the side that's

4   closest to your cheek is your buccal canal; the side that's

5   closest to your tongue is your lingual canal.

6           So if you looked at the tooth, the crown would be down

7   here, would be a ball.  And then these two roots would be

8   sitting, you know, inside his mouth.  This would be buccal;

9   that would be lingual.  So he has two canals.

10  Q   Yeah, so I just want to understand when you say you're

11  drilling a canal that you're going up into the canal of the

12  tooth through the pulp; is that correct?

13  A   Sort of.  Not exactly.

14  Q   Okay.

15  A   The pulp is the part that fits into the canals, so that's

16  soft material.  The canals is actually part of the structure of

17  the tooth.  Does that make sense?

18  Q   Yeah.

19  A   Okay.

20  Q   Thank you.

21          So following this appointment, you scheduled

22  Mr. Weaver to come back on December 13th, 2011?

23  A   Yes.

24  Q   And is that -- that says just NV.  That's next visit?

25  A   Next visit, root canal Number 12.  12/13/2011.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    So this procedure was going to be continued to the next
2    appointment.
3    A    Yes, sir.
4    Q    And so is this the next appointment right here?
5    A    Yes.
6    Q    On 12/13?
7    A    Yes.
8    Q    What does this say?
9    A    We ran out of time.
10   Q    And so that's the situation we talked about before when it
11   went past 3:30 and the staff had to start cleaning up.
12   A    Correct.
13   Q    So he was then rescheduled to be seen on December 22nd.
14   A    Correct.
15   Q    What happened here on December 22nd?
16   A    According to this, it said patient rescheduled due to staff
17   shortage.
18   Q    So is this a situation where Mr. Weaver would come up to
19   the dental office and then be sent away?  Or how is an
20   appointment cancelled for a staff shortage?
21   A    It depends.  If we find out early in the morning that we're
22   being pulled to work the other side, then we cancel the
23   patients for the day.
24   Q    So then would a notice be sent out to the patient?  Or he
25   just wouldn't be brought to the medical room?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    No, we call the cell houses and notify the entire cell

2    house.  We notify the sergeant that their passes are being

3    cancelled for the rest of that day.  And we give them the

4    specific name, the inmate number, and where he's located.  So

5    they have to let him know that he's been cancelled.  Generally

6    speaking, when it's a staff shortage, they know, like, in the

7    beginning of the morning, that meant some people called off or

8    whatever, and so now we have to switch hats and go do a

9    different job.

10   Q    Okay.  So then when this happened, the appointment was

11   cancelled for staff shortage.  And this is not your

12   handwriting, correct?

13   A    No.  That's not me, no.

14   Q    But he was cancelled due to a staff shortage, and then

15   rescheduled for January -- is that 9th?

16   A    January 9th, yes.

17   Q    Okay.  And then what is this next entry?

18   A    Okay.  It says patient put in a request about a root canal

19   temporary filling out of the tooth.  That was a referral exam.

20   And because it was on 1/5/2012, according to that AD, if the

21   person already has an appointment scheduled -- that would be

22   5(b) under the AD you showed everybody -- then they maintain

23   that appointment unless the person is saying he's in pain,

24   et cetera.  There was no indication on his note, so he

25   maintained that same appointment on 1/9/2012.

259

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   So this is where Mr. Weaver then put in a request to be

2   seen.

3   A   Yes.

4   Q   And he already had a scheduled appointment, and so the

5   scheduled appointment just stayed.  Is that accurate?

6   A   That's correct.

7   Q   Okay.  And so it says that the temporary filling fell out

8   of his tooth.  So what is the temporary filling?

9   A   Okay.  Again, a temporary filling, it's -- Cavit is the

10  material we use, if you want the technical term.  Cavit is a

11  soft material, but it gets hard once it goes in the person's

12  mouth.  You put it over the opening of the root canal to kind

13  of block bacteria, food, things like that.  It assists in

14  maintaining a sterile environment inside the tooth.

15          Now, if the temporary filling is out, it's already not

16  a sterile environment because the temporary is out.  So -- does

17  that make sense?

18  Q   Yes.

19  A   Okay.  Thank you.

20  Q   And so that you'll bring him back in and see him.  So he

21  came back in on January 9th.

22  A   Correct.

23  Q   And so what happened on January 9th?

24  A   At that time we cleaned out the tooth.  The canals were

25  enlarged.  If you look at the size -- and, again, the size is

Dr. Mitchell - Direct (Resumed) by Meyer

1   determined by when you're putting your files in.  Once you

2   start getting binding or the file starts to get too tight, then

3   you try to file it that length, and then you flare the canal so

4   we can fill it.

5           So what I said is that his length was a 20 on both

6   canals.  Originally, I told you that the file was a size 20.

7   So it goes 20, 25, 30, 35, 40, 45.  So I pushed it up how many

8   ever file numbers that is to a 45.  Once I got a good finish on

9   that, then I flared it to a 50.  That's flaring the top part of

10  the canal.  I closed it up, irrigating with sodium

11  hypochlorite, which is kind of like a bleach solution.  It

12  disinfects the inside of the canal.  We dry it.  Then I put the

13  medicaments in, CPCP and Cavit.

14  Q   But the root canal was not completed on this date.

15  A   No, sir.  Anytime you instrument a tooth, you do not close

16  on the same day.

17  Q   So he was scheduled to come back on January 26th, 2012; is

18  that right?

19  A   Yes.

20  Q   And there's another entry here it looks like for

21  January 12th.

22  A   Yes.

23  Q   So what happened on January 12th.

24  A   Okay.  This is a couple of days after we instrumented the

25  tooth, et cetera.  I get a call, and I believe we were on

261

Dr. Mitchell - Direct (Resumed) by Meyer

1  lockdown, but Sergeant Washington called.  He reported the

2  patient was having some pain.  So basically because I've

3  instrumented the tooth a couple of days before, I sent him out

4  pain medication and antibiotics, just to deal with the fact

5  that he was having some discomfort after the actual

6  instrumenting of the tooth.

7  Q    And what kind of antibiotics did you send?

8  A    I sent him Amoxicillin, 500 milligrams.  And I also sent

9  him out Motrin, 400 milligrams.

10 Q    But Mr. Weaver was not examined in the dental office this

11 day; is that correct?

12 A    No, he was not.

13 Q    So you were relying on Sergeant Washington's description

14 when you sent him the Motrin and the Amoxicillin?

15 A    Right.  And the fact that I had just worked on him on 1/9.

16 It's not uncommon if you've had a root canal and you've

17 instrumented the tooth, enlarged it, et cetera, that a person

18 can have some discomfort.  So this is within the normal purview

19 of -- that's not unusual.

20 Q    And it looks like the appointment -- the pre-existing

21 appointment stood.

22 A    Yes.

23 Q    And so this is the next appointment.  December --

24 January 26th, 2012.  Correct?

25 A    Correct.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   And so what happened on the 26th?

2   A   All staff reported to NRC, Level 4 lockdown.  Patient had

3   to be rescheduled.

4   Q   So there was a lockdown at Stateville, correct?

5   A   Yes.

6   Q   And so Mr. Weaver's appointment was rescheduled to February

7   8th.

8   A   Correct.

9   Q   Now, here on February 8th -- I'm going to try to keep it on

10  the screen -- here on February 8th, Mr. Weaver is listed as a

11  no-show, correct?

12  A   Correct.

13  Q   And he's rescheduled for an appointment on what date?

14  A   It looks like it says 4/20/2012.

15  Q   So that would be April 20th?

16  A   Yes.

17  Q   And it does not say the reason why Mr. Weaver was a

18  no-show, right?

19  A   No.

20  Q   It doesn't elaborate on that at all.

21  A   No.

22  Q   And then we have the next record, which looks like it's

23  March; is that correct?

24  A   March 13, 2012.

25  Q   And what happened in March?

263

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    Another doctor saw him.  And it said referral reviewed.
2   Patient complained of temporary fell out of root canal.  Stated
3   Tooth Number 12 and maybe pain.  Patient scheduled.  And,
4   again, he maintained the appointment of 4/20/2012.  However, he
5   said see if can move up.
6            So basically he's looking at the schedule, he's making
7   a decision that you may not want him to wait that long.
8   Q    Okay.  And so it looks like Mr. Weaver's temporary filling
9   fell out of his tooth again.
10  A    Yes.
11  Q    Making the sterile environment inside his tooth no longer
12  sterile.
13  A    Correct.
14  Q    And it looks like -- it says maybe pain?  So he might be in
15  pain?
16  A    That's what Dr. Saffold said, yes.
17  Q    And he's rescheduled for -- and he remained scheduled for
18  4/20 at this time.
19  A    Yes.  But he also said see if he can move up the
20  appointment.
21  Q    And so that's what happens on this next line, right?
22  A    Right.
23  Q    So then instead of 4/20, it looks like he's being
24  rescheduled for, what, March 29th?
25  A    March 29th.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q    And so then you see him on March 29th; is that correct?

2   A    Yes.

3   Q    So what happened on March 29th?

4   A    Again, we went back in because, again, now the tooth has to

5   be resterilized, et cetera, re-instrumented the tooth.  It

6   looked like I moved the file up 50, kept the same length, and

7   basically irrigated with sodium hypochlorite again and put CPCP

8   and Cavit in the tooth, just to kind of get it resterilized,

9   et cetera.

10  Q    So it looks like you're widening the -- what would you call

11  it?

12  A    Canals.

13  Q    So you're widening the canals again; is that correct?

14  A    Widen it a little bit, yes.

15  Q    Why?

16  A    In my assessment, that's what I needed to do.

17  Q    But for what reason?

18  A    A lot of times if you're seeing that the person is still

19  getting some drainage or whatever in the tooth, then I'm trying

20  to make sure there's no additional nerve, anything in there, so

21  I increased him by about 5/10th of a -- whatever, to a 50, and

22  I flared him to a 55, again, in anticipation of hopefully I can

23  get Mr. Weaver finished so we can seal the tooth up, et cetera.

24  Q    Sure.  So you said drainage.  Is there an indication that

25  his tooth had drainage at this time?

Dr. Mitchell - Direct (Resumed) by Meyer

1  A   No.  But, again, if the temporary has been out, there's

2  usually bacteria and stuff like that that has grown in it.  So

3  I may not have indicated that, but more than likely -- the

4  temporary has been out, according to this -- Dr. Saffold said

5  3/13.  This is now 3/29.  So my goal is to try to make sure

6  I've covered all my bases, everything is sterilized, et cetera,

7  and it's ready to be filled.

8  Q   And so then he's scheduled to be seen again, what, on 4/12;

9  is that correct?

10  A   Yes.  And there's actually, if you skip that page --

11  Q   I understand.

12  A   Oh, okay.

13  Q   I understand.

14      So the next entry on this page is 4/20, correct?

15  A   Yes.  Somebody wrote on the wrong page, but go ahead.

16  Q   But it's out of order, isn't it?

17  A   Yes.

18  Q   So if we skip ahead to the next chart, we actually have an

19  entry for 4/12 right up here in the top right.

20  A   That's correct.

21  Q   And is this your entry?

22  A   Yes.

23  Q   So what happened on April 12th?

24  A   He was still feeling probably a little discomfort, so I

25  backed off of my length.  I had it originally at a 20.  I moved

Dr. Mitchell - Direct (Resumed) by Meyer

1  him back to an 18.5 so that he wasn't feeling any discomfort

2  when you're going in with the file.  I maintained the same

3  width, et cetera, with the canal.  I irrigated with sodium

4  hypochlorite.  I put CPCP and Cavit and sealed the tooth again.

5  Q   So this is going into the tooth again.  I'm correct?  With

6  the file?

7  A   Yes.

8  Q   Okay.  And so just so I understand, we're talking about

9  length numbers and width numbers.  So the length number is how

10 deep into the tooth you were going; is that fair?

11 A   I didn't know what that -- what was the word you --

12 Q   Deep into the tooth.

13 A   I don't know --

14 Q   How would you describe the length?  Is that --

15 A   When it said 20, 20 is longer than 18.5, so I'm backing off

16 of the length a little bit.

17 Q   Right.  So a 20 would go deeper into the tooth than an

18 18.5; is that fair?

19 A   Yeah.  I didn't understand your question.

20 Q   Right, yeah.  So the length tells you how far into the

21 tooth you're going.

22 A   Yes.

23 Q   And the width tells you how wide the opening is.

24 A   It's how wide I'm filing the canals, not how wide the

25 actual tooth's entry is.  But we're talking strictly canals.

267

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    Right, inside of the tooth.

2    A    In the canals.

3    Q    In the canals.

4    A    The crown is different than canals.

5    Q    Yes.

6    A    Okay.

7    Q    And both are part of the tooth, correct?

8    A    Both are part of the tooth, yes.

9    Q    Thank you.

10           So we're widening.  I'm sorry, you're back -- you're

11   filing the teeth again on 4/12, correct?

12   A    Yes.

13   Q    And then he's scheduled to be seen on what date?

14   A    4/17.

15   Q    4/17.  And this is you treating him again, correct?

16   A    Yes.

17   Q    And so what happened on 4/17?

18   A    Drainage present --

19           COURT REPORTER:  I'm sorry, I didn't hear you.

20   BY THE WITNESS:

21   A    I'm sorry.  I'll move over this.  I could have read it

22   there.

23           It said root canal Number 12.  Drainage is present in

24   the buccal canal.  I irrigated with sodium hypochlorite and

25   CPCP.  I also put him on Azithromycin, which is a

Dr. Mitchell - Direct (Resumed) by Meyer

1   broad-spectrum antibiotic.

2          I'm trying to see if I -- I gave him six tablets.

3   Normally, you take that -- you're going to take a stat dose of

4   two, and then one for the next -- every day one tablet, because

5   it's a real strong antibiotic.  And, again --

6   Q   That --

7   A   -- I'm looking at how much drainage, yes.

8   Q   I'm sorry.  And I apologize for talking over you.

9          But I just wanted to clarify that's the dosage of the

10  antibiotic that we're talking about, correct?

11  A   Yeah.  Azithromycin, I gave him -- those are 250-milligram

12  tablets.

13  Q   Thank you.  And so you said there was drainage present?

14  A   Yeah.  When you open the tooth in any root canal, you're

15  going to, when it's a dry field, the temporary stayed in

16  place -- because that's important.  You remove the temporary.

17  You remove the cotton pellet that you always put in there as

18  well.  The cotton pellet has the CPCP on it.  You have to have

19  a way to put that in the tooth, if I didn't say that before.

20  You remove the temporary cotton pellet.

21          The first thing we always do to check a tooth is we

22  start with the paper point.  Paper point goes into the canals.

23  You take out one.  If there's any moisture or, et cetera, on

24  it, then you know that there's drainage in that particular

25  canal.

269

Dr. Mitchell - Direct (Resumed) by Meyer

1        You go to the next canal, you put a paper point in.

2   And paper points are sized the same way the files are, but

3   they're just rolled up paper that we buy.  I mean, this is

4   manufactured stuff, okay?  Put the paper in there.

5        So based upon this note, his buccal canal had some

6   drainage.  That's all.

7   Q    So what's drainage?

8   A    When you start seeing moisture or something coming from the

9   end of the tooth.  That can mean that there can be some

10  bacteria that's being maintained in the tooth, et cetera.  So

11  if I see moisture, if it comes out wet, then guess what?  I'm

12  not going to fill it.  Because if you fill it, then he's going

13  to have pressure at the end of it.  So it's indicating to me

14  what I need to do next for this root canal.

15  Q    Thank you.

16  A    Okay?  You're welcome.

17  Q    And so it looks like his next appointment is still 4/20 at

18  this point; is that correct?

19  A    Yes.

20  Q    And that entry was on the previous page, right?

21  A    Correct.

22  Q    So we'll turn back.  And so what happened on 4/20?

23  A    It looks like we had a staff shortage, so we were probably

24  pulled to the other side.  And the dentist -- another dentist

25  rescheduled his appointment to 5/3.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   And so then we'll turn back, and he's seen again on 5/3,

2   correct?

3   A   Yes.

4   Q   By you.  Correct?

5   A   Yes.

6   Q   And so on May 3rd, you filed the canals of the tooth again,

7   correct?

8   A   No.  On May 3rd when I put the paper points in, the lingual

9   canal was dry, so he got it actually finished.  The buccal

10  canal still had some bleeding.  I pulled back again on the file

11  or I shortened -- because, again, that might be an indication

12  he's having some problem at the end of the tooth, et cetera --

13  but we pulled back on the file, and I did not finish that canal

14  because, again, when you open, you always open and check to see

15  if you see anything in the canal before you can finish it.  The

16  buccal canal could not be finished because I saw some bleeding

17  when I put my paper point in.

18  Q   So going back, there are two canals.  One is filled at this

19  point; one is not.

20  A   One is filled with Gutta-percha, and it's done.  The next

21  one --

22          COURT REPORTER:  One is filled with?

23  BY THE WITNESS:

24  A   Gutta, G-U-T-T-A.  These are not my terms.  And then

25  P-E-R-C-H-A, percha.  It's -- it's a material -- it's, like,

Dr. Mitchell - Direct (Resumed) by Meyer

1  pink, and it's compatible with the body.  It's seals the tooth

2  up.  Okay?

3  BY MR. MEYER:

4  Q    And so then the treatment -- the root canal treatment is

5  then continued to the 9th.

6  A    Yes.

7  Q    And you continue that treatment on the 9th.

8  A    Yes, I put him back on antibiotics again.

9  Q    Why?

10 A    Because, again, I'm still seeing some drainage in the

11 tooth.  It's clear drainage, but still there's some push-back,

12 something is coming from the end of the tooth.  So, again,

13 rather than close his tooth, it makes more sense to me that you

14 cover and make sure there's no infection or anything going on,

15 so he's put back on Azithromycin to see if that was going to

16 clear up any drainage that I'm seeing in the tooth.

17 Q    So there was drainage present, correct?

18 A    Yes.

19 Q    And it looks like there was also some soreness; is that

20 correct?

21 A    I said buccal canal, some drainage present.  I didn't say

22 soreness.  I said some, S-O-M-E, drainage present.  Irrigate

23 with sodium hypochlorite.  Prescription of Azithromycin, 250

24 milligrams, dispense 6 tablets.  Return appointment on

25 5/15/2012.

Dr. Mitchell - Direct (Resumed) by Meyer

            Did I read everything for you?

1

2   Q    Yes.  And so I was just -- I was curious about that word,

3   because you said "some."

4   A    Uh-hum.

5   Q    And I was just clarifying that.  Thank you.

6   A    Okay.

7   Q    So he was prescribed antibiotics.  There was drainage

8   present.  He was seen again -- scheduled to be seen again on

9   the 15th, correct?

10  A    Yes.

11  Q    He was seen on the 15th by you.

12  A    Yes.  Yes.

13  Q    And so this is where the second canal is filled, correct?

14  A    Correct.

15  Q    And you scheduled him for a follow-up visit on June 26th.

16  A    Right.  Do you want an explanation or just -- do you want

17  to know why?

18  Q    Sure, tell me why.

19  A    Okay.  Anytime that you've done a root canal, before you do

20  a final restoration on a tooth, you want to make sure that the

21  patient's tooth is going to be asymptomatic.

22          That return appointment was for me to do the -- for

23  the final filling to go into his mouth.  And so I gave him

24  about six weeks to make sure there's no symptoms, no problems,

25  et cetera.  Okay?

273

                    Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    And so by asymptomatic, what do you mean?

2    A    That he's not complaining of any pain in the tooth, that

3    there is no swelling, he's not indicating any problems with the

4    actual tooth.

5    Q    And then once he's not complaining --

6    A    Then I'll put a permanent filling, and that seals it off

7    permanently.

8    Q    And so that would be the final restoration --

9    A    Yes.

10   Q    -- that you would perform.

11   A    (Nods affirmatively.)

12   Q    So he's scheduled to be seen 6/26, correct?

13   A    Yes.

14   Q    And what happened on 6/26?

15   A    Level 4 lockdown.

16   Q    So he was not seen on the 26th.  Correct?

17   A    (Shaking head.)

18   Q    So then he was scheduled to be seen again on the 31st.

19   A    Yes.

20   Q    And so what happened on the 31st?

21   A    We're still on lockdown.

22   Q    So he wasn't seen on the 31st either.

23   A    No.  But, pay attention, there's --

24   Q    Yes.

25   A    -- a little note on there.  On that particular day, because

Dr. Mitchell - Direct (Resumed) by Meyer

1   now we've gone -- it's actually almost three months or

2   somewhere in that time, it's -- you're looking at the 31st, so

3   that's a month.  June is another almost month.  So now you're

4   looking like two and a half months.  So I made a call on that

5   particular day because, again, we're on lockdown, I have no

6   authority to bring the patient up, but I did contact the

7   shift -- that's why I said no-show, patient went on a visit.

8   We've called to try to get him brought up.  And when we called

9   for him, we were told that he couldn't come because he was on a

10  visit.  So I make the call.

11          And, again, something that you don't know, when they

12  go on a visit, they pass the hospital.  When they come back,

13  they pass the hospital.  We will see them either way.  It

14  doesn't matter.  He can stop going or coming.  Because, again,

15  we don't have any patients other than the patient that we've

16  called for.  That would be Mr. Weaver.

17  Q   Okay.  So he was rescheduled due to a Level 1 lockdown.

18  He's also noted as a no-show because he was on a visit at the

19  time.  Correct?

20  A   Yes.

21  Q   And so then he was scheduled to be seen again on the 16th?

22  A   Yes.

23  Q   And there's an entry here on the 3rd?

24  A   Yes.  I think I tried to get him up even that day, and

25  we -- we didn't get him, so we just rescheduled his

Dr. Mitchell - Direct (Resumed) by Meyer

1   appointment.

2            THE COURT:  Okay.  That's where we have to end for

3   today.  All right?

4            So, Ladies and Gentlemen, please do not talk about the

5   case with anyone.  Don't research anything.

6            Have a nice night and relax.  We'll see you tomorrow.

7            Come in at 10:00 a.m. tomorrow.  I have a number of

8   matters on my morning motion call that I think will take a

9   little longer, so 10:00 a.m. tomorrow.  Okay?

10           And, remember, tomorrow is until 5:00.  Okay?  5:00

11  p.m.

12           All right.  Thank you.

13           COURT SECURITY OFFICER:  All rise.

14      (Jury out at 4:03 p.m.)

15           THE COURT:  Okay.  You can step down.

16           The rest of you can be seated.

17           How much longer on this witness?

18           MR. MEYER:  Not much, your Honor.  I'm -- I have two

19  more pages.  I'm toward the very end of my examination.

20           THE COURT:  Okay.  And then how many other witnesses?

21           MR. MEYER:  One.  That's a short one.

22           THE COURT:  All right.  What does that mean?

23           MR. MEYER:  Ms. Parthum will be --

24           THE COURT:  All relative.

25           MR. MEYER:  -- conducting the examination.  It will be

276

Dr. Mitchell - Direct (Resumed) by Meyer

1   Defendant Pfister -- Pfister.

2           MS. PARTHUM:  I expect it will last less than half an

3   hour.

4           THE COURT:  Okay.  And then what about you folks when

5   you put your case on?  I take it you'll call the doctor again?

6           MR. STALEY:  We will, Judge.  Given the extent of this

7   examination, mine will be shorter than this.  I can assume it

8   will be maybe 45 minutes.  And then we have one other witness,

9   who is one of Mr. Weaver's counselors.  That shouldn't take

10  more than ten minutes.

11          THE COURT:  Okay.  So be prepared to do your closings

12  tomorrow so that we can get to jury deliberations tomorrow.

13          I have to switch around my schedule because I

14  anticipated that you would be able to be doing that sooner.

15          So come in at 9:15 if there are any issues that you

16  want me to address before they come in at 10:00.  If you all

17  are comfortable with what you are doing, then just notify Lynn,

18  my courtroom deputy, that you don't have any issues, which is a

19  good thing, and then I'll just see you at 10:00 when we begin,

20  okay?

21          And I think I have some paperwork for the

22  gentlemen -- yes.  I would like -- I'm going to put

23  9:00 o'clock again because it seems to be telling you -- I

24  think that trek in the snow is not exactly on your side right

25  now.

Dr. Mitchell - Direct (Resumed) by Meyer

1        (Tendered.)

2            THE COURT:  Thank you.

3            You had everything you needed yesterday, right?  I

4    know it gets to be hard for you to get the right paperwork

5    before you leave.

6            There you go.  Have a night nice.  Be safe.

7            Those on the criminal case, is anybody here on the

8    criminal case?  Not yet?

9            All right.  We'll start in a few minutes.  I'm going

10   to meet with the Pre-Trial Services officer.

11           Those on the trial, you need to clean off your tables

12   quickly and get out because we have 11 arraignments to do or 13

13   arraignments in the next few minutes.  Okay?

14           LAW CLERK:  All rise.  Court is in recess.

15       (Proceedings concluded at 4:06 p.m.)

16                  C E R T I F I C A T E

17       I certify that the foregoing is a correct transcript of the

18   record of proceedings in the above-entitled matter.

19

20

21   /s/ GAYLE A. McGUIGAN                    March 7, 2018
     Gayle A. McGuigan, CSR, RMR, CRR             Date
     Official Court Reporter

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS

2                         EASTERN DIVISION

3   WENDELL WEAVER,              )  Docket No. 15 C 02950
                        )

4             Plaintiff,    )  Chicago, Illinois
                        )  February 8, 2018

5          v.              )  11:02 a.m.
                        )

6   DR. JACQUELINE MITCHELL and   )
   RANDY PFISTER,            )

7                        )
             Defendants.   )

8

9                          VOLUME 3-A
             TRANSCRIPT OF PROCEEDINGS - Jury Trial

10     BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

11

   APPEARANCES:

12

13   For the Plaintiff:     MOLOLAMKEN LLP by
                        MR. GERALD P. MEYER

14                   MS. MICHELLE JOYCE PARTHUM
                        300 North LaSalle Street

15                   Chicago, Illinois  60654

16   For the Defendants:    OFFICE OF ILLINOIS ATTORNEY GENERAL by
                        MR. NICHOLAS SCOTT STALEY

17                   MR. JOSEPH PETER LUPINACCI
                        100 West Randolph Street, 13th Floor

18                   Chicago, Illinois  60601

19

20

21

22   Court Reporter:       GAYLE A. McGUIGAN, CSR, RMR, CRR
                        Federal Official Court Reporter

23                   219 South Dearborn, Room 2318-A
                        Chicago, Illinois 60604

24                   (312) 435-6047
                        Gayle_McGuigan@ilnd.uscourts.gov

25

I N D E X

WITNESS                                                      PAGE

DR. JACQUELINE MITCHELL
        Direct (Resumed) By Mr. Meyer ............. 284
        Cross By Mr. Staley ...................... 314

RANDY PFISTER
        Direct By Ms. Parthum ..................... 322
        Cross By Mr. Staley ...................... 336
        Redirect By Ms. Parthum ................... 339

DR. JACQUELINE MITCHELL
        Direct By Mr. Staley ..................... 354
        Cross By Mr. Meyer ....................... 389

SYTERA SANDERS
        Direct By Mr. Lupinacci .................. 392
        Cross By Ms. Parthum ..................... 405
        Redirect By Mr. Lupinacci ................ 409

RANDY PFISTER
        Direct By Mr. Staley ..................... 411

WENDELL WEAVER
        Direct By Mr. Meyer ...................... 414
        Cross By Mr. Staley ...................... 416


Closing Argument by Mr. Meyer                 419

Closing Argument by Mr. Lupinacci             433

Rebuttal Argument by Mr. Meyer                445


Jury Charge                                   448


Verdict                                       470

 1            (In open court outside the presence of the plaintiff and

 2       jury:)

 3                 THE CLERK:  15 C 2950, Weaver versus Mitchell, et al.

 4                 THE COURT:  Let's bring my jury in.

 5                 THE CLERK:  Okay.

 6                 MR. MEYER:  Your Honor, we had a couple issues.

 7                 THE COURT:  What are they?

 8                 MR. MEYER:  So there are two exhibits that we believe

 9       the defendants are going to try to introduce today.

10       Ms. Parthum is prepared to argue it.

11                 THE COURT:  Okay.

12                 MS. PARTHUM:  Yes, your Honor.  We've been informed

13       that there are two different exhibits that the defense is

14       seeking to admit.  One is a grievance officer's report.  We

15       have a number of objections to the admission of this exhibit,

16       including hearsay, reliability, 403, and it being incomplete.

17                 THE COURT:  Okay.

18                 MS. PARTHUM:  Would you like a copy of the exhibit,

19       your Honor?

20                 THE COURT:  Of course.

21                 And what's the basis for bringing it in?

22            (Plaintiff enters courtroom.)

23                 MR. STALEY:  Judge, it is the response to the

24       grievance that Mr. Weaver testified to earlier that he wrote.

25       We believe we can get it in under the business record

1    exception.  Dr. Mitchell herself was the one who relayed the

2    information that is included in the response.  She said that is

3    verbatim what she told Ms. McBee (phonetic).

4         Additionally, Dr. Mitchell can testify that these are

5    kept in the regular course of business.  She's familiar with

6    the document --

7         THE COURT:  Hold on just a second.

8         So this response was given to Mr. Weaver.  And what

9    you want to get in is that no action as grievant appears to be

10   receiving appropriate dental care at this time, what was given

11   to Mr. Weaver?

12        MS. PARTHUM:  I'm sorry, your Honor.  What was the

13   question?

14        THE COURT:  What is the information in this response

15   that you want to bring in?

16        MR. STALEY:  That I want to bring in?

17        THE COURT:  Yes.

18        MR. STALEY:  I believe at the top it says "per

19   Dr. Mitchell," and then there's I believe three paragraphs --

20        THE COURT:  Okay.  And it was provided to Mr. Weaver

21   to tell him what -- the response to his grievance, right?

22        MR. STALEY:  Correct, Judge.

23        THE COURT:  All right.  And why is it hearsay if it

24   goes to his state of mind and the way that he would have

25   reacted to receiving the information?

1          MS. PARTHUM:  It's hearsay, your Honor, because this

2     was prepared by someone named Anna McBee.  We understand that

3     this person will not be testifying today.  It is --

4          THE COURT:  When is this going to happen?

5          MR. STALEY:  During Dr. Mitchell's direct examination.

6          THE COURT:  When is Dr. Mitchell's direct examination?

7     Not until after lunch.

8          MR. STALEY:  Yes.

9          THE COURT:  All right.  Bring in the jury.

10         MR. STALEY:  There was one other issue, if I can be

11     heard.

12         THE COURT:  You can't.  Bring in the jury.

13         COURT SECURITY OFFICER:  All rise.

14       (Jury in at 11:04 a.m.)

15         THE COURT:  Please be seated.

16         I'm so sorry about this delay.  Last night, there was

17     14 defendants added to a criminal gang case that I have in my

18     courtroom, making the Number 34.  So for the last evening and

19     this morning, I've been dealing with all of the arraignments on

20     that criminal matter, so it has nothing to do with the lawyers

21     here.  They have all been waiting patiently, as you've been

22     waiting patiently, and I've dealt with 34 defendants.

23         So I apologize for my delay, but it's not like I knew

24     they were going to be arrested.

25         JUROR:  That's true.

1          THE COURT:  So that's what happens.

2          So let's get started, and we'll go as far as we can.

3    I haven't had a chance to talk to the lawyers about their

4    issues because I didn't want to waste any more of your time.

5    If they have an issue, they may have to see me at sidebar.

6    We'll just see how far we go until lunch, okay?

7          Go ahead.

8     (Witness Dr. Jacqueline Mitchell resumes the stand.)

9          MR. STALEY:  Judge, if I may make one comment before

10   the examination begins.

11         Mr. Pfister reminded me he is a little hard of

12   hearing.  So just so he can hear all of the testimony that's

13   being elicited, if everybody could speak up.

14         THE COURT:  So you're one of the offenders, because

15   you have a soft voice.  And you're the worst offender.  You're

16   the softest voice.

17         But, Mr. Pfister, I do have a hearing device that I

18   can give to you, if you would like.  My court reporter uses

19   one, and it just magnifies everything for you.

20         Kathleen, can you go talk with my courtroom deputy and

21   see if we can obtain one?  We just have to make sure we have

22   good batteries in it.

23         In the meantime, I can control her microphone to keep

24   it up.

25         I think -- do you hear Ms. Mitchell, generally?

Dr. Mitchell - Direct (Resumed) by Meyer

1      DEFENDANT PFISTER:  I haven't heard hardly anything
2  the whole time.
3      THE COURT:  Oh, no.
4      DEFENDANT PFISTER:  I'm more concerned about when I
5  get up there.
6      THE COURT:  So I will get that for you.
7      Gayle, are you wearing yours now?
8      COURT REPORTER:  Yes.
9      THE COURT:  So it's just like what Gayle has, looks
10  like that, and it hangs down, and it will magnify, and it will
11  help you.
12      Meanwhile, speak directly into the microphone when you
13  are speaking so that we can make sure that the defendant hears.
14      DEFENDANT PFISTER:  Thank you.
15      THE COURT:  I'm asking you -- that would be, "Yes,
16  Judge, I will."
17      MR. MEYER:  Oh, yes, Judge.  Excuse me.
18      THE COURT:  Okay.  Thank you.
19      All right.  Doctor, you are still under oath.  Do you
20  understand that?
21      THE WITNESS:  Yes, ma'am.
22    (Witness previously sworn and takes the stand.)
23      THE COURT:  Okay.  Now you may proceed.
24              DIRECT EXAMINATION (Resumed)
25  BY MR. MEYER:

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    Good morning, Dr. Mitchell.

2    A    Good morning.

3    Q    Just briefly, when we left off yesterday, we were

4    discussing Mr. Weaver's dental treatment as recorded in his

5    medical record, correct?

6    A    Yes.

7    Q    You began his root canal process in November 2011; is that

8    correct?

9    A    November 28th.  Yes, sir.

10         MR. MEYER:  And, your Honor, this is the medical

11   record that's already been entered into evidence.  If I may

12   publish to the jury?

13         THE COURT:  Hold on, folks.  I have to turn that on

14   for you.

15         Does everyone have it now?

16       (Nodding of heads.)

17         THE COURT:  Okay.  Thank you very much.

18         Go ahead.

19         MR. MEYER:  Thank you, your Honor.

20   BY MR. MEYER:

21   Q    That's this entry here, correct?

22   A    Yes.

23   Q    And the root canal treatment, as we went over yesterday in

24   some detail, it continued for several months; is that correct?

25   A    Yes.

286

1  Q   Excuse me.  And on May 3rd, 2012, you filled one of the two

2  canals in his Number 12 tooth; is that right?

3  A   Yes.

4  Q   On May 9th, you noted some drainage in the B canal.  That's

5  the second canal in his tooth.  Is that right?

6  A   Yes.

7  Q   And do you recall, we had some discussion about this word

8  here?

9  A   I said it was "some."

10  Q   Some.

11  A   S-O-M-E.

12  Q   You were deposed in this case; is that correct?

13  A   Yes.

14  Q   Do you still have a copy of your deposition testimony up

15  there at the stand?

16  A   I don't have anything.

17  Q   I'll bring you a copy.  Thank you.

18      (Tendered.)

19         THE CLERK:  I'm checking, your Honor.

20         THE COURT:  Testing, testing.  Does it work?

21         Mr. Pfister, try this one.

22         Okay.  Do you hear me?  Testing, testing.  Can you

23  hear me?

24         DEFENDANT PFISTER:  (Nods affirmatively.)

25         THE COURT:  Okay, good.  Let's give it a try and see

Dr. Mitchell - Direct (Resumed) by Meyer

1    if it helps, okay?

2              DEFENDANT PFISTER:  Thank you.

3              MR. MEYER:  Does your Honor require another copy of

4    Dr. Mitchell's deposition testimony?

5              THE COURT:  Oh, no, I have mine.

6              MR. MEYER:  Thank you.

7    BY MR. MEYER:

8    Q   Dr. Mitchell, if you could please turn to page 232.  Let me

9    know when you're ready.

10   A   I'm ready.

11   Q   And I'm going to start at line 4.

12             At your deposition, you were asked:

13             Mr. Weaver -- this is paraphrased -- was scheduled for

14   a follow-up related to the buccal canal, that's the B canal, on

15   5/9/2012.  That's this entry.

16             Were you asked that question?

17   A   I think so, yes.

18   Q   And your answer was:  "Yes."  Correct?

19   A   Yes, that's what it says.

20   Q   And the next question you were asked is:  "And did you see

21   Mr. Weaver on May 9th?"

22             Correct?

23   A   Yes.

24   Q   And your answer was?

25   A   "Yes."

288

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   And then the question -- the next question you were asked

2  is:  "What treatment did you provide?"

3          Were you asked that question?

4  A   Yes.

5  Q   And your answer was:  "I saw that he was still sore, and I

6  put him back on the Azithromycin."

7          Was that your answer?

8  A   That was my answer, but the word is "some" over there.

9  Q   Okay.  I understand that's your testimony today.

10  A   Okay.

11  Q   But you were under oath when you were deposed, correct?

12  A   Yes.

13  Q   And your answer on that day was that he was still sore,

14  correct?

15  A   Yes.  That's what it says.

16  Q   Thank you.

17          You then filled the B canal, that's the second canal,

18  at the next appointment here on the 15th; is that right?

19  A   Yes.

20  Q   And we talked yesterday about some rescheduled appointments

21  in June and July, correct?

22  A   Yes, you did.  Yes.

23  Q   And we kind of left off here in August; is that right?

24  A   Yes, you did.

25  Q   So on August 3rd, Mr. Weaver was scheduled for an

289

Dr. Mitchell - Direct (Resumed) by Meyer

1  appointment on August 16th?

2  A    Yes.

3  Q    And he requested an appointment, actually on August 15th,

4  the day before he was scheduled to have his next appointment;

5  is that right?

6  A    Yes.

7  Q    And so the 15th, that's going to be the date that you

8  received his request, not necessarily the date that he wrote

9  it; is that right?

10  A    That would be correct.

11  Q    And he made this request because he -- the filling had

12  fallen out of his root canal tooth, the Number 12 tooth; is

13  that right?

14  A    Yes.

15  Q    And so you saw Mr. Weaver on August 16th of 2012; is that

16  right?

17  A    Yes.

18  Q    And you filled the tooth; is that right?

19  A    Yes.

20  Q    And it says two pins placed.  What does that mean?

21  A    Pins are used to provide additional support to a tooth, and

22  so he received two additional pins inside the tooth to help

23  support the tooth.

24  Q    Okay.  And so at this point, the restoration of the root

25  canal is complete; is that right?

Dr. Mitchell - Direct (Resumed) by Meyer

1   A    No.  At that point, the restoration of the tooth is

2   complete.  The root canal was completed on 5/18, 15 -- I don't

3   have a chart, so I can't flip back.

4   Q    Excuse me.

5   A    The root canal is complete at the time that both canals are

6   filled.  The restoration of the tooth, which is different, was

7   completed on 8/16/2012.

8   Q    So I understand we're making a distinction between the root

9   canal and the restoration.  The restoration is part of the

10  process that follows the root canal, correct?  They're two

11  different things?

12  A    They're two different things.

13  Q    Okay.  So the restoration of his root canaled tooth was

14  completed on August 16th.

15  A    That's correct.

16  Q    Thank you.

17  A    Okay.

18  Q    So there's a lot more in the medical record.  We're not

19  going to go over each line.  But I am going to skip ahead, if

20  you will, to February 18th, 2016.

21  A    Four years later, yes.

22  Q    Yes.

23  A    Okay.

24  Q    And so here Mr. Weaver is requesting an exam, correct?

25  A    Yes.  That's what it says.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   And he's scheduled for the next day?

2  A   Yes.

3  Q   And it looks like he requested the exam because he had

4  suffered a broken tooth; is that right?

5  A   Yes.

6  Q   And that broken tooth was the Number 12 tooth, the one that

7  had been root canaled?

8  A   Yes.

9  Q   Thank you.

10  A   Okay.

11  Q   So we're going to skip ahead some more.  It's the very next

12  page in his medical record.

13       On October 17th, 2016, Mr. Weaver again requests an

14  appointment; is that right?

15  A   Yes.

16  Q   Does it say why he requested the appointment?

17  A   It says:  "Patient requests appointment for pain in RCT

18  treated tooth."

19  Q   And so he was scheduled for an appointment on the next day

20  on the 18th; is that right?

21  A   Yes.

22  Q   And that appointment was rescheduled, correct?

23  A   Yes.

24  Q   Why?

25  A   Apparently, Mr. Weaver had an appointment at the University

Dr. Mitchell - Direct (Resumed) by Meyer

1    of Illinois Hospital.

2    Q   And so that would be for -- potentially for another medical

3    issue, unrelated?

4    A   Yes, he -- we do additional services, for instance, medical

5    issues that can't be addressed at the facility at the

6    University of Illinois Hospital, so yes.

7    Q   So certain -- excuse me.  But certain medical issues that

8    can't be treated within Stateville, he's taken to another

9    facility where they can there treat him?

10   A   University of Illinois Hospital.

11   Q   So Mr. Weaver was then seen on the 20th of October --

12   A   Yes.

13   Q   -- is that correct?

14   A   Yes.

15   Q   And he complained of a tingling feeling at the apex of 12;

16   is that right?

17   A   Yes, that's what Dr. Saffold wrote.

18   Q   Right.  And this is not your signature.  Correct?

19   A   No, it's Dr. Saffold.

20   Q   Thank you.

21        But this doctor, looks like, did give him a

22   prescription; is that correct?

23   A   Yes.

24   Q   And what was he prescribed?

25   A   He was prescribed Tylenol, 325 milligrams, and Clindamycin,

Dr. Mitchell - Direct (Resumed) by Meyer

1    150 milligrams.

2    Q    What's Clindamycin?

3    A    Clindamycin?

4    Q    What is it?

5    A    Oh, it's an antibiotic.

6    Q    Thank you.

7         So we'll skip ahead another entry, but I'd like to

8    talk about this entry right down here.

9         And this is your signature again, correct?

10   A    That's mine there and above, yes.

11   Q    And above.

12   A    Yes.  The 2/3/2017 and the 3/27/2017.

13   Q    Great.  And I'm interested in this entry here.

14        And so this is Mr. Weaver requesting another

15   appointment; is that right?

16   A    Yes.  Mr. Weaver requested an appointment for a toothache.

17   Q    So he reported a toothache.  Correct?

18   A    Yes.

19   Q    And then it looks, again, that he was seen on the next day.

20   That looks like it might be a 2.  Is that a -- can you read

21   this doctor's handwriting, first of all?

22   A    Not really.  But on 3/28/2017 -- I can read sections of it.

23   Apparently, he was having a toothache in Tooth Number 17 and

24   32.

25   Q    My real question is can you read the date?

Dr. Mitchell - Direct (Resumed) by Meyer

1    A    It says 3/28/17, $5 paid for Number 17 and 32.

2    Q    And so he had some pain, some tooth pain, it looks like 17

3    and 32.

4    A    Yes.

5    Q    Is that what it says?

6    A    Yes.

7    Q    Thank you.

8    A    Uh-hum.

9    Q    Okay.  I'm going to move on now from the medical records.

10   I'd like to talk to you a little bit about patient grievances.

11            So in your role at Stateville, you have opportunity to

12   review patient grievances from time to time; is that right?

13   A    All of the dentists in the department actually address

14   patient grievances.  So, yes, I do as well.

15   Q    So what is a grievance?

16   A    If the inmate feels that he has been wronged or that he has

17   not received something that he feels he's entitled to, he can

18   file a grievance.  Not just for dental.  He can file a

19   grievance on his dietary.  He can file a grievance on multiple

20   events.  So it's a standard form that they use to, I guess,

21   move forward a complaint that they're having.

22   Q    And you would generally review grievances that are related

23   to dental in some way; is that right?

24   A    Myself, as well as all of the dentists in the department.

25   Normally, it takes a dentist to respond to a grievance.

Dr. Mitchell - Direct (Resumed) by Meyer

1  Q   I'm going to hand you a document that we've marked as
2  Exhibit 3.
3  A   Okay.
4      (Tendered.)
5  BY MR. MEYER:
6  Q   Would you take a moment to familiarize yourself with the
7  document?
8  A   I have.
9  Q   Thank you.
10      Do you recognize this document?
11 A   I recognize that this is a grievance, so yes.
12 Q   So what is the document?
13 A   It appears to be a grievance written by Mr. Weaver on
14 3/16/2009.
15 Q   Okay.  And did you review this grievance at the time?
16 A   I don't know.
17 Q   Can you look at the first page?  Can you tell me what that
18 is?
19 A   That's a response that I sent to -- apparently I sent to
20 the grievance office.  So, yes, I probably responded to it.
21 Q   So you responded to the grievance that is behind the letter
22 that's on top; is that right?
23 A   Yes.
24 Q   And you would have read the grievance before responding to
25 it, wouldn't you?

Dr. Mitchell - Direct (Resumed) by Meyer

1  A   Yes.  But you have to understand, we have over 2,000

2  residents, so I don't sit and say I remember Mr. Weaver's

3  grievance particularly.

4       I just wanted to make that clear.

5  Q   Sure.  I understand.  I'm not asking you to remember it as

6  you sit here today --

7  A   But, yes, before I respond to anyone's grievance, I always

8  write -- I mean, I've always -- I review the grievance as well

9  as the person's dental record.

10 Q   And just to be clear, I'm not asking you if you remember

11 all the details of this grievance as you sit here today.

12 A   Okay.

13 Q   I'm asking you in your practice if you were to write a

14 letter in response to a grievance, you would have read the

15 grievance before responding to it, correct?

16 A   Yes.

17 Q   Thank you.

18      MR. MEYER:  Your Honor, at this time we would move to

19 admit Exhibit 3.

20      THE COURT:  Is there an objection on this?

21      MR. STALEY:  We would object based on relevance.  It's

22 related --

23      THE COURT:  Okay.  The relevance because it's -- it's

24 too early?  It's the '09?

25      MR. STALEY:  Correct, Judge.

297

Dr. Mitchell - Direct (Resumed) by Meyer

1          THE COURT:  That's sustained.

2          MR. MEYER:  Your Honor, may I address this at sidebar?

3          THE COURT:  Not now.  You can do it later.

4          MR. MEYER:  Thank you.

5    BY MR. MEYER:

6    Q    Dr. Mitchell, you care about your patients, correct?

7    A    Yes.

8    Q    And so when a patient has a complaint about the treatment

9    that you've provided, you take that complaint seriously, don't

10   you?

11   A    Yes.

12   Q    And when a patient has a serious complaint, that's

13   something that you would tend to remember, wouldn't you?

14   A    In the 25 years and 3 months that I worked for the Illinois

15   Department of Corrections, I take everybody's complaints

16   serious at that time.  However, I'm 68 years old now, and I

17   can't tell you what the first complaint was in -- whenever I

18   started.  The issue for me is that I take it serious at that

19   particular time.  I tried to move forward, what I can, and I

20   tried to address the issue at that time.  But do I sit around

21   and say I remember everybody's issue?  No, I don't.  And I'm

22   sorry.  But I also don't remember every complaint my children

23   have had either, so I'm just -- no, I don't remember.

24   Q    I understand.  And that's not my question.

25   A    Okay.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q   That's not my question.

2        So my question is that if you performed a procedure,

3    you know, a more significant procedure on one of your patients,

4    and your patient was unhappy with that procedure, and you

5    reviewed the grievance, that's something that you wouldn't

6    forget immediately, is it?

7    A   I don't forget, but I don't necessarily say that I retain

8    everything that has happened in the 25 years and 3 months that

9    I practiced with the Illinois Department of Corrections.

10       Lastly -- can I say this?

11   Q   Sure.

12   A   If it's in reference to this particular grievance, I didn't

13   do the procedure, didn't do the root canal, so I can't

14   necessarily say I remember any of the specifics about this

15   particular tooth or this grievance, because, guess what?  I

16   responded to his question, his issue at that time.  I utilized

17   his medical record, which has all of the dental documentation,

18   to respond.  I don't make up stuff.  I don't decide that this

19   is my answer.  My answer is based strictly on what the record

20   says, because I have it right there in front of me, and I'm

21   typing based upon that record, giving them a reasonable

22   response to what his issue is.  Okay.

23   Q   So -- okay.  So, look, I understand you didn't perform the

24   root canal back in --

25   A   Okay.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    I understand that.

2    A    Okay.

3    Q    And I'm not trying to suggest that you did.

4         But you did recommend a course of treatment following

5    that root canal, did you not?

6    A    I explained to the patient what would be a course of

7    treatment if that were available, just like in the world

8    everybody would like certain things.  I'd like to drive a

9    Tesla.  I don't.  I drive an Accord.  But the reality is I can

10   provide what I have at that time.  And I'm sorry if it's -- but

11   I can say that this is what, in an ideal world, I would do.

12   But the basic dentistry, I provide what we can do:  Basic

13   dentistry.

14   Q    Just to be clear, we're talking about the post and core and

15   crown following the root canal on Mr. Weaver's Number 5 tooth,

16   correct?

17   A    I don't know.  Is that the tooth you're talking about?

18   Q    We reviewed the medical records yesterday, did we not?

19   A    You went through Number 5, you went through Number 12, so

20   I'm not quite sure what specific tooth.  If we're going to

21   10/1/08, that reference is to Tooth Number 5.

22        I don't mean to be disrespectful, but I would like for

23   you to clarify.  Which tooth are you talking about?  That's

24   what I need you to do.

25   Q    I'm talking about the Number 5 tooth, which is what I said,

Dr. Mitchell - Direct (Resumed) by Meyer

1  which is the same tooth that is being discussed in the

2  grievance, which has been the subject of our last ten

3  questions.

4          Are we clear that we're talking about the Number 5

5  tooth, and we're talking about the time period here in 2008?

6  A   Okay.  Now I'm clear.  Go ahead.

7  Q   Great.

8          So what you -- what I just heard you say -- and I just

9  want to make sure that I understand it.

10          What I just heard you say --

11  A   Uh-hum.

12  Q   -- is that you kind of recommended this course of

13  treatment.  You mentioned this thing that, you know, may have

14  been appropriate in private practice or it's this kind of

15  butterflies-in-the-air ideal treatment that isn't done at

16  Stateville.  That's how you're describing the post and core and

17  crown treatment here today; is that right?

18  A   That's --

19          MR. STALEY:  Objection.  Misstates testimony.

20          THE COURT:  I'm granting the -- sustaining the

21  objection based upon the argumentative nature of the form of

22  the question.

23          MR. MEYER:  Yes, your Honor.  I'll restate it.

24  BY MR. MEYER:

25  Q   So you said that this is an ideal treatment.  Is that

Dr. Mitchell - Direct (Resumed) by Meyer

1   right?

2   A    Yes.

3   Q    And this is an ideal treatment in private practice, right?

4   That's what you said.

5   A    For patients who -- yes.  Okay.  Yes.

6   Q    Okay.  And so what you're saying is that this isn't

7   something that's available to people like Mr. Weaver who are at

8   Stateville.  Is that what you're saying?

9   A    I'm saying this is something that's not available to a lot

10  of people in the general population.

11           If, in fact, a person has a root canal in my private

12  office, and their insurance company says that your crown will

13  cost $800, we're only going to pay $400, the person, if he

14  doesn't have $400, then he doesn't get a crown.  He gets a

15  regular filling.

16           In the event that the person says my insurance

17  company, and I have the difference, then they pay it.

18           This is the real world.  I'm not trying to eliminate

19  somebody's rights to have certain things, because that's

20  certainly not my interest.  My interest is -- and excuse me --

21  well, go ahead.

22  Q    So, Dr. Mitchell, we went over certain policies that apply

23  to your practice at Stateville yesterday.  Do you recall those

24  policies?

25  A    Yes.  And basically we -- yes.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q    And you're allowed to provide clinically necessary

2   treatment, aren't you?

3   A    As long as you have the equipment, the time, the supplies,

4   et cetera, to do it, based upon the A.D. that you showed me on

5   specialty care.  That is what you said, right, sir?

6   Q    What does this word say that I just highlighted?

7   A    Patient advised he needs --

8   Q    No, no, just the word.  What word is that?

9   A    I said "needs."

10  Q    Thank you.

11          Now, one of the things you just mentioned is cost.

12          In your private practice, if someone can't afford a

13  crown, they don't get a crown.

14          Is that what I just heard you say?  Is that accurate?

15  A    That's correct.

16  Q    Mr. Weaver offered to pay -- to have his family pay for a

17  crown; isn't that right?

18  A    I don't know anything about that.  No.

19  Q    Would you turn to page 2 of the document I just handed you?

20          MR. STALEY:  Objection, Judge.  This is related to the

21  Number 5 tooth.  It's not an issue in this case.

22          THE COURT:  It is.  Sustained.  It's irrelevant.

23          I'm going to have a sidebar because we need to talk.

24      (At sidebar outside the hearing of the jury:)

25          THE COURT:  Okay.  So I've written a nice summary

Dr. Mitchell - Direct (Resumed) by Meyer

1    judgment opinion, and I went through what's in and what's out.

2    And I've given you some leeway with the 5, which is whether or

3    not he had an understanding from his past treatment as to what

4    happens when a tooth breaks or crown as far as his own

5    treatment and what her understanding was of his past treatment.

6    But we are now, like, you've been putting on for hours all of

7    this back and forth regarding deliberate indifference on 5.

8             MR. MEYER:  So that is not my intention.

9             THE COURT:  That's what's coming out.

10            MR. MEYER:  Okay.

11            THE COURT:  If it's not your intention, that's what's

12   coming out.  That's why I'm sustaining the objection.  And the

13   document that I sustained the objection for has nothing about

14   his state of mind or her direction to him regarding that state

15   of mind.

16            MR. MEYER:  Oh, and that's not why I'm trying to --

17            THE COURT:  That's why I kept -- that's why I

18   sustained the objection.

19            MR. MEYER:  So for me the issue is really about her

20   knowledge and her state of mind when she's performing the root

21   canal on his Number 12 tooth.  That's why all of this

22   information is relevant to me --

23            THE COURT:  But that's got to come in that way,

24   because right now it's just coming in as did he offer to pay

25   for the Number 5 tooth.  That's not at issue.

Dr. Mitchell - Direct (Resumed) by Meyer

1      MR. MEYER:  Sure.  So, I mean, I'm confused, because I
2  believe we addressed this issue in the motion *in limine* and the
3  document was ruled admissible --
4      THE COURT:  Oh, we did --
5      MR. MEYER:  And so I think --
6      THE COURT:  The document that I just excluded?
7      MR. MEYER:  Yes, your Honor.
8      THE COURT:  Did you just object to a document that I
9  ruled on before?
10      MR. STALEY:  You ruled on it.  We have the same
11  objection.  It's my understanding the motion in limine is not
12  set in stone.  It's a preliminary --
13      THE COURT:  Well, did I give you a preliminary ruling
14  or did I give you a ruling?
15      MR. MEYER:  You gave me a ruling --
16      THE COURT:  Kathleen, get the -- I cannot believe that
17  you're going to make me go back to a motion *in limine* ruling.
18      And I can't believe you told me you had a two-day
19  trial.
20      I need the ruling on the motion *in limine*.  Find it.
21      You know what?  Okay.  You know what?  I'm not doing
22  this.  They've been waiting for an hour.  No, I'm not doing
23  this.  Go back and do your work, and I'm sustaining every
24  single objection that is an argument about deliberate
25  indifference about Number 5.  Go back to my summary judgment.

Dr. Mitchell - Direct (Resumed) by Meyer

1          If I flipped my ruling, I flipped my ruling.  Do your
2    job.
3        (Sidebar proceedings concluded.)
4    BY MR. MEYER:
5    Q    Dr. Mitchell, it was your testimony yesterday that 99
6    percent of the time when the patients have an appointment
7    they're seen; was that your testimony?
8    A    Yes.
9    Q    And it's your testimony that they show up for their
10   appointments 99 percent of the time.
11   A    Yes.
12   Q    But you know that there are a lot of reasons that dental
13   patients at Stateville don't make their appointments, don't
14   you?
15   A    There are reasons why some people don't make their
16   appointments.  But, again, there is -- I'm sorry.  Yes.
17   Q    There are reasons, correct?
18   A    Yes.
19   Q    Sometimes they don't get their passes, correct?
20   A    I don't know anything about that.
21   Q    Sometimes the patients are in other programs or at other
22   appointments.
23   A    That's possible, yes.
24   Q    Sometimes the patients are in recreation.
25   A    Yes.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q   Sometimes they're in commissary.

2   A   Yes, they can be, yes.

3   Q   And sometimes there's a lockdown.

4   A   Yes.

5   Q   You have had patients miss appointments for those reasons.

6   A   Some have, yes.

7   Q   And you know from your position as a lead dentist that

8   there are other dentists at Stateville who have had patients

9   miss their appointments for those reasons, correct?

10  A   Some, yes.

11  Q   And you know how important it is for patients to make their

12  appointments, don't you?

13  A   I think it's important because I'm a dentist, and I am

14  self-serving in the fact that I think my service is the best

15  service in the world, so of course I want everybody to come.

16  Q   That's my question.  In your opinion, it's important for

17  patients to come --

18  A   Yes, I want patients to come --

19         COURT REPORTER:  One at a time, please.

20  BY MR. MEYER:

21  Q   Could you please let me finish my question before you begin

22  answering?  I apologize.  But thank you.

23         In your opinion, it is important for patients to make

24  their appointments with you, correct?

25  A   Correct.

Dr. Mitchell - Direct (Resumed) by Meyer

1   Q    Thank you.

2          And you keep track of appointments in the medical

3   records, correct?

4   A    Correct.

5   Q    And you know that other people in the IDOC look at that

6   information to see how well your program is functioning,

7   correct?

8   A    Correct.

9   Q    And so you know that sometimes they bring in experts from

10  the outside to review the dental office and to review other

11  programs at Stateville to see how well they're functioning and

12  to see if there are any ways for those programs to be improved;

13  is that correct?

14  A    Correct.

15  Q    And those audits that involve the dental program, they're

16  important to your work, aren't they?

17       (No response.)

18  BY MR. MEYER:

19  Q    When I'm finished talking, you may answer.

20  A    Are you finished?

21  Q    Yes.

22  A    You didn't say "correct," so that's why I didn't know

23  whether I should say "correct" or not.  Correct?

24  Q    Correct.

25  A    Tell me if you want to say "correct" or not.

Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    I'll restate my question.

2            Those audits that involve the dental program are

3    important to your work; is that correct?

4    A    Correct.

5    Q    Thank you.

6            And they're important because Stateville is a public

7    institution, correct?

8    A    Correct.

9    Q    Thank you.

10           You mentioned audits a few times yesterday.  Do you

11   remember mentioning audits?

12       (No response.)

13   BY MR. MEYER:

14   Q    Do you remember mentioning audits?

15   A    Correct.

16   Q    It's a question.  It starts with the word "Do."

17           Do you understand that's a question?

18           Do you remember mentioning audits yesterday?

19   A    You have been --

20   Q    Yes or no?

21   A    Yes.

22   Q    Thank you.

23           During these audits, experts come in and they

24   interview the staff, don't they?  Yes or no.

25   A    Yes.

                    Dr. Mitchell - Direct (Resumed) by Meyer

1    Q    Thank you.

2             You understand that the experts want first-hand

3    information from the people who work there.  Yes?

4         (No response.)

5    BY MR. MEYER:

6    Q    The experts who are reviewing the dental office, they want

7    first-hand information from the staff.  Yes or no.

8    A    Yeah.  Yes.

9    Q    They want accurate information, the people who are

10   reviewing your program, they want to know what's going on.  Yes

11   or no.

12            MR. STALEY:  Judge, we would object based on

13   relevance.  We'd also ask for a sidebar.

14            THE COURT:  No sidebar.  And overruled.

15            Come on, keep going.

16   BY THE WITNESS:

17   A    Yes.

18   BY MR. MEYER:

19   Q    You understand that the purpose of the audits is to

20   understand how well the program is functioning.  Yes?

21   A    Yes.

22   Q    You have been interviewed by these experts.  Yes?

23   A    Yes.

24   Q    Thank you.

25            The experts make findings, correct?

Dr. Mitchell - Direct (Resumed) by Meyer

1      (No response.)

2   BY MR. MEYER:

3   Q   Correct?

4   A   Correct.

5   Q   Sometimes they produce reports, correct?

6   A   Correct.

7   Q   And they make recommendations on how to improve the

8   facilities, correct?

9   A   Correct.

10  Q   You care about Stateville, correct?

11  A   Correct.

12  Q   And you care about the patients that you and your staff

13  treat within Stateville, correct?

14  A   Correct.

15  Q   You want to make sure that you know areas that need fixing,

16  correct?

17  A   Correct.

18  Q   And then you work to fix them, don't you?  Yes?

19  A   Yes.

20  Q   You want to improve it.  Yes?

21  A   Yes.

22  Q   So in your role as lead dentist, you review those reports

23  and recommendations.  Yes?

24  A   Yes.

25          THE COURT:  All right.  Now I need to have another

Dr. Mitchell - Direct (Resumed) by Meyer

1    sidebar.  Okay?

2        (At sidebar outside the hearing of the jury:)

3            THE COURT:  First of all, getting back to your

4    previous objection, I said that that was permitted for her to

5    know that he wanted his tooth not pulled, and you went through

6    30 minutes of his treatment and whether he's sore and whether

7    he's this or that, and that was not the purpose of the

8    admissibility.  So that was my ruling in pretrial.  It's clear

9    in the docket.  That's what it was for.  So my ruling stands.

10           MR. MEYER:  Your Honor, I'm sorry, but when -- that

11   was relating to the Number 12 tooth.  All the time we spent in

12   the medical records yesterday and in the beginning this

13   morning, that was related to the Number 12 --

14           THE COURT:  Your own words this morning was we've been

15   on Number 5 for at least the last ten questions.  Remember?

16           MR. MEYER:  Excuse me, your Honor.

17           THE COURT:  Would you like to argue about this with

18   me?

19           MR. MEYER:  No, no.  Your Honor, I'm sorry.  I would

20   just like to explain myself because the ten questions I was

21   referring to were the ten questions that were just referring to

22   that document, that one document.

23           THE COURT:  But it had nothing to do with whether he

24   wanted to keep his tooth or have his tooth pulled.  That was

25   the admissibility of it.  That was the reason for it.  It was

Dr. Mitchell - Direct (Resumed) by Meyer

1    allowed to be used for that reason.  That was my pretrial
2    ruling.
3              MR. MEYER:  Okay.
4              THE COURT:  All right?
5              MR. MEYER:  Okay.
6              THE COURT:  Now, what do you think you're going to get
7    in with her on this right now?
8              MR. MEYER:  That there's -- that the testimony that
9    she gave yesterday and the testimony that she just gave this
10   morning, that 99 percent of patients make their appointments is
11   just not accurate.  She knows it's not accurate --
12             THE COURT:  No, no, no, what's your expert?  What are
13   you going to do right now?
14             MR. STALEY:  If I may, I know where this is going.
15   There was a report that was just tendered to us this morning --
16             MR. MEYER:  I just found it.
17             MR. STALEY:  -- that he wishes to bring in that
18   criticizes, and also some of it is good, about Stateville's
19   medical facilities and their dental facilities.  This is the
20   first time we have ever seen this document.  Discovery has been
21   closed for over eight months, and this trial has been continued
22   on plaintiff's own request.  There's been more than enough time
23   for them to get this document and have a chance for us to
24   review it and our client to review it.  Our client was on the
25   stand.  The trial was continued until today.  Plaintiff's

313

Dr. Mitchell - Direct (Resumed) by Meyer

1   counsel knows there's no way we can discuss this with her.

2   It's a bombardment.  It's an ambush on her -- against her

3   because she has no idea what this report even is or what it

4   says or when it was put together.

5           MR. MEYER:  Well, that's not accurate because she just

6   said that she reviews --

7           THE COURT:  What is the report?  When did you receive

8   it?  What does it conclude?

9           MR. MEYER:  Early this morning -- I found it because

10  she mentioned audits yesterday.  I thought her testimony about

11  99 percent couldn't possibly be true, and so I did some

12  searching to see if I could find it, one of the audits --

13          MR. STALEY:  Judge, audits were --

14          MR. MEYER:  And this is it -- if I may finish.  And,

15  you know, this is the audit that mentioned Dr. Mitchell by

16  name.  They interviewed her.  They've got a 40 percent failure

17  rate on the appointments.

18          THE COURT:  Absolutely not.  This is an expert

19  analysis done for a broader purpose, which back-doors in a 702

20  expert who has done an audit, for myriad reasons, within the

21  facility, other than whatever she's doing, and comes up with

22  the conclusion that this jury needs to make, which is taking it

23  out of the ken and the decision-making process of the jury by

24  superimposing, not just an individual, but four doctor

25  individuals here, right here -- oh, I guess one is a nurse -- a

Dr. Mitchell - Cross by Staley

1    dentist, two doctors, and a nurse -- who expertly say that

2    she's doing a bad job?  Not a chance are you bringing this in.

3    It's not part of discovery.  It's not disclosed.  And it is

4    back-dooring a 702 expert and taking away the ultimate decision

5    from the jury.

6         MR. MEYER:  I wouldn't try to give this document to

7    the jury.  I would just ask her a question.

8         THE COURT:  No, you may not.

9         MR. MEYER:  Thank you.

10        (Sidebar proceedings concluded.)

11        MR. MEYER:  Just one moment, please.

12        THE COURT:  Yes.

13        (Counsel conferring.)

14        MR. MEYER:  No more questions.

15        THE COURT:  Okay.  Are you going to cross now and then

16   call?  Or what do you want to do?

17        MR. STALEY:  I just have a few questions on cross,

18   Judge.

19        THE COURT:  That's fine.

20        MR. STALEY:  Very, very short cross-examination.

21        THE COURT:  All right.  Go ahead.

22                        CROSS-EXAMINATION

23   BY MR. STALEY:

24   Q    Good afternoon, Dr. Mitchell.

25   A    Hi.

315

Dr. Mitchell - Cross by Staley

1   Q    Yesterday, when your testimony began, do you recall being

2   asked about certain bullpens that inmates were put in when they

3   came to the health care department -- or the health care unit?

4   A    Yes.

5   Q    And I believe you testified that there were separate

6   bullpens for separate classes of inmates; is that correct?

7   A    Yes.

8   Q    Those being general population, segregation, and PC?

9   A    Yes.

10  Q    Can you explain to the jury what PC is?

11  A    It's a protective custody bullpen.  Those are people who

12  might be injured if they're put into the general population,

13  things like that.  So those individuals have to be separated

14  from everybody to -- for their own safety.

15  Q    So the general gist of having these separate bullpens is

16  these class of inmates, they can't interact with each other; is

17  that correct?

18  A    Yes.

19  Q    And is that an obstacle for you in scheduling individual

20  patients?

21  A    Sometimes we can't bring a person -- for instance, we have

22  specific days that we see segregation people.  We have specific

23  days that we have to see protective custody individuals.  And

24  so that takes so many days out of your schedule.  When PC is

25  in, then that day is devoted to protective custody.

Dr. Mitchell - Cross by Staley

1    Segregation has a whole day.  So that leaves you, like, three

2    days the rest of the week, like three other days for just the

3    general population people.

4    Q    Also during your testimony I believe yesterday, part of

5    today, when you were going over the individual medical records

6    of Mr. Weaver, there were a couple issues that came up that

7    postponed his treatment where it had to be rescheduled, one of

8    which was when the staff ran out of time.  Do you recall that?

9    A    Yes.

10   Q    And I believe you explained that there was a time cut-off,

11   I believe 4:00 o'clock.  That's when usually things need to be

12   finished and packed up; is that correct?

13   A    Yes.

14   Q    Do you set those time restrictions?

15   A    No.

16   Q    Other than asking a correctional officer or security

17   personnel to, you know, let you finish what you're doing, is

18   there any control you have over those restrictions?

19   A    No.

20   Q    There were also times that it was noted that there was a

21   staff shortage or -- I'll just stick with staff shortage.

22           Do you have any control when there are staff

23   shortages?

24   A    No.

25   Q    I believe you testified that sometimes staff are pulled

Dr. Mitchell - Cross by Staley

1    from what is Stateville over to what is the reception center?

2    A    Yes.  Northern reception center.

3    Q    And that's a different facility; is that correct?

4    A    It's part of Stateville; but, yes, it's a different

5    building, different purpose.

6    Q    Do you make those decisions to pull the individuals and put

7    them in a different facility?

8    A    No.

9    Q    There was also a mention of lockdowns, which you explained

10   what a lockdown was.

11          When Stateville or an institution goes on a lockdown,

12   do you make that decision?

13   A    No.

14   Q    When there's restricted movement and inmates are unable to

15   come to the health care unit or the dental department, is that

16   a decision you make?

17   A    No.

18   Q    There was also testimony about a procedure called a post,

19   core, and crown.  There was testimony related to the Number 5

20   tooth, which I believe you said that due to the fact that

21   Mr. Weaver had a large cavity on that tooth, a post, core, and

22   crown would have been ideal for him; is that correct?

23   A    Do you want me to say correct?

24   Q    I want you to say what the truth is.

25   A    Okay.  Yes.  I think if you review the note from 1/30/2008

Dr. Mitchell - Cross by Staley

1    when the doctor, Dr. Gart (phonetic), worked on that particular

2    tooth, she made a lot of notations in reference to that

3    particular tooth.  Because it had a large cavity, et cetera, it

4    had a lot of unsupported tooth structure, and so that was the

5    basis of my saying that that particular tooth did not have a

6    lot of tooth structure, you know, that supports your cusp left

7    once -- when it was ready for the restoration.

8    Q    And was that your reasoning behind suggesting a post, core,

9    and crown?

10   A    My reasoning oftentimes is when I'm working with my

11   patients, I like to talk to them about things, you know, this

12   is what I have to do, but this is what, you know, if I could do

13   it differently, I think this would be a better option for this

14   particular tooth.

15         Again, that comes from my background in teaching.  I

16   came from the University of Illinois as an assistant professor

17   in restorations.  That's what I used to do before I started

18   working for the Department of Corrections.

19         So I'm talking, trying to help him to understand the

20   importance of what's going on with his tooth, et cetera.  And

21   so my goal was to try to educate him and to help him see what

22   was going on with that particular tooth.

23   Q    Okay.  And because you had that conversation, the post,

24   core, and crown then was noted in his medical records.

25   A    I noted that I had discussed that with him, that that would

Dr. Mitchell - Cross by Staley

1   have been the ideal treatment for that particular tooth, yes.

2   Q   Okay.  So then we get to the Number 12 tooth, the tooth

3   that is at issue in this lawsuit.  And you performed the root

4   canal on that tooth, correct?

5   A   Yes.

6   Q   Was a post, core, and crown -- strike that.

7           Once the root canal was finished, was a post, core,

8   and crown medically necessary for Mr. Weaver?

9   A   No.  He had a lot of supporting tooth structure.  That

10  particular tooth came -- radiographically, if you had looked at

11  the x-ray, it has a very small cavity that's going directly

12  toward the pulp.  He didn't have as much tooth structure -- it

13  wasn't an extensively damaged tooth initially.

14          So, again, it was a matter of you're working in the

15  dead center of the tooth, the cusps are supported by dentin,

16  which is what's underneath the top part of your teeth that you

17  see, so not necessarily, no.

18  Q   Okay.  So basically what you're saying is the Number 12

19  tooth was in a different condition than what the Number 5 tooth

20  was?

21  A   Yes.

22  Q   You also mentioned during your testimony this phrase

23  "community standards" or "community-based services."  Can you

24  explain that a little more?

25  A   In all services -- and I don't care whether it's dentistry,

Dr. Mitchell - Cross by Staley

1  medicine, medications, anything that pertains to the treatment

2  of people -- there is, for instance, a community-based

3  standard, which is basic dentistry.

4          In those cases, a lot of times at the community health

5  centers and things like that, they take a person's tooth out

6  instead of doing root canals.

7          If it comes down to the restoration, it's going to be

8  a removable prosthesis versus a bridge versus an implant, which

9  would be the higher level of care.  All of those are reasonable

10 options.  And a lot of them are attendant with socioeconomic

11 factors, different factors like that.  I don't control that.  I

12 just say that, you know, if you were to go to like a

13 community-based location, that's what we provide.  We provide

14 basic dental services to our patients.  We do cleanings.  We

15 don't do periodontal surgery.  We do removable prosthetics.  We

16 don't do fixed prosthetics.  We don't do any implants.  Again,

17 we don't even have the equipment.  The thought of it just is

18 not something that's available.

19         So it's a matter of we provide more basic care and --

20 with the intent of trying to provide the person with as

21 complete dentition as possible.

22         When people lose a tooth, then we have the ability to

23 make them replacement teeth to hold their teeth in place,

24 et cetera, but those are removable as opposed to a fixed

25 appliance.

Dr. Mitchell - Cross by Staley

1              So I hope I answered your question.

2    Q   You did, Dr. Mitchell.

3    A   Okay.  Thank you.

4    Q   If I'm understanding correctly, when you refer to

5    community-based standards that Stateville provides, you're

6    basically saying that they provide general dentistry treatment?

7    A   Yes.  General dentistry.  That -- that's what we have

8    available to us.

9    Q   There was also a point in your testimony this morning when

10   there was reference to your deposition.  Do you still have that

11   in front of you?

12   A   Yeah.  Ah-ha.

13   Q   I believe it was this portion?

14   A   What page is that?  Because I closed the page.

15   Q   It is 232.  If you can see it on the screen, that's --

16   A   Okay.

17   Q   And you testified that you said when you saw -- at your

18   deposition, you testified that when you saw Mr. Weaver, he was

19   still sore, and you put him back on antibiotics; is that

20   correct?

21   A   Yes.

22   Q   Okay.  And then today you were asked what a particular word

23   in the medical record was, correct?

24   A   Yes.

25   Q   That's not what you were asked at your deposition, correct?

Pfister - Direct by Parthum

1  A   Can I -- I don't think so, no, but ...

2           MR. STALEY:  Nothing further, Judge.

3           THE COURT:  Any redirect?

4           MR. MEYER:  No.

5           THE COURT:  You can step down.

6      (Witness excused.)

7           THE COURT:  And you can call your next witnesses.

8           MS. PARTHUM:  Your Honor, the plaintiff calls

9  Mr. Randy Pfister.

10     (Approaching.)

11          THE COURT:  Do you need that up here?  Because you can

12  wear it up there.  Do you need that?  You can wear it on the

13  witness stand.

14          DEFENDANT PFISTER:  It broke.

15          THE COURT:  Oh, I'll get you another one.

16          Kathleen --

17          DEFENDANT PFISTER:  I should be okay if I'm

18  face-to-face.

19          THE COURT:  Okay.  Raise your right hand.

20     (Witness duly sworn and takes the stand.)

21          THE COURT:  Okay.  Have a seat.

22             RANDY PFISTER, PLAINTIFF'S WITNESS, SWORN

23                     DIRECT EXAMINATION

24  BY MS. PARTHUM:

25  Q   Good morning, Mr. Pfister.

323

Pfister - Direct by Parthum

1    A    Good morning.

2    Q    Can you hear me okay?

3    A    Yes.

4    Q    Would you just let me know if I get too soft at any point?

5    A    Yes, ma'am.

6    Q    Until recently, you were the warden at Stateville

7    Correctional Center, correct?

8    A    Correct, ma'am.

9    Q    When did you transition out of that role?

10   A    A week ago today, February 1st.

11   Q    So for my questions this morning, I'm going to focus on the

12   time that you acted as the warden until a week ago --

13   A    Yes, ma'am.

14   Q    -- okay?

15            Stateville Correctional Center is part of the Illinois

16   Department of Corrections; is that right?

17   A    Yes, ma'am.

18            THE COURT:  Here's another one if you want to use it.

19            THE WITNESS:  Thank you.

20            THE COURT:  Testing, testing.  That one is working?

21            THE CLERK:  Just in case --

22            THE COURT:  Just in case.

23        (Tendered.)

24            THE COURT:  Thanks.

25   BY MS. PARTHUM:

Pfister - Direct by Parthum

1   Q   Mr. Pfister, I've handed you what's been previously marked

2   as Exhibit 6.  You recognize this document, correct?

3   A   I recognize it as one of the administrative codes.  I don't

4   recognize it specifically.

5   Q   It's an administrative code governing the Department of

6   Corrections?

7   A   Yes, ma'am.

8           MS. PARTHUM:  Your Honor, the parties have stipulated

9   to the admissibility of this exhibit, and plaintiffs offer it

10  into evidence.

11          THE COURT:  Okay.  That's in.

12      (Said exhibit received in evidence.)

13          THE COURT:  Do you want to show it?

14          MS. PARTHUM:  Yes.  Permission to show it, please.

15          THE COURT:  Yes.

16  BY MS. PARTHUM:

17  Q   Mr. Pfister, if you would start by referring to the bolded

18  wording at the top of the first page.

19          I'll zoom in a little bit so you can see it.

20  A   Okay.

21  Q   So if you look starting at the top, this is part 20 of the

22  Illinois Administrative Code; is that right?

23  A   It appears to be, yes, ma'am.

24  Q   And the title pertains to Corrections, Criminal Justice,

25  and Law Enforcement, correct?

Pfister - Direct by Parthum

1    A    Yes, ma'am.

2    Q    The part falls within Chapter 1:  Department of

3    Corrections; and Subchapter D:  Programs and Services?

4    A    Yes, ma'am.

5    Q    And the particular part we're looking at is Part 415,

6    Health Care.  Correct?

7    A    Yes, ma'am.

8    Q    If you look down at Section 415.10 on Applicability.  It

9    states:  "This part applies to adult and juvenile correctional

10   centers and programs within the Department of Corrections."  Is

11   that right?

12   A    Yes, ma'am.

13   Q    And Stateville is an adult correctional center within the

14   Illinois Department of Corrections; is that right?

15   A    Correct.

16   Q    So this code applies to Stateville, correct?

17   A    Correct.

18   Q    And this code controls the provision of dental care to

19   inmates at Stateville, correct?

20   A    It pertains to it, yes.  As far as controlling, I'm not

21   really that familiar with the document, so -- but I'm assuming

22   you are correct, yes.

23   Q    If you take a look at the effective date underneath the

24   section I just read, it states that it's effective March 1st of

25   2005, correct?

326

Pfister - Direct by Parthum

1   A    Yes, ma'am.

2   Q    And you're not aware of any amendments that would supersede

3   this policy?

4   A    I am not.

5   Q    I'm going to turn to the second page on the Definitions

6   section and just focus in on B.

7        So that says:  "Chief Administrative Officer means the

8   highest ranking official of a correctional facility."  Is that

9   right?

10  A    Yes, ma'am.

11  Q    And as the warden, when you were acting in that role, you

12  were the Chief Administrative Officer for Stateville, correct?

13  A    Yes, ma'am.

14  Q    Focusing on Section 415.15, Responsibilities, Subsection A

15  at the bottom, if you would just read that to yourself briefly.

16       So as Chief Administrative Officer, you were one of

17  three individuals primarily responsible for the provision of

18  health care within Stateville, correct?

19  A    Yes.

20  Q    And while you were able to delegate that responsibility,

21  you were ultimately responsible for the health care policy,

22  correct?

23  A    Ultimately, yes, ma'am.

24  Q    And all the work done by the dental staff at Stateville was

25  controlled by you, the assistant warden of programs, and your

Pfister - Direct by Parthum

1  staff, correct?

2  A   I'm not going to agree with that 100 percent.  If you can

3  elaborate a little bit more.  Controlled by?

4  Q   Maybe it will help if I refresh your memory with your

5  deposition.

6       (Tendered.)

7            MR. STALEY:  Judge, I'm not sure the witness's memory

8  has been exhausted.  He's saying that he doesn't agree with --

9            THE COURT:  That's okay.  Maybe it's half

10 impeachment/half refreshing.  We'll see.

11 BY MS. PARTHUM:

12 Q   Mr. Pfister, I'm going to ask you to turn to page 33 of

13 this transcript.

14           Starting at line 20, just to give you some context for

15 the conversation that's going on, the question was:

16           "Do you know how many dental professionals are

17 employed at the Stateville Correctional Center" --

18           THE COURT:  Okay.  Now, if you are refreshing, you

19 know that the proper way to do so is that he reads it, he turns

20 it over, and then you reask your question.

21           If you're impeaching, it's a whole different ballgame.

22           Which one?

23           MS. PARTHUM:  It's impeachment, your Honor.

24           THE COURT:  Okay.  Well, then you need to commit him

25 first to what he was doing, and you haven't done that.

Pfister - Direct by Parthum

1      So you're standing for an objection.  Objection

2  sustained.  Not impeachment.  You have to have him commit

3  first.

4  BY MS. PARTHUM:

5  Q   Mr. Pfister, I believe you testified that you do not

6  control the conduct of the dental staff at Stateville; is that

7  right?

8  A   Is that the same question you asked me earlier?  I'm a

9  little bit confused now where we're going with this.

10  Q   I don't remember the question perfectly, but I believe your

11  testimony -- my question had been whether the work done at

12  Stateville was controlled by you, the assistant warden of

13  programs, and your staff.

14  A   The work --

15  Q   Yes.

16  A   -- is controlled?

17  Q   Yes.

18  A   As far as the dentists?

19  Q   Yes.

20  A   I don't have a degree.  I have no idea what a dentist

21  would -- as far as my work would -- or I would control her

22  work.

23  Q   So you don't feel comfortable agreeing that you control the

24  work of the dentists; is that right?

25  A   No, I -- I would not feel comfortable agreeing that I

Pfister - Direct by Parthum

1    control the work of the dentists.

2    Q    Okay.  So if you would take a look back at the deposition

3    where we were reading.

4    A    Sure.

5    Q    So you were being asked about the dental professionals

6    within Stateville.

7              Do you see where I was when I just read the question

8    and the answer?

9    A    You were on 33, line 20, correct?

10   Q    Yes, that's right.  So that's just to give you context.  So

11   we're talking about the dental professional.

12             If you could turn to page 34, looking at line 9.  You

13   were asked:

14             "Regardless of whether or not they're direct employees

15   or assigned via contract through Wexford, sir, would it be

16   accurate to say that all the work done by those individuals is

17   controlled by you and the assistant and your staff?"

18             And you answered:  "Correct."

19             Were you asked that question, and did you give that

20   answer?

21   A    Apparently so.  I don't know what the questions were

22   leading up to that.  But I'm, right now, I'm basically

23   referring to the actual dental work.  I mean, how could I be

24   controlling of that?

25             I'm not saying I didn't say it.  Obviously, I did,

Pfister - Direct by Parthum

1    but ...

2    Q    Now, all individuals that work at Stateville dental

3    facility are required to follow the Illinois Department of

4    Corrections' policies, correct?

5    A    Yes, ma'am.

6    Q    So let's turn back to this exhibit.  And if you could look

7    at subsection F at the top of the page.  It states:  "Persons

8    committed to adult and juvenile facilities, excluding

9    transition centers, shall be provided medical and dental

10   treatment, with the consent of the parent or guardian where

11   applicable, as prescribed by a department physician or

12   dentist."  Is that right?

13   A    Yes, ma'am.

14   Q    And this policy does not provide any limitation on the type

15   of dental care that can be provided by Stateville dentists,

16   correct?

17   A    It doesn't appear to be any limitations, no, ma'am.

18   Q    So if a Stateville dentist identifies a treatment plan for

19   an inmate, then based on this policy, that treatment plan

20   should be followed, correct?

21   A    I would agree with that.

22        (Tendered.)

23   BY MS. PARTHUM:

24   Q    Mr. Pfister, I've just handed you what's previously been

25   admitted as Exhibit 5.

Pfister - Direct by Parthum

1          MS. PARTHUM:  Permission to publish, your Honor?

2          THE COURT:  You may.

3     BY MS. PARTHUM:

4     Q    This is an Administrative Directive for the Illinois

5     Department of Corrections, correct?

6     A    Yes, ma'am.

7     Q    And this particular directive pertains to dental care for

8     offenders; is that right?

9     A    Yes, ma'am.

10    Q    The effective date of the directive is September 1st, 2002?

11    A    Yes, ma'am.

12    Q    And there were amendments in 2011 and 2012.

13    A    Yes, ma'am.

14    Q    I'm going to refer you to Section 2B on the first page,

15    which is Applicability.

16          This Administrative Directive applies to all adult

17    facilities within the Illinois Department of Corrections,

18    correct?

19    A    Excluding the ones mentioned, yes.

20    Q    So this Administrative Directive applies to Stateville,

21    correct?

22    A    Yes.

23    Q    If you would take just a moment to review Section 1B, the

24    Policy Statement.

25    A    Okay, ma'am.

Pfister - Direct by Parthum

1    Q    Focusing on the last two lines of that section, it requires

2    that Stateville provide each inmate with clinically indicated

3    dental treatment throughout the term of his incarceration,

4    correct?

5    A    Yes, ma'am.

6    Q    And the amendments to this directive in 2011 and 2012 make

7    no change to that policy statement, correct?

8    A    I would have to look at the amendments.

9         No, ma'am, I do not believe so.

10   Q    So if you would look at Section F at the top of page 2

11   under Requirements, it states:  "The Chief Administrative

12   Officer shall ensure that dental examinations of offenders are

13   conducted in accordance with the provisions of this directive."

14   Correct?

15   A    Yes, ma'am.

16   Q    And as we discussed, the warden is the Chief Administrative

17   Officer, correct?

18   A    Correct.

19   Q    So in your capacity as warden, you were charged with making

20   sure that inmates received dental examinations in accordance

21   with this policy, correct?

22   A    Ultimately, yes.

23   Q    I'd like to focus now on Section 5 titled "Dental

24   Requests."

25        Looking first at Subsection A, it states:  "Where an

Pfister - Direct by Parthum

1   offender requests a specific routine or non-emergency service,

2   the offender may be scheduled for an appointment without a

3   dental examination.  The service shall be scheduled, but need

4   not be performed, within 14 days of such request."  Is that

5   correct?

6   A   Yes, ma'am.

7   Q   And then looking at Subsection B, that states:  "An

8   offender requesting other dental care shall be examined by

9   dental personnel within 14 days of such request, unless the

10  offender is already scheduled for treatment or service

11  regarding the same complaint or service."  Is that right?

12  A   That's what it says, yes, ma'am.

13  Q   So Subsection B provides that if an inmate requests dental

14  care other than specific routine or non-emergency service, that

15  inmate must be actually examined within 14 days of the request,

16  correct?

17  A   Are you still on B?

18  Q   Yes, sorry.  I'm summarizing B.

19          Would you like me to restate the question?

20  A   Yes, please.

21  Q   So what Subsection B means is that if an inmate requires

22  dental care other than specific routine or non-emergency

23  service, that inmate must be examined within 14 days, correct?

24  A   That appears to be what it's saying, yes, ma'am.

25  Q   And there's no exception to that policy if the prison goes

Pfister - Direct by Parthum

1   on lockdown, right?

2   A    There doesn't appear to give any options there, no.

3   Q    There's no exception to that 14-day rule for staff

4   shortages?

5   A    According to this, no.

6   Q    There's no exception to that 14-day rule for equipment

7   failures?

8   A    According to this, no.

9   Q    There's no exception to that rule if the dental staff runs

10  out of time?

11  A    According to this, no.

12  Q    And there's no exception to that rule if an inmate fails to

13  show up for a scheduled appointment.

14  A    It's not identified there, no.

15  Q    Okay.  Let's look next at Section 8, titled "Specialized

16  Dental Services."  Subsection A states that:  "Consultation and

17  referral capability to recognized specialties of dentistry,

18  such as oral surgery, shall be available and utilized as

19  clinically indicated and subject to utilization review."  Is

20  that right?

21  A    That's what it says, yes, ma'am.

22  Q    So is that -- that subsection provides that referral to a

23  dental specialist shall be made for inmates when clinically

24  indicated, correct?

25  A    As clinically indicated and subject to utilization review.

Pfister - Direct by Parthum

1    Q    And looking just above at the "Dental Emergencies" section,

2    that section states:  "Any offender in a correctional facility

3    experiencing a dental emergency as defined by the staff dentist

4    shall receive a dental examination no later than the next

5    working day after the emergency occurs."  Correct?

6    A    That's what it states, ma'am, yes.

7    Q    And this administrative direction contains no exception to

8    that rule for dental emergencies, correct?

9    A    There appears to be no exceptions on this document, no.

10   Q    So there's no exception to that next working day rule in

11   the case of a prison lockdown?

12   A    There's no exception specified, no.

13   Q    And no exception to that rule in the case of staff

14   shortages?

15   A    Not on this document, no.

16   Q    And no exception to that rule in the case of equipment

17   failure.

18   A    Not in this document, no.

19   Q    Okay.  We're coming to the end.

20        So this is Attachment A to that directive.  It's the

21   American Public Health Association-Based Categorization of

22   Dental Patients; is that right?

23   A    Yes, ma'am.

24   Q    And looking at the first sentence just below that header,

25   it states:  "Dentist and dental hygienists shall use the

Pfister - Cross by Staley

1    following APHA-based categorization of dental patients as a

2    guide to providing dental care and for the establishment of

3    priorities to identify and treat oral conditions."  Is that

4    right?

5    A    That's what it says, ma'am, yes.

6    Q    And so the first category below there is Category 1,

7    Emergency Treatment, correct?

8    A    Yes.

9    Q    And so inmates suffering from conditions listed under this

10   category are to receive emergency treatment at Stateville,

11   correct?

12   A    That's what's indicated, yes.

13   Q    And the very first condition listed there as requiring

14   emergency treatment is A, bleeding and pain.  Correct?

15   A    Yes, ma'am.

16   Q    And the second condition listed as requiring emergency

17   treatment is acute periapical abscess, correct?

18   A    Yes, ma'am.

19          MS. PARTHUM:  Nothing further, your Honor.

20          THE COURT:  Okay.  Cross-examination.

21                      CROSS-EXAMINATION

22   BY MR. STALEY:

23   Q    Good afternoon, Mr. Pfister.

24   A    Afternoon, sir.

25   Q    Will you please tell me when you became warden of

Pfister - Cross by Staley

1   Stateville Correctional Center?

2   A    November of 2015.

3   Q    Now, turning to the document that plaintiff's counsel was

4   asking you questions about, you said this is an Administrative

5   Directive of the Department of Corrections; is that correct?

6   A    Yes, sir.

7   Q    So this is a policy that the Department of Corrections puts

8   on itself?  Does that make sense?

9   A    It's the department's Administrative Directives.  Each

10  facility is responsible to follow them, and if required, we

11  make directives at the facility level called institutional

12  directives.  We can strengthen the directive, but we can't

13  weaken the directive -- directions and requirements that are

14  put forward on this Administrative Directive.

15  Q    Okay.  This is not -- this is not put together by the

16  medical community to determine a standard of care, is it?

17  A    It is -- the individuals involved in putting this

18  together -- and I'm only assuming this -- would be the

19  department's medical director and medical professionals.  As

20  far as people that do not work for the department, that I'm not

21  aware of.

22  Q    And if you turn to Section D, can you read that for the

23  jury, please?

24  A    "Designees"?  That part, sir?

25  Q    Yes.

Pfister - Cross by Staley

1    A    "Individuals specified in this directive may delegate

2    stated responsibilities to another person or persons unless

3    otherwise directed."

4    Q    Now, earlier you stated that you didn't have any dental

5    degree; is that correct?

6    A    Correct, sir.

7    Q    Do you have any medical degree at all?

8    A    No, sir.

9    Q    And you, as the Chief Administrative Officer when you were

10   warden of Stateville, you would be listed in this directive; is

11   that correct?

12   A    Sure.

13   Q    So you would be one of the individuals that could delegate

14   responsibilities that are listed in this document?

15   A    When -- when we are not allowed to delegate, it

16   specifically states.  I haven't read it in-depth to see if it

17   does state that anywhere, but I don't believe it says that I

18   cannot delegate.

19   Q    And when you were warden of Stateville Correctional Center,

20   did you delegate responsibilities that were related to dental

21   care?

22   A    Most certainly.

23   Q    Did you designate those responsibilities to individuals

24   that have medical training?

25   A    Specialists like dentists and eye doctors, things of that

Pfister - Redirect by Parthum

1    nature, sure, they have supervisors.  Very rarely do their

2    supervisors have a Ph.D. as far as dentistry or eye care,

3    things like that.  So, yes, they would be supervisors.  But as

4    far as specifically fully aware of any treatment they're

5    providing, that lack -- that knowledge would be very limited.

6    Q    Is that a way of saying that the treatment that an inmate

7    receives at Stateville is designated by the treating physician

8    or the treating dentist?

9    A    That would be the real quick and easy way to put it, yes,

10   sir.

11            MR. STALEY:  Nothing further.

12            THE COURT:  Redirect.

13                      REDIRECT EXAMINATION

14   BY MS. PARTHUM:

15   Q    Mr. Pfister, I'm just going to take a moment to look back

16   at the administrative code that we were speaking about earlier.

17            If you look at Subsection B at the top of page 2, the

18   first sentence there states:  "No other individual may

19   routinely perform duties whenever a rule in this part

20   specifically states the Director, Chief Administrative Officer,

21   or Agency Medical Director shall personally perform the

22   duties."  Is that right?

23   A    Yes, ma'am.

24   Q    And as we discussed, you were the Chief Administrative

25   Officer under this policy, correct?

Pfister - Redirect by Parthum

1    A    On the -- since November of 2015, yes.

2    Q    When you acted as warden, correct?

3    A    That was my capacity.  I wasn't acting warden.  I was a

4    warden.

5    Q    Right.  Understood.  Let me clarify.

6              When you held the title of warden --

7    A    Correct.

8    Q    -- you were the Chief Administrative Officer under this

9    policy.

10   A    Yes, ma'am.

11             MS. PARTHUM:  Nothing further.

12             THE COURT:  Anything on that?

13             MR. STALEY:  Nothing based on that, Judge.

14             THE COURT:  You can step down.

15        (Witness excused.)

16             THE COURT:  Do you have another witness?

17             MR. MEYER:  No, your Honor.

18             THE COURT:  Okay.  So I think what we'll do now,

19   folks, is you'll take your lunch break.  If you could take it

20   until 1:30, because I want to talk to them about the jury

21   instructions.  The defense has a case that it's going to put on

22   at 1:30.  Okay?

23             Don't talk about the case.

24             Have a nice lunch.

25             COURT SECURITY OFFICER:  All rise.

 1      (Jury out at 12:23 p.m.)

 2              THE COURT:  You can being seated.

 3              I want to ask you about your jury instructions.  Do

 4      you have them in front of you?

 5              MR. STALEY:  One moment, Judge.

 6              THE COURT:  Do they have this version, Kathleen?

 7              LAW CLERK:  No.

 8              THE COURT:  Oh, they don't.  Okay.  All right.  Then

 9      what I'm going to do is I'm going to give you the version that

10      I have right now, and then you can look at it over your lunch,

11      and I'll see you again at 1:15 so we can discuss them then.

12              So if you could give them a copy or email it to them.

13          (Law Clerk confers with Judge Kendall.)

14              THE COURT:  That's okay.  Let them look at it.  Get

15      their mindset on it.  Okay?

16              All right.  I'll see you at 1:15.

17              LAW CLERK:  All rise.  Court is in recess.

18          (Lunch recess taken at 12:24 p.m.)

19

20

21

22

23

24

25

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  WENDELL WEAVER,             )  Docket No. 15 C 02950
                          )
4              Plaintiff,   )  Chicago, Illinois
                          )  February 8, 2018
5           v.           )  1:35 p.m.
                          )
6  DR. JACQUELINE MITCHELL and  )
  RANDY PFISTER,           )
7                          )
              Defendants.   )
8

9                     VOLUME 3-B
          TRANSCRIPT OF PROCEEDINGS - Jury Trial
10    BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

11

   APPEARANCES:
12

13  For the Plaintiff:    MOLOLAMKEN LLP by
                          MR. GERALD P. MEYER
                          MS. MICHELLE JOYCE PARTHUM
14                        300 North LaSalle Street
                        Chicago, Illinois  60654
15

   For the Defendants:   OFFICE OF ILLINOIS ATTORNEY GENERAL by
16                       MR. NICHOLAS SCOTT STALEY
                       MR. JOSEPH PETER LUPINACCI
17                       100 West Randolph Street, 13th Floor
                       Chicago, Illinois  60601
18

19

20

21

22  Court Reporter:       GAYLE A. McGUIGAN, CSR, RMR, CRR
                       Federal Official Court Reporter
23                       219 South Dearborn, Room 2318-A
                       Chicago, Illinois 60604
24                       (312) 435-6047
                       Gayle_McGuigan@ilnd.uscourts.gov
25

 1          (In open court outside the presence of the jury:)

 2          THE COURT:  Have you all looked over the jury

 3     instructions so that we can maybe clean them up for now?

 4          MR. MEYER:  Yes, your Honor.

 5          THE COURT:  All right.  Do you have some changes?  And

 6     some discussion?

 7          MR. MEYER:  Your Honor, as far as the agreed

 8     instructions go, we're fine with them.  We know there are two

 9     contested instructions in the back.

10          I don't know if defense counsel has any issues they

11     would like to raise.

12          MR. STALEY:  For the same reasons we stated at the

13     pretrial conference, we still raise objections to both the

14     deliberate indifference to a serious medical need concerning

15     the tooth abscess.

16          Judge, there's -- I mean, there's been limited

17     testimony that there -- there's been no testimony there even

18     was an abscess present during Dr. Mitchell's care of

19     Mr. Weaver.  And at this point, it's a very contested issue.

20     It has been in this case.  I think it's improper for the jury

21     to get a specific instruction that basically says a tooth

22     abscess is a serious medical need that requires, you know, this

23     attention.

24          THE COURT:  I think it's a little bit overarching in

25     that it's probably a tooth abscess can be a serious medical

 1    need that may require prompt medical treatment, because it

 2    depends upon the circumstances.  But other than that, I think

 3    that's a correct statement of what the cases say.

 4              MR. MEYER:  Thank you.  And I would agree to that

 5    change, your Honor.

 6              THE COURT:  Let me just read the second part of it.

 7              And is the second sentence from the case?

 8              MR. MEYER:  It's direct language from the case.  I may

 9    have slightly changed some of the, like --

10              THE COURT:  I'll just look at the language from the

11    case again and make sure I agree with it.  But my first -- it

12    will be given that a tooth abscess can be a serious medical

13    need that may require prompt medical treatment.

14              It gives you your argument as well that this one

15    wasn't even known by the defendants.

16              MR. MEYER:  And I just want to note, I have the *Dobbey*

17    decision, if that's helpful to the Court.

18              THE COURT:  Okay.

19              MR. MEYER:  I can hand up a copy --

20              THE COURT:  That's where this case came from?

21              MR. MEYER:  Yes, your Honor.

22              THE COURT:  Yes, can you just pass it up?  Because --

23    unless you have it in front of you.

24              LAW CLERK:  It's in your binder.

25              THE COURT:  Oh, it's in my binder.  Never mind.  I've

 1    got it.

 2              Anything else on the other instructions?

 3              My concern is that we didn't -- you didn't give me a

 4    verdict form, so we were spending some time at lunch to do

 5    that.

 6              MR. MEYER:  I apologize, because we actually worked

 7    out a form.  We have one.  If there's --

 8              THE COURT:  Can I see it?

 9              MR. MEYER:  Yes, absolutely.

10              THE COURT:  I'll see -- because I'm picky about

11    verdict forms not being all legalese, but simply kind of the

12    straightforward language.  Let me just take a peek at what

13    you've agreed on.

14              MR. STALEY:  That's what we attempted to put together.

15              MR. MEYER:  Should we email it to Lynn?

16              THE COURT:  No, Kathleen.  If you can do it, you --

17    you can give him your email.

18              MR. STALEY:  Judge, just for the record, I want to put

19    on the record that we do still object to the punitive damages

20    instruction.

21              THE COURT:  Right.  And I'm still not done.  I have to

22    wait until the whole case is in before I make that call.

23              MR. STALEY:  I understand that.

24              THE COURT:  All right.

25              MR. STALEY:  One final point, Judge.  There were three

346

 1    contested defendants' instructions that I see were not included

 2    in here.  They were on file on the docket.  I do have paper

 3    copies of them.

 4         THE COURT:  Yes.  Let me see what you're talking

 5    about.

 6         So we received an email from the chief judge who is

 7    directing the individuals who have -- the individual judges who

 8    have juries to let the jurors go home at 4:30 or 5:00.

 9         I'm very concerned about that, getting your case in,

10    because, although I can leave to have them deliberate on

11    Monday -- because we assume they're not going to be here

12    tomorrow -- I'm doing a big speech out on the West Coast on

13    Monday.  So I need you to get it wrapped up to get to

14    deliberation.  We can let them deliberate with another judge,

15    but it's a mess if we have to not finish this case and come

16    back.  You won't be able to come back until next Thursday.

17         MR. MEYER:  I will close today.  I do not plan on

18    being long-winded.

19         MR. STALEY:  I will go as fast as I can.

20         THE COURT:  I know, I know.

21         Who has got a crime -- you heard -- they fronted that

22    he had a felony.  Well, let's see what happens with that.

23         MR. MEYER:  Your Honor, we withdrew our objection to

24    that instruction, I believe.

25         THE COURT:  To the impeachment of conviction of a

1    crime?

2              MR. MEYER:  Yes, is it --

3              MR. STALEY:  It's not included, and I remember that --

4              THE COURT:  And it wasn't included?  Okay.

5              And then the other one, defendants being sued as

6    individuals, neither the Illinois Department of Corrections nor

7    State of Illinois is a party to this suit?

8              MR. STALEY:  I believe they withdrew their objection

9    on that as well.

10             MR. MEYER:  That's accurate.

11             THE COURT:  And then plaintiff must prove by a

12   preponderance of the evidence that Randy Pfister was personally

13   involved in the conduct that plaintiff complains about.  You

14   may not hold Randy Pfister liable for what other employees did

15   or did not do.

16             MR. MEYER:  And so that's where I think we do have a

17   disagreement.  And the reason is, if we turn to these agreed

18   instructions -- and I think we had one on -- we had proposed

19   one on Pfister that's -- and let me back up, because our claim

20   against Pfister is --

21             MR. STALEY:  I don't mean to interrupt you --

22             THE COURT:  Injunctive relief?

23             MR. STALEY:  I know where you're going.

24             MR. MEYER:  Yeah, go ahead.

25             MR. STALEY:  Mr. Meyer is correct.  We did put a

1    separate one for Pfister together, which is included in the

2    agreed.  I would withdraw that instruction.

3           THE COURT:  There you go.  That's what we thought.

4    Okay.

5           So can you make sure that these two are in there?  And

6    then when you get that done, I'll take a look.

7           All right.  So with that in mind, can we get started

8    with this jury so we can try to get you done?

9           MR. STALEY:  Judge, we would make a motion under Rule

10   50 --

11          THE COURT:  Okay, go ahead.

12          MR. STALEY:  -- for judgment as a matter of law.

13   Would you like to hear argument?

14          THE COURT:  I would, please.

15          We're beneath the lock-up.

16          MR. STALEY:  Judge, as we see it, there are basically

17   three issues in this case:  Plaintiff's alleged delays in

18   medical treatment; the fact that plaintiff did not receive a

19   post, core, and crown; and the fact that this abscess, which

20   was discovered by Dr. Scheive, it was allegedly there for a

21   certain amount of time.

22          As to the delays in medical treatment, there has not

23   been a showing by plaintiff that Dr. Mitchell was personally

24   involved in any of those delays.  She has testified,

25   unrebutted, that she does not have decisions -- she is not in a

1    decision-making position when there are lockdowns, when an

2    inmate refuses -- or shows a no-show in the documents, when

3    there are staff shortages, or when there are -- a medical

4    device or some sort of equipment fails.  Dr. Mitchell has no

5    control over that.  Those are the only delays that have been

6    presented in this case.  And there's -- once again, there's

7    unrebutted testimony that she does not have control.  She's not

8    personally involved in those delays.  So on that issue, we

9    believe there should be judgment as a matter of law.

10            THE COURT:  Okay.

11            MR. STALEY:  Going to the next issue, which is the

12   post, core, and crown, again, there's Mr. Weaver's testimony

13   that he believes he was entitled to it, he should have got a

14   post, core, and crown, but he's not an expert.  The only

15   medical opinion that has been rendered about that issue is

16   Dr. Mitchell.  She said during her cross-examination that a

17   post, core, and crown was not medically necessary for

18   Mr. Weaver's Number 12 tooth.  We believe that testimony,

19   unrebutted, alone affords Dr. Mitchell judgment as a matter of

20   law.

21            THE COURT:  Okay.

22            MR. STALEY:  The third issue, as to the abscess, as I

23   stated earlier, there's no testimony in evidence that this

24   abscess was present during Dr. Mitchell's treatment of

25   Mr. Weaver.  The only testimony that has been presented is that

1   there was an abscess in July of 2017 when he went to

2   Dr. Scheive.  There's been no testimony how long that abscess

3   was present.  There's been no testimony that it was diagnosed

4   at Stateville and then left untreated.  There's been no

5   evidence that there was an abscess at all when Mr. Weaver was

6   at Stateville.  And for that reason, we believe we're entitled

7   to judgment as a matter of law.

8           THE COURT:  Okay.  Thank you.  Response?

9           MR. MEYER:  Yes, your Honor.  So, first, responding to

10  defendants' first argument with respect to the delays in

11  treatment.  He's right that Dr. Mitchell is not in control of

12  things like staff shortages.  She is in control of things like

13  running out of time.  She can choose to stay later to complete

14  a procedure if she chooses to.  She also testified that she, as

15  lead dentist, has final review of the schedule.  And there are

16  periods of time, your Honor, during this root canal procedure

17  where Mr. Weaver isn't seen for many weeks, and this is in the

18  middle of treatment.  We think those delays are substantial and

19  fairly attributable to Dr. Mitchell.

20          THE COURT:  Okay.  And the post, core, and crown?

21          MR. MEYER:  With respect to the post, core, and crown,

22  Mr. Weaver's testimony is that Dr. Mitchell told him orally

23  that he needed a post, core, and crown on his Number 12 tooth.

24  She wrote that in the medical records with the Number 5 tooth.

25  Admittedly, it is not found in the medical records with respect

 1    to the Number 12 tooth, but that's where that comes from.  It's

 2    a party opponent admission.  It is evidence.

 3              THE COURT:  And then the abscess?

 4              MR. MEYER:  With respect to the abscess, your Honor,

 5    he was not diagnosed with an abscess at Stateville, but he did

 6    present with symptoms of an abscess.  And he presented with

 7    symptoms that led, not only Dr. Mitchell, but other dentists on

 8    staff to prescribe him antibiotics.  And that to me leads --

 9    you know, that leads one to believe that they at least

10    suspected that there could be an abscess.  He then continued to

11    present symptoms of an abscess, including pressure above his

12    Number 12 tooth, that really were left untreated until he went

13    out and saw Dr. Scheive.

14              THE COURT:  Okay.  So I think that when it comes to

15    the abscess, it's true that you didn't have the direct, like,

16    x-ray or review that showed the abscess while there, but the

17    reasonable inference of seeing the abscess afterwards can be

18    made and argued that the symptoms were present, and based upon

19    the types of treatment he was receiving that it was -- it's a

20    reasonable likelihood.  So I don't think we can -- and I think

21    that's a fact dispute, so that one cannot go away.

22              The post, core, and crown is an interesting one from

23    my perspective regarding the testimony that's come out as to

24    whether or not it's something that could ever be deemed

25    deliberate indifference for not giving it if it's not something

 1    that they normally would give or whether he's entitled to it.

 2           I'm going to let it go to the jury, with the

 3    understanding that I can revisit that issue if upon the review

 4    of the testimony I think otherwise.

 5           Delays.  Very slight testimony that she might have

 6    been able to work later, but, more importantly, having the

 7    final review could have also said this person needs a follow-up

 8    or this person needs to come back in X number of days.  So to

 9    that extent, that issue will go to the jury as well.

10           So let's keep going forward.  The motion for directed

11    verdict is denied.

12           I'd like to bring the jury out, if we can keep going.

13           MR. MEYER:  For one quick moment, may I expound upon

14    the post, core, and crown claim?  Because I think it relates to

15    another claim that wasn't fairly --

16           THE COURT:  Even though I've denied it?  Even

17    though --

18           MR. MEYER:  Yes, your Honor, just for the record,

19    since you said you might reconsider it.

20           The post, core, and crown claim, it also relates to

21    the root canal where Mr. Weaver would not have agreed to the

22    root canal treatment, and she should have known that at the

23    very least if there wasn't going to be a post, core, and crown

24    involved in it.  So those are interrelated issues.

25           THE COURT:  Okay.  All right.  Can I bring my jury

1    out?

2            MR. STALEY:  Yes, you can, Judge.

3            THE COURT:  Thanks.  I don't believe it started -- has

4    anyone been outside?  I haven't been outside.  I don't think

5    snow has started, right?  I don't think it's expected until

6    tonight, so -- hopefully.

7            I did have this occur once before, and we did let a

8    jury go home, and we had a snow day, believe it or not, in my

9    time on the bench, literally where they closed the courthouse.

10           MR. MEYER:  Your Honor, according to my weather app.,

11   it's going to begin at 6:00 p.m.

12           THE COURT:  Okay.  Well, that's good.  Then at least

13   if we can get the evidence in while the courthouse is open, and

14   it will be open until 6:00 p.m., that's the most key thing.

15           Come on in.

16           COURT SECURITY OFFICER:  Ready, your Honor?

17           THE COURT:  Yes, I am.  Thank you.

18      (Jury in at 1:48 p.m.)

19           THE COURT:  Go ahead and get seated and comfortable.

20           So the plaintiff has rested their case, and we're

21   going to turn now to the defense case.

22           And they have the right to call the same witnesses,

23   even though the plaintiff may have called their witnesses, they

24   have a right to put on their case their way.

25           So go right ahead and call your first witness, please.

```
 1              MR. STALEY:  Defense calls Dr. Jacqueline Mitchell.
 2              THE COURT:  Okay.
 3         (Approaching.)
 4              THE COURT:  Please raise your right hand.
 5         (Witness duly sworn and takes the stand.)
 6              THE COURT:  Okay.  Have a seat.
 7          DR. JACQUELINE MITCHELL, DEFENDANTS' WITNESS, SWORN
 8                         DIRECT EXAMINATION
 9    BY MR. STALEY:
10    Q    Good afternoon again, Dr. Mitchell.
11    A    Hi.
12    Q    Can you please, once again, state your name for the record?
13    A    Jacqueline Fay Mitchell-Lawshea.
14    Q    When you previously took the stand, we went -- or
15    plaintiff's counsel went into your background, but I just want
16    to touch on a few things.
17              You are a licensed dentist?
18    A    Yes.
19    Q    And where did you receive your -- is it a D.D.S.?
20    A    Yes.
21    Q    Where did you receive that?
22    A    University of Illinois College of Dentistry.
23    Q    Did you have any previous education before that?
24    A    Yes.
25    Q    What was that?
```

Dr. Mitchell - Direct by Staley

1    A    I had a Bachelor of Science in Occupational Therapy and

2    Biology from Western Michigan University.

3    Q    Is there anything -- you said you were a licensed dentist.

4         Is there anything that you need to renew in order to

5    keep that license?

6    A    Yes.  Every three years, we have to renew our dental

7    license, as well as our drug enforcement license.

8    Q    And is your license current as of today?

9    A    Yes.

10   Q    So once you got your D.D.S., did you begin practicing

11   dentistry?

12   A    Yes.

13   Q    Where did you begin in your practice?

14   A    Initially, I was teaching at the University of Illinois

15   College of Dentistry, and I was in private practice.

16   Q    When you taught, what classes did you teach?

17   A    Operative dentistry, which is the restoration, restorative

18   of teeth.

19   Q    And then you only had your private practice on -- on the

20   side, I guess?

21   A    Initially, yes.

22   Q    At some point, you began practicing in correctional

23   facilities.

24   A    Yes.

25   Q    When did that come about?

356

Dr. Mitchell - Direct by Staley

1   A    In 1986.  I started working one day a week at Pontiac

2   Correctional Center.

3   Q    What made you start working there?

4   A    My brother was the head dentist, and they needed a

5   part-time dentist one day a week.

6   Q    And from that one day a week, obviously we know that it

7   became much more.  What influenced your decision to work at

8   Stateville?

9   A    First of all, I didn't initially start at Stateville.

10          I was at Pontiac for approximately seven years,

11  initially working as the one-day-a-week dentist.  And then in

12  1988, I became the full-time dental director.  I was there

13  until '92.

14          At that time, I came to Joliet Correctional Center as

15  their dental director.  And I held that position until

16  February, actually, 18th, 2002.

17          At that time, our facility was closed, and we were

18  moved to Stateville Correctional Center.

19  Q    Okay.  Now, Dr. Mitchell, I want to go back to what's been

20  previously marked Plaintiff's Exhibit 1, which is Mr. Weaver's

21  dental record.

22          Can you tell me when you first -- or not when you

23  first, when Mr. Weaver first started receiving treatment on his

24  Number 12 tooth?

25  A    August 29th, 2011.

Dr. Mitchell - Direct by Staley

1   Q    And what happened on that date?

2   A    He was seen.  He received an injection.  And he actually

3   had a DO amalgam placed on Number 12 and an MO amalgam placed

4   on Number 13.

5   Q    Why did he have those procedures?

6   A    He apparently had tooth decay on those particular teeth.

7   Q    And on that date, were you the dentist that treated

8   Mr. Weaver?

9   A    No.

10  Q    When is the first time that you actually treated

11  Mr. Weaver?

12  A    I saw him on November the 28th, 2011.

13  Q    Okay.  Now, that's, what, a four-month span from when he

14  first received the amalgam filling on Number 12; is that

15  correct?

16  A    Yes.

17  Q    What -- why such a long time span?

18  A    I think -- it looks like within two weeks of his

19  appointment, he put a request in.  Apparently, he was having

20  problems with Tooth Number 12 and 13.

21       He was scheduled back, and then it looks like he was a

22  no-show on 9/23, 9/29, and 10/15/2011.

23       And then after three no-shows, we don't schedule

24  people back.  We wait for them to re-request.

25       On 11/3, he put in another request, and then he was

Dr. Mitchell - Direct by Staley

1    scheduled for the 11/28/2011 appointment.

2    Q    When the dental department received that November 3rd, 2011

3    request, are you the individual that scheduled him for

4    November 28th?

5    A    No.

6    Q    But you saw him on November 28th.

7    A    Yes.

8    Q    On November 28th, what happened?

9    A    At that time, he received an exam.  Basically, it was

10   determined that he had a filling that was extremely close to

11   the pulp.  And that's what's documented.

12        Upon removing the filling, then we noticed that it was

13   very close to the pulp.  At that time, there was a discussion

14   with Mr. Weaver, who did not want his tooth removed.  And the

15   only other option was to either leave it as it would be or to

16   do a root canal.

17        If the tooth were left untreated, he would probably

18   develop a necrotic tooth and acute periapical abscess and then

19   ultimately additional problems with the tooth.

20   Q    You said a necrotic tooth?

21   A    Yes.  What happens when your pulp chamber -- pulp

22   chamber -- and I think I explained this before -- it has the

23   nerve supply, the blood supply that innervates the tooth.  The

24   tooth is like a living organism.  And that's -- the

25   nourishments and everything comes through the actual pulp

359

Dr. Mitchell - Direct by Staley

1   canal.

2           When you are that close where the patient is

3   developing pain, et cetera, in the tooth, that means that

4   you've developed an irreversible pulpitis.  And at that point,

5   there's two choices.  And one is to extract the tooth; the

6   second one is either do a root canal -- I guess there's three

7   choices; or you could leave it alone and let the person suffer,

8   so ...

9   Q   So Mr. Weaver underwent a root canal.

10  A   Yes.  There was the start of a root canal where the nerve

11  was actually removed.

12  Q   And what's the purpose of a root canal?

13  A   It's a way of saving the person's tooth, especially when

14  someone is adamant they don't want the tooth out.  It's a more

15  complicated procedure than extracting the tooth.  Extraction is

16  a definitive procedure.  Once we take the tooth out, that's

17  over.  There's no additional work.  But if a person really

18  wants to maintain their teeth, then that's the only option you

19  have when you have developed a -- an irreversible pulpitis.

20  Q   And this irreversible pulpitis -- pulpitis --

21  A   Irreversible pulpitis.

22  Q   Pulpitis.

23  A   Yes.

24  Q   Is that what Mr. Weaver was suffering from?

25  A   Yes.

Dr. Mitchell - Direct by Staley

1   Q    So you start the root canal on November 28th, 2011.

2   A    Yes.

3   Q    And we know from Mr. Weaver's testimony that this root

4   canal took several months to actually finish.

5   A    Yes.

6   Q    I believe around five months is the time span.

7   A    Yes.

8   Q    When dealing with patients in Stateville Correctional

9   Center, this five-month time span to complete a root canal, is

10  that unusual?

11  A    No.

12  Q    So when is the date that you finished the root canal?

13  A    According to your records, I think it was 5/15/2012.  I

14  think -- I mean, I don't have a chart up here, so ...

15  Q    Do you see 5/15/2012 on this document?

16  A    Yes.  That's when his last canal was filled.

17  Q    And there were several instances throughout this record

18  that you explained earlier you didn't fill -- or you didn't

19  permanently fill a canal because there was drainage present at

20  one point?

21  A    Drainage.  Whenever there's a symptom with a particular

22  canal, as I explained, you cannot just say I'm going to fill

23  it, and then the person then will have attendant symptoms,

24  et cetera.  So that's one of the reasons that you delay the

25  actual final fill with the Gutta-percha.

Dr. Mitchell - Direct by Staley

1  Q   At any time during this root canal process, was Mr. Weaver
2  diagnosed with an abscess?
3  A   No.
4  Q   At any time during this root canal process, did you have
5  reason to believe that he might have an abscess?
6  A   No.
7  Q   I believe one other time the filling of the canal was
8  postponed because Mr. Weaver had some bleeding in his canal?
9  A   Yes.
10 Q   Is that unusual?
11 A   No, that -- that can happen.  A lot of times when we're
12 instrumenting a tooth with the files, we're actually using a
13 rubber stopper.  Sometimes if the rubber stopper moves a little
14 bit, you can go longer, and then that can irritate the end of
15 the tooth.  There's different reasons.
16        But the other thing is when you're filing, you're
17 cleaning debris out from inside the tooth, the canals.  The
18 debris can go in there and create an irritation.
19        The last thing is you can start getting symptoms from
20 underneath the tooth, but I don't think that was the issue.
21 Q   Is bleeding an indication of some type of infection?
22 A   No.  Not necessarily, no.
23 Q   And in Mr. Weaver's case, was it any indication he might
24 have an infection?
25 A   No.

Dr. Mitchell - Direct by Staley

1  Q    The other issue that happened to Mr. Weaver is there were,

2  I think, two or three times where his temporary filling, I

3  believe you called it a Cavit, came out.  Do you recall that

4  testimony?

5  A    Yes.

6  Q    Is that something that's unusual?

7  A    No.  Again, when a person has a temporary filling, it's

8  designed for ease of coming in and out.  If it were hard, it

9  would take longer to get in and out of the tooth.  So it's a

10 material that initially goes in very soft, and then with

11 moisture it gets hard.  However, it's designed for us to be

12 able to remove it within less than a minute or so so we can

13 access the canal.  That's why it's a temporary.

14          Now, if a person eats sticky foods, things like that,

15 you can pull it out.

16          So, again, that's not an uncommon process.  You would

17 like not to have that happen because then you have to

18 re-cleanse the canals and stuff like that.  But temporaries

19 come out.

20 Q    When Mr. Weaver's temporary filling came out, medically

21 speaking, was that any cause for alarm?

22 A    No.  I mean, it's more work for the dentist who is

23 performing the root canal, but it's not life-threatening.  It's

24 not going to create any other problem, other than now I have to

25 now re-cleanse, re-sterilize the canal.

363

Dr. Mitchell - Direct by Staley

1    Q    So the root canal is finished on 5/15/2012.

2    A    Correct.

3    Q    At that point, had there been a restorative procedure done?

4    A    No.  The restorative was scheduled.  And I think I said

5    yesterday -- not to be redundant -- about six weeks later,

6    we're going to bring the person back, make sure there's no

7    symptoms in the tooth, he's not experiencing any difficulty.

8    It's easier if something has to be retreated to do it at that

9    point.  So you give it enough time to just make sure the tooth

10   is asymptomatic.  So he had a temporary filling in, and the

11   root canal was complete.

12   Q    So you said you give it some time to make sure the patient

13   doesn't have any complaints or any causes for concern.

14        Is that why you scheduled the next date for June 26th

15   of 2012?

16   A    Correct.

17   Q    And we know now that on June 26th, Mr. Weaver was not seen.

18   A    That's correct.  We were on a lockdown.

19   Q    He eventually put in a request?

20   A    Yes.  That date was 8/3 -- he put a request in to have his

21   appointment rescheduled for the fill on 8/3/2012.

22   Q    And what was the reschedule date?

23   A    We maintained the same date that he already had been given

24   from the previous lockdown.  If you look at, it looks like

25   7/31, he was scheduled for 8/16.  So when we received the

Dr. Mitchell - Direct by Staley

1   request on 8/3, we maintained that date.

2   Q   Okay.  So he has the date of 8/16.  What happens after

3   August 3rd?

4   A   Can you roll it up a little bit?

5   Q   Yes, I can.

6   A   Thank you, thank you.

7            Apparently, Mr. Weaver put in another request on

8   8/15/2012.  Patient -- it says patient placed a request

9   concerning missing filling on root canal Number 12.

10  Q   Does this mean his temporary filling fell out?

11  A   Temporary filling came out, yes.

12  Q   And at this point, I believe you stated the root canal is

13  finished.

14  A   The root canal is finished, yes.

15  Q   So when his temporary filling comes out, is there any

16  concern about that?

17  A   Not really.  There's no problem with any bacterial

18  infection, anything getting in there.  It's just a matter of

19  now -- it's still a matter of restoring what's left of the

20  tooth, the top part of the tooth.  But I don't have to

21  re-cleanse anything because that's already sealed off.

22  Q   So there's no concern that bacteria might get in there?

23  A   No.  Not at that point, no.

24  Q   And then when is the next time he is seen?

25  A   He's seen the next day.  He maintained the same scheduled

Dr. Mitchell - Direct by Staley

1   appointment, which was August 16th, 20 -- looks like 2012.

2   Q   And on August 16th of 2012, is that when the final

3   restorative filling is put in?

4   A   Yes.

5   Q   Would this be a permanent filling?

6   A   Yes.

7   Q   And at this point, the entire process is complete?

8   A   Yes.

9   Q   And according to the medical records, when is the next time

10  that Mr. Weaver requests treatment or the next time he's seen?

11  A   It looks like, according to the chart, on 2/3/2013, a

12  request was received in the dental department by -- one of the

13  doctors noted it, and she scheduled him for 2/15/2013.

14  Q   You said 2/3/13?

15  A   2 -- I think that's 2/3.  Looks like 2/3.

16  Q   Dr. Weaver -- my apologies, Dr. Mitchell, you were in the

17  courtroom earlier when Mr. Weaver was on the stand; is that

18  correct?

19  A   Yes.

20  Q   And did you listen to his testimony?

21  A   Absolutely.

22  Q   And do you recall him testifying in regards to a grievance

23  that he wrote on 2/4/2013?

24  A   Yes.

25  Q   And I believe Mr. Weaver testified to the effect that he

Dr. Mitchell - Direct by Staley

1   wrote this grievance because sometime three weeks back, which

2   he agreed would bring it sometime around the middle --

3   middle/beginning of January, his tooth broke?

4   A   Yes.

5   Q   And I believe Mr. Weaver testified that the broken pieces

6   of his tooth went into his gum and caused him to bleed.  Do you

7   recall that?

8   A   Yes.

9   Q   And he also testified that during this three-week time

10  period, from beginning/middle of January up until the time of

11  this grievance, he put in 10 to 15 request slips to be seen,

12  but he had not been seen.  Do you recall that?

13  A   Yes.

14  Q   You testified earlier that -- or you testified to the

15  process of request slips and what an inmate needs to do to

16  request service.  Do you recall that?

17  A   Yes.

18  Q   Can you briefly describe that process once again?

19  A   Okay.  The residents have -- the inmates have various

20  avenues for them accessing dental care.

21          One of the ways is they can put in a written request.

22  The request -- in each cell house, there's a box on the first

23  floor that the request can go in.  And we have med. techs that

24  walk the cell houses twice a day, and they actually can pull

25  the requests.  That's one way.

Dr. Mitchell - Direct by Staley

1        The second way is that the nurses we have -- our

2 nurses are required to go out and pass meds. in the cell

3 houses.  So the nurses are out twice a day passing medication.

4        They have the avenue of their counselor who comes

5 through if they aren't getting responded to.

6        They have correctional officers on each of the

7 galleries that they can pass their -- the request to.

8        They have a lieutenant and a sergeant that's in the

9 house and a major.

10        So there's multiple ways that a request can actually

11 be sent over to Dental.

12        Once -- do you want to know how we process it or just

13 how he can put in a request?

14 Q   Just how he can put in a request.

15 A   Those are the ways he can put in a request.  I mean --

16 Q   And then those individuals that he gives it to, which you

17 described, do they bring it to the health care unit?

18 A   Yes, they will give it to medical staff, if it's the

19 correctional officers.  If it's the med. tech or the nurses,

20 all of our requests go into a box in medical records, and every

21 morning we empty that box and address the requests that we've

22 received.

23 Q   And I believe you testified earlier that the dental

24 department keeps a log of these requests?

25 A   Yeah, we have a logbook.

368

Dr. Mitchell - Direct by Staley

1          MR. STALEY:  Judge, I'm going to be placing a document

2     on the screen that will not be published to the jury.

3          THE COURT:  Okay.  Hang on.

4          MR. STALEY:  It will eventually, but I will not be

5     seeking leave yet.

6          THE COURT:  Got it.

7          Did you get it at your table?

8          MR. MEYER:  Yes.

9          THE COURT:  Thank you.

10          MR. STALEY:  For your reference, Judge, this is --

11     give me one moment.

12          In the pretrial materials, it's marked as Defendants'

13     Exhibit 6.

14          THE COURT:  Okay.

15     BY MR. STALEY:

16     Q   Dr. Mitchell, this document is three pages long.

17          Can you tell me what this document is?

18     A   It's a copy of the way our request log looks.  It's a copy

19     of pages out of the request log.

20     Q   Okay.  And this -- does this document reflect a certain

21     time period?

22     A   Yeah.  According to your first entry, it starts on

23     7/23/2012.

24     Q   This is the last page?

25     A   It goes to 2/8/2013.

369

Dr. Mitchell - Direct by Staley

1    Q    And are these documents kept in the ordinary course of

2    business at Stateville's Dental Department?

3    A    Yes.

4              MR. MEYER:  Your Honor, we don't object to this

5    exhibit.

6              THE COURT:  Okay.  It can be admitted then.

7         (Said exhibit received in evidence.)

8              MR. STALEY:  May I publish it to the jury?

9              THE COURT:  Yes.  It takes a second.

10   BY MR. STALEY:

11   Q    Okay, Dr. Mitchell.  Now, there are a number of blacked-out

12   portions of this document.  Do you know what those are?

13   A    Those are redactions that our legal department will do as

14   not to, I guess, violate HIPAA and all of the rules that we

15   can't display inmates -- other inmates' names and numbers,

16   et cetera.  Just kind of -- it's a -- this is the actual page.

17   But the person who copied it put paper over to redact a lot of

18   it, and then she redacted everybody's name and number for the

19   other requests.

20   Q    Okay.  So everybody but Mr. Weaver was redacted.

21   A    Everybody but Mr. Weaver, yes.

22   Q    There are five columns in this document.  Can you explain

23   what these five columns are?

24   A    Okay.  The first column, we always input the inmate's name.

25        And then the next column would be his number.

Dr. Mitchell - Direct by Staley

1          And then a brief explanation of what he's requesting

2   information on.

3          The next is the date the request was received.

4          And then the last thing is the date that he's actually

5   scheduled for the services.

6   Q    Okay.  Now, according to this document that starts in July

7   of 2012, after July of 2012, when is the first time that

8   there's a record of Mr. Weaver requesting an appointment?

9   A    August the 3rd, 2012.

10  Q    And is that notated right here?

11  A    Yes.

12  Q    Is that Mr. Weaver's name?

13  A    Yes.

14  Q    What is in the next column?

15  A    His inmate number.

16  Q    Okay.  And you said the third column represents what the

17  request is about?

18  A    Yes.

19  Q    What does it say there?

20  A    He was asking a question in reference to his root canal.

21  Q    Okay.  And the third -- the fourth column is the date that

22  you received the request?

23  A    Yes.

24  Q    And that's August 3rd?

25  A    Yes.

Dr. Mitchell - Direct by Staley

1  Q   And the next date is the date that he is scheduled for.

2  A   Yes.

3  Q   What date is that?

4  A   August 16th.

5  Q   Okay.  I'm quickly going to turn back to what has been

6  marked as Plaintiff's Exhibit 1, which are Mr. Weaver's medical

7  records.

8          Do you see the date of August 3rd on this record?

9  A   Yes.

10  Q   And what does it tell you?

11  A   That he was requesting an appointment to reschedule his

12  appointment.  Reschedule appointment.  That's what he was

13  asking for.

14  Q   Okay.  And what is the date that it says it was rescheduled

15  for?

16  A   For 8/16/2012.

17  Q   Going back to the appointment logs.  From the medical

18  records, the medical records corroborate what is in the

19  appointment log for that entry.

20  A   Yes.

21  Q   Now, do you see Mr. Weaver's name anywhere else on the

22  first page?

23  A   No.

24  Q   Turning to the second page, do you see Mr. Weaver's name

25  anywhere on this page?

372

Dr. Mitchell - Direct by Staley

1    A    Yes.

2    Q    Would that be at the bottom?

3    A    Yes.

4    Q    And would this indicate the next time that he requested

5    treatment?

6    A    Yes.

7    Q    And jumping to the third column, what is the purpose of the

8    treatment he's requesting?

9    A    It says missing filling -- I can't see that real clear.

10   Q    Let me try to focus it.

11   A    Thank you.

12        Missing filling slash root canal Number 12.

13   Q    Okay.  And what is the date that you received this request?

14   A    August the 15th, 2012.

15   Q    And what date is he scheduled for?

16   A    8/16/2012.

17   Q    So the next day.

18   A    Yes.

19   Q    Once again, going back to the dental records, do you see

20   August 15th?  Do you see that date on the records?

21   A    Yes.

22   Q    What does it say?

23   A    Patient placed request concerning missing filling on root

24   canal Number 12.  And next visit, 8/16/2012.  Alicia Shivers.

25   Q    And then if we turn the page to the next treatment log, is

Dr. Mitchell - Direct by Staley

1    he seen on 8/16?

2    A    Yes.

3    Q    And I believe you indicated earlier that's the date he

4    received his final filling?

5    A    Yes.

6    Q    So the medical records, again, corroborate what is on the

7    dental appointment logs.

8    A    Yes.

9         Can I say one more thing?

10        If you look, there's numbers on the top.  If you by a

11   ledger, the ledgers have, like, 122, 123, 124, so they're

12   basically showing that this is the progression in our --

13   Q    Are you talking about this number?

14   A    Yeah, yeah, because all the pages -- like on 123, his name

15   is nowhere on that.  It's just -- so they're only -- whoever

16   pulled this up for you copied the next available page that his

17   name was on.

18   Q    Okay.

19   A    Okay.

20   Q    Do you see Mr. Weaver's name anywhere else on this second

21   page?

22   A    No.

23   Q    Turning to the third page.  Do you see Mr. Weaver's name

24   there?

25   A    Yes.

374

Dr. Mitchell - Direct by Staley

1   Q    And what type of treatment is he requesting?

2   A    A fill.

3   Q    And what is the date that you received the request?

4   A    It looks like it says 2/8/2013.

5   Q    And what is the date that he was scheduled for?

6   A    2/15/2013.

7   Q    Now, if we go back to the medical records, after 8/16 of

8   2012, what is the next entry?

9   A    Referral review, filling, and it has -- one of the doctors,

10  and then the date he was scheduled, 2/15/2013.

11  Q    Earlier you said it was 2/3/13.  Could that be an 8?

12  A    Yeah.

13  Q    Given the fact that the appointment log says 2/8?

14  A    Yeah, that's an 8.  I'm -- I couldn't see it.  It wasn't

15  clear.  Okay.

16  Q    Okay.  So I'll put the request log back up.

17         So in this request log that spans from July 23rd of

18  2012 to February 8th of 2013, it shows that Mr. Weaver -- it

19  shows that the dental department received three separate

20  requests from Mr. Weaver.

21  A    Yes.

22  Q    And the medical records confirm that he was seen after

23  those requests.

24  A    Correct.

25  Q    Is there anything indicated on this log document about the

Dr. Mitchell - Direct by Staley

1    10 to 15 requests Mr. Weaver alleges he put in regarding his

2    broken tooth?

3    A    No.

4    Q    And if those requests would have been received by the

5    dental department, would they have been included in this log?

6    A    Yes.

7    Q    Going back to the medical records, Mr. Weaver puts in this

8    request on February 8th, 2013, and you said he was scheduled

9    for February 15th of 2013.

10            Does he come in on February 15th?

11   A    No.

12   Q    Does it say why not?

13   A    He's a no-show.

14   Q    Is he rescheduled?

15   A    2/25/2013.

16   Q    And on 2/25/2013, what happens?

17   A    He's a no-show.  And we sent a refusal out.

18   Q    I'm sorry?

19   A    And we sent a refusal out.

20   Q    I believe you explained earlier what a refusal is?

21   A    Yeah.  Rather than continue to send appointments, we send a

22   refusal in case the person doesn't want to come for the -- for

23   any further services, et cetera.

24   Q    Okay.  And once an inmate receives this refusal, whose

25   responsibility is it to get it back to the dental department?

376

Dr. Mitchell - Direct by Staley

1    A    His.  He can give it to his officers, the medical staff, or

2    put it in that box, and they'll return it to us.

3    Q    Did you ever receive a refusal slip back from Mr. Weaver on

4    this date?

5    A    No.

6    Q    If you would have, would it have been -- would it have been

7    noted in the medical records?

8    A    Yes.  And it would have been placed actually in the actual

9    medical record at that point.

10   Q    Okay.  So on 2/25, he's a no-show.  He's -- is he

11   rescheduled?

12   A    Yes, to 3/11/2013.

13   Q    And what happens on that date?

14   A    He was a no-show for the appointment again.  And, again,

15   another refusal was sent.

16   Q    Did you ever receive that refusal back from Mr. Weaver?

17   A    No.  But after three no-shows, we don't reschedule until

18   the person requests additional services.

19   Q    Okay.  And when is the next date that's notated in the

20   medical records?

21   A    Apparently, we sent him out a pass.  It was time for his

22   biannual exam, and it says that he was a no-show for the

23   two-year on 6/27/2013.

24   Q    Okay.  Is that date rescheduled?

25   A    Yes.  We rescheduled him to 7/10/2013.

Dr. Mitchell - Direct by Staley

1   Q   And on 7/10, was Mr. Weaver seen?

2   A   Yes.

3   Q   And at this biannual exam, what took place?

4   A   We normally do an exam of his teeth, and then we take

5   bitewings to see if he has any additional cavities, things like

6   that.

7   Q   You said there was an x-ray taken?

8   A   Yes.

9           MR. STALEY:  Once again, Judge, I'll be showing

10  Dr. Mitchell an exhibit that has not been published to the jury

11  yet.

12          THE COURT:  Did you show the other side to see if they

13  have any objection?

14          MR. STALEY:  I have shown the other side.

15          MR. MEYER:  We don't object to that.

16          THE COURT:  Then just go let you use it.

17      (Said exhibit received in evidence.)

18          THE COURT:  Make sure you mark it for my record, okay?

19          MR. STALEY:  Yes, Judge.

20  BY MR. STALEY:

21  Q   This is a two-page document.  One is a cover page.

22          MR. MEYER:  What is this exhibit number, Counsel?

23          MR. STALEY:  This is Exhibit Number -- one moment -- I

24  believe Exhibit Number 7 in the pretrial order.

25  BY MR. STALEY:

Dr. Mitchell - Direct by Staley

1   Q   Dr. Mitchell, can you tell me what this document is?

2   A   It appears to be a copy of the actual x-rays that we took

3   on 7/10/2013 on Mr. Weaver.

4   Q   Okay.  And what about this?

5   A   That's not a good, clear copy, but it's the actual copy of

6   the actual x-rays -- oh, that's better.  Yeah.  It's showing

7   the teeth, the molars, the bicuspids on the right, and the

8   molar and bicuspids on the left.

9   Q   Is this the x-ray that was taken on 7/10/2013?

10  A   Yes.

11  Q   And does this show Mr. Weaver's Number 12 tooth?

12  A   Yes.

13  Q   Can you point out on the screen where that is?

14  A   Can I touch it?  Or what do you want me to do?

15  Q   Yes, as you did earlier.

16  A   Right here.

17  Q   That's his Number 12?

18  A   Yes.

19  Q   And from this x-ray, can you determine whether or not that

20  Number 12 tooth is broken?

21  A   No -- I mean, I can't -- it doesn't appear to be broken.  I

22  see the filling, et cetera, and the root canal, et cetera.

23  Q   Okay.  Going back to the medical record, if Mr. Weaver's

24  Number 12 tooth was broken, as he suggests in his grievance,

25  would that have been noted somewhere once he was seen?

Dr. Mitchell - Direct by Staley

1   A   Yes.  And he would have been scheduled.  I scheduled him

2   for a filling on Number 2 at that time.

3   Q   Okay.  On 7/10/2013, is there any notation that his Number

4   12 tooth is broken?

5   A   No.

6   Q   So are there any other treatments that are prescribed to

7   Mr. Weaver on 7/10/13?

8   A   I put him down to have a filling on Tooth Number 2.

9   Q   Okay.  If you can gloss over this page.

10         When is the next time that Mr. Weaver's Number 12

11  tooth comes into play?

12  A   Actually, on 2/19/16, one of the other doctors saw him.

13  Said broken tooth, pointing to Number 12.  12, root canal

14  treated and buccal cusp separated from amalgam filling, but

15  still attached to root.  She took an x-ray and said patient did

16  not want extraction today, so -- and the rest of it I can't

17  read.

18  Q   You said that was on 2/19/16?

19  A   Yes.

20  Q   Is that the last entry here?

21  A   Yes.

22  Q   Okay.  So Mr. Weaver's tooth is broken on 2/19/16.

23  A   Yeah, according to this, yes.

24  Q   Okay.  And you stated that you are not the doctor that saw

25  him on that date?

Dr. Mitchell - Direct by Staley

1    A    No.

2    Q    Okay.  Once a tooth is broken, such as described in this

3    medical record, what can happen to the tooth?

4    A    Based upon what she's saying, she basically is saying the

5    tooth has split.  The buccal cusp has broken.  And, again, that

6    then allows for ingress of bacteria, things like that, to get

7    into the root of the tooth.  That's why she's now saying --

8    normally, she would say restore if it's a break that she can

9    repair.  But that's why she went to patient did not want

10   extraction, because she was prepared to take the tooth out at

11   that point.

12   Q    Does this indicate to you that Mr. Weaver was advised that

13   it needed to be extracted?

14   A    Yes.

15   Q    I believe it's states that he did not want it extracted

16   today.

17   A    Yeah, ah-ha.

18   Q    Going to the next -- can you describe the treatment he

19   received on 2/22/2016?

20   A    We received a grievance.  And, basically, that's where it

21   was responded to in that he had already been seen before we

22   actually received the grievance, that he had already been seen

23   for his complaint.

24   Q    So no treatment on Number 12 on this date.

25   A    No.  That was just a response to the grievance.

Dr. Mitchell - Direct by Staley

1    Q    So according to the medical records, the next date he is

2    seen is 10/17/16?

3    A    No.  He put a request in.

4    Q    On 10/17?

5    A    Yes.  Patient requests appointment for pain in the root

6    canal tooth -- root canal treated tooth -- I'd have to look at

7    the written part because I can't really read that last part,

8    but -- yeah, then he was scheduled for 10/18 to come back,

9    based upon his saying he was in pain.

10   Q    And was he seen on 10/18?

11   A    No.

12   Q    Why not?

13   A    He went on a medical visit to the University of Illinois.

14   Q    Okay.  Was he rescheduled?

15   A    Yes.

16   Q    For what date?

17   A    10/20.

18   Q    Was he seen on 10/20?

19   A    Yes.

20   Q    What happened on 10/20?

21   A    The other doctor, Dr. Saffold, saw him.

22   Q    Do you need me to zoom in --

23   A    Seen patient for -- I'm having a hard -- request exam --

24   Q    Do you need me to zoom in, Doctor?

25   A    Yeah.  If I had the paper copy, it would work better.

Dr. Mitchell - Direct by Staley

1          Okay.  Seen patient for dental request.  Exam patient.
2   Complaining of tingling -- I can't read that -- at the apex of
3   Number 12.  Root canal tooth, maybe finished.  Buccal cusp
4   fractured off.  Only lingual of amalgam left.  I can't read
5   that.  Patient does not want tooth extracted, Number 12.
6   States that he will let us know.  And then Dr. Saffold ordered
7   him pain medication and an antibiotic.
8   Q   You said there was a fracture notated in there.
9   A   Yeah, he's still saying that the fracture is there.  And,
10  again, he's saying that the tooth needs to come out.
11  Q   Okay.  And, again, Mr. Weaver refused to have it extracted?
12  A   Yes.
13  Q   Okay.  He said he would let the dental department know?
14  A   Yes.
15  Q   Okay.  And was he prescribed any medication on this day?
16  A   Yes.  He was given Tylenol and Clindamycin, 150 milligrams.
17  Q   I think everybody knows what Tylenol is.  What is the other
18  medication that was prescribed?
19  A   It was an antibiotic.  The other gentleman asked me that
20  before.  Clindamycin.
21  Q   And if you have a situation such as Mr. Weaver's at this
22  point where a patient is being advised that a tooth needs to be
23  extracted, if they are refusing extraction, is there anything
24  else you can do for them?
25  A   No.

Dr. Mitchell - Direct by Staley

1    Q    Besides give them medication?

2    A    Yes.

3    Q    Now, when is the next time, according to this document,

4    that you see Mr. Weaver?

5    A    Okay.  I saw him on the same day that the doctor above that

6    saw him, Dr. Orenstein saw him, and basically on 2/3/17.

7    Q    Okay.  Is this Dr. Orenstein's note?

8    A    Yeah, that's Dr. Orenstein's.

9    Q    Is this your note?

10   A    That's mine.

11         And at that time, Dr. Orenstein is saying in his note,

12   Number 5 -- Number 5 and 12.  Number 5 no pain, no something.

13   Although previous root canal and fracture, patient states he

14   wants to leave the roots in.  And I explained that -- what

15   Dr. Orenstein was explaining to him, and, again, is that he

16   could not have a partial made.  Before I can make him a

17   partial -- and we were allowed to do that -- but the vendor now

18   says that all the roots and everything have to be out before we

19   can make him a partial.  So his previous tooth, I made him

20   like -- it's a unilateral partial.  But now we no longer can do

21   that.  So Dr. Orenstein explained that to him, and then he

22   referred him over to me.  At that time, I talked to Mr. Weaver

23   and I explained to him that they won't -- he was requesting a

24   partial without the tooth being extracted to replace the area

25   of Number 12.  I did submit for the partial, and I did explain

Dr. Mitchell - Direct by Staley

1   to the person who approves it now what his particular situation

2   was.  So that's what that note is about.

3   Q   Can you read your note verbatim what it says there on

4   2/3/2017?

5   A   "Patient requests partial without tooth being extracted to

6   replace crown Number 12.  I submitted for the partial."  And I

7   signed my name.

8   Q   Okay.  And the next date is 3/27/2017.  What happened on

9   that date?

10  A   On 3/27/2017, he requested an appointment for a toothache.

11  He was scheduled the next day.

12  Q   Would that be the next date that shows up in the dental

13  records?

14  A   Yes.

15  Q   And is that, again, Dr. Orenstein?

16  A   Yes.

17  Q   Are you able to read that?

18      (No response.)

19  Q   When is the next date that you see Mr. Weaver?

20  A   I can read it.  I just -- I mean, I can tell you that he's

21  referring him, and basically he did a referral --

22      MR. MEYER:  Objection.  This seems like speculation to

23  me.

24  BY THE WITNESS:

25  A   No.  If you would like me to read it out loud to you, it's

Dr. Mitchell - Direct by Staley

1  fine.  I'm just saying --

2          MR. MEYER:  It seems to me -- my objection, your

3  Honor --

4          THE COURT:  Is that she's speculating on what is being

5  said.

6          MR. MEYER:  Yes.

7          THE COURT:  Okay.  So that's sustained.  And I'll also

8  sustain it as far as foundation.  But if you can lay the

9  foundation that she was able to read it and somehow acted in

10  conformity with it, she's able to do so.  You have to lay the

11  foundation, though.

12          THE WITNESS:  That's fine.

13          MR. STALEY:  I can move on, Judge.

14  BY MR. STALEY:

15  Q   When is the next time that you saw Mr. Weaver?

16  A   I saw him on 4/25.  And I did a consultation on the patient

17  and advised that Dr. Sandhu (phonetic), who is the person who

18  approves our partials, did not approve the partial unless the

19  teeth roots were removed.  Patient agreed to extraction.  After

20  partials are approved -- I resubmitted for the partial for --

21  and I appealed the decision for him.  And then I scheduled him

22  for the extraction of Number 12.

23  Q   So on -- did you say 5/16/2017?

24  A   Yes.

25  Q   Okay.  So on this date, Mr. Weaver finally did agree to get

Dr. Mitchell - Direct by Staley

1    his tooth extracted.

2    A    He agreed that we could schedule him to have the tooth

3    extracted, yes.

4    Q    Was there a date set up for that extraction?

5    A    5/16/2017.

6    Q    And what happened on 5/16/2017?

7    A    He was a no-show.

8    Q    Okay.  Is he seen again by you after that date?

9    A    Scheduled him back for 5/25/2017.

10   Q    What happened on that date?

11   A    Mr. Weaver advised me that he wants to hold --

12            MR. MEYER:  Objection.  This is irrelevant.

13            THE COURT:  Okay.  I'm not sure what we're going to

14   say, so I think I'm going to need to have a sidebar.

15        (At sidebar outside the hearing of the jury:)

16            MR. STALEY:  Judge, I can tell you what the record is

17   going to say is that Mr. Weaver refused extraction at that

18   point due to this lawsuit.  He wanted to wait until the lawsuit

19   was finished in order to continue with his treatment on that

20   tooth.

21            MR. MEYER:  I'm just not comfortable with the jury

22   hearing testimony about the lawsuit and the way the lawsuit is

23   affecting his treatment.  I feel like it's, you know, just not

24   relevant.

25            THE COURT:  It's not comfortable because it's bias,

Dr. Mitchell - Direct by Staley

1  and bias is absolutely always relevant because it can motivate

2  his reason for bringing the lawsuit.  So objection is

3  overruled.  He can get it in.

4        (Sidebar proceedings concluded.)

5            THE COURT:  Go ahead -- I'm sorry, are you ready,

6  Gayle?

7            COURT REPORTER:  Yes.  Thank you.

8            THE COURT:  Go ahead.

9  BY MR. STALEY:

10  Q   Dr. Mitchell, I believe we were at 5/25/2017.

11  A   Yes.

12  Q   Can you tell me on that date did you see Mr. Weaver?

13  A   Yes.

14  Q   And what does your note from that date say?

15  A   "Patient wants to hold on treatment because of pending

16  settlement of lawsuit.  Will request appointment when his

17  attorney says it's okay."

18  Q   And do you know what lawsuit that's referring to?

19  A   This one.

20  Q   Did you -- do you recall independently speaking to

21  Mr. Weaver about that?

22  A   Yeah, I wrote the note.  Yes.

23  Q   And then that next entry, that is not you, is it?

24  A   No.

25  Q   Is that Dr. Orenstein?

Dr. Mitchell - Direct by Staley

1   A    Yes.

2   Q    Turning to the next page of the medical records, do you see

3   Mr. Weaver again?

4   A    On 7/19/2017.

5   Q    And what happens on that date?

6   A    He was a follow-up after seeing the -- Dr. Scheive that was

7   in here earlier for oral surgery to have 17 and 32 extracted.

8   And, apparently, while he was there, he also had Number 12

9   extracted.

10  Q    Okay.  So at this point, his Number 12 tooth has been taken

11  out.

12  A    Yes.

13  Q    Is there any other treatment he receives on that date?

14  A    I basically -- we have to write an order for whatever

15  medications that the oral surgeon wants the patient to have, so

16  that's what that is.  I'm putting in for him to get

17  antibiotics, pain medication, that kind of thing.  So once we

18  do a follow-up, that's what we do.

19  Q    Okay.

20  A    Uh-hum.

21  Q    And, Dr. Mitchell, I believe you testified

22  earlier -- strike that.

23           Is there any other time that is listed on this page

24  that you saw Mr. Weaver?

25  A    Nope.  No.

Dr. Mitchell - Cross by Meyer

1   Q   And this document goes up until August 24th of 2017?

2   A   Yes.

3   Q   I believe you testified earlier that you left Stateville on

4   July 31st?

5   A   July 31st, 2017.

6   Q   So this would be the end of your treatment of Mr. Weaver?

7   A   Yes.

8           MR. STALEY:  No further questions, Judge.

9           THE COURT:  Cross-examination.

10          MR. MEYER:  Thank you, your Honor.

11                      CROSS-EXAMINATION

12  BY MR. MEYER:

13  Q   Good afternoon, Dr. Mitchell.

14  A   Hi.

15  Q   So you testified a little bit about sending some refusals

16  to Mr. Weaver, and you didn't get those back.  Do you remember

17  that testimony?

18  A   Yes.

19  Q   You don't know if Mr. Weaver ever received those refusals,

20  do you?

21  A   I can't say that he received them, no, I cannot.

22  Q   You just testified about this "service rendered" note.  Do

23  you remember that testimony?

24  A   Yes.

25  Q   And so this testimony -- this note actually refers to this

Dr. Mitchell - Cross by Meyer

1   lawsuit, correct?

2   A   Yes.

3   Q   So when you're recording your notes here in the medical

4   records, you know that you're in litigation with Mr. Weaver,

5   correct?

6   A   I know that Mr. Weaver said that he's waiting on the

7   settlement of the lawsuit, so I guess.

8   Q   Well, the note references a lawsuit, correct?

9   A   Yes.

10  Q   And you said in your direct testimony that you knew that

11  that was referring to this lawsuit, correct?

12  A   Yes.

13  Q   And so my question to you is that when you're recording

14  your notes in the medical record, you know that you're in

15  litigation with Mr. Weaver, correct?

16  A   Yes.

17  Q   Thank you.

18          Do you remember this document?

19  A   Yes.

20  Q   And you said it begins, you know, somewhere in, what, July

21  of 2012; is that right?

22  A   This copy starts on July 23rd of 2012.

23  Q   Right.

24  A   I told you yesterday that the book actually starts in 2002.

25  And it's a leather binder, you know, a ledger.

Dr. Mitchell - Cross by Meyer

1   Q   Great, that's my question.

2           And so you pointed out in your direct testimony that

3   it has page numbers, and you pointed out that this is page

4   number 122.

5   A   Correct.

6   Q   Where are pages 1 through 121?

7           MR. STALEY:  Objection, Judge.

8           MR. MEYER:  I'll withdraw the question.

9           THE COURT:  Okay.  So we'll have to address that

10  later.  Thank you.

11  BY MR. MEYER:

12  Q   You testified on direct also that it's common to have a

13  root canal last five and a half months?  Is that your

14  testimony?

15  A   I said that at Stateville it can take up to five and a half

16  months for a root canal to be finished based upon time

17  constraints, et cetera, so yes.

18  Q   Okay.  No more questions.

19          THE COURT:  Okay.  Do you have anymore direct

20  examination?

21          MR. STALEY:  No, Judge.

22          THE COURT:  Okay.  Then you can step down.  All right?

23      (Witness excused.)

24          THE COURT:  And then do you have another witness to

25  call?

1          MR. LUPINACCI:  Yes, Judge.  The defendants would like
2    to call Sytera Sanders.  She's out in the hallway.
3          THE COURT:  Okay.  Go get her, please.
4       (Witness enters courtroom.)
5          MR. LUPINACCI:  Ms. Sanders, take the stand.
6          THE COURT:  Pardon?
7          MR. LUPINACCI:  Could she take the stand?
8          THE COURT:  Yes, of course.  You have to show her
9    where, though.
10         MR. LUPINACCI:  Just up here.
11         THE COURT:  Please raise your right hand.
12      (Witness duly sworn and takes the stand.)
13         THE COURT:  Okay.  Have a seat.
14         SYTERA SANDERS, DEFENDANTS' WITNESS, SWORN
15                    DIRECT EXAMINATION
16   BY MR. LUPINACCI:
17   Q    Good afternoon.  Could you please state your name for the
18   jury?
19   A    Sytera, that's S-Y-T-E-R-A, Lynn Sanders.
20   Q    And, Ms. Sanders, do you have a certain title?
21   A    Yes.
22   Q    How would you like to be referred to?
23   A    You can call me Ms. Sanders.
24   Q    Ms. Sanders okay?
25         THE COURT:  Before we get started, what I'd like to do

393

Sanders - Direct by Lupinacci

1    is take a short break to address something, okay?

2            Can you folks just take a few minutes in the jury room

3    for a second?

4            Thank you.

5            COURT SECURITY OFFICER:  All rise.

6        (Jury out at 2:41 p.m.)

7            THE COURT:  You can stay.

8            What are you doing with a gun in my courtroom?  How

9    did you get in the building with a gun?

10           THE WITNESS:  I am a parole agent.

11           THE COURT:  It doesn't matter.

12           Walk her downstairs.

13           COURT SECURITY OFFICER:  Yes, ma'am.

14           THE COURT:  Okay?  You need to lock up that weapon.

15   We don't have weapons in federal court.

16           COURT SECURITY OFFICER:  Come with me.

17           THE COURT:  How did that happen?

18           MR. LUPINACCI:  I don't know --

19           COURT SECURITY OFFICER:  I'll find out.

20           THE COURT:  Can you find out, please?

21           COURT SECURITY OFFICER:  Yes, ma'am.

22           THE COURT:  Never had that happen before.

23           I want to know how she got through security without

24   locking up her weapon.

25           Well, let's take a little break while that happens.

394

Sanders - Direct by Lupinacci

1    I've reorganized your jury instructions. They're not

2  changed as far as the language. But the way that you've done

3  your element -- your elemental instructions is that they're all

4  packed with the definitions in the elements instructions.

5  You'll see when you get them that I just have the four

6  elements, and then each element gets defined afterward. It's

7  just much better for the jurors' brains.

8         And, secondly, I did put the instruction in from the

9  case that I want you to look at. I know you have an objection

10  to it. It's from the -- remind me of the name of the case.

11         MR. STALEY: *Dobbey*.

12         THE COURT: Thank you.

13         And I've drafted a consent instruction from the cases.

14  So Kathleen will print those out for you.

15         And let's pick up at 3:00 o'clock when you can read

16  those and -- when she comes back.

17         But that's a security breach --

18         MR. LUPINACCI: Sure, absolutely.

19         THE COURT: -- like I haven't seen, okay? Sorry.

20         LAW CLERK: All rise. Court is in recess.

21  (Recess taken from 2:43 p.m. to 3:07 p.m.)

22  (Judge Kendall attends to other matters.)

23  (In open court outside the presence of the plaintiff and

24    the jury:)

25         THE COURT: I won't rush you all. I just want to see

Sanders - Direct by Lupinacci

1    if you've had a chance to look at the jury instructions.

2              MR. MEYER:  They look wonderful, your Honor.

3              THE COURT:  So what I did is I just -- I'm going to

4    use your expression:  Unpack them.  And so it's elements and

5    then definitions, and then I added the two instructions.

6              Do you agree with the consent instruction?

7              MR. MEYER:  I do, your Honor.  Thank you.

8              THE COURT:  And do you gentlemen agree with the

9    consent instruction?

10             MR. STALEY:  We do, Judge.

11             THE COURT:  Because that's the correct statement of

12   the law from the cases that we discussed.  All right?

13        (Plaintiff enters courtroom.)

14             THE COURT:  If there's any objections to those

15   instructions, let me know.

16             I'm still looking at the verdict form, which I think

17   is a little bit in need of some tweaking.

18             Thank you very much.

19             These are fine, so we just -- I just want to look at a

20   hard copy of the verdict form for me to --

21             LAW CLERK:  Which verdict form?

22             THE COURT:  Mine.  Should I go online -- I can --

23             LAW CLERK:  I'll grab --

24             THE COURT:  Okay, just so I can look at it.

25             All right.  Can we get started again?  Is everybody

396

Sanders - Direct by Lupinacci

1   ready?

2           MR. STALEY:  Yes, Judge.

3           THE COURT:  Please come on back up to the witness

4   stand, and I'll call the jury in.

5       (Witness approaches and retakes the stand.)

6           THE COURT:  We have a big breach of our security with

7   that issue, so that's --

8           THE WITNESS:  I apologize.

9           THE COURT:  I'm sure it was not your fault, but it was

10  definitely a breakdown.

11          And I have, as you all saw, 34 Latin Kings and all of

12  their family members around my courtroom today for their

13  superseding arraignment, with some of them facing the death

14  penalty and many facing life, and you come in with a gun on

15  your hip, so it was not exactly a good afternoon for that.

16          All right.  We're going to bring the jury in.  I don't

17  know if they know that.

18          MR. LUPINACCI:  Judge, I think one of the attorneys

19  left their folder here.  I'm just going to give it to your

20  clerk.

21          THE COURT:  Oh, okay.  Was it Mr. Steingold maybe, the

22  defense attorney?

23          MR. LUPINACCI:  It may be so.

24          THE COURT:  Yes.  Why don't you put it right next to

25  Lynn's desk there.  He'll probably come back for it.

Sanders - Direct by Lupinacci

1      Let me tell them that they can bring the jury back in.

2          THE CLERK:  All rise.

3      (Jury in at 3:10 p.m.)

4          THE COURT:  Please be seated.

5          We're in the homestretch.  Sorry for that unexpected

6   break, but I think you had a treat, didn't you?

7          JUROR:  Yes, thank you.

8          THE COURT:  All right.  If you want to start over from

9   the beginning, since I cut you off so suddenly, you're free to

10  do so.

11  BY MR. LUPINACCI:

12  Q    Ms. Sanders, could you introduce yourself again for the

13  jury?

14  A    My name is Sytera, that's S-Y-T-E-R-A.  Middle name is

15  Lynn.  Last name is Sanders, S-A-N-D-E-R-S.

16  Q    Ms. Sanders, can you tell the Ladies and Gentlemen of the

17  Jury where it is that you work?

18  A    I work for the Illinois Department of Corrections, Parole

19  Division, as a temporary parole commander.

20  Q    And how long have you been with the Illinois Department of

21  Corrections?

22  A    For the last 22 years.

23  Q    So what was your job in 2013?

24  A    I'm pretty sure that I was a correctional counselor II at

25  Stateville.

Sanders - Direct by Lupinacci

1   Q    Correctional counselor II.

2   A    That's correct.

3   Q    And what is that job?  What do you do?

4   A    A correctional counselor II is an advocate for the

5   offenders within the department.  We generally make rounds once

6   a week, provide them with any issues, try to assist them with

7   any issues.  It's a bridge between them and their families and

8   any entity within the department.

9   Q    Are you assigned to particular inmates?

10  A    We're assigned to housing units.  And at the time, I was --

11  I believe I was in Unit D, Edward.

12  Q    And if a particular inmate resides in Edward house, then

13  you would be his or her correctional counselor?

14  A    That is correct, depending upon which floor that he is on.

15  Q    What types of things do they come to you with as a

16  correctional counselor?

17  A    Grievances issue, family issues, medical issues, issues

18  with obtaining things that they've purchased from commissary.

19  Q    And can you explain rounds, what you mean by that?

20  A    Rounds is when you go to the housing facility and you see

21  each individual parole -- I'm sorry, each individual client on

22  a one-on-one basis and talk to them about whatever it is that

23  they're concerned with.

24  Q    And do you recall whether or not you make any notes in

25  doing these rounds?

Sanders - Direct by Lupinacci

1   A   Yes.  We do case notes once we are done with the daily day

2   visits.

3   Q   Where do you document the case notes?

4   A   That -- case notes are documented in -- on the computer.

5   Q   There's a computer program that you use?

6   A   Yes.

7   Q   And what's it called?

8   A   The acronym is CHAMPS.  I don't recall the acronym's full

9   name at this point.

10          MR. LUPINACCI:  Your Honor, I'd like to hand the

11  witness what's been previously marked as Defense Pretrial

12  Exhibit 5.

13          THE COURT:  Okay.  That's fine.  You don't need to ask

14  to approach.

15          MR. LUPINACCI:  Okay.

16          THE COURT:  You can mark it that way, though.

17          MR. LUPINACCI:  Actually, I'll use the overhead.

18          THE COURT:  Sure.  Is it on for you?

19          MR. LUPINACCI:  I can turn it on.

20          THE COURT:  I think it is.

21          MR. LUPINACCI:  Perfect.

22          THE COURT:  There you go.

23          MR. LUPINACCI:  I think it's going to publish to the

24  jury, so can we turn that off real quick, Judge, because I

25  haven't admitted it yet.

Sanders - Direct by Lupinacci

1        THE COURT:  Gentlemen, are you -- sorry, Gentlemen and

2   Lady, are you objecting --

3        MR. MEYER:  This one is fine.  That's fine.

4        THE COURT:  There we go.  It will be admitted then,

5   and you can publish.

6        (Said exhibit received in evidence.)

7        MR. LUPINACCI:  Thank you, Judge.

8   BY MR. LUPINACCI:

9   Q    This cumulative counseling summary, is this -- fair to say

10  it's a print-out of this computer software program you use to

11  document notes after doing rounds?

12  A    Yes.

13  Q    And do you remember putting any notes in for any times that

14  you met with Mr. Weaver?

15  A    Yes.  If Mr. Weaver was on my caseload, any time I met with

16  him I conducted a case note.

17  Q    We'll start back in May of 2011.  That's the first time

18  that we have that you met with Mr. Weaver.  We've redacted

19  information that's not relevant to the case, and the attorneys

20  have agreed to it.  And so all you're going to see here is

21  stuff that's relevant to the case, okay?

22        So we'll start with May 2011.  Can you read that okay

23  on your screen?

24  A    Yes.

25  Q    Can you read that to the jury?

Sanders - Direct by Lupinacci

1   A   It says:  "Seen in HU," which is the health care unit.  "No

2   concerns at this time.  Commissary price list left in the

3   cell."

4   Q   If -- this is something that you talked to him when you

5   were on rounds?

6   A   Yes.

7   Q   And so you had a face-to-face conversation with Mr. Weaver.

8   A   That is correct.

9   Q   And afterwards you documented this.

10  A   That is correct.

11  Q   If, on May 8, 2011, when you met with Mr. Weaver and he was

12  making any complaints of pain or any medical complaints, would

13  you have documented it?

14  A   That is correct.

15  Q   And you would have documented it right in this "Comment"

16  section.

17  A   Yes.

18  Q   And going through 2011, I see that you meet with him really

19  like once a week, once every two weeks; is that accurate?

20  A   That's correct.

21  Q   Is there a time that you have to do rounds?

22  A   No.  There -- you're supposed to do rounds monthly.  I

23  generally did my rounds every two weeks to see my individuals.

24  Q   Okay.  And every time you did a round, you made a note?

25  A   That's correct.

Sanders - Direct by Lupinacci

1  Q   And so let's just take, for example, on August 18th, 2011,

2  this one right here.

3  A   Uh-hum.

4  Q   It says:  "Inmate states he's okay."

5          Can you tell me what type of conversation you would

6  have had with Mr. Weaver on August 18, 2011, that prompted a

7  comment like that?

8  A   Not exactly.  I probably just asked him how he was doing,

9  and he said he's okay, because that's too far back to go back

10  for my memory.

11  Q   You don't remember specifically, but what is it in your

12  custom or routine as a correctional counselor the type of

13  conversation you would have had?

14  A   Generally, I would approach the cell or living quarters

15  wherever they are at and ask them how they are doing, how are

16  things going.  And if he say he's okay, then he's okay, and I

17  just go to the next cell.

18  Q   What if he said he wasn't okay?

19  A   If he said he wasn't okay, then we would have had -- we

20  would have had dialogue about what was the problem, what was

21  the issue.

22  Q   Going through 2011 and 2012, we see the same type of

23  frequency of visits.  And you continue to make notes where,

24  let's just say, for example, this April 24th, 2012 -- this one

25  right here that I put a star next to, can you see that?

403

Sanders - Direct by Lupinacci

1    A    Yes, I can.

2    Q    Okay.  I see it says:  "Level one lockdown, routine rounds,

3    no concerns reported."  Is that accurate?

4    A    Yes, it is.

5    Q    So you continue to do rounds even when the facility is in

6    lockdown.

7    A    Absolutely.

8    Q    And you met with Mr. Weaver face-to-face, and you asked him

9    if he had any concerns.

10   A    Yes.

11   Q    And in April 2012, he didn't have any concerns that he

12   expressed to you.

13   A    As my report indicates, no, he had no concerns.

14   Q    If he had concerns, such as pain or discomfort or a medical

15   issue or a dental issue, would you have documented it?

16   A    Yes.

17   Q    Is it fair to conclude that since you didn't document that,

18   that he didn't complain to you about those things?

19   A    That would be correct.

20   Q    Okay.  Going through 2012, now we're looking at similar --

21   similar entries that you've put in here.

22            Let's go to 2013.

23            Do you remember when you stopped being a correctional

24   counselor?

25   A    I do not remember the exact date, because there was an

Sanders - Direct by Lupinacci

1    interruption in me being a counselor, then me going to TASA.

2    Q    I'm sorry --

3    A    Assistant warden, somewhere else, during that time.

4    Q    I see.  So you moved to a different job.

5    A    Yes.

6    Q    So in particular where I really want to focus our attention

7    is August 16, 2012, this time frame, August 2012.  And if you

8    could take a minute to just review.  We can all review it

9    together if you want to glance at it.  Take a look at

10   August 2012 to January 2013.

11             Again, the redacted ones are things that are

12   irrelevant to the case.

13             And the ones that aren't redacted, can you tell

14   whether Mr. Weaver ever complained to you of pain or discomfort

15   during that time?

16   A    According to my case notes, it appears that he did not.

17   Q    Okay.  Going -- starting in February 2013, right where we

18   left off from the previous page, and moving up to July 2013.

19   Same question:  Can you tell the jury whether Mr. Weaver ever

20   complained to you of pain or discomfort during this time frame?

21   A    According to my case notes, there's no indication that he

22   complained of any pain or anything else.

23   Q    And the same question that I asked from the earlier dates:

24   If Mr. Weaver would have complained to you, would you have

25   documented it?

Sanders - Cross by Parthum

1    A    Yes, I would have.

2    Q    And you're his counselor.  And so if he didn't complain to

3    you, can we fairly conclude that he didn't complain to you of

4    any pain or discomfort?

5    A    That would be a correct statement.

6    Q    All right.  Thank you.  I don't have any further questions

7    for you.  Okay?

8              THE COURT:  Okay.

9              MS. PARTHUM:  Just briefly, your Honor.

10             THE COURT:  Okay.

11             MR. MEYER:  One moment.

12         (Counsel conferring.)

13                        CROSS-EXAMINATION

14   BY MS. PARTHUM:

15   Q    Ms. Sanders, the title that you have that's reflected on

16   these documents is Corrections Parole Agent.  Is that right?

17   A    My current position is a temporary commander in Parole.

18   Q    I'm referring to the position reflected in this exhibit you

19   were just shown.

20   A    That would be correct.

21   Q    So were you acting as a correctional officer at the prison?

22   A    At what time?

23   Q    At the time reflected in these records.

24   A    No.  What's reflected in the record is my current title,

25   not the title that I was at that particular time.

Sanders - Cross by Parthum

1    Q    Okay.  What was your title at the time of these records?

2    A    Correctional counselor II.

3    Q    Were you ever a corrections -- were you ever a correctional

4    officer?

5    A    Yes, I was.

6    Q    When was that?

7    A    1996 until 2011.

8    Q    Now, you don't have any dental training; is that right?

9    A    No, I do not.

10   Q    You don't have medical training?

11   A    I have some.

12   Q    You don't hold yourself out as a dental professional, do

13   you?

14   A    No, I do not.

15              MS. PARTHUM:  Your Honor, may we briefly approach on

16   something?

17              THE COURT:  Of course.

18        (At sidebar outside the hearing of the jury:)

19              MS. PARTHUM:  This is a grievance we spoke about

20   earlier.

21              Ms. Sanders noted on this grievance form -- and we

22   had, in our discussions about redacting this document, had

23   redacted something about this grievance inadvertently.

24              I'd like to just show her this, not admit the exhibit,

25   but just ask her to confirm that she did receive a grievance

Sanders - Cross by Parthum

1    about a dental issue at this time frame.

2         THE COURT:  Okay.

3         MR. LUPINACCI:  Object to scope.  I didn't bring it up

4    for that reason.

5         THE COURT:  But you did open the door to her saying

6    that there was a time where he might have said that there was a

7    problem because you asked all those questions, so that's

8    overruled.

9         You can bring it in.

10        (Sidebar proceedings concluded.)

11        THE COURT:  Not the document, the statement.

12        MS. PARTHUM:  Yes.

13        THE COURT:  Okay.

14        (Tendered.)

15   BY MS. PARTHUM:

16   Q   Ms. Sanders, I just handed to you what's been pre-marked as

17   Plaintiff's Exhibit 4.

18        Would you just briefly take a look at the first page

19   of this document?

20        And if I could direct your attention about two-thirds

21   down this document.

22        Do you see your signature?

23   A   Yes.

24   Q   And the date of this -- of your signature is March 18th,

25   2013, correct?

Sanders - Cross by Parthum

1  A   Correct.

2  Q   And if you would look up at the top portion of this form.

3       And can you describe, what is this form?

4  A   This is a grievance form that the offenders use when they

5  have a grievance about something that has not occurred to their

6  liking.

7  Q   And in this form -- this form was filled out by Mr. Weaver,

8  correct?

9  A   I would assume so.  His signature is at the bottom.

10 Q   And in this grievance form, Mr. Weaver complains about a

11 dental problem he's experiencing at this time; is that right?

12 A   That's correct.

13 Q   And the date of his grievance is February 4th, 2013.

14 A   Yes.

15 Q   So you did receive a grievance from Mr. Weaver pertaining

16 to his dental issues in February 2013, correct?

17 A   Yes.

18      MS. PARTHUM:  Nothing further, your Honor.

19 BY THE WITNESS:

20 A   Well -- let me go back.

21      I did not receive that in February.  I received it on

22 the date that I signed off on it, which was March 18th, 2013.

23 BY MS. PARTHUM:

24 Q   Okay.  So Mr. Weaver made a grievance related to dental

25 issues in February of 2013 --

409

Sanders - Redirect by Lupinacci

1   A    Yes.

2   Q    -- is that right?

3   A    Yes.

4   Q    And you received it in March of 2013.  Correct?

5   A    That's correct.

6          MS. PARTHUM:  Nothing further.

7          THE COURT:  Do you want any redirect on that?

8          MR. LUPINACCI:  Just one set of questions.

9        (Counsel conferring.)

10                   REDIRECT EXAMINATION

11  BY MR. LUPINACCI:

12  Q    Ms. Sanders --

13  A    Yes, sir.

14  Q    -- when you receive a grievance, you document that, too?

15  A    Yes.

16  Q    So on March 17, 2013, if I can draw your attention to that

17  portion of the counseling summary, we had previously redacted

18  it because we didn't -- we actually missed it, everybody.  So

19  if you could just see that -- was this the type of note that

20  you would have made after you received a grievance?

21  A    Yes.

22  Q    And just marks off what you did with it.  Can you explain

23  that to the jury what you did with the grievance?

24  A    Okay.  Medical grievances, because I'm not a medical

25  practitioner, any medical grievance, there's a standard

Sanders - Redirect by Lupinacci

1    statement that is indicated, which -- to which I read.  You

2    review it, you forward it to the grievance office and to the

3    health care unit, and the health care unit is to review and

4    make a decision on what's to be done.  Counselors have nothing

5    to do with medical grievances outside of processing them.

6    Q    Outside of the formal grievance process, they can still

7    complain to you with issues, right?

8    A    Yes.

9    Q    And you'll document it?

10   A    That is correct.

11   Q    And then what would you do with that information?  If they

12   say -- if they say that there's a problem, they're having a

13   medical issue, what would you tell them to do?

14   A    Well, generally, from my perspective, if I have someone

15   that's having a medical issue, and there's a continuos

16   complaint about it, I will generally contact the medical

17   department myself and see if I can get them in earlier, because

18   there's generally a long waiting list.

19   Q    After reviewing this counseling summary of all your notes

20   and your recorded interactions with Mr. Weaver, is there any

21   evidence that you did that in this case?

22   A    No, there is not.

23   Q    And there's -- can you conclude that that's because

24   Mr. Weaver never came to you for any other medical issues other

25   than this one grievance that you did properly forward on?

Pfister - Direct by Staley

1   A    That would be correct.

2   Q    Okay.  Thank you.

3            THE COURT:  Anything on that?

4            MS. PARTHUM:  Nothing, your Honor.

5            THE COURT:  Okay.  Then you can step down and be

6   excused.

7        (Witness excused.)

8            THE COURT:  Do you have another witness?

9            MR. STALEY:  Defendants would like to call Mr. Randy

10  Pfister.

11           THE COURT:  Okay.  Mr. Pfister, up here, please.

12           You can take your ear thing -- is it working?  I think

13  so.

14       (Approaching.)

15           THE COURT:  Please raise your right hand.

16       (Witness duly sworn and takes the stand.)

17           THE COURT:  Are those working?

18           THE WITNESS:  Yes.

19           THE COURT:  Okay.  Go ahead.

20           RANDY PFISTER, DEFENDANTS' WITNESS, SWORN

21                    DIRECT EXAMINATION

22  BY MR. STALEY:

23  Q    Good afternoon, Mr. Pfister.

24  A    Afternoon.

25  Q    As you stated earlier, you started -- you became warden at

Pfister - Direct by Staley

1    Stateville Correctional Center in November of 2015?

2    A    Yes, sir.

3    Q    And did you hear Mr. Weaver and Dr. Mitchell testify

4    earlier today and yesterday?

5    A    Earlier today.  I didn't hear much from yesterday.

6    Q    Did you hear earlier that Mr. Weaver's root canal was

7    finished sometime around May of 2012?

8    A    I did hear that, yes, and seen that.

9    Q    That was almost three years before you became warden?

10   A    Correct.

11   Q    Mr. Pfister, I want to turn your attention to what has

12   previously been marked as Plaintiff's Exhibit 5.

13           Can you, once again, explain what this is?

14   A    This is an Administrative Directive put together by

15   administrative staff from Central Office in Springfield that

16   guides the facilities for all of us to be consistent.  And each

17   facility on particular administrative directives, we are

18   required to adapt institutional directives from this format.

19   Q    And are there other administrative directors -- directives

20   that apply to different situations within the department?

21   A    There are many of them.  Yes, sir.

22   Q    Okay.  And do all of these administrative directives work

23   together?

24   A    As much as possible.

25   Q    You've heard testimony throughout this trial about

Pfister - Direct by Staley

1  lockdowns; is that correct?

2  A    Yes, sir.

3  Q    From a warden's perspective, can you tell me what a

4  lockdown is?

5  A    Lockdown is something -- we would place a facility on

6  lockdown for several reasons:  Mostly security-related; also

7  weather-related; various types of anything involving

8  security-related issues; health-related issues, such as

9  pandemic outbreak, things of that nature, that would limited

10  any type of movement.

11  Q    Is there an administrative directive that pertains to

12  lockdowns?

13  A    Yes, sir.

14  Q    Does that work alongside of, say, an administrative

15  directive that pertains to health care?

16  A    Pretty much, if we are faced with a situation that a

17  lockdown of the facility is required, many of the other

18  administrative directives take somewhat of a second nature

19  because of security-related concerns, safety-related for the

20  inmates, again, weather-related, fire-related.

21  Q    So this is a safety issue?

22  A    Most certainly.

23          MR. STALEY:  Nothing further, Judge.

24          THE COURT:  Okay.  Do you want to cross?

25          MS. PARTHUM:  No cross.

Weaver - Direct by Meyer

1    THE COURT:  Okay.  No cross.  Then you can step down,

2    too.  All right?

3         (Witness excused.)

4         THE COURT:  Do you have anyone else you want to call?

5         MR. STALEY:  Defense rests, Judge.

6         THE COURT:  Okay.  Do you want to put on a rebuttal

7    case?

8         MR. MEYER:  Your Honor, we'll recall Mr. Weaver, just

9    to comment very briefly on the counselor.

10        THE COURT:  Sure, that's fine.

11        Come on up here, Mr. Weaver.

12        (Approaching.)

13        (Witness duly sworn and takes the stand.)

14        THE COURT:  Okay.  Have a seat.

15        And you may proceed.

16        MR. MEYER:  Thank you.

17          WENDELL WEAVER, PLAINTIFF'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19   BY MR. MEYER:

20   Q   Good afternoon, Mr. Weaver.

21   A   Good afternoon, sir.

22   Q   That last witness, not Mr. Pfister, but the counselor, do

23   you recognize her?

24   A   Yes, Ms. Sanders.

25   Q   And so do you explain your medical issues to her?

Weaver - Direct by Meyer

1   A    No.  And if you try to, she'll tell you to write it in a
2   grievance.
3   Q    So you have explained your medical issues to her in the
4   past?
5   A    Everybody have.  It's known that the counselors don't
6   pertain to medical, period.  And so if you bring it to their
7   attention, they're not going to say nothing but tell you put it
8   in a grievance and mail it to me.  Some of them won't even take
9   the grievance.
10  Q    So just so I understand, when you have done that, what's
11  her response to you?
12  A    "Write it in a grievance."
13  Q    Now, she said she would meet with you.  Did you have
14  private meetings with her?
15  A    No.
16  Q    So what were your meetings with her like?
17  A    She'll walk up to the cell when you and your cellie in
18  there, and she'll talk to you all, you know, individually.
19  Q    So you would -- would you be having a conversation in front
20  of another person?
21  A    Yes.
22  Q    And so when you say "cellie," you mean the person you room
23  with --
24  A    Yes.
25  Q    -- you share your cell with?

Weaver - Cross by Staley

1    A    Yes.

2    Q    Is she someone that you trust?

3    A    No.

4    Q    Why?

5    A    She's a correctional officer.

6              MR. MEYER:  No more questions.

7                        CROSS-EXAMINATION

8    BY MR. STALEY:

9    Q    Mr. Weaver, you just previously stated that you don't trust

10   Ms. Sanders?

11   A    Yes.

12   Q    So you have some type of agenda against her?

13   A    No.  Yes, really.  She come around maybe once a month.

14   That once a week, that's a lie.

15   Q    So your opinion of her is biased based on?

16   A    I'm just telling the truth.  I just didn't appreciate what

17   she just did.

18   Q    So you have a problem with her?

19   A    Not just her.  It's all the counselor in Stateville are the

20   same.

21             MR. STALEY:  Nothing further.

22             THE COURT:  Anything on that?

23             MR. MEYER:  No.

24             THE COURT:  Okay.  You can step down.

25        (Witness excused.)

```
 1              THE COURT:  And do you have any other rebuttal?
 2              MR. MEYER:  No, your Honor.
 3              THE COURT:  Okay.  That is the end of the evidence, so
 4    that means that we're going to do closing arguments and get you
 5    on your way before the snow falls, because they're short
 6    arguments.
 7              So do you need five minutes to regroup?  Everyone?
 8              I'll give them five minutes.  Just go back in for five
 9    minutes, because they're going to take about one hour to
10    finish.  All right?
11              COURT SECURITY OFFICER:  All rise.
12              THE COURT:  Get set up, get your exhibits ready for
13    them.  And I really mean five minutes.
14         (Jury out at 3:36 p.m.)
15              THE COURT:  Do you want to move anything?  You can
16    move that.  You can turn it.
17              Take your bathroom breaks now because we've got to
18    roll through.  Got a directive from the chief judge for
19    wrapping up.
20              MR. MEYER:  And, your Honor, I was going to shoot for
21    about 30 minutes.  Is that about fair?
22              THE COURT:  I don't have any deadline for you.  Just
23    understand that the chief has asked us to try to get these
24    jurors home.  So -- he said 4:30.  I said we were going to go
25    until 5:00, just so we could finish, because I think the
```

1    likelihood of you not having them in tomorrow is significant.

2         MR. MEYER:  I'll set my timer for about 25.  I'll try

3    to wrap it up.

4         THE COURT:  I am not limiting your argument in any

5    way.

6         MR. MEYER:  I understand.

7         THE COURT:  If it doesn't work, we'll have to keep

8    going.

9         MR. MEYER:  It's my own limitation.  I understand --

10        THE COURT:  I have a new verdict form because yours

11   doesn't cover everything.

12        MR. MEYER:  Yes, your Honor.

13        THE COURT:  So please take a look at it.

14     (Tendered.)

15        THE COURT:  Tell me if you have any objections.

16        MR. MEYER:  Plaintiff is fine with the verdict form.

17        THE COURT:  Thank you.

18        MR. STALEY:  Judge, we don't have any problem.  I just

19   want the clarification.  I assume because it's on here you have

20   ruled punitives are --

21        THE COURT:  Over your objections, though.  Yeah.

22        MR. STALEY:  Thank you, Judge.

23        THE COURT:  And your objection is noted.

24     (Recess taken from 3:40 p.m. to 3:45 p.m.)

25     (In open court in the presence of the jury:)

1      THE COURT:  Okay, folks, please be seated.

2      We're going to start with the closing arguments.

3  Mr. Meyer is going to start for the plaintiff.

4      The arguments are not evidence.  This is what he

5  believes the evidence showed, and he's going to argue the

6  reasonable inferences from that.

7      You may proceed.

8      MR. MEYER:  Thank you, your Honor.

9  <u>CLOSING ARGUMENT BY MR. MEYER:</u>

10     MR. MEYER:  Ladies and Gentlemen of the Jury, counsel,

11 may it please the Court.

12     We all know what it feels like to have a toothache or

13 another nagging medical issue and to feel the need to see a

14 dentist or a doctor right away, so it's not hard to understand

15 what Mr. Weaver was feeling when he went and sought dental

16 treatment in the only place that he could.

17     Mr. Weaver placed his trust in Dr. Mitchell to help

18 take care of his serious medical needs, and the law requires

19 Dr. Mitchell to treat Mr. Weaver's serious medical needs and to

20 take reasonable care in that treatment.

21     But she did not take reasonable care, Ladies and

22 Gentlemen, when she left long gaps in his root canal treatment.

23 It took over five months to complete.  That's nine months of

24 needlessly prolonged pain.  You heard Mr. Weaver testify about

25 the pain he experienced during that root canal therapy.  He

Closing Argument - Mr. Meyer

1    rated it as an eight out of ten, at first.  It went down after

2    a while.  But that was where it started.  And that lasted for

3    five and a half months.

4              Dr. Mitchell began drilling into his tooth in

5    December 2011.

6              She drilled into it again in January of 2012.

7              She didn't see him in February.

8              She drilled again in March.

9              She drilled twice in April.

10             Three times in May.

11             She didn't see him in June or July.

12             And she finally finished the restoration of that tooth

13   in August.

14             That's nine months later.

15             She drilled into his tooth eight separate times.

16             And she described how the more structure a tooth

17   loses, the weaker and more brittle it becomes.  So is it any

18   wonder that Mr. Weaver lost his tooth?  Is it any wonder it

19   broke?  And he now has to live the rest of his life without a

20   Number 12 tooth.  It affects his smile.  It affects his

21   self-confidence.  It affects day-to-day activities like eating.

22             You heard about how, over that period of nine months,

23   the temporary filling in his tooth fell out multiple times.

24             You heard Dr. Mitchell on that stand tell you that

25   when the temporary filling falls out of the tooth, it is no

Closing Argument - Mr. Meyer

1    longer a sterile environment.  And she explained to you that

2    what that means is that the bacteria can enter the tooth,

3    causing infection and other complications.

4          So is it any wonder that that tooth became infected,

5    had an abscess that was later diagnosed by Dr. Scheive?

6          Dr. Mitchell failed to provide -- to take reasonable

7    steps to provide care for Mr. Weaver's serious medical needs

8    when she ignored signs that his tooth was abscessed.

9          And, Ladies and Gentlemen, she failed to take

10   reasonable care to treat his serious medical needs when she

11   performed a root canal on him, when she should have known that

12   he would have refused that procedure had she asked and

13   explained to him that it could not be performed with a post,

14   core, and crown that would support the tooth and prevent it

15   from breaking.

16         Ladies and Gentlemen, there's no doubt about it.

17   Dr. Mitchell was deliberately indifferent to Mr. Weaver's

18   serious medical needs.

19         Now, defendants will try to convince you that

20   Mr. Weaver's problems are his own fault.  He didn't show up for

21   a few appointments.  You heard about how the appointment

22   process works.  He gets an appointment card the day before his

23   appointment.  He's sent an appointment card the day before his

24   appointment.  She doesn't know whether he receives it or not.

25         Now, Mr. Weaver's testimony that went uncontradicted

Closing Argument - Mr. Meyer

1    is that when he receives an appointment card, he goes to his

2    appointment.

3             And remember the testimony.  Mr. Weaver said that no

4    dentist ever told him he missed an appointment.

5             Dr. Mitchell said that no patient ever told her they

6    missed an appointment card.

7             Well, you couldn't tell somebody that you missed

8    something that was never sent, right?  If he didn't know he had

9    an appointment, if he had never gotten his appointment card, he

10   couldn't have known that he missed the appointment if no one

11   told him.

12            Defendants will try to convince you that Mr. Weaver,

13   he didn't request enough appointments.

14            Between late July and early February of 2013, this is

15   after the root canal is completed -- and remember the

16   counselor:  Mr. Weaver, yeah, he filed a grievance, but he

17   didn't complain enough to every single person who works at the

18   prison.

19            Ladies and Gentlemen, don't be fooled.  These

20   arguments are baseless.

21            Mr. Weaver made his complaints consistently.  They're

22   recorded in his medical records.  And I encourage you to read

23   those with care.

24            So let's review the elements of Mr. Weaver's claims.

25            Judge Kendall will instruct you that to succeed on his

Closing Argument - Mr. Meyer

1   claim, Mr. Weaver has to show by a preponderance of the
2   evidence -- that means more likely than not -- that he had a
3   serious medical need.
4           The defendants knew about that need or had reason to
5   believe, strongly suspected facts, showing a strong likelihood
6   that he had that need.
7           That they failed to take reasonable measures.  That's
8   what we were talking about.
9           And as a result, Mr. Weaver was harmed.
10          So what's a serious medical need?  Well, there's an
11  instruction on that, too.
12          A serious medical need is a condition that a doctor
13  says requires treatment, or something that's so obvious that a
14  lay person would know that it requires treatment.
15          You heard Mr. Weaver testify about excruciating pain.
16          You heard Dr. Scheive testify about Mr. Weaver's
17  abscess.
18          And you heard Mr. Weaver testify about breaking his
19  teeth.
20          Ladies and Gentlemen, those were all things listed as
21  medical emergencies in the policy document that's been admitted
22  as Exhibit 5 that Dr. Mitchell admits governs her treatment of
23  Mr. Weaver.
24          Those are things that are so obvious, you don't need a
25  doctor to tell you that they're serious.

Closing Argument - Mr. Meyer

1    You also heard Mr. Weaver and Dr. Mitchell testify
2    about the temporary filling falling out of his tooth during his
3    five-and-a-half-month root canal.
4    You heard Dr. Mitchell tell you the tooth is no longer
5    sterile when that happens.  And you heard that this is
6    dangerous with the patient.
7    Ladies and Gentlemen, those are also serious medical
8    needs.
9    Ladies and Gentlemen, there's also a slightly
10   different kind of serious medical need, and that's Mr. Weaver's
11   right to have his refusal of certain medical treatments
12   respected.  And I'm going to show you the instruction on that.
13   So in just a moment, Judge Kendall will instruct
14   you -- and I'll zoom in on that, I see --
15   THE COURT:  I'm doing that.
16   MR. MEYER:  Thank you, your Honor.
17   THE COURT:  Because it's just too -- I can't read
18   it -- there you go.  That's it.
19   MR. MEYER:  So you will be instructed that Mr. Weaver
20   has a right, it's limited, but he has the right to refuse
21   treatment, to be informed of the treatment, to be informed of
22   alternatives, and that so long as you find that Dr. Mitchell's
23   failure to inform him about the procedure, about the root canal
24   procedure, was deliberately indifferent, then that's also a
25   violation.

Closing Argument - Mr. Meyer

1        There's no doubt that Dr. Mitchell knew of

2   Mr. Weaver's serious medical needs.  She saw him ten times just

3   between November 2011 -- ten times -- and August of 2012.

4        He complained to her of pain.  He complained to her of

5   pressure in his face above his Number 12 tooth.  He complained

6   of a strange numb feeling in that same area.  She noted

7   drainage in his medical records.

8        And Dr. Mitchell knew that Mr. Weaver would not have

9   agreed to a root canal in his Number 12 tooth because after his

10  Number 5 tooth broke -- and that's not the subject of this

11  lawsuit -- he told her he did not want to lose any more teeth.

12       And keep in mind the post, core, and crown was central

13  to that.

14       Dr. Mitchell also did not take reasonable measures.

15       And I'm checking those off, Ladies and Gentlemen,

16  because those are the elements of his claim.  Those are the

17  things that we just covered.  He had a serious medical need,

18  and Dr. Mitchell was aware of it.

19       Now, defense counsel will come up here after me, and

20  they'll tell you Mr. Weaver received a lot of care.  He was at

21  the dentist's office a lot.  They'll try to convince you that

22  that was enough.  Don't be fooled.  Dr. Mitchell knew that her

23  treatment of Mr. Weaver was inadequate, at best.

24       You heard testimony about the symptoms of an abscess:

25  Drainage, pain, pressure above the tooth.  Mr. Weaver

Closing Argument - Mr. Meyer

1    complained about all of those symptoms to Dr. Mitchell.  She

2    did nothing.  Sure, she sent him an antibiotic after his root

3    canal, without examining him.  She never followed up on it.

4    When he complained of pressure and pain again?  Nothing.

5              You saw they had the capability to take x-rays.  They

6    never took the panoramic x-ray that Dr. Scheive took that

7    showed the abscess, that showed the very, very top of the tooth

8    deep in the mouth.

9              She ignored his symptoms and sent him on his way.

10             She also ignored his wishes not to have a root canal

11   without a post, core, and crown.  Even though she knew he

12   didn't want it, should have known he didn't want it, she did it

13   anyway.

14             And don't forget it was Dr. Mitchell who told

15   Mr. Weaver he needed a post, core, and crown in the first

16   place.

17             She didn't tell him, Oh, this would be the ideal

18   treatment in my private practice, but we just can't do it here.

19   She said:  This is what you need, but I can't give it to you.

20   She says it was Stateville policy.  Ladies and Gentlemen, that

21   policy is not written down anywhere.

22             And Dr. Mitchell needlessly extended that root canal

23   treatment for months.

24             Keep in mind she also had the ability.  We -- we

25   reviewed that.  Mr. Weaver went and saw Dr. Scheive, a dentist

Closing Argument - Mr. Meyer

1    outside of Stateville.  If he needed treatment that she

2    couldn't provide, she could have sent him out, or at least

3    asked.  She didn't.

4         So let's review those nine months between the

5    beginning of Mr. Weaver's root canal treatment and the time the

6    root canal -- the root canal tooth was restored.

7         Is that me --

8         THE COURT:  No, that's doing it -- that is the

9    poltergeist doing it on its own.

10        MR. MEYER:  All right.

11        Mr. Weaver requested an appointment November 23rd,

12   2011.  Ladies and Gentlemen, this is all reflected in the

13   medical records.  Please review them with care when you

14   deliberate.  He requested the appointment.  He was seen on

15   November 28th.  That's when Dr. Mitchell began the root canal.

16        He came back on December 7th.  Dr. Mitchell drilled

17   into his tooth again.  Continued the root canal.

18        On December 13th, she just ran out of time.

19        On the 22nd, staff shortage.

20        On January 5th, Mr. Weaver's filling fell out, and he

21   requested another appointment.

22        He was seen on January 9th when Dr. Mitchell drilled

23   into his tooth again.

24        Just three days later, Dr. Mitchell prescribed his

25   antibiotics, without seeing him.

Closing Argument - Mr. Meyer

1      Then we have a lockdown.  He wasn't seen on
2  January 26th.

3      He wasn't seen at all in February 2012.

4      Yes, he was logged in the medical records as a
5  no-show.  But you heard that testimony, Ladies and Gentlemen.
6  There's no way to know whether Mr. Weaver knew he had an
7  appointment at all.

8      Also keep in mind Dr. Mitchell testified that when a
9  patient doesn't show up for an appointment, they do whatever
10 they can to go find the patient.  And when they find out where
11 the patient is or what the patient is doing, they note it in
12 the medical records.

13     Look at the no-show entries in Mr. Weaver's medical
14 records.  It just says no-show on February 8th.  Could they not
15 find him?  It is a prison.  You shouldn't think he would be
16 that hard to track down.

17     He made another appointment request on March 13th.
18 His filling fell out, and he was experiencing pain.

19     He made another appointment request two days later.

20     And then he was finally seen on March 29th when
21 Dr. Mitchell continued the root canal.

22     She continued the root canal, drilling into his tooth
23 again on April 12th.

24     Again, on April 18th.

25     And then on April 20th, another staff shortage.

Closing Argument - Mr. Meyer

1      She drilled again on May 3rd.

2      Again on May 9th.

3      Again on May 15th.

4      She didn't see him at all in June.  Lockdown.

5      She didn't see him at all in July.  Another lockdown.

6      This is one of those instances in the medical records

7   where you'll note they did say that he was on a visit.

8      What the medical record doesn't say is whether or not

9   Mr. Weaver refused to come to his appointment, or whether the

10  guard who was tasked with bringing him to his appointment just

11  saw that he was on a visit, called back to the dental office,

12  and didn't even tell Mr. Weaver or give him the option.

13     But Mr. Weaver requested another appointment right

14  away on August 3rd.

15     And, again, on August 15th when his filling fell out.

16     The tooth was sealed on August 16th.

17     Now, this is interesting, because you'll recall that

18  Dr. Mitchell testified when the filling falls out, that the

19  tooth is no longer a sterile environment.  Bacteria gets

20  inside.  But then she sealed the bacteria in the very next day?

21  I guess we know how that abscess started.

22     Ladies and Gentlemen, there's no doubt that Mr. Weaver

23  has been harmed.

24     This is where you will look at evidence that his

25  condition has worsened or that he suffered prolonged,

Closing Argument - Mr. Meyer

1    unnecessary pain.

2            Let's see, he permanently lost his tooth.

3            He had an untreated abscess.

4            You heard that surrounding the abscess, you heard

5    Dr. Scheive testify that there was bone loss.  Well, you heard

6    from Dr. Mitchell that bone loss is the -- can result from an

7    abscess.  So he has bone loss.

8            You also heard that bone loss from an abscess only

9    happens when the abscess has been there for a long time.  It is

10   not something that happens immediately.

11           And that's exactly what happened here.

12           And an abscess, Ladies and Gentlemen, it is a serious

13   medical condition.  It is a dangerous situation for the

14   patient.  The infection can spread.  The patient can die.

15           Ladies and Gentlemen, that sounds like torture.  If

16   that isn't prolonged and unnecessary pain, then I don't know

17   what is.

18           And that's on top of the five-and-a-half-month root

19   canal that was performed on him when he didn't even want it.

20           Ladies and Gentlemen, that's deliberate indifference.

21           That's all about Dr. Mitchell.  Let's look briefly now

22   at Mr. Pfister.

23           Now, the claim against Mr. Pfister is a little more

24   narrow than the claim against Dr. Mitchell.

25           To find in favor of Mr. Weaver against Mr. Pfister,

Closing Argument - Mr. Meyer

1    you have to know -- you have to believe Dr. Mitchell's

2    testimony that when she did not provide Mr. Weaver with a post,

3    core, and crown, she acted pursuant to a policy at Stateville.

4    That was her testimony.

5              You have to then find that the policy caused a

6    deprivation of his rights, and that the policy was adopted by

7    Mr. Pfister.

8              So you heard -- you saw that that policy, it's not

9    written down anywhere.

10             If you believe Dr. Mitchell, that was the policy.

11             You heard from Mr. Weaver that Dr. Mitchell told him

12   that the post, core, and crown was necessary to prevent his

13   tooth from breaking.

14             And you heard from Mr. Pfister that those policies

15   carried over from the time he became warden.

16             If this was truly the policy at Stateville, then you

17   should find for Mr. Weaver.

18             Ladies and Gentlemen, liability is clear.

19             For Dr. Mitchell, you must consider the question of

20   damages.

21             Now, I am not asking you to make Mr. Weaver a rich

22   man.  We've all heard the story about the woman who spilled

23   coffee on herself at McDonald's.  Regardless of the truth of

24   that story, that's not what we're doing here today.

25             I am asking you to compensate Mr. Weaver for his

Closing Argument - Mr. Meyer

1   injuries:  The loss of a tooth; the needlessly prolonged pain

2   and suffering; the bone loss; the increased risk to his health

3   from a prolonged, untreated abscess.

4          I don't envy you.  You have a difficult task.  You

5   have to assign a dollar amount to those injuries.  But I trust

6   you in your judgment that you will arrive at a fair amount.

7          I would suggest to you today the relatively modest sum

8   of $25,000.  You may go a little bit lower than that; you may

9   go higher.  Ladies and Gentlemen, it is entirely in your hands,

10  and I trust you to make the decision.

11         Ladies and Gentlemen, you'll also be asked to consider

12  the question of punitive damages.

13         Now, punitive damages are a different thing.

14  Compensatory damages compensate the plaintiff for his injuries.

15  Punitive damages punish the defendants for their conduct.  They

16  serve as an example to the defendants and as a warning to

17  others not to engage in the same behavior.

18         The standard for these damages is higher, as you'll

19  see and you will be instructed by Judge Kendall, that you will

20  only award these damages, if, in addition to being deliberately

21  indifferent to Mr. Weaver's serious medical needs, you find

22  that she also acted in malicious or reckless disregard of his

23  rights.  That means it's complete indifference to his safety or

24  his rights.

25         But, Ladies and Gentlemen, we have that here.  I laid

Closing Argument - Mr. Lupinacci

1   out the evidence for you.  I don't need to belabor it.  You

2   know what happened in this case.

3           Mr. Staley will come up here and talk to you just

4   after me.  He is going to make some other arguments.

5           But, Ladies and Gentlemen, in closing, I will ask you

6   to look at this form.  This is the form you will be given when

7   you retire to deliberate.  I'm asking you to check "Yes" in

8   both of those boxes after carefully reviewing the evidence.

9           Thank you.

10          THE COURT:  Okay.  Thank you, Mr. Meyer.

11          Is it Mr. Lupinacci then?

12          MR. LUPINACCI:  Yes, Judge.

13          THE COURT:  All right, sir.  This is the defense

14  closing.

15  CLOSING ARGUMENT BY MR. LUPINACCI:

16          MR. LUPINACCI:  Thank you, Judge.  Thank you, Counsel.

17  Mr. Staley was nice enough to let me give the closing today.

18          So first I want to thank everybody.  I know it's a

19  huge time commitment, and you've given up your days to come

20  here and listen to us and learn all about dental procedures and

21  about the Number 12 tooth.  So thank you all for taking the

22  time to come here.  We really appreciate it.  It's an important

23  part of our justice system.

24          This case, the way we see it, it's about wants versus

25  needs.

Closing Argument - Mr. Lupinacci

1        You heard a lot of wants.  And you heard a lot of

2 needs.  Mr. Weaver said he wants implants.  He wanted a crown

3 on his Number 12 tooth.  He didn't want it to be extracted.

4 And he wanted to keep the tooth for that whole treatment span

5 that we went over.  And we went over it thoroughly.  It's a lot

6 of treatment.

7        He needed to resolve the pain and to resolve the

8 infectious process.  He needed a root canal.  And that's what

9 Dr. Mitchell did.

10        And then, over time, because you're removing the

11 roots, the teeth -- the tooth becomes brittle.  It needed to be

12 extracted.  And time and time again, Mr. Weaver said he didn't

13 want it to be extracted.  He needed an extraction.

14        And then they called Dr. Scheive to come talk to you,

15 the oral surgeon.  And what did he do?  He extracted the Number

16 12 tooth, the same thing Dr. Mitchell wanted to do time and

17 time again and was repeatedly refused by Mr. Weaver because

18 Mr. Weaver didn't want it to be extracted.

19        He wanted implants.  What did he get after it got

20 extracted?  Dentures.  He needed dentures to fill that Number

21 12 space, and he got them.  And he's not wearing them today.

22 He wasn't wearing them when he took the stand.  He showed you

23 his Number 12 tooth space.  They didn't show you the dentures

24 that were made for him.

25        The burden of evidence -- the burden of proof in this

Closing Argument - Mr. Lupinacci

1    case is on this table.  They need to show you by a

2    preponderance of the evidence, more probably true than not, in

3    order for you to find in their favor, more probably true than

4    not that that table over there was deliberately indifferent to

5    his dental needs.  That burden is on them.  And that law is

6    going to be instructed to you from the judge, which brings up a

7    really good point.  The law comes from the judge.  Not this

8    table, not that table; it only comes from the judge.

9            The evidence only comes from that box.  So if you

10   didn't hear it from a witness and we didn't get it admitted

11   into evidence as a piece of paper document through one of those

12   witnesses, it's not to be considered.

13           The evidence doesn't come from little comments, side

14   comments and arguments that you hear from one of us, not even

15   me.

16           As a jury, you decide credibility of the witnesses.

17   You decide the facts.  You weigh which witnesses' testimony

18   you're going to believe and why.  You are the deciders on

19   whether or not whichever witness is telling the truth.  You see

20   the documents.  They're in front of you.  You heard the

21   testimony, and you get to decide.

22           We have three main issues here.  That's the way I've

23   broken it apart.  We've got this informed -- whether he

24   received informed consent from Dr. Mitchell.  And if he would

25   have -- what procedures he would have elected to go forward

436

Closing Argument - Mr. Lupinacci

1  with.  That's one.

2           Two, he wanted a post, core, and crown.

3           And, three, the delays.  And you heard in opening

4  statements all about the delays.  Treatment delayed is

5  treatment denied.  That was the opening theme.

6           Well, that's not the law.  The law is deliberate

7  indifference.  A little bit different.

8           We're going to get into that in a second, and you saw

9  the jury instruction.  That's the law.

10          Again, the law doesn't come from our table.  It comes

11 from the judge.

12          With informed consent, Mr. Weaver wanted to keep his

13 tooth.  He was faced with two options:  Mr. Weaver, you can

14 extract that tooth, or you can have a root canal.  And he said:

15 Well, Dr. Mitchell, I want to keep the tooth.  She said:  Okay,

16 well, that's the root canal.  So she does a root canal.  And we

17 all saw all the treatment, from 2008 onward, that he's received

18 through the Illinois Department of Corrections, all those

19 appointments that we went over one by one.

20          He got a root canal with a metal filling.  He got what

21 he needed.  It removed the pain.  Mr. Weaver said after the

22 root canal, he didn't feel any pain.  He didn't have the hot

23 and cold sensation anymore.  The root canal was done right.

24          Post, core, and crown.  Another want out of

25 Mr. Weaver.  Sure, I understand.  I get it.  He wanted a crown.

Closing Argument - Mr. Lupinacci

1    Okay.  IDOC doesn't provide crowns.  What they do provide is
2    the community standard for dentistry.  And Dr. Mitchell said
3    what that community standard was, which is a root canal with a
4    metal filling, which was a permanent restorative treatment.
5    And she did it.  A couple of times, as the tooth failed, they
6    continued to try to build it up.  At one time, she even
7    inserted pins into his tooth to try to make it stronger and
8    last longer for Mr. Weaver.  She tried.  Because every time he
9    said:  I don't want it extracted, Doctor, I don't want it
10   extracted.  And you've got this doctor trying.  She's devoted
11   her career -- 21 years at the Illinois Department of
12   Corrections, not to mention the years that she spent as a
13   professor of dentistry at U. of I.  You've got someone
14   dedicated to public service.  She's bending over backwards to
15   give Mr. Weaver what he wants.  But he wants more.  He wants
16   something different.
17          You never heard testimony from anybody that said that
18   a post and crown was ever needed for Number 12.
19          We talked a lot about Number 5.  Well, that's not at
20   issue here.  That's old time -- a long time ago.
21          But nobody ever told you that a post, core, and crown
22   was ever needed for Number 12.
23          So to sit here today and say I should have got it, the
24   only person who thinks he should have got it is Mr. Weaver.
25   Mr. Weaver is not a dentist.  You got a dentist, Dr. Mitchell,

Closing Argument - Mr. Lupinacci

1    who is telling you he didn't need it.  He needed a root canal.

2    And the root canal worked.

3         Then the next thing is the delays.  Mr. Weaver wants

4    you to believe that the delays in treatment, the time it took

5    to do the root canal and the procedures, and the times that

6    they were on lockdown, and all these issues that not -- aren't

7    in Dr. Mitchell's control, and you all heard testimony about

8    that, that that amounts to a deliberate indifference of his

9    serious medical needs.

10        We all sat here and watched a lot of treatment get

11   read off.  And I know I keep saying that, but it's true.  It's

12   a lot of treatment to say, on the other hand, it's deliberate

13   indifference to his medical needs.

14        I prepared a brief slide show, and you'll see it on

15   the monitors in front of you, just to go through that treatment

16   quickly.  And we don't need to spend a lot of time on it.  When

17   you go through it, I think you'll see it's a lot of treatment.

18   Just for Number 12.  We don't need to go back to 2008.  We can

19   start right in 2011.

20        THE COURT:  Is it VGA?

21        MR. LUPINACCI:  Yes, Judge.

22        THE COURT:  Okay.  Let's just see if it gets there.

23        MR. LUPINACCI:  While we're looking at the slide

24   show --

25        THE COURT:  Is that the background?

Closing Argument - Mr. Lupinacci

1    MR. STALEY:  No.  It should pull up the --

2    THE COURT:  Yeah.

3    MR. LUPINACCI:  That's okay.

4    While we're loading it up, you all remember when we

5 started yesterday, we spent a lot of time with Dr. Mitchell on

6 the stand going through each treatment.  We started in 2008.

7 And then when it got to be a little more recent, 2012, I

8 remembered about -- I think it was four years of treatment that

9 we just kind of fast-forward and glossed over and we didn't

10 really -- really reference when plaintiff's counsel had

11 Dr. Mitchell on the stand.

12    THE COURT:  Are you at your table or at the evidence

13 cart for your presentation?

14    MR. STALEY:  At the table.

15    THE COURT:  At the table.  Okay.  It's probably coming

16 in from a different source.  Try this.

17    There you go.  We saw it.

18    There you go.

19    MR. LUPINACCI:  Can you change that display setting so

20 that it shows the full screen?

21    MR. STALEY:  It is on the computer.

22    MR. LUPINACCI:  Oh.  Let's get rid of it.  That's too

23 hard to read.  We've been here long enough.

24    So we can go into the evidence, what you did see, what

25 the people said when they took the stand, what came out of that

Closing Argument - Mr. Lupinacci

1    box, because Dr. Mitchell, she went through all of her

2    treatment history.  She explained to you everything she did for

3    Mr. Weaver.  You all saw it, and you all can review it in the

4    medical records.  And it's your decision to weigh the

5    credibility of that.

6        And then you heard testimony from Warden Pfister, who

7    has committed, again, his life to the Illinois Department of

8    Corrections and has been promoted to deputy director.

9        The Illinois Department of Correction policies are

10   things that they place on themselves.  They're their own

11   expectations.  They're setting their goals for treatment of

12   people.  And he relies on dentists.  He relies on the

13   dentists -- reasonably so, because he's not one -- to determine

14   what treatment is necessary.

15       To say that Warden Pfister is deliberately indifferent

16   or the Illinois Department of Corrections is deliberately

17   indifferent because of their policies is disingenuous.

18       He's relying on the dentists, and the dentists

19   provided prompt and adequate medical treatment, dental

20   treatment, for Mr. Weaver.

21       Not to mention the root canal that was performed, it

22   was performed three years before Mr. Pfister was even the

23   warden at Stateville.  He was the warden in November 2015.

24   This root canal was 2012.  How could he be deliberately

25   indifferent?

Closing Argument - Mr. Lupinacci

1    We heard testimony from his counselor.  Mr. Weaver

2   doesn't like his counselor.  But her testimony was pretty

3   helpful.  She was the point person for him to complain to of

4   any pain or discomfort.  She was assigned to him.  He didn't.

5   He never did.  The one time he submitted a grievance, the one

6   time he submitted the grievance that you saw, she documented

7   it, and she passed it on to the reasonable person.

8    It makes you think that she would do that if she got

9   any other complaint, too.  Why wouldn't she?  She seemed like a

10   very reasonable person.

11    Again, you have to weigh the credibility of the

12   testimony.  You have to decide if she actually went on the

13   visits to see the inmates and made those notes or she just

14   fabricated them all.  And now she's a commander.  So there's

15   that.

16    And then we talked to Dr. Scheive, the oral surgeon

17   from Joliet.  And he admitted that extraction of the Number 12

18   tooth in July was not the scope of the referral.  And the only

19   reason he found it is because it was an incidental finding on

20   the x-ray.

21    Now, plaintiff's counsel just said, plaintiff's

22   counsel just said to you -- Dr. Scheive didn't say this, but

23   plaintiff's counsel said it -- that Dr. Scheive did a pan X,

24   and that's why he discovered the abscess.  Dr. Scheive did a

25   pan X because the wisdom teeth at issue were located in the

Closing Argument - Mr. Lupinacci

1  bottom right corners of his mouth on the outside and they were

2  distally inclined leading out.  The direct x-rays that were

3  done for all the other occasions weren't looking for distally

4  inclined wisdom teeth.  That was the reason why he did the

5  x-ray, and he admitted that incidentally he notices the abscess

6  on 12.

7          Dr. Mitchell didn't do a pan X x-ray because it wasn't

8  indicated.  It wasn't necessary.  It wasn't needed.  We

9  quibbled a lot about the word "indicated."  It doesn't really

10 matter.  It wasn't needed.

11         Plaintiff was already on antibiotics for the cyst in

12 his mouth, so he's getting treatment for all sorts of other

13 things as well.  So there's no deliberate indifference for

14 other things, but just this Number 12.  That was the only thing

15 that apparently Dr. Mitchell, allegedly, refused -- refused to

16 treat, refused to acknowledge.  Everything else is taken care

17 of, all the treatment.  There's no issues.  Just this one.

18 Just this one little bit.  That's the one at issue.  That's the

19 one we want to focus on.

20         And Mr. Weaver, we heard testimony from him.  And I

21 get it.  I know that losing a tooth is probably -- it's

22 painful, and I know it's sad.  I'm sympathetic, too.  I'm not

23 going to take away from that.  Nobody here is ever going to

24 criticize Mr. Weaver and deny that he's been truthful about

25 that he's frustrated about losing another tooth.  I get it.  We

Closing Argument - Mr. Lupinacci

1   all get it.  But it doesn't mean that Dr. Mitchell and Warden

2   Pfister were deliberately indifferent and violated his

3   constitutional rights.

4        It's okay to feel sympathetic.  It makes us human.

5   But it's not okay to conclude and make that huge leap that it's

6   someone else who violated his constitutional rights.

7        Now, the plaintiff is going to have the last word.

8   They get to stand up again and give a little rebuttal.

9        You've heard a lot of evidence in this case.  You've

10  heard me talking for a little bit now.  You heard Mr. Staley,

11  too.  I want you to think about what we would say if we were

12  allowed to get up again and talk in response to what this table

13  is going to tell you.

14       You're going to get jury instructions from the judge.

15  And his counsel showed you those jury instructions.  He showed

16  you one that I think is incredibly important, but we glossed

17  over probably the most important part.  This one only -- only

18  blew up to fit the whole screen.

19       This is not a claim for medical negligence.  This is a

20  claim for deliberate indifference.  Simple negligence is not

21  sufficient.

22       So even if you think -- and that's fine if you do --

23  even if you think that, you know, the root canal probably

24  wasn't done right, it broke down over time, and, you know, it

25  probably wasn't the right thing to do from a dentist point of

Closing Argument - Mr. Lupinacci

1   view and -- I get it.  Maybe you feel that way.

2           That's not in front of you.  This is not a medical

3   negligence case.  This is not a med. mal. case.  This is a

4   constitutional case.  You would have to go way farther than

5   negligence and show that Dr. Mitchell, in all the treatment she

6   rendered, was beyond negligence, it was deliberate indifference

7   to his Eighth Amendment rights, which rose to such a level that

8   it provided cruel and unusual punishment for Mr. Weaver.

9           You're going to get the law, and the judge is going to

10  read it to you, and you'll have an opportunity to review it

11  when you deliberate.  You're going to get the evidence.  And we

12  don't need to go through it again.  Maybe it's best that we

13  don't even have a timeline because, frankly, we've been through

14  this enough.

15          How many times did he get treated for his root canal

16  for Number 12?  Over 30 times.

17          How many times did he no-show?  13 times.

18          Okay, so we get the little anecdotes here and there

19  about, well, maybe the guard didn't bring him to the

20  appointment, or maybe he decided to go on a visit and it was

21  more important because his kids were there.  Okay, I get it.

22  That maybe accounts for a few.  But 13 times?  Lots of

23  no-shows.  He's not -- he's refusing the treatment that they're

24  trying to provide for him because he knows -- he's not happy

25  with what it is.

445

Rebuttal Argument - Mr. Meyer

1      This is a case of wants and needs.  He needed a root

2  canal.  Five, six years later, that root canal, that tooth

3  broke, and he needed -- it needed to be extracted, and he

4  needed dentures, and he got all of those things.

5      Nobody has taken the stand and given you evidence or

6  testimony that he needed something different that he wasn't

7  provided.  Maybe then we'd have something really tough to

8  consider and wrap our heads around.  But that's a lot of

9  treatment.  That's a lot of no-shows.  That's a lot of

10  refusing.  And he even refused on the basis of this lawsuit.

11  It's in the records.  He didn't want the treatment because he

12  didn't want it to affect the case that he's before you to talk

13  about.

14      It's your decision.  You weigh the credibility.  The

15  facts of the case are in your hands.

16      I want to thank you again for your time.  I know it's

17  a huge commitment.  Appreciate it.

18      THE COURT:  Okay.  Is it Ms. Parthum -- oh, Mr. Meyer

19  again.  Okay.  We have a rebuttal case from the plaintiff now.

20      MR. MEYER:  Thank you, your Honor.

21  REBUTTAL ARGUMENT BY MR. MEYER:

22      MR. MEYER:  Ladies and Gentlemen, I've taken up enough

23  of your time.  I will be very brief.

24      My colleague -- my co-counsel, Ms. Parthum -- she got

25  up a couple days ago, and she told you a story.  She told you

Rebuttal Argument - Mr. Meyer

1    the story of Mr. Weaver and his treatment at Stateville at the

2    dentist's office.  That story is the same story that I just

3    told you.  It hasn't changed.  It hasn't changed from when

4    Mr. Weaver filed his first grievance in February 2013.

5             Now, the story that Mr. Staley got up and told you,

6    that was different.  He told you the evidence would show that

7    Dr. Mitchell provided Mr. Weaver with prompt and adequate

8    treatment.  Those were his words.  Prompt and adequate.  Not

9    even close.

10            The defendants and Dr. Mitchell are preventing --

11   presenting Mr. Weaver with a false choice.  You either lose

12   your tooth or you get a root canal, and then it breaks and you

13   lose it anyway.

14            Dr. Mitchell never tried to replace the filling.  She

15   never tried to refer him out to a specialist.  She knew they

16   didn't have the equipment to perform the procedure he wanted,

17   and she did nothing.  No, she root canaled him anyway.  That's

18   what she did.  Those are not reasonable measures.

19            It doesn't matter how many times he saw the dentist.

20   Deliberate indifference is deliberate indifference.  It doesn't

21   get better if you keep doing it.

22            Mr. Lupinacci, he mentioned that we glossed over some

23   medical records.  They recalled Dr. Mitchell in their case.  If

24   they thought those records were important, they could have gone

25   over that in their case.

Rebuttal Argument - Mr. Meyer

1    I implore you to look at the full medical records with
2    care when you deliberate, all of them.
3         They mentioned dentures.  That's a red herring.  That
4    means it's a distraction.  It doesn't mean anything.
5         The same thing with the grievance officer.  He's
6    supposed to bring up every medical issue he's experiencing
7    while he has a pending grievance to a non-medical professional
8    in front of other people?  Or that means that, Oh, it wasn't so
9    bad.
10        Look at the medical records.  He's raising these
11   issues.
12        Now, Dr. Scheive, yes, he noted the abscess in that
13   panoramic x-ray.  But you'll remember his testimony.  He knew
14   to look at the Number 12 tooth because of the symptoms that
15   Mr. Weaver reported to him.  He said:  Hey, this is bothering
16   me, I've got some pressure up here.
17        And they want you to find against Mr. Weaver because
18   there were some no-shows after the root canal therapy was
19   completed.
20        Ladies and Gentlemen, he doesn't have his choice of
21   dentists.  He's going to go see Dr. Mitchell again.  Even if he
22   did deliberately choose not to make those appointments, can you
23   blame him?  And does that undo everything that she did before
24   that time?  Of course not.
25        Ladies and Gentlemen, Mr. Lupinacci, he went over the

Jury Charge

1    claim.  He's throwing around terms like constitutional

2    violation.  He's right.  Neither of our tables makes the law.

3    The judge will tell you what the law is, and she will tell you

4    that this is the law.  These are the instructions that you'll

5    receive here on your screen.

6         In closing, we went over each one of these elements.

7    We checked each one.  Liability is clear.

8         Thank you.

9         THE COURT:  Okay.  Thank you, attorneys, for your

10   arguments.

11   <u>JURY CHARGE</u>:

12        THE COURT:  Folks, now I am going to instruct you on

13   the law.  Remember I told you that I would give you the law.

14        So don't worry about taking notes too carefully

15   because I'm going to give you a packet of these in the back to

16   share.

17        So members of the jury, you have seen and heard all of

18   the evidence in this case and the arguments from the attorneys,

19   and now I will instruct you on the law.

20        You have two duties as a jury:

21        Your first duty is to decide the facts from the

22   evidence in this case, and this is your job and your job alone.

23        Your second duty is to apply the law that I give you

24   to the facts.

25        You must follow these instructions, even if you

Jury Charge

1    disagree with them.

2          Each of the instructions is important, and you must

3    follow all of them.

4          Perform these duties fairly and impartially.  Do not

5    allow sympathy, prejudice, fear, or public opinion influence

6    you.  You should not be influenced by any person's race, color,

7    religion, national ancestry, or sex.

8          Nothing I say now and nothing I said or did during the

9    trial is meant to indicate any opinion on my part about what

10   the facts are or about what your verdict should be.

11         The evidence consists of the testimony of the

12   witnesses, the exhibits admitted into evidence, and

13   stipulations.

14         A stipulation is an agreement between both sides that

15   certain facts are true.

16         Certain things are not to be considered evidence.  I

17   will list them for you.

18         First, if I told you to disregard any testimony or

19   exhibits or I struck any testimony or exhibits from the record,

20   that testimony and exhibits are not in evidence and should not

21   be considered.

22         Second, anything that you may have seen or heard

23   outside of the courtroom is not evidence, and it must be

24   entirely disregarded.  This includes any press, radio,

25   internet, or television reports that you may have seen or

Jury Charge

1  heard.  Such reports are not evidence.  Such reports should not

2  be given in your consideration, and it must -- you must not be

3  influenced in any way by publicity.

4          Third, questions and objections or comments by the

5  lawyers are not evidence.  Lawyers have a duty to object when

6  they believe a question is improper.  You shouldn't be

7  influenced by any objection, and you should not infer from my

8  rulings that I have any view as to how you should decide the

9  case.

10         Fourth, the lawyers' opening statements and their

11  closing arguments to you are not evidence.  Their purpose is to

12  discuss the issues and the evidence.  If the evidence as you

13  remember it differs from what the lawyers said, your memory is

14  what counts.

15         Now, any notes that you may have taken during this

16  trial, those are only aids to your memory.  The notes are not

17  evidence.  So if you haven't taken notes, you should just rely

18  on your independent recollection of the evidence and not be

19  unduly influenced by the notes of other jurors.  Notes are not

20  entitled to any greater weight than the recollections or the

21  impressions of each juror about the testimony.

22         Each party is entitled to have the case decided solely

23  on the evidence -- excuse me -- that applies to that party.

24  You must not consider it against any other party.

25         You should use common sense in weighing the evidence

Jury Charge

and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and we conclude from it that another fact exists. In law, we just call this an inference. A jury is allowed to make reasonable inferences. Any inference you make must be reasonable, and it must be based on the evidence.

You may have heard the phrases "direct evidence" and "circumstantial evidence."

Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact.

Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is true.

I'll give you an example.

As an example of direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago, and I saw that it's raining."

Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give any evidence. In reaching your verdict, you should consider all of the evidence in the case, including the circumstantial evidence.

452

Jury Charge

1       Now, you must decide whether the testimony of each of

2  the witnesses is truthful and accurate, in whole, in part, or

3  not at all.  So you must decide what weight, if any, you give

4  to the testimony of each witness.

5       In evaluating the testimony of any witness, you may

6  consider, among other things:

7       The ability and the opportunity the witness had to

8  see, hear, or know the things that the witness testified about;

9       The witness's memory;

10       Any interest, bias, or prejudice that the witness may

11  have;

12       The witness's intelligence;

13       The manner of the witness while testifying;

14       And the reasonableness of the witness's testimony in

15  light of all of the other evidence in the case.

16       You may consider statements given by a party under

17  oath before trial as evidence of the truth of what he or she

18  said in the earlier statements, as well as in deciding what

19  weight to give his or her testimony.

20       With respect to other witnesses, the law is different.

21  If you decide that, before the trial, one of these witnesses

22  made a statement that is inconsistent with his or her testimony

23  here in court, you may consider the earlier statement only in

24  deciding whether his testimony here in court was true and what

25  weight to give his testimony here in court.

Jury Charge

1    Excuse me while I just stand for a minute.  I need to
2  move a bit.
3    In considering a prior inconsistent statement, you
4  should consider whether it was simply an innocent error or an
5  intentional falsehood and whether it concerns an important fact
6  or detail.
7    You have heard evidence that plaintiff has been
8  convicted of a felony.  You may use that evidence only to
9  keep -- to help you decide whether to believe the witness and
10 how much weight to give his testimony.
11   It is proper for a lawyer to meet with any witness in
12 preparation for trial.
13   You may find the testimony of one witness or a few
14 witnesses more persuasive than the testimony of the larger
15 number of witnesses.  You need not accept the testimony of the
16 larger number of witnesses.
17   Sorry, Gayle.
18   The law does not require any party to call as a
19 witness every person who might have knowledge of the facts of
20 the -- related to this trial.  And, similarly, the law does not
21 require any party to present as exhibits all of the papers and
22 the things that were mentioned during the trial.
23   The plaintiff in the case is Wendell Weaver, and I
24 will refer to him as the plaintiff.  And the defendants in the
25 case are Jacqueline Mitchell and Randy Pfister, and I will

Jury Charge

1    refer to them as the defendants.

2         You must give separate consideration to each defendant

3    in this case.  Although there are two defendants, it does not

4    follow that if one is liable, the other is also liable.

5         Defendants are being sued as individuals.  Neither the

6    Illinois Department of Corrections nor the State of Illinois is

7    a party to this lawsuit.

8         Now, when I say a particular party must prove

9    something by "a preponderance of the evidence," or when I use

10   the expression "if you find" or "if you decide," this is what I

11   mean:  When you have considered all of the evidence in the

12   case, you must be persuaded that it is more probably true than

13   not true.

14        You have heard evidence about whether the defendants'

15   conduct complied with or violated an administrative rule or an

16   institutional directive.  You may consider this evidence in

17   your deliberations.  But, remember, the issue is whether the

18   defendants acted with deliberate indifference to plaintiff's

19   serious medical needs, not whether a procedure might have been

20   complied with or violated.

21        Now, to succeed on his claim against defendant

22   Jacqueline Mitchell for failure to provide medical care, the

23   plaintiff must prove each of the following things by a

24   preponderance of the evidence:

25        First, that Mr. Weaver had a serious medical need;

Jury Charge

1    Second, that the defendant was aware that he had a

2    serious medical need or strongly suspected facts showing a

3    strong likelihood that he had a serious medical need but

4    refused to confirm whether these facts were true;

5    And, third, that the defendant consciously failed to

6    take reasonable measures to provide treatment for the serious

7    medical need;

8    And as a result of defendant's action or inaction, the

9    plaintiff was harmed or was subjected to a substantial risk of

10   harm.

11   Now, if you find that the plaintiff has proved each of

12   these things by a preponderance of the evidence, then you

13   should find for the plaintiff, and go on to consider the

14   question of damages.

15   If, on the other hand, you find that the plaintiff has

16   failed to prove any -- any one of these things by a

17   preponderance of the evidence, then you should find for the

18   defendant, and you will not consider the question of damages.

19   Now, when I use the term "serious medical need," I

20   mean a condition that a doctor says requires treatment, or

21   something so obvious that even someone who is not a doctor

22   would recognize it is as requiring treatment.  In deciding

23   whether a medical need is serious, you should consider the

24   following factors:

25   The severity of the condition;

Jury Charge

1          The harm, including the pain and suffering, that could
2    result from a lack of medical care;

3          Whether providing treatment was feasible;

4          And the actual harm caused by the lack of medical
5    care.

6          A tooth abscess can be a serious medical need that
7    requires prompt medical treatment.

8          You may infer that defendant was aware that plaintiff
9    had a serious medical need or strongly suspected facts showing
10   a strong likelihood that plaintiff had a serious medical need
11   if the need was obvious.

12         You may infer that defendant consciously failed to
13   take reasonable measures if defendant's action or failure to
14   act was such a substantial departure from accepted professional
15   judgment, practice, or standards that it showed a complete
16   abandonment of medical judgment.

17         Now, plaintiff does not have to show that defendant
18   ignored him or provided no medical care.  If defendant provided
19   some care, plaintiff must show that the defendant knew her
20   actions likely would be ineffective or that defendant's actions
21   were clearly inappropriate.

22         In deciding whether the defendant failed to take
23   reasonable measures, you may consider the seriousness of
24   plaintiff's medical need, how difficult it would have been for
25   defendant to provide treatment, and whether the defendant had

Jury Charge

1    legitimate reasons related to safety or security for failing to
2    provide treatment.

3         The decision of a medical professional to do nothing,
4    even though he or she knows that a patient has a serious
5    medical condition requiring prompt treatment that the
6    professional is capable of and reasonable for providing,
7    amounts to deliberate indifference.

8         Plaintiff may prove that defendant harmed him with
9    evidence that his condition worsened as a result of defendant's
10   conduct or that he suffered prolonged, unnecessary pain.

11        Now, although prisoners retain a limited right to
12   refuse treatment and to be informed of the proposed treatment
13   and viable alternatives, failure to obtain informed consent by
14   itself is nothing more than a claim for medical negligence, not
15   for deliberate indifference.  In order to rise to the level of
16   a constitutional violation, a prison official's failure to
17   adequately inform a patient regarding proposed medical
18   treatment must be done with, at a minimum, deliberate
19   indifference to the prisoner's right to refuse treatment.
20   Simple negligence is not sufficient.

21        Now, in order to prevail on plaintiff's claim against
22   the Defendant Pfister alleging liability based on an official
23   policy, practice, or custom, the plaintiff must prove all of
24   the following elements by a preponderance of the evidence:
25             One, that the defendant -- yes, that Defendant

Jury Charge

1  Mitchell did not provide plaintiff with a post, core, and

2  crown.  When she did that, she acted pursuant to a policy at

3  Stateville Correctional Center;

4          And, two, the policy caused the deprivation of the

5  plaintiff's rights.  In other words, the policy is so closely

6  related to the deprivation of the plaintiff's rights as to be

7  the moving force that caused his ultimate injury;

8          And, three, that the policy was adopted by Defendant

9  Pfister from a deliberate choice to follow a course of action

10  to not perform post, core, and crown procedures.

11          If you find that the plaintiff has proved each of

12  these things by a preponderance of the evidence, then you

13  should find for the plaintiff on his claim against Defendant

14  Pfister.  And if, on the other hand, you find that the

15  plaintiff has failed to prove any one or more of these things,

16  then you should find for the defendant.

17          If you decide for the defendants on the question of

18  liability, then you should not consider the question of

19  damages.

20          If you find that the plaintiff has proved any of his

21  claims against any of the defendants, then you must determine

22  what amount of damages, if any, the plaintiff is entitled to

23  recover.

24          If you find in favor of the plaintiff's claim, then

25  you must determine the amount of money that will fairly

Jury Charge

1  compensate him for any injury that you find he sustained as a
2  result of the defendants' wrongful conduct. These are called
3  compensatory damages.

4       Plaintiff must prove compensatory damages by a
5  preponderance of the evidence. Your award must be based on
6  evidence and not on speculation or guesswork. This does not
7  mean, however, that compensatory damages are restricted to the
8  actual loss of money. They include both the physical and the
9  mental aspects of injury, even if they are not easy to measure.

10      You should consider the following types of
11 compensatory damages:

12      The physical pain and suffering that the plaintiff had
13 experienced;

14      And the mental and emotional pain and suffering that
15 plaintiff has experienced.

16      No evidence of the dollar value of physical or mental
17 and emotional pain and suffering has been or needs to be
18 introduced. There's no exact standard for setting the damages
19 to be awarded on account of these factors. You are to
20 determine an amount that will fairly compensate plaintiff for
21 injuries he has sustained.

22      Now, if you find for the plaintiff, you may, but are
23 not required to, assess punitive damages against the defendant.
24 The purpose of punitive damages are to punish a defendant for
25 his conduct and to serve as an example or warning to the

Jury Charge

1    defendant and others not to engage in similar conduct in the
2    future.

3           So the plaintiff must prove by a preponderance of the
4    evidence that punitive damages should be assessed against a
5    defendant.  You may assess punitive damages only if you find
6    that his conduct was malicious or in reckless disregard of the
7    plaintiff's rights.  Conduct is malicious if it is accompanied
8    by ill will or spite or is done for the purpose of injuring the
9    plaintiff.  Conduct is in reckless disregard of a plaintiff's
10   rights if, under the circumstances, it reflects complete
11   indifference to plaintiff's safety or rights.

12          If you find that punitive damages are appropriate,
13   then you must use sound reason in setting the amount of these
14   damages.  Punitive damages, if any, should be in an amount
15   sufficient to fulfill the purposes that I have just described
16   to you, but should not reflect bias, prejudice, or sympathy
17   toward either or any party.

18          In determining the amount of any punitive damages, you
19   should consider the following factors:

20          The reprehensibility of the defendant's conduct;

21          The impact of the defendant's conduct on the
22   plaintiff;

23          The relationship between the plaintiff and the
24   defendant;

25          The likelihood that the defendant would repeat the

Jury Charge

1    conduct if an award of punitive damages is not made;

2           The relationship of any award of punitive damages to

3    the amount of actual harm that the plaintiff suffered.

4           Now, upon retiring to the jury room, you must select a

5    presiding juror, and that presiding juror will preside over

6    your deliberations and will be your representative here in

7    court.

8           I have prepared a form of verdict.  You've seen the

9    parties use it in some of their closing.  You'll have one of

10   them in the back.  You are going to take them with you.  And

11   when you have reached a unanimous agreement on the verdict,

12   your presiding juror will fill in and date the appropriate

13   form, and all of you will sign it.

14          Now, the verdict form is very straightforward.  I know

15   you've seen some pieces of it already.

16          It states that as to Count One, as to Mr. Weaver's

17   claim against Dr. Mitchell on the failure to provide proper

18   medical care, it simply says:  Was defendant Dr. Mitchell

19   deliberately indifferent to Mr. Weaver's serious medical need?

20   Yes or no.

21          As to Count Two, it says:  Was Defendant Mitchell

22   deliberately indifferent to a serious medical need?  And that

23   has to do with promptly scheduling dental treatment.  Yes or

24   no.

25          And then if you answer "Yes" to either of those

Jury Charge

1   questions, then you are going to look at the issue of awarding

2   damages.  And you make a determination of what your

3   compensatory damages is, and you put it in that amount.  And

4   then if you answer "No," you simply move on to the final

5   Question Number 5.

6          Only if you give compensatory damages do you consider

7   punitive damages.

8          And then those are your -- you may, but you're not

9   required to award them, but there's a line for doing so if you

10  want to.

11         Then Count Three is whether the Defendant Randy

12  Pfister improperly denied him medical treatment through the

13  policies that he oversaw.  And that's going to be yes or no.

14         And then Count Four is whether or not he was

15  deliberately indifferent -- this is against Mr. Pfister -- to

16  direct the Health Care Unit at Stateville to promptly

17  reschedule treatment appointments through the policies that he

18  oversaw.

19         Then each of you is going to sign it and date it.  It

20  has to be unanimous.  All right?

21         Now, I don't anticipate that you're going to need to

22  communicate with me.  And if you do need to communicate with

23  me, the only proper way from this point on is in writing.  So

24  the writing must be signed by that presiding juror.  And if he

25  or she is unwilling to do it, then some other juror can do it

463

Jury Charge

1   and sign it.  The writing should be given to the court security

2   officer here, who then will give it to me.  And then I will

3   respond, either in writing or by having you return to the

4   courtroom, where I'll answer your question.

5           Now, if you do communicate with me, do not indicate

6   what your numerical division is, if any, like we're six to six.

7   Don't do that.

8           I shall tell you that if you are going to ask a

9   question, I am required to run the question by both parties,

10  and so it takes a minute or so to get them all back into the

11  courtroom, so you're not going to get a quick answer.  You can

12  continue to deliberate if you have a question.

13          All right.  The verdicts must represent the considered

14  judgment of each juror.  Your verdicts, whether for or against

15  the parties, must be unanimous.

16          And you should make every reasonable effort to reach a

17  verdict.  In doing so, you should consult with one another,

18  express your own views, and listen to the opinions of your

19  fellow jurors.  Discuss your differences with an open mind.  Do

20  not hesitate to examine your own views and change your opinion

21  if you come to believe that it's wrong.  But you should not

22  surrender your honest beliefs about the weight or the effect of

23  the evidence solely because of the opinions of the other jurors

24  or for the purpose of returning a unanimous verdict.

25          All of you should give fair and equal consideration to

Jury Charge

1    all of the evidence and deliberate with the goal of reaching an

2    agreement that is consistent with the individual judgment of

3    each juror.

4            You are the impartial judges of the facts.

5            Okay.  Now, with that, I'm going to swear in the court

6    security officer, and I'm going to give you some directions,

7    okay?  About what to do.

8            First, let me get your oath.

9            Please raise your right hand.

10    (Court Security Officer duly sworn.)

11            THE COURT:  Now, Ladies and Gentlemen, Mother Nature

12    is interfering with your job.  There has been -- the chief

13    judge has issued an order to us that we should let you go home

14    now.  So you're going to go back in the jury room.  You're not

15    going to deliberate tonight.  The Court is concerned about your

16    well-being, and they want you to get home safely.

17            I don't think it makes any sense to make you come into

18    the city during the snowstorm tomorrow, so that means that you

19    should come in on Monday to deliberate.

20            So if anyone is going to have an issue with that, I

21    would like you to give me the information for a phone call or a

22    letter, and I will do so.  It's going to be a snow day.  Most

23    likely, the courthouse -- it's already on skeleton crew, but

24    who knows what's going to happen beyond that.

25            So you are now going to deliberate.  I will have you

Jury Charge

1    go back into the jury room.  I want to make sure that I have

2    all of your cellphone numbers that are accurately with me.  And

3    you'll have to return here Monday morning at 9:00 a.m. to

4    deliberate.

5              So I thought that you would be able to get to it, but

6    the snowstorm is going to keep you from it.  So I apologize,

7    but that's not my call.  Some -- somebody has more power even

8    than my lifetime appointment, so sorry about that.  All right?

9              Go ahead and grab your belongings.  And make -- the

10   phone numbers you gave me are the right phone numbers?

11             JUROR:  Yes.

12             THE COURT:  Okay.  All right.  Be safe getting home.

13             JUROR:  Okay.  You, too.  Thank you.

14             COURT SECURITY OFFICER:  All rise.

15        (Jury out at 5:08 p.m.)

16             THE COURT:  Okay.  Please be seated for a second.

17             So, you know, it's a judgment call as to whether to

18   try to bring people in.  But what's probably going to happen is

19   you would bring some people in who wouldn't make it, and -- so

20   the chief is kind of directing the few juries that are out to

21   just have them come back on Monday.  And I think that makes

22   sense.  So Monday will be deliberation.

23             I have asked one of my colleagues to take the verdict

24   and any notes that come in, but you still will be coming to my

25   courtroom.  I will not be here on Monday.  So I will be

1   reachable by telephone to answer or be on speakerphone for any

2   questions.

3          MR. LUPINACCI:  Judge, if I may.  Monday is a state

4   holiday.

5          THE COURT:  Oh, my goodness.  Well, does that matter

6   to you?

7          MR. LUPINACCI:  Well, our office is closed, but -- I

8   mean, I don't know, are schools closed?  How does that impact

9   anybody else?

10         THE COURT:  I don't know.  Can you go back there and

11  stop them for a minute?

12         Casimir Pulaski?

13         MR. LUPINACCI:  Lincoln's birthday.

14         THE COURT:  What do we have?  Is it a federal holiday?

15  So a week from Monday is the federal holiday.

16         MR. LUPINACCI:  Yes.  And I don't know how that also

17  affects transportation for Mr. Weaver.

18         THE COURT:  Oh.  For you.

19         MR. LUPINACCI:  Right.

20      (Counsel conferring.)

21         THE CLERK:  They're -- do you want them to come --

22         THE COURT:  Yeah, come on back in.

23         THE CLERK:  All right.

24         THE COURT:  Before the jurors come back in, how am I

25  going to get, in a snowstorm, Mr. Weaver up from his facility?

467

1    It will take these guys hours tomorrow.  Right?  So, I mean,

2    you're not suggesting we still try to go tomorrow?  Or you are?

3           MR. STALEY:  Judge, I would leave it up to the jury

4    what they want to do.

5           THE COURT:  I don't know if that makes any sense.  I

6    have an obligation to keep them safe, you know?  I mean, I

7    can -- what I can do is I can tell them I'll give them a call

8    later on, but then it's going to be like 11:00, 12:00, 1:00 in

9    the morning or something, until we make a determination.

10          How many hours does it take you to come up from your

11   facility?

12          STATEVILLE OFFICER:  We can get here about

13   10:00 o'clock.  We can get here.

14          THE COURT:  Well, they can deliberate -- they can

15   begin deliberating without you.  We only need him here for a

16   question or the verdict.

17          STATEVILLE OFFICER:  As long as it's not a blizzard.

18          THE COURT:  All right.  Bring them back in.

19          COURT SECURITY OFFICER:  All rise.

20       (Jury in at 5:11 p.m.)

21          THE COURT:  Okay.  Folks, please be seated for a

22   second.

23          I'm a federal girl here, so I didn't know, but they're

24   informing me that Monday is a state holiday.

25          Is that accurate for any of you?  Does it impact any

1    of you?

2            JUROR:  What's Monday?

3        (Laughter.)

4            THE COURT:  It's Lincoln's birthday.  So nobody here

5    is impacted by that.

6            JUROR:  What date is that?

7            THE COURT:  It is the 11th?  Right?  No, the 12th.

8    It's February 12th.

9            JUROR:  I'm a little impacted by that.

10           JUROR:  I can't -- off the top of my head, that date

11   is in my head, but I can't remember what it is --

12           THE COURT:  So here's what I want you all to know:

13   I'm not trying to delay you in getting to your verdict.  The

14   Chicago Public Schools have already closed for tomorrow, so

15   that's the big indicator that nobody is going to be on the

16   roads tomorrow.  So I was going to just have you come back next

17   week.

18           Now, they're informing me they don't work on Monday,

19   they have the day off because they're a state employee.  We

20   have to get Mr. Weaver up.  That's a state employee.  So

21   there's that second issue.

22           I have the option of informing you by telephone at

23   like midnight if they close the courthouse; but my guess is it

24   would, but I -- I feel like I'm putting you all at risk having

25   you come down here tomorrow in a snowstorm.  We're expecting

469

 1    over a foot of snow is what they're saying.

 2            JUROR:  I won't be able to make it.  I wouldn't even

 3    be able to make it.

 4            THE COURT:  All right.  So how many are impacted by

 5    Monday?

 6        (A showing of hands.)

 7            THE COURT:  You think the state holiday --

 8            JUROR:  I'm impacted by Monday.  Can we stay?  We

 9    can't do it tonight?  It's no way possible we can --

10            THE COURT:  I have to get special permission from the

11    Court to do it tonight.  Seriously.  There was an order that

12    was sent out.  So you can go back -- go pick your presiding

13    juror, and I'll call the marshals and the chief judge and find

14    out.

15            JUROR:  Thank you.  We appreciate it.

16            JUROR:  Babysitter for another day.

17            THE CLERK:  All rise.

18        (Recess taken from 5:14 p.m. to 5:28 p.m.)

19        (In open court outside the presence of the plaintiff and

20        the jury:)

21            THE COURT:  So the -- do I have everybody?  Oh, no,

22    I'm sorry, Mr. --

23        (Plaintiff enters courtroom.)

24            THE COURT:  Okay.  So I just contacted the chief judge

25    and got permission for them to stay, because they said they

 1    wanted to get started.  And then I got the security detail to

 2    stay.  And I went back to tell them that everything was set,

 3    and I have a note that says we've reached a verdict.  So you

 4    have a verdict.

 5              They'll be out in a minute, okay?  So if you want to

 6    line them up.

 7              THE CLERK:  Absolutely.

 8              COURT SECURITY OFFICER:  All rise.

 9        (Jury in at 5:29 p.m.)

10              THE COURT:  Okay, Ladies and Gentlemen, please be

11    seated.

12              I got permission for you to stay, and I just got the

13    security to stay, and then I got your note.  So I understand

14    you've reached a verdict.  And, therefore, can you please pass

15    it forward to me?

16        (Tendered.)

17              THE COURT:  Thank you.

18    VERDICT:

19              THE COURT:  Okay.  The verdict is that we, the jury,

20    find as follows:

21              As to Count One, plaintiff Wendell Weaver's claim that

22    defendant Dr. Jacqueline Mitchell failed to provide proper

23    dental treatment.  Was Defendant Dr. Jacqueline Mitchell

24    deliberately indifferent to Plaintiff Wendell Weaver's serious

25    medical needs?  No.

1        As to Count Two, plaintiff Wendell Weaver's claim that

2   Defendant Dr. Jacqueline Mitchell failed to promptly reschedule

3   dental treatment.  Was Defendant Dr. Jacqueline Mitchell

4   deliberately indifferent to Plaintiff Wendell Weaver's serious

5   medical needs?  No.

6        So there's no damages.

7        As to Count Three, Plaintiff Wendell Weaver's claim

8   that Defendant Warden Randy Pfister improperly denied him

9   medical treatment through the policies he oversaw.  Was

10  Defendant Warden Randy Pfister deliberately indifferent to

11  Plaintiff Wendell Weaver's serious medical needs?  No.

12       As to Count Four, Plaintiff Wendell Weaver's claim

13  that Defendant Warden Randy Pfister failed to direct the Health

14  Care Unit at Stateville Correctional Center to promptly

15  reschedule treatment appointments through the policies he

16  oversaw.  Was Defendant Warden Randy Pfister deliberately

17  indifferent to Plaintiff Wendell Weaver's serious medical

18  needs?  No.

19       So would any of you like to poll the jury with this?

20    (Counsel conferring.)

21       MR. MEYER:  No, your Honor.

22       THE COURT:  Okay.  All right, Ladies and Gentlemen --

23  here's the note and the verdict.

24    (Tendered.)

25       THE COURT:  I'm discharging you from your service.

1     What I do normally, and I'm going to do it now as

2  well, is I always invite my jurors to come back and talk with

3  me, ask me questions, and I can answer anything that you have,

4  now that you are released from your duty.  And also if you have

5  any comments that you think would be helpful to the lawyers.

6  The plaintiffs' lawyers were recruited by me, and they did this

7  project pro bono, meaning they weren't paid for this project.

8  And so I'm sure that just the experience would be beneficial if

9  anyone has any comments regarding their trial skills and work.

10     I usually require both sides to be there for that; but

11  under the circumstances, I think that because we have pro bono

12  recruited counsel, it might be beneficial for you.

13     If you would like to do that, come on back.

14     I have a certificate for you.  It's not much.  It's a

15  thank you.  I hope you put it on your refrigerator with your

16  kids' artwork and tell people that you fulfilled your civic

17  duty.

18     And if you have any questions, I'll answer them now.

19     So gather your belongings, and I'll meet you in

20  chambers.

21     If anyone has to leave and wants to leave, you're

22  permitted.  It's not a forced march.  Thank you.

23     COURT SECURITY OFFICER:  All rise.

24  (Jury out at 5:33 p.m.)

25  (Proceedings concluded.)

1                    C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript of the

3     record of proceedings in the above-entitled matter.

4

5

      _/s/ GAYLE A. McGUIGAN_____          _March 7, 2018_
6     Gayle A. McGuigan, CSR, RMR, CRR                    Date
      Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25