# Stateville Correctional Center

# (SCC) Report

February, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

Overview .................................................................................................................................. 3

**Executive Summary** ............................................................................................................ 3

**Findings** ................................................................................................................................ 5

    Leadership and Staffing ..................................................................................................... 5

    Clinic Space and Sanitation .............................................................................................. 7

    Intrasystem Transfer .......................................................................................................... 8

    Nursing Sick Call ............................................................................................................... 9

    Provider Sick Call ............................................................................................................ 11

    Chronic Disease Management ........................................................................................ 12

    Pharmacy/Medication Administration .......................................................................... 20

    Laboratory ....................................................................................................................... 21

    Urgent/Emergent Care .................................................................................................... 22

    Scheduled Offsite Services-Consultations/Procedures ................................................. 23

    Infirmary .......................................................................................................................... 24

    Infection Control .............................................................................................................. 27

    Inmates' Interviews ......................................................................................................... 28

    Dental Program ............................................................................................................... 29

    Continuous Quality Improvement .................................................................................. 37

**Recommendations** ........................................................................................................... 38

**Appendix A – Patient ID Numbers** .............................................................................. 40

# Overview

On January 21-23, and February 24-25, 2014, we visited the Stateville Correctional Center in Joliet, Illinois. This was the first site visit to SCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Michael Magana and his staff for their assistance and cooperation in conducting the review.

# Executive Summary

Stateville is a maximum-security facility. The current population for the entire complex (Northern Reception Center, Minimum Security Unit and Stateville proper) is 4078 inmates, approximately 1600 of whom were housed at Stateville proper, the focus of this report. The maximum-security unit has a 32-bed infirmary which serves the entire complex. There are four dialysis chairs at Stateville which can therefore accommodate up to 18 dialysis patients.

There is a major problem with access to care at this facility. Clinics are frequently cancelled due to lockdowns, staffing issues, and to a lesser degree by "no shows," thus resulting in delayed or missed chronic care clinics, telemedicine visits and sick call. In the charts that we reviewed, anywhere from 33% to 75% of scheduled appointments were cancelled for these reasons.

The Medical Director is a surgeon by training and chart reviews suggested that his primary care skills are not up to date. The other physician has more current skills, but ironically defers to the Medical Director for cases which are more complex or higher risk. Neither physician has access to any electronic medical references or resources; this decreases the likelihood that patients will be treated according to the most current accepted standards of care. This was indeed the case in many of the charts we reviewed.

A global problem with the chronic care program is that patients are not scheduled according to their degree of disease control, but rather by the calendar month. This is a statewide policy issue which needs to be corrected. We also found many instances in which patients' chronic diseases were not managed as aggressively as they should have been when their degree of control was poor. In many of the charts that we reviewed, the problem lists were not updated.

With regard to the diabetes clinic, the timing between insulin administration and the start of the meals can be quite variable, and feeding times change day-to-day, placing patients at

considerable risk of hypoglycemia. Patients requiring insulin are prescribed this therapy no more than twice a day. While this may be sufficient for many type 2 diabetics, physiologic insulin replacement (with 3-4 injections per day) is recommended for the majority of patients with type 1 diabetes.

We noted a disturbing pattern of treatment interruptions and delays in specialty care for patients with HIV infection. Telemedicine clinic visits were cancelled and postponed with similar frequency as other chronic care clinics due to lockdowns and security issues. However, compounding the problem for the HIV patients is that the onsite providers are almost completely uninvolved in managing or monitoring any aspects of patients' HIV disease. One of the consequences of this lack of involvement is that no one onsite is monitoring patients' medication adherence. Thus, when patients run out of medication or skip doses, it appears that no one notices until the patient's next ID telemedicine visit many months later. It is of crucial importance that patients not miss doses or run out of HIV meds, as this is highly associated with treatment failure and adverse outcomes.

A large part of the problem is a policy issue. The most recent copy of the Department's Chronic Illness Treatment Guidelines that we were provided did not even contain a section on HIV infection, or define an HIV chronic care clinic. Similarly, the Wexford HIV policy addresses exposure concerns for employees, but is essentially silent on the issue of HIV treatment for inmates. The facility has thus adopted a practice of leaving the entirety of HIV care to the ID consultant, access to whom is quite limited as already discussed. This has had the unfortunate effect of essentially disengaging the facility providers from any aspect of patients' HIV care. None of the HIV patients were enrolled in the chronic disease clinic in the formal way that other patients were enrolled; they were seen by the ID specialist only (and only when clinics were not cancelled as discussed above). While we would not expect the average primary care clinician to be facile in treating HIV disease itself, we would expect them to be providing primary care to this population. This would include actively monitoring this high-risk population for medication compliance, side effects, and the primary care complications related to the disease and its treatment, such as hyperlipidemia, diabetes and cardiovascular disease.

Patients admitted to the infirmary at Stateville were often not seen according to timelines described by policy, either by the clinicians or by the nursing staff. We were also surprised to observe several instances where patients' conditions were not managed as aggressively as their conditions warranted during their infirmary admission.

Stateville, given the fact that it is a maximum-security facility and houses many older and sicker patients, requires the services of a Health Care Unit Administrator dedicated specifically and exclusively to Stateville. In addition, the official staffing allocation is inadequate to meet the rather demanding medical needs. The response has been to allow for the hiring of additional staff; however, such a complex facility cannot be allowed to function on the basis of positions which can be deleted or delayed in terms of hiring on a moment's notice. The Stateville facility requires a designated number of nursing and primary care and medical records positions.

Most of the services at Stateville are frequently cancelled, due to either lock downs or "no-shows" or absence of health care staff. This results in substantial delays and sometimes problems

not ever being addressed. In addition, the absence of leadership and especially clinical leadership results in practitioner performance which is frequently ineffective with no chance of improvement because of the absence of review and feedback.

The intrasystem transfer process does not effectively insure continuity of care for patients who enter with prior diagnosed problems. In addition, the urgent/emergent responses frequently reflect problems with the initial assessment and response or with follow-ups after patients return from sendouts. Additionally, scheduled offsite services reflect persistent problems with the timeliness of access to these services or problems with follow-up once the service is provided. And finally, the quality improvement program, which should have identified the programmatic deficiencies and addressed them, is non-functional, including the responses to grievances.

Due to the maximum-security level of inmates housed in the facility, it is only necessary and appropriate that exam rooms be created in cell houses B, E and F to allow sick call to be conducted in the cell house, thus reducing the movement of inmates out of the cell house. In addition, the mealtimes, with breakfast starting at 2:00 a.m. and lunch at 9:00 a.m., cause real problems for the diabetics to maintain a normal diurnal variation with regard to eating and sleeping. Every effort should be made to move up the start of the morning meals to 3:30 a.m. at the earliest.

# Findings

## Leadership and Staffing

Staffing is difficult to assess as a result of Stateville and the Northern Reception Center (NRC) being viewed as one facility with one Schedule E of approved and budgeted staffing positions. This means there is a sharing of staff, particularly nursing staff, who are moved back and forth between the two facilities depending on a given activity or need. For example, when the intake process begins at the NRC, nursing staff at Stateville go to the NRC to assist with intake. As a result, the work being performed at Stateville stops and may not be restarted depending on the number of inmates going through intake and the length of time nursing staff are required to work at the NRC. Additionally, when nursing staff "call-off" work, scheduled staff has to be moved around to fill those vacancies. For example, if a nurse scheduled to work at the NRC does not report to work, a nurse at Stateville, who already has an assignment, is pulled off that assignment and sent to the NRC. Depending on the day of the week and how many nursing staff are working, this could result in the duties the Stateville nurse was originally assigned to perform not being done. A review of staffing schedules, "call-off" and overtime records showed a daily occurrence of nursing employees not reporting to work resulting in staffing adjustments shift by shift. The schedules reviewed indicated 100% of the time nursing staff was removed from their assignment at Stateville to fill a vacancy/need at the NRC. As a result, Stateville is chronically out of compliance with established policy for the timely completion of sick call, periodic physical examinations, chronic illness clinics and timely administration of medication. Compounding this problem is the significant number of "state" nursing position vacancies. For example, of 20 approved Correctional Nurse II positions, 10 are unfilled due to three vacancies and seven long-term leaves of absence. Also, of 18 approved Correctional Medical Technician positions, eight are unfilled due to two vacancies, and again, six long-term leaves of absence. In

order to help combat these staffing problems, the contract medical provider has been authorized to submit Adjusted Staffing Requests (ASRs) to hire staff outside of the authorized Schedule E budgeted positions. Currently, the contract medical provider has been authorized through the approval of an ASR to hire a total of 40 registered nurses (RNs) and licensed practical nurses (LPNs) over and above the budgeted Schedule E positions. At the time of the inspection, a combination of 27 RNs and LPNs had been hired.

With the view that Stateville and the NRC function as one facility, only one FTE Health Care Unit Administrator (HCUA) is approved to manage the health care programs at both facilities. Due to the significantly different missions of each facility and the high level of activity at each facility, it is strongly recommended that there is a full-time Health Care Unit Administrator assigned to each facility. Compounding this issue is the fact that the current HCUA is chronically absent and takes extended Leaves of Absence. At the time of the inspection, the HCUA was not available except for approximately four hours one morning at the NRC. The meeting had to occur at the NRC because the HCUA was no longer permitted by the warden to enter Stateville as a result of a leg brace the HCUA was required to wear. As a result, she is unable to provide any administrative oversight or monitoring of the health care program or provide any guidance to supervisory or line staff. The medical contractor Director of Nursing is managing the health care program and is quite competent.

Of additional concern is the lack of strong leadership at the NR, which further reinforces the need for a full-time HCUA position dedicated to the NRC to provide direction and oversight of the program.

The underdevelopment of the Stateville health care program is in part attributable to a Health Care Administrator position which is functionally vacant but is filled by a person on prolonged medical leave. The Medical Director position is filled by a surgeon who does not provide clinical oversight for the program. There is a functioning Director of Nursing employed by the vendor who appears to be working hard to keep the program afloat. The leadership vacuum, especially at such a complex facility, is responsible for the state of programmatic underdevelopment. This vacuum appears to have failed to identify or develop a strategy that addresses the overwhelming access problems related to lockdowns, etc.

Other staffing is listed in the following table:

*Table 1. Health Care Staffing*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 1.0 | 0 | Contract |
| Staff Physician | 1.0 | 1.0 | 0 | Contract |
| Nurse Practitioner | 1.0 | 0 | LOA | Contract |
| Health Care Unit Adm. | 1.0 | LOA | LOA | State |
| Director of Nursing | 1.0 | 1.0 | 0 | Contract |
| Nursing Supervisor | 1.0 | 1.0 | 0 | State |
| Nursing Supervisor | 1.0 | 1.0 | 0 | Contract |
| Corrections Nurse I | 0 | 0 | 0 | State |
| Corrections Nurse II | 20.0 | 10.0 | 3 vac. & | State |

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| | | | 7 LOA | |
| Registered Nurse | 0 | 0 | 0 | Contract |
| Licensed Practical Nurses | 7.0 | 7.0 | 0 | Contract |
| Correctional Medical Technician | 18.0 | 10.0 | 2 vac. & 6 LOA | State |
| Health Information Adm. | 1.0 | 1.0 | 0 | Contract |
| Health Info. Assoc. | 2.0 | 2.0 | 0 | Contract |
| Phlebotomist | 0.5 | 0.5 | 0 | Contract |
| Radiology Technician | 0 | 0 | 0 | Contract |
| Pharmacy Technician | 0 | 0 | 0 | Contract |
| Pharmacy Technician | 1.0 | 1.0 | 0 | State |
| Staff Assistant | 1.0 | 1.0 | 0 | Contract |
| Staff Assistant | 2.0 | 0 | 1 vac. & 1, 13 yr. LOA | Contract |
| Chief Dentist | 1.0 | 1.0 | 0 | Contract |
| Dentist | 2.0 | 2.0 | 0 | State |
| Dental Hygienist | 1.0 | 1.0 | 0 | Contract |
| Dental Assistant | 2.0 | 1.0 | 1 | Contract |
| Optometry | 0.2 | 0.2 | 0 | Contract |
| Physical Therapist | 0.4 | 0.4 | 0 | Contract |
| Physical Therapy Asst. | 0 | 0 | 0 | Contract |
| **Total** | **66.1** | **43.1** | **23 (19 state & 4 contract)** | |

# Clinic Space and Sanitation

The Stateville health care unit was clean, well lighted, reasonably well maintained and environmentally comfortable. It is a large unit consisting of four large inmate holding/waiting areas, an urgent care/emergency room, medication preparation room, medication storage, medical supply and storage, medical records department, four-chair dental clinic, a 32-bed infirmary and multiple office areas.

Inmate porters perform the janitorial duties.

The urgent care/emergency room was appropriately equipped. A random inspection of controlled medication, needles/syringes, sharp instruments and tools indicated all perpetual inventories were accurate and being counted at the appropriate intervals. Keys to access the previously mentioned items were appropriately restricted to on-duty medical staff. An automatic external defibrillator (AED) and emergency response kit are checked each shift to assure operability of the AED and adequate and appropriate emergency supplies. The dental clinic was very clean, well maintained and organized. The medical records department was less organized and

cluttered. The medication preparation and storage rooms were clean, organized and appropriately equipped with access restricted to medical personnel.

The infirmary is a large rectangle, two long hallways and two short hallways, with a nursing station centrally located in the middle of the rectangle.

Blood-borne pathogen precautions were being used in all areas as evidenced by the use of sharps containers, personal protective equipment available for use as indicated, the use of a licensed medical waste disposal company, the IDOC blood-borne pathogen manual being immediately available to staff and staff training on the subject matter.

# Intrasystem Transfer

In this area we look at how well the facility processes newly entering inmates in order to insure continuity of care. We reviewed 13 records of which seven had significant problems.

**Patient #1**
This is a 45-year-old male with hepatitis C who arrived at Stateville on 1/2/14. This patient had completed treatment for hepatitis C and yet the transfer summary lacks a description of this prior treatment.

**Patient #2**
This is a 45-year-old with hearing loss who arrived on 1/28/14. Again, the transfer summary lacks any documentation of the significant hearing loss.

**Patient #3**
This is a 38-year-old who arrived on 1/24/14. This patient, on arrival, had an elevated systolic pressure but was never referred either for monitoring or clinician visit.

**Patient #4**
This is a 26-year-old with mental health issues and polysubstance abuse who arrived on 1/2/14. In this record, the RN wrote on the transfer form, "vital signs not indicated." Vital signs should be expected without exception on all intrasystem transfers.

**Patient #5**
This patient arrived on 1/9/14, but the forms are blank.

**Patient #6**
This is a 29-year-old who arrived on 1/15/14 with a history of asthma and psychiatric problems. He was listed as his asthma being in good control without meds but there was no chronic care referral and no evaluation by a physician to determine whether the asthma should be described as resolved and therefore not in need of any follow up.

**Patient #7**
This is a 53-year-old male with hypertension and cataracts who arrived on 1/2/14. However, there is no transfer summary available in his record.

# Nursing Sick Call

Stateville uses a sick call request system for nursing sick call. Inmates wanting to access sick call complete a sick call request form that is available in the cell houses. Once completed, the inmate deposits the form directly into a locked medical drop-box which is located in each cell house. Each morning on the 7:00 a.m. to 3:00 p.m. shift, a correctional medical technician (CMT) who could be a licensed practical nurse (LPN) or a non-licensed staff member, collects and reviews each slip to determine which inmates need to be evaluated immediately versus those who can be scheduled over the next 72 hours. The CMT documents in a sick call logbook each inmate's name, number, date of request, date reviewed, date scheduled and the date to be evaluated. Inmates determined to need urgent care are referred to either a registered nurse (RN) or physician and evaluated the same day. Inmates determined to not have an immediate need are scheduled to be evaluated within 72 hours. Registered nurses (RNs) conduct sick call. Sick call in F-house, which is administrative and disciplinary segregation, is conducted three times a week, and sick call in cell houses B, C, D, E and X are conducted two times a week. Sick call is conducted in each cell house. A room has been designated on the bottom floor of each cell house for sick call; however, the rooms in cell houses B, E and F do not have an examination table. Security staff escorts each inmate to the sick call room. The RN evaluates the inmate and either treats the individual from a physician approved treatment protocol or refers the individual to the physician. Department of Corrections policy requires request slips are reviewed within 24 hours of receipt, and those individuals determined to have routine requests are scheduled and evaluated within 72 hours of request slip review. Per the Director of Nursing (DON), individuals with routine health care requests are evaluated within five days rather than the required three days.

It was reported that nursing sick call is frequently interrupted or terminated because security staff will make the decision to no longer escort inmates from the galleries down to the nurse sick call room on the first floor.

Ten nurse sick call records were reviewed as follows.

## Patient #1

This patient is a 55-year-old. He submitted a request slip dated 11/15/2013 complaining of severe abdominal pain with blood in stool; it was noted as received on 11/23. The request was reviewed by a CMT and scheduled for 11/25. He was evaluated by a RN 11/29. The SOAP note stated, "Patient complained of stabbing pain in abdomen and blood in stool for past six months." The RN noted no rebound or tenderness and bowel sounds in all four quadrants. The documented plan was to avoid fatty foods and he was referred to the physician on 12/18. He was evaluated in cardiac/hypertension clinic on 12/10, but abdominal pain and blood in stool were not addressed. He was not evaluated by physician on 12/18 due to no provider and was rescheduled for 1/9/2014. He was not evaluated by physician on 1/9 due to no provider and there were no further notes.

This patient had the same complaints in August 2013, and after submitting five requests, he was evaluated by the physician's assistant on 8/5/2013. There is a documented exam noting blood on exam glove after rectal exam and palpable internal hemorrhoids. The assessment was constipation, anal fissure and hemorrhoids. Fiber Lax and Annusol-HC suppositories were ordered. The patient's medical record reflects that he was not evaluated in sick call as scheduled on 8/19, 8/21, 8/28, 8/30, 9/9, 9/13 and 9/26/13 due to lockdown.

## Patient #2

This is a 58-year-old patient with diabetes and hypertension. He was evaluated on 12/23/13 in urgent care for complaints of stopping breathing while asleep, which wakes him with shortness of breath. Vital signs were collected and recorded; blood pressure was elevated at 148/98. There was no documented assessment or plan and he was instructed to return as needed. On 1/18/14 at 2:45 a.m., he reported to urgent care with complaints of chest pain. Vital signs were collected and documented and all were WNL. The physician was notified and an EKG ordered. The EKG was performed and reported to the physician, who ordered pain medication and Nitro 0.4 mg. SL and report back to physician in 30 minutes. The physician was contacted after 30 minutes and told that the patient reported he no longer had any pain. The patient returned to the cell house. At a cardiac clinic appointment on 1/21, the patient reported he no longer was having chest pain, but he frequently wakes up not breathing. This was not addressed in cardiac clinic.

## Patient #3
This patient is a 49-year-old. He submitted a request slip which was noted as received and triaged on 11/21/13 by a RN. He was evaluated by an RN on 11/25 for a complaint of sharp pain in his right rib cage area since playing handball a week previously. Vital signs were noted and all WNL. The patient rated his pain as 7 out of 10. No examination was noted. Acetaminophen two tabs TID for seven days were given and he was told to return as needed. There were no further notes.

## Patient #4
This patient is a 37-year-old. There is no documentation as to the date the request was received and triaged. He was scheduled to be evaluated 12/20/13 for complaint of stomach pain. He was noted as a no-show and rescheduled for 12/27. He was evaluated on 12/27 with a complaint of RLQ intermittent pain, no N/V or diarrhea and vital signs WNL. An abdominal examination noted with bowel sounds x 4 and RLQ protrusion when patient coughs. The assessment was hernia and he was referred to the physician. He was scheduled for 1/8/14, but not evaluated due to no provider. He was rescheduled for 1/21, but noted as a no-show. He was rescheduled for 2/4, but there were no further notes.

## Patient #5
This patient is a 37-year-old. There was a request noted as received and triaged 11/17/13 by a RN. He was scheduled for sick call 11/20 for complaint of URI. He was seen 11/20, but stated he no longer had any complaints and he was instructed to return as needed.

## Patient #6
This patient is a 47-year-old. There was a request noted as received and triaged 11/22/13 by a RN. There was a request to have a colonoscopy and it was scheduled for 11/30. He was not seen 11/30 due to no provider and was rescheduled for 12/7. He was not seen on 12/7 due to no provider and rescheduled for 12/11. Again, he was not seen 12/11 due to "time constraints," and rescheduled for 12/14. He was evaluated by a RN on 12/14 and referred to physician on 12/23 to discuss the procedure. He was not seen 12/23 due to no provider and there were no further notes.

## Patient #7

This patient is a 51-year-old. A request was noted as received and triaged 1/15/14 by a RN. He complained of abdominal pain and was scheduled for 1/18. He was previously evaluated on 1/2 for a compliant of constipation; Colace and Fiber Lax were ordered. On 1/10, he complained of

abdominal pain and was evaluated by a physician in urgent care. An abdominal exam was noted as WNL. H. pylori treatment was started and follow-up scheduled for 1/20. He was not seen on 1/20 due to no provider and was rescheduled for 1/22. He was seen by an LPN and rescheduled with the physician for 2/19. There were no further notes.

### Patient #8

This patient is a 32-year-old. He submitted a request slip complaining of testicular pain; there was no date on the slip and no date as to when the slip was received and triaged. He was scheduled for sick call for 1/22/14. He was seen by an RN and there was no documented examination. He was referred to a physician. He was evaluated by a physician on 1/23 and started on antibiotics. He was scheduled for follow-up on 2/19.

### Patient #9

This patient is a 32-year-old. He submitted a request slip complaining of weakness and weight loss; the request was dated as received and triaged 12/24/13. He was scheduled for sick call on 12/26. He was evaluated by an RN and scheduled for a chronic care clinic. There was no documented examination, assessment or plan and no documentation addressing weakness and weight loss.

### Patient #10

This patient is a 37-year-old. He submitted a request complaining of a dislocated thumb; the request was dated as received and triaged on 12/28/13. He was scheduled for sick call 1/3/14. On 1/3, the patient was escorted to the health care unit and evaluated by an RN. A preprinted sick call protocol form was completed but not date or time stamped. The patient was referred directly to the physician. The physician ordered "stat" lab work due to possible altered mental status, and x-ray of the left thumb. There was no documentation in the record of an x-ray being performed or any results. The note from the physician, which had no date or time, stated that the patient was informed he had a strained thumb which had healed. There was no further documentation.

## Provider Sick Call

We reviewed nine records of patients seen in PA sick call and six of the records contained some problems.

### Patient #1

This is a 31-year-old male who on 11/18/13 was referred for pain at the base of his neck. The assessment was appropriate but there is no use of a pain scale in order to quantify the severity of the pain. Neck films were ordered along with symptomatic treatment. The neck x-rays were negative and he was to be followed up in three weeks, but no visit occurred until more than two months later, at which time new treatment orders were issued.

### Patient #2

This is a 35-year-old with hypertension and obesity seen on 11/18/13 for bumps on the back of his head and also for renewal of blood pressure medicines. He was assessed as having folliculitis and the meds were reordered but not until nine days later.

**Patient #3**
This is a 35-year-old who was seen on 11/18/13 for back pain. He had been seen four days earlier by the Medical Director but back pain was not addressed. On 11/18 the CMT wrote, "No need to be seen because the patient had been seen by the physician four days earlier for the same problem." This was inaccurate. On 1/2/14, he was scheduled to see the physician but the record indicates "No provider present." Again, on 2/1 the visit was cancelled due to inadequate staffing for RN sick call. This patient has not been seen since these unresolved complaints.

**Patient #4**
This is a 49-year-old with a history of a fungal infection of his toenails as well as proptosis. He was to be seen on 11/19/13 for follow up of laboratory tests but was not seen until 12/16. Treatment was ordered in the progress note but we were unable to find the prescription. There was also a request for follow up in one month but this also never took place.

**Patient #5**
This is a 57-year-old with asthma and hyperlipidemia seen 11/21/13 for increased urination. Laboratory tests were ordered but never performed and therefore there was no follow up.

**Patient #6**
This is a 55-year-old who was seen on 11/21/13 for prostate problems. The patient has been on Flomax and he was to record the frequency of his symptoms and to return in 7-10 days. He was never seen in follow up but was seen 12/13 in his scheduled hypertension clinic, but the urinary problems were never addressed.

# Chronic Disease Management

There are two dedicated chronic disease nurses; one for the "high risk" clinics (HIV, hepatitis C, general medicine) and one for the more routine diseases (hypertension, diabetes, asthma, seizure). Likewise, the doctors' chronic care responsibilities are divided along the same lines. Patients are seen every four months regardless of degree of control, though Dr. D will often request follow-up visits in the interim. Unfortunately, these interim visits are frequently thrown off by lockdowns and instances of "no provider." Labs are reliably drawn timely before the chronic care appointments and all chronic diseases are addressed at each chronic care clinic visit, though this often requires the provider to fill out multiple forms for a single visit. Problem lists were frequently not up to date and we noted multiple instances of patients running out of their medications.

## Cardiac/Hypertension

### Patient #1
This is a 54-year-old with diabetes, hyperlipidemia and coronary artery disease. His problem list was last updated in 1999 and does not list coronary artery disease. The patient had an MI in 2007 with stent placement, then another stent in 2008. He was seen in hypertension clinic on 5/24/13

complaining of chest pain, stating, "It feels like my heart pain." The physician noted the patient's history of coronary artery disease but did not get an ECG. Instead, the plan was to refer to Medical Director clinic for further evaluation of the chest pain and sublingual nitroglycerin was ordered as needed. She also noted that the patient's hyperlipidemia was under poor control but made no change to his medications.

She did refer the patient for ingrown toenail removal and saw him back for this on two different occasions.

The next note is dated 6/20, when the patient saw the Medical Director for dyspnea on exertion and exertional chest pain "as in 2007 and 2008 when he had cardiac stenting." He ordered a chest x-ray and ECG "this week" and referred the patient to cardiology. This was approved on 6/24, but not scheduled until 12/10, nearly six months later.[1] The x-ray was scheduled for 6/26, but not done due to lockdown. It was rescheduled for 6/28, but again cancelled due to lockdown. It was finally done on 7/10, three weeks after it was ordered.

His next chronic care visit was not until 9/27, at which time he denied chest pain or shortness of breath but was having palpitations. His LDL was still above goal at 129, so the physician stopped his simvastatin 20 mg and started pravastatin 40 mg (a higher dose of a less potent drug which essentially amounts to no change). She also ordered naproxen 500 mg twice a day routinely for six months, which is relatively contraindicated in patients with coronary artery disease. She noted "follow up with cardiology as scheduled," implying either that the six-month delay was acceptable to her or she was not aware of the scheduled appointment date. There are no further chronic care notes, though he was seen a few times for eye complaints and shoulder pain.

He then presumably went to his cardiology appointment on 12/10 and ended up being admitted to the hospital, as the next notes in the chart state that he was returning to the institution having undergone triple bypass surgery. He was admitted to the infirmary. There were no hospital notes or notes from the cardiology appointment.

*Opinion*: This patient presented with chest pain that seemed clearly anginal in nature; he even described it as identical to his known cardiac chest pain. The first doctor did nothing to work this up aside from refer the patient to her colleague, who is no more adept than she is. The Medical Director also took a very casual approach to the problem, evidently tolerating a six-month delay in specialty care for this potentially life-threatening problem.

## Patient #2
This is a 55-year-old man with hypertension, diabetes, hyperlipidemia, coronary artery disease and HIV, but his problem list mentions only diabetes and hypertension.

---

[1] We spoke to the scheduler about this excessive delay, who explained that UIC only allows a limited number of appointment slots for all prison referrals. She submits the list of patients who are approved for consultation to UIC and is later informed of the appointment information. She stated that if the provider wants the patients to be seen sooner, they can request that she arrange for the patient to see a local provider. However, there is no system in place to inform the providers of when the UIC appointment is going to occur.

At the 4/13/13 chronic care clinic his blood pressure was 140/103, but the patient had not had his meds that morning; there was no further exploration of this issue. The doctor ordered blood pressure checks and encouraged compliance. She ordered a follow-up visit in two weeks. He was scheduled on 5/4 and 5/8, but not seen due to lockdowns.

On 5/17, he was seen in chronic care clinic, at which time his blood pressure was 130/92 and lisinopril was added. His blood pressure remained elevated after that: 139/98, 130/94, 138/97, 142/84, 146/110, but he was not seen again by a provider until his next chronic care clinic five months later, on 10/15. At this visit, his blood pressure was 140/90 and again he had not taken his meds that day. The doctor ordered blood pressure checks weekly for six months but did not change his medication.

On 1/9/14, he was seen for a respiratory illness and his blood pressure was 130/94, which was not addressed.

He was scheduled for chronic care clinic on 1/17/14, but not seen due to "no show."

On 1/21 and 1/30, he was seen by the Medical Director for ongoing respiratory symptoms and his blood pressure at both visits was elevated (128/91 and 145/101) but not addressed.

On 1/30, the doctor reviewed his labs and requested a follow-up visit. He was scheduled for 2/1, but he was not seen due to "minimal movement per shift commander." He was rescheduled for 2/22, but not seen due to "no provider."

*Opinion*: This patient has not been seen timely for his inadequately controlled hypertension, nor has this problem been addressed with any vigor. There should be no such thing as a "no show" in a maximum-security prison.

## Diabetes

Breakfast is served during what most people would consider the middle of the night, 1:30 a.m. to 3:30 a.m. Diabetics get a snack bag at breakfast. A nurse is sent to the unit and waits until the food is there before administering the insulin. Lunch is between 8:45 a.m. and 12:40 p.m. and is served in the dining hall. Dinner may be served any time between 4:30 p.m. and 7:30 p.m. Patients on insulin get another snack bag at 3:00 p.m. Insulin lines are run at the health care unit prior to dinner; patients return to their cells until their tier is called. The wait times between the insulin administration and the beginning of the meal therefore can be quite variable. We were told that the feeding order changes daily due to security concerns. There are two insulin administration times a day; none of the diabetics were ordered insulin more frequently than twice a day.

We found problems in the following cases:

**Patient #3**
This is a 54-year-old with diabetes, hyperlipidemia and coronary artery disease. He was seen in chronic care clinic on 5/24/13 with diabetes control that had been deteriorating over the past

year. His A1c had gradually risen from 9.2% in August 2011 to the most recent value of 12.3% on 5/17/13, yet the provider made no changes to his insulin dose.

His next chronic care visit was on 9/27, at which time his A1c was 9.8%. His basal insulin dose was increased from 70 to 74 units at bedtime and sliding scale insulin was added. Follow up was ordered for 11/7 with another A1c prior; however, he was not seen that day due to lockdown. He was rescheduled for 11/9, but not seen that day "due to no provider." On 11/19, there is another note indicating that he was not seen "due to no provider." When he was finally seen on 11/26, it was to address an eye complaint, not his diabetes.

*Opinion*: This patient has not been seen timely for his diabetes and his disease has not been managed as aggressively as his poor control warrants.

**Patient #4**

This is a 61-year-old diabetic with hypertension, hyperlipidemia, hypothyroidism and colon cancer. His problem list was last updated on 11/22/12 and does not list hyperlipidemia or hypothyroidism. His diabetes control has been improving over the past year and is now under good control. His chronic care clinics have not always occurred timely over the past year, though he has been seen for his chronic diseases four times since February 2013 and is under good control now.

His cancer care follow up has not been timely according to his most recent oncology report, which describes the patient being "lost to follow up" on two occasions, which resulted in delays in work up and treatment.

*Opinion*: This patient has not been seen timely for his cancer care, which has negatively impacted the timeliness of his treatment. His problem list needs to be updated.

**Patient #5**

This is a 58-year-old man with diabetes, hypertension and asthma. His diabetes has been poorly controlled over the past year. At the 1/18/13 visit, his A1c was 10.7% and his metformin was increased. He was scheduled to be seen by the Medical Director on 1/29, 2/6, and 3/21, but was not seen on any of these dates due to "no provider." On 5/7, he was scheduled to be seen but was not due to a lock down. He was next seen on 5/30 in chronic care clinic, at which time his A1c had improved to 8.4%, but his metformin was discontinued due to renal insufficiency. There was no plan to monitor the effect of this intervention aside from following up routinely in chronic care clinic in four months.

On 7/24, his A1c was measured at 11.1%. This was reviewed by the doctor on 8/1, who ordered a follow-up appointment for 8/8, but patient was not seen due to lockdown. He was seen on 8/14, at which time the doctor acknowledged his poor diabetes control but did not adjust his medications.

On 10/2, he was seen in chronic care clinic and insulin was added. Blood work was ordered in four weeks and follow up in 5-6 weeks. He was seen on 11/6, but the doctor indicated that she did not have the lab results (though they had been resulted on 10/31) and so rescheduled him for

11/21. She noted his elevated A1c from the month prior but made no changes, given that his fingersticks were improved.

He was next seen on 1/15/14 in chronic care clinic. There were no new labs since October and no changes were made to his regimen.

*Opinion*: This patient had multiple interruptions in care due to custody and staffing issues. His diabetes does not appear to have been managed as aggressively as his poor disease control would merit. Blood work has not been well coordinated with clinic visits.

## HIV Infection/AIDS

There were 15 HIV infected patients at the time of our visit, all of whom were managed entirely by the ID consultant via telemedicine; the onsite clinicians were completely uninvolved in the care and monitoring of patients' HIV disease. This includes even the primary care aspects of the disease, such as monitoring for medication side effects, compliance and complications resulting from the disease and its treatment, such as hyperlipidemia and cardiovascular disease, which are inherently primary care issues. We think it is a mistake not to enroll these patients in the chronic disease program in the identical way that other patients are enrolled, because the end result is that this high-risk population is being monitored less diligently than other patients with chronic illnesses, despite their being more vulnerable in many cases.

There was a disturbing pattern of treatment interruption and delays in specialty care in the charts that we reviewed. The documentation in these charts was in a language of blaming the patient for running out of medication in nearly all cases. Considering there are only a handful of HIV patients at this facility, there is no reason that they cannot be monitored closely enough to ensure that treatment interruptions do not occur. The majority of the recent order sheets had been thinned from the health records, rendering it difficult or impossible to determine if medications were renewed timely or the specialist's recommendations were followed promptly after telemedicine encounters.

We reviewed six random records (40%) of patients with HIV infection. Of the 27 clinic appointments for which these patients were scheduled, only 10 were completed, for a cancellation rate of 63%. These cases are described below.

**Patient #6**
This is a 38-year-old man who was diagnosed with HIV/AIDS on 7/31/13, at which time his CD4 count was extremely low at 3. The PA saw him on 8/6, ordered appropriate labs and referred him to ID telemedicine. He was scheduled for 8/23, but not seen due to lockdown. He was scheduled to see the Medical Director on 8/22, but was not seen due to a lockdown. He was rescheduled for 9/11, but again not seen due to lockdown.

On 9/13, he was seen by ID telemedicine, who recommended he start on Bactrim, Azithromycin and Atripla urgently. The order forms had been thinned from the health record so it was not possible to determine if the recommendations were followed timely. The ID doctor wanted to see the patient back in six weeks, but the next telemedicine did not occur until January.

He was finally seen by the Medical Director on 10/3. Presumably, he had recently started on HIV therapy, but there was no discussion regarding side effects, compliance, etc. There was minimal physical exam – only a comment on his skin rash.

On 10/17, the PA wrote a note stating that she was informed by the patient's friend that the patient was out of his medication. He was not seen again until 1/3/14, when an RN quoted him as saying "Sometimes I don't always get my medication." There are no other notes in the chart, any chronic care forms or baseline intake for chronic care clinic.

On 1/7, he was seen in follow up by ID telemedicine, who noted that the patient runs out of medication for about a week each month. The consultant did not have access to the most recent labs which had been drawn on 1/3, but were not resulted until 1/9.

*Opinion*: This patient has had significant delays in accessing care with regard to specialty follow up and serious medication interruptions. It is of crucial importance that patients not miss doses or run out of HIV meds, as this is highly associated with treatment failure and adverse outcomes. Patients who are newly started on therapy need to be seen within a few weeks to evaluate for medication side effects and compliance with therapy. Patients who are newly diagnosed need particularly close monitoring and support.

**Patient #7**
This is a 54-year-old man with HIV infection since 2004 who arrived at Stateville on 3/13/13. He was seen in ID telemedicine on 4/8, at which time no new labs were available. He was following up for an increased viral load from the prior visit, thought to be due to missed doses, so new labs were essential to this visit. The ID doctor therefore requested that these be done and faxed immediately and the patient be seen again in three months. Instead, he was scheduled for 8/23 (four months later), but not seen due to lockdown. He was rescheduled for 9/13, but marked "no show for HIV telemed due to security." A nurse's note states he was seen on 9/16, but there was no report in the chart. The next clinic was scheduled for November but took place on 12/18.

There were no onsite provider notes in the chart at all.

*Opinion:* This patient has not been seen timely in ID clinic and there have been disruptions in his medication continuity. Labs have not been coordinated with the ID telemedicine visits and he has received essentially no primary care since his arrival nearly a year ago.

**Patient #8**
This is a 50-year-old man with HIV, end stage renal disease on dialysis, hepatitis C, hypertension, hyperlipidemia, SC trait and latent TB infection who was diagnosed with HIV in 1997. He has been seen timely for two of the last three ID clinics, the most recent being in December 2013. The latest clinic was delayed due to custody reasons. His viral load has been suppressed for at least the past year and he has been compliant with medications.

**Patient #9**

This is a 55-year-old man with advanced HIV, first diagnosed in 1994, who is on "deep salvage" therapy. He also has diabetes, hypertension, coronary artery disease and hyperlipidemia, but his problem list mentions only diabetes and hypertension.

At the 8/5/13 ID telemedicine visit, the patient reported that he had only been getting half a tablet of his Intelence; it should have been 200 mg twice a day but on the MAR it shows that for several months it was ordered as 100 mg twice a day. The order sheets had been thinned from the record. At the follow-up visit in December, (one month overdue), this issue was not addressed. The more recent MARs reflect the appropriate dose.

*Opinion*: Considering that the patient's treatment options are very limited at this point, the magnitude of this error was particularly great.

**Patient #10**
This is a 51-year-old man with end stage renal disease on dialysis and HIV infection who arrived at Stateville on 10/9/13, but has yet to be seen by a facility provider since his arrival. He was seen by ID telemedicine on 12/18 and the provider requested labs, but it does not appear that these were ordered. In fact, there were no labs in the chart since the patient arrived at Stateville.

*Opinion*: This patient has not had blood work done timely and has not been seen by a provider at the facility since his arrival.

**Patient #11**
This is a 47-year-old HIV patient who has only been seen once in the past year by a facility provider. This was in June of 2013 when he was seen by the PA at the patient's request because he missed his lab appointment and his hemorrhoids were bothering him. HIV labs were ordered that visit but the patient was never seen by a facility provider again.

He was seen in ID telemedicine clinic in April 2013 at which time a three month follow up was requested. Instead, he was scheduled four months later on 8/6, but was a "no show." He was rescheduled for 8/23, but was not seen due to lockdown. On 9/13, he was a "no show for HIV telemed clinic due to security." He was seen on 9/16 per a nurse note, but there was no consult report in the chart. His most recent ID note was on 12/18.

*Opinion*: This patient has not been receiving adequate primary care. His HIV care has also not been timely.

## Pulmonary

We performed a detailed chart review of five random records of patients enrolled in the pulmonary chronic care clinic. In every case, multiple chronic clinic visits were cancelled due to lockdowns or the absence of the provider. On average, 38% of scheduled appointments were cancelled due to lockdowns or "no provider." If no-shows are also considered, the proportion of missed appointments exceeds half of all scheduled appointments (53%) for this sample.

**Patient #12**

This is a 33-year-old man with poorly controlled asthma. Attempts at providing chronic disease care over the past year have been as follows:

- 2/12/13 – Cancelled due to no provider
- 2/13 – No show
- 2/16 – Lockdown
- 3/6 – No provider
- 3/23 – No show
- 5/11 – No show
- 6/4 – Patient was seen. At this point, he was using his rescue inhaler daily due to allergies. His peak flow was 540 and he was deemed to be under "fair" control. Loratadine and Nasonex were added.
- 11/8 – No show
- 11/14 – No provider
- 12/3 – Seen. He was using his rescue inhaler multiple times daily. Peak flow readings were somewhat low at 520/500/490. Wheezing was heard on exam and his steroid inhaler was increased.
- 2/6/14 – Left without being seen
- 2/11 – Still using his rescue inhaler daily. Peak flow a bit low at 520/500/480. Meds renewed. Long discussion regarding medication usage.

There were no unscheduled visits for respiratory symptoms.

*Opinion*: This patient's asthma is poorly controlled given his daily use of the rescue inhaler. Therefore, he should have been seen more frequently for monitoring and medication adjustment. The majority of his scheduled chronic care visits did not take place for various reasons including "no show," which should be unheard of in a maximum-security prison.

**Patient #13**

This is a 45-year-old man with poorly controlled asthma. He was scheduled to be seen 12 times over the past year, but only four of these appointments were completed. On four occasions, he was not seen due to "no provider," including one occasion where this was personally written by the doctor. On three occasions he was marked "no show" and one visit was cancelled due to a lockdown.

On three of the four occasions that he was seen, he was using his rescue inhaler multiple times a day and required intensification of his treatment regimen.

During his 11/1/13 visit, he was using his inhaler four times per day and reportedly "coughing nonstop." He was wheezing on exam. Medications were added and a four-week follow-up visit was requested; however, he was not seen again for $3^{1}/_{2}$ months due to three "no shows" and a lockdown.

*Opinion*: This patient has not received timely care for his poorly controlled asthma.

**Patient #14**

This is a 45-year-old man with asthma. His chronic care over the past year unfolded as follows:

On 2/1/13, the patient was seen for his annual chronic care visit. He reported that his last asthma attack was "a long time ago" and that he had run out of both his inhalers four months ago. His peak flows were low at 450/450/400. There was no wheezing on exam. Given his reportedly good control, his inhaled steroid was discontinued and the albuterol renewed.

On 6/1, he reported no recent attacks but was using his rescue inhaler twice a day. His peak flows were low at 450/450/450. Lungs were clear. His inhaled steroid was renewed and a chest x-ray was ordered.

On 8/21, he was scheduled but not seen due to a lockdown.

On 10/22, he reported that he had been using the rescue inhaler 3-4 times per day but ran out four months ago. His peak flows were low at 250/355/400. The inhaled steroid was increased and the rescue inhaler was reordered. The patient was discouraged from "overusing" his rescue inhaler.

On 10/28, he was not seen due to "no provider."

At the 2/4/14 visit, he reported that he was using his rescue inhaler twice a day. Peak flows were low at 400/400/425 and loratadine was added.

*Opinion*: This patient should not have run out of his inhalers. It seems distinctly possible that the patient was "overusing" his inhaler because his asthma was poorly controlled.

**Patient #15**
This is a 59-year-old man with asthma. In the past year, he was scheduled nine times and seen on five occasions. Twice he was not seen due to "no provider," once due to a lockdown, and once he left without being seen. Though his peak flows were low, he was relatively asymptomatic until October 2013, when he experienced an exacerbation due to allergies. He was treated appropriately and referred to nurse sick call for follow up.

*Opinion*: This patient had multiple interruptions in his chronic clinic visits.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. The service is a "fax and fill" system, which means patient prescriptions faxed to the pharmacy today by 2:00 p.m. will arrive at the facility the next day. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 31-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. A local "back-up" pharmacy is used to obtain medication which is needed immediately and is not available in stock. The medication storage area is staffed with one full-time pharmacy technician, and Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the

Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication storage area revealed a clean, well-lighted and generally well-maintained area. An

interview with the pharmacy technician revealed a knowledgeable individual. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and medical tools. A random inspection of perpetual inventories and counts indicated all were correct. Inspection of the medication preparation room revealed a clean, well-lighted and well-maintained area. A random inspection of perpetual inventories indicated all were correct. Medication is administered by registered nurses (RN) and licensed practical nurses (LPN). Due to the cell houses being multi-tiered and not having elevators, nursing staff are unable to take medication carts to the cell houses or administer medication directly from the patient specific bubble pack. Instead, the nurse takes the appropriate dose from the bubble pack and places it in a small medication envelope which has been labeled with the inmate's name, number, name of the medication, the strength, the dosage and the cell number. The nurse then proceeds to each cell house, reports to security and is provided a security escort to go cell-to-cell. The cell houses have open-barred doors. The inmate is responsible to come to the door with a beverage and identification. The nurse positively identifies the inmate, pours the pills into the inmate's hand and observes as the inmate takes the medication, drinks and swallows. The nurse then conducts a mouth check to assure the inmate has swallowed the medication. The nurse repeats this process until all medications are administered. When completed, the nurse returns to the health care unit and documents the administration, refusal or absence on a patient-specific medication administration record (MAR). Observation of the process revealed administration by a LPN, who properly identified the patients, administered the medication, observed the ingestion, performed a mouth check and documented the administration on the MAR. Even though it is institutional policy that security staff escorts nursing staff during medication administration, after approximately 10 minutes, the security officer left the nurse and did not return. The nurse continued with medication administration until the cell house was completed.

## Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides 0.5 FTE of phlebotomy to draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. There were no reports of any problems with this service; however, the phlebotomy position should be increased to 1.0 FTE. UIC reports all reportable cases to both the facility and the Illinois Department of Public Health. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate that expires June 13, 2015 on file. There were no reports of any problems with this service.

# Urgent/Emergent    Care

## Offsite Services/Emergencies

We reviewed six records of patients sent offsite on an emergency basis. Four of the records demonstrate concerns with regard to either the responses onsite prior to the send out or the care following return. A common pattern throughout is the absence of emergency room reports.

### Patient #1

This is a 32-year-old male with a prior open reduction and internal fixation of the humerus after a motor vehicle accident in 2002. On 11/14/13, while lifting weights in the gym, a barbell accidently struck his head. He came to the medical unit and was treated symptomatically and was to be followed up in five days. One day later he complained of severe headache and dizziness. He was given cool compresses and referred to the physician. When seen by the physician three days later on 11/18, he was given a medicine used to treat migraines for two weeks. A day later an order was written for a lay-in and skull x-rays along with cold compresses and he was to be reevaluated in two days. On 11/20, he continued to complain of dizziness and so he was referred to RN sick call to be seen on 11/23. However, his visit from 11/23 was rescheduled to 11/25 and then to 11/27. Meanwhile, because of severe symptoms, on 11/21 he was sent to the emergency room, where he finally received a brain scan. Fortunately, the scan was negative and he returned to the prison and was seen on return by the physician. In our view there was a significant delay in accessing the necessary CT scan which could have early on provided some reassurance with regard to the nature of his problem.

### Patient #2

This is a 78-year-old male with asthma, hyperlipidemia, a history of a heart attack and hypertension. On 11/19/13, he complained of chest pain and was sent out a few hours later and returned four days later from St. Joseph's Hospital. On return he was seen by a nurse and sent to the infirmary. There were some hospital records in the chart, but most importantly no discharge summary. Several staff informed us that it was difficult if not impossible to obtain a discharge summary from patients sent to St. Joseph's Hospital. This patient was admitted for 23 hours to the infirmary and was discharged one day later. There is a note written in the chart by the physician which does not mention the patient's release to the housing unit. This patient's pain persisted and the patient was seen on 1/17/14 in the chronic care clinic. At that time, he indicated that he was using nitroglycerin for chest pain daily. His lipids were elevated. The patient was referred to the physician but still had not been seen as of 2/19. The Medical Director who tends to see these cases is booked up for a little more than a month. After our discussion this patient was seen on 1/24 by the physician.

### Patient #3

This is a 64-year-old male with coronary artery disease and prior stent placement along with hyperlipidemia, benign prostatic hypertrophy, rheumatoid arthritis and a prior cholecystectomy. On 12/6/13, he was sent out as a possible stroke. He presented with swollen hands and wrists and a sore neck along with a facial drop and he was very slow to respond. He was sent to the hospital via ambulance and returned a few days later. There is no discharge summary available; there was also no nursing note upon return. Apparently the hospital diagnosis was rheumatoid arthritis, a

flare-up, which does not really explain his slow responsiveness. He was followed up by an advanced level clinician on 2/11 and 2/16.

**Patient #4**

This is a 53-year-old male with a history of seizures, chronic chest pain and multiple stent placements. He has proven to be a difficult patient, with intermittent refusal of blood pressure medicines which then tends to lead to an elevated blood pressure and the presence of chest pain. He was admitted to the infirmary on 7/1/13 for a severely elevated blood pressure and released a day later when the blood pressure returned to normal. He also has occasionally been uncooperative with regard to vital signs. On 7/15, he refused his meds because they were crushed due to prior problems. He was counseled and scheduled to see the physician 10 days later, but a day later his blood pressure was found to be low as was his pulse and he was lightheaded. So he saw the physician urgently and the physician discontinued the use of crushed medications. He was placed in the infirmary for observation. On 7/26, he was noted to be in poor control with regard to his hypertension and on a recheck one hour later he was still poorly controlled. Despite this he was released to his cell house. At 10:00 p.m. the same day he was complaining of severe chest pain. The physician was called and the patient was placed in the infirmary for observation. The blood pressure at that time as well as a repeated blood pressure demonstrated poor control. Despite the poor control, he wished to return to his cell house. A day later, he indicates he feels his blood pressure is high and in fact it was severely elevated, along with a rapid pulse rate. A physician on call in the evening ordered medications, which were not successful in controlling the pressure for the next three days. Despite this he was eventually returned to the cell house. On 9/18, he complained of dizziness and his blood pressure was found to be extremely low. He was given IV fluids and sent to the hospital and returned five days later. At the time of return, his blood pressure was elevated but he had no complaints. He was sent for observation in the infirmary and seen by the MD one day later. Again, there is no discharge summary from the hospitalization. The absence of timely or any discharge summaries and also emergency room reports clearly compromises the ability of the onsite staff to timely and appropriately follow up on patient needs.

## Scheduled Offsite Services-Consultations/Procedures

We were informed that when an advanced level clinician orders a consultation or a procedure it is reviewed by the onsite Medical Director and if he concurs it is submitted to the Wexford UM program and discussed on Mondays with a physician in Wexford's central office. We were also told that if it is not approved, an alternate plan is recommended. Ultimately, once the approval is obtained the Wexford central office contacts UIC for the scheduling of the appointment. We learned, however, that sometimes more than a month can elapse after the approval before UIC receives the information regarding the approval.

We reviewed nine records of patients scheduled for either a consultation or a procedure. We reviewed these records with regard to the appropriateness and timeliness of the request as well as the timeliness of the service and the appropriateness of the follow up onsite. Six of the nine records demonstrated problems.

**Patient #1**

This is a 23-year-old male with type 2 diabetes and hypertension along with diabetic neuropathy and stage 4 chronic kidney disease. In addition, he also had erosive gastritis. On 10/30/13, he was scheduled for a vascular surgery consult regarding his chronic kidney disease. There is no report in the chart and no mention in any progress note since. The patient did go to the clinic but there has been no follow up.

**Patient #2**
This is a 51-year-old male with type 2 diabetes mellitus who was scheduled for an ear, nose and throat consultation on 10/30/13. He had been sent there because of difficult to control epistaxis. He saw the ENT specialist and there is a nursing note upon return, but there has been no physician follow up and no orders written consistent with the ENT recommendations.

**Patient #3**
This is a 53-year-old with no chronic problems who was scheduled for the vascular lab on 11/1/13. There is a note by the physician assistant regarding the pre-op meds and the vascular note is in the chart. There has been no follow up since by a physician.

**Patient #4**
This is a 39-year-old with scoliosis who was referred to ortho and had an appointment scheduled for 10/28/13. The report demonstrated a left meniscus tear for which an MRI of the knee and the C spine were recommended, along with an EMG of the left upper extremity. There is a nurse return note but no physician follow up note and no orders.

**Patient #5**
This is a 70-year-old who had a GU appointment scheduled for 11/6/13. This was to follow up on prostate cancer, which did not appear on his problem list; the list did include glaucoma. The report indicates that the patient needs a CT scan and a bone scan. There is no physician follow up note but there is a nurse note which indicates the patient went for the CT scan, but there is no report from the CT scan nor are there any follow up notes by a physician.

**Patient #6**
This is a 47-year-old male with sickle cell trait and asthma who was sent to general surgery for an appointment on 10/28/13 for an evaluation of a right inguinal hernia. The patient went and there is a return note by a registered nurse. There is a report from the general surgeon in the chart which recommends right inguinal hernia robotic repair. There has been no follow up of any kind.

# Infirmary

The infirmary is located within the Health Care Unit. The infirmary floor plan is a rectangle, two long hallways and two short hallways. The nursing station is located in the center of the rectangle and has access to both long hallways. Patient rooms are located along the outer perimeter of the rectangle. Access to the infirmary is controlled by security staff posted just outside the infirmary. The unit is staffed 24 hours a day, seven days a week. Staffing consists of both RNs and LPNs with at least one RN on duty each shift. There are a total of 32 infirmary beds configured as 10 single cells and 11 double cells. Included in the cell configuration are two negative air pressure respiratory isolation rooms.

The beds in the 10 single rooms are an all-metal frame with a thin plastic covered mattress and 18 to 24 inches off the floor. The beds in the remaining eleven rooms are a combination of traditional single beds and hospital beds. Only five of these 22 beds allow for the head or foot to be elevated. These beds do have a thicker plastic coated mattress and are located higher off the floor. On the day of the inspection, there were a total of 28 patients classified as follows:

1. Five mental health
2. One hunger strike
3. Two acute care patients; one uncontrolled diabetic and one follow-up heart attack and uncontrolled blood pressure
4. Twenty classified as chronic care

As reported by nursing staff, the patients requiring the most care are noted as follows:
1. Two paraplegic patients
2. One patient with cancer of the prostrate which has metastasized to the spinal cord
3. One post-stroke patient
4. One Alzheimer patient
5. One cancer patient

A review of the medical records of the patients in these five categories revealed more frequent visits and documentation by the physician than required by policy. Nursing staff, too, was documenting more frequently than required by policy. Review of the documentation indicated provider specific issues as to the frequency, quality and completeness of documentation. Inmate porters perform the housekeeping/janitorial duties and are supervised by both nursing and security staff. There is no evidence inmate porters receive any specialized training in regard to appropriate cleaning and sanitizing in the health care unit.

There is a 32-bed infirmary. At the time of our visit, there were 24 Stateville inmates in the infirmary, six from NRC and two empty beds. Of the Stateville inmates, 14 were chronic/long term admissions, five were for mental health reasons and five were for acute illnesses. One of these acute admissions was a man on a hunger strike, and two of the four remaining had been discharged the morning of our visit.

The Medical Director stated that he rounds daily but does not always write a note. Indeed, according to our record reviews, it appeared that patients were not seen as frequently as policy dictates, either by the physician or by the nursing staff. We also had concerns regarding the quality of the health care provided to the patients, as outlined in the cases below.

We reviewed the following acute admissions.

### Patient #1
This is a 54-year-old with diabetes, hyperlipidemia and coronary artery disease who had bypass surgery in December 2013 and was admitted to the infirmary upon his return on 12/24. There were timely notes by the Medical Director until 12/30, but then none for two weeks. Of the 62

shifts the patient spent in the infirmary, there were 23 nursing notes. There were nine days which had no notes by any health care provider.

On 1/2/14, an RN note indicates that the patient went out to see cardiology for follow up; however, there is no note from cardiology. When we requested the cardiology notes and discharge summary, we were told that both UIC and St. Joe's require an authorization for release of information form before they will send reports.

*Opinion*: This patient was not seen according to policy either by the physician or by the nursing staff.

### Patient #2
This is a poorly controlled type 1 diabetic who was admitted to the infirmary on 2/4/14 for diabetic control. He also has hypertension, hyperlipidemia and hypothyroidism. He was managed on twice-daily NPH and regular insulin plus sliding scale.

As of the date of our visit (2/24), he had been seen on average once per week (February 4, 6, 11, 19, 24) by the physician. There were nurses notes at least daily on 18 of the 21 days he had been in the infirmary, but on three days, there were no notes at all (provider or nurse); February 12, 15, 17.

Shortly after his admission (2/6), blood work revealed that the patient's thyroid medication dose was too high (low TSH, high T4). This report was signed by one physician with attention to the other, but neither doctor adjusted the thyroid medication dose.

On the same lab report, the patient's potassium was found to be elevated (5.5) and he was on several medications known to cause hyperkalemia, including an ACE inhibitor and aldactone. No changes have been made to the meds and the potassium has not been checked since.

*Opinion*: This patient was not seen timely according to policy. We discussed this patient's lab abnormalities with the Medical Director, who had a plan in mind, but this was not articulated in the health record.

### Patient #3
This patient was admitted for acute care on 2/17/14 via telephone order after he was discharged from St. Joe's following an acute MI. He was returned from the hospital to Stateville on 2/19. Staff requested hospital reports but were basically provided only a cardiology consult and some laboratory results. Notably absent was a discharge summary which would have been critical to understanding the hospital's findings and recommendations. The Medical Director did the admission note on 2/19 and saw the patient again on 2/24. The patient's blood pressure has been uncontrolled for the entirety of his stay in the infirmary, with multiple dangerously high readings (170/60, 200/80, 220/78, 190/80, 218/70, 180/68, 210/70, etc.), but these readings were often not addressed.

On 2/20, the patient's blood pressure was 220/78 and 190/80 on recheck. The Medical Director was notified but no new orders were obtained.

On 2/21, the patient's blood pressure was 170/70 and the RN noted "MD aware," but took no new orders. Later that day, the LPN called the Medical Director three times and left messages for blood pressure readings of 190/80 and 160/68, but no new orders were received.

On 2/22, the nurse contacted the Medical Director for a blood pressure of 201/70 and received an order to start hydrochlorthiazide 25 mg/d. Later that evening, the nurse called back to report that the blood pressure was unchanged. The Medical Director responded by switching one of his blood pressure medications to another similar drug, which resulted in essentially no change at all.

The next day, the patient's blood pressure was better initially (117/52, 124/56) but by evening it was back up to 188/92.

On 2/24, the physician saw the patient, whose blood pressure was 186/84. He noted, "blood pressure not controlled yet," but made no medication changes.

*Opinion*: This patient's blood pressure has not been managed adequately, particularly in light of his recent heart attack.

**Patient #4**
This is a 60-year-old male with a history of hypertension, peptic ulcer disease, hepatitis C, COPD and he returned status post tracheostomy. He was admitted to the infirmary at Stateville after return from UIC on 1/25/14. In a progress note, his acuity level is described by the physician but there is no order and there were several days in February with no nursing notes, including 2/17, 2/18 and 2/22. This case is a reflection of the confusion around the use of an acuity level that determines the minimal frequency for both advanced level clinician as well as nursing assessments.

# Infection Control

There is a named infection control nurse who is responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens and compliance with Illinois Department of Public Health reporting requirements. Additionally, this nurse is responsible for the HIV and Hepatitis C clinics.

The facility has a contract with a large national medical waste disposal company which comes on-site two times per month to haul away medical waste. There were no reported issues with this service.

Inspection of the infirmary, urgent care/emergency room, dental clinic, sick call areas in the medical department and cell houses and emergency response bags verified the presence of personal protective equipment. Puncture proof containers for the disposal of sharps are in use in all medical areas and are appropriately placed in the medical waste containers when full.

Inmates assigned as "porters" in the Health Care Unit and who perform janitorial duties may or may not have received any training as to appropriate cleaning and sanitation methods. They are

required to watch a blood-borne pathogen educational video and are supervised by both nursing and security staff.

Reportable STIs are picked-up and reported by UIC.

There are two negative air respiratory isolation rooms located in the infirmary. Both visual and audible alarms indicate when negative air has been lost. Additionally, nursing staff conduct a negative airflow tissue test daily when the rooms are occupied and weekly if not.

All mattresses on the infirmary beds are plastic coated and are cleaned and sanitized between patients and as needed.

When required, the infection control nurse interfaces with the County Department of Public Health and the Illinois Department of Public Health (IDPH). The nurse monitors, completes and submits to IDPH all reportable cases. Skin infections and boils are aggressively monitored, cultured and treated. Health Care Unit nursing staff conduct monthly safety and sanitation inspections in the dietary department and perform pre-assignment "food handler" examinations for staff and inmates to work in the dietary department. A tour of the health care unit, including the infirmary, verified personal protective equipment (PPE) available to staff in all areas as needed. Additionally, PPE is included in the emergency response bags and in the cell house sick call rooms. Puncture proof containers for the disposal of syringes/needles and other sharp objects are in use in all areas of the health care unit as needed and in the cell house sick call rooms. The facility uses a national commercial waste disposal company for disposing of medical waste. Institutional staff is trained in communicable diseases and blood-borne pathogens.

# Inmates' Interviews

Five insulin dependent inmates were interviewed. All five had been diagnosed several years previously, and all five were knowledgeable regarding their chronic disease. All five were knowledgeable regarding the significance of their hemoglobin A1c blood level. Four of the five knew the results of their most recent hemoglobin A1c blood level. All five reported being evaluated by the physician every 3-4 months and having the ability to perform blood glucose monitoring prior to the administration of insulin. All five were of the opinion that the physician responsible for their diabetic care does a "good job."

All five patients voiced the following issues:
1. Very little educational literature provided/available
2. Difficulty obtaining medication when first ordered and sometimes with refills
3. Difficulty receiving shoes ordered by the physician because they are denied by the medical vendor
4. No podiatry care
5. No on-site dietician
6. When evaluated by an off-site specialist, there is difficulty getting back to see the specialist and the institutional medical vendor does not follow the suggestions/orders of the specialist

7.  Security staff not following physician orders, i.e., not allowing plastic basins for foot soaks
8.  Being cuffed from behind too tightly and for too long
9.  Breakfast starting between 1:00 and 2:00 a.m.; lunch starting at 9:00 a.m.
10. Sometimes receive insulin prior to eating and sometimes after eating.

# Dental Program

## Executive Summary

On May 21 and 22, 2014, a comprehensive review of the dental program at Stateville CC was completed with the following observations and findings.

The clinic itself is rather large and well equipped. Cabinetry and countertops are old, worn and damaged, making proper disinfection almost impossible. It is time for replacement. Although the staffing level for the providers is adequate, the lone dental assistant is overworked and often not available to assist at chair side. A second dental assistant should seriously be considered.

A major area of concern was that comprehensive care was provided without a comprehensive intra and extra-oral examination and well-developed treatment plan. A documented soft tissue examination was not provided nor was periodontal assessment part of the treatment process. Appropriate radiographs were not always available and provision of hygiene care and prophylaxis was inconsistent. Oral hygiene instructions were seldom documented.

Another area of concern was dental extractions. All dental treatment should proceed from a documented diagnosis. The reason for extractions should be part of the record entry. This was often not the case. Also, proper diagnostic radiographs were not always present. This is a serious omission. Antibiotics were often prescribed prophylactically after extractions with no diagnosis, or indication why there were provided. This is not a standard of care.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A record review revealed that all partial dentures proceeded without a comprehensive examination and treatment plan. Periodontal assessment and treatment was not provided. Oral hygiene instructions were seldom included. It was almost impossible to demonstrate that all fillings and extractions were completed prior to impressions. Periodontal health was never documented.

At Stateville CC, sick call is accessed through the inmate request form. There was no real triage system in place to evaluate urgent care needs, i.e., pain and swelling. Inmates with urgent care complaints from the request form often took six to seven days to be seen by the dentist or other appropriate health care provider. These inmates should be seen within 24-48 hours from the date of the request form.

In none of the records reviewed was the SOAP format being used. Treatment was provided with little information or detail preceding it. Record entries did not include clinical observations or diagnosis to justify treatment.

A well-developed Policy and Procedural Manual insures that a dental program addresses all essential areas and is run with continuity. The Policy and Protocol manual at Stateville CC only addressed dental personnel and their duties and responsibilities. This is not at all adequate. Issues such as access to care, dental services, provision of care, clinical management, infection control, etc. were not included at all.

Failed appointments were a real problem at Stateville CC. A rate as high as 40% was found. This is an unacceptably high percentage and reflects a real difficulty in getting inmates to the dental clinic for appointments. This results in delayed and inconsistent treatment. The problem is compensated for somewhat by over scheduling, but this is not an acceptable, long-term solution.

Medical conditions that require precautions and consultation with medical staff prior to dental treatment should be well documented in the health history section of the dental record and "red flagged" to bring them to the immediate attention of the provider. The precautions taken should also be well documented in the record entry. Anticoagulant therapy is a good bellwether condition to track the above. In three of the six records reviewed, no health history was documented at all on the dental record. None of the records were "red flagged" for anticoagulant therapy or any condition requiring precautions.

Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinicians indicated that they do not routinely take blood pressures on these patients.

Although dental contributes to the Continuing Quality Improvement program at Stateville CC, it should invigorate and expand the CQI process to address the weaknesses outlined in this report.

## Staffing and Credentialing

Stateville CC has a dental staff of one full-time dentist, one 20 hour part-time dentist, two full-time assistants, and a full-time hygienist. This should be adequate to provide meaningful dental services for Stateville's 2000 inmates. Dr. Mitchell is employed by the IDOC and all the rest of the staff are contracted by Wexford Health Services.

CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists. The number of dentists and hygienists is adequate to meet the needs of this institution. The lone assistant is overworked in a clinic with this many dentists. On the whole, this is a strong team that works well together to create a very busy and smooth running clinic.

**Recommendations:**
1. Serious consideration should be given to hiring a second dental assistant. The lone assistant has too many duties to perform and the dentists are often left working without an assistant. This is professionally very unrewarding and can present risks to the patient. All surgeries should be performed only with an assistant.

## Facility and Equipment

The clinic consists of four chairs and units in a spacious single room area. One of the units is dedicated to hygiene care. The dental units were rather new and in good condition. The chairs were over 20 years old but were not torn or overly worn, and functioned well. Cabinetry was very old and worn. Counter tops were broken, corroded and badly water damaged in one of the corners. There was extreme water damage in the cabinet under the sink. Work surfaces were badly pitted and catered from use. Plexiglas was placed over these surfaces to provide a smooth work surface capable of disinfection. The x-ray unit is in good repair and works well. The autoclave is rather new and functions well. The compressor is in good repair. The instrumentation is adequate in quantity and quality. The hand pieces are older but well maintained and repaired when necessary. The ultra-sonic unit was not working at the time of my visit. I was told that a request for repair had been submitted.

Again, the clinic itself consisted of four chairs in a spacious work area. Free movement around each unit was acceptable Providers and assistants had adequate room to work, and none of the chairs interfered with each other. There was a separate large sterilization and laboratory area of adequate size. It had a large work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate area of this space and did not interfere with sterilization. The staff had a separate rather small room for office space.

**Recommendations:**
1. Replace the cabinetry and countertops as they are very old, worn and irreversibly damaged. Proper infection control is almost impossible on these surfaces.

## Sanitation, Safety and Sterilization

We observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on some of the surfaces. Unit recycling was thorough and adequate. All in all, the clinic was neat, clean and orderly.

An examination of instruments in the cabinets reveals that all were properly bagged and sterilized and stored. No instruments were maintained in bulk. All handpieces were sterilized and in bags.

The sterilization procedures themselves were adequate and proper. Flow from dirty to clean to sterilized was improper, as bagging of instruments was done in front of the ultra-sonic unit. Cleaned instruments were passed back over the dirty area. The ultra-sonic was not functioning at the time of my visit.

There was not a biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. I also observed that no warning sign was posted where x-rays were being taken to warn pregnant females of possible radiation hazards.

## Review Autoclave Log

A review of spore testing logs revealed that a "Maxi-test" in office biological indicator system was in use. The incubator was maintained in the sterilization area. The results were logged weekly. There was a gap in logged results from the last week of January to the first week in April with no real explanation provided. I was assured that the testing was done during this period. It is essential that these logs be accurately maintained over a long period of time.

**Recommendations:**
1. That the sterilization spore testing log be accurately maintained and kept on record indefinitely.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant females.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients.

One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well-documented intra and extra-oral examination and a well-developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed no comprehensive examination was performed in three of the records and very minimal examinations in three others. In only four records did a meaningful comprehensive examination precede routine care. No examination of soft tissues or periodontal assessment was part of the treatment process. Hygiene care and prophylaxis was inconsistent, provided in six of the 10 patient records. A further review showed that bitewing radiographs were part of the treatment process in eight of the 10 records. Restorations were, in two of the 10 patients, provided from the information from the panorex radiograph. This radiograph is not diagnostic for caries. A periodontal assessment was not done in any of the records. Further, oral hygiene instructions were not always documented in the dental record as part of the treatment process.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well-developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or peri-apical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.

## Dental Screening

Although Stateville CC is not a reception and classification center, I reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken, to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Recommendations:** None. All records reviewed were in compliance.

## Extractions

We reviewed 10 dental records of dental surgical inmates to determine if:
1. Recent pre-operative radiographs reflecting the current condition of tooth extracted. X-rays must be diagnostic value showing apices of teeth.
2. Reason for extraction is documented.
3. Consent Form is used and signed by the patient.

One of the primary tenets in dentistry is that all dental treatment proceeds from a well-documented diagnosis. In four of the 10 records reviewed, the reason for the extraction was not documented. In two of the records, a proper diagnostic x-ray was not present. This is a serious omission. Record entries are often very difficult to follow. Treatment at times seemed disjointed and lacking in continuity. The time between appointments can be long due to rescheduling associated with failed appointments. Also, antibiotics were often given after extractions. They seemed to be provided prophylactically. This is not an indicated standard of care. They should be prescribed only when indicated by a well-established diagnosis.

**Recommendations:**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in many dental entries observed. It would also aid in establishing a better continuity of care.
2. Proper diagnostic x-rays be available for every surgical procedure.
3. Prescribe antibiotics only as necessary. Prescribing routinely after extractions is not a standard of care.

## Removable Prosthetics

We reviewed dental records of five patients having received completed partial dentures to determine if restorative procedures were completed prior to fabrication of partial dentures (68-MED-12 Dental Services D. Provision of Dental Care page 4 #5 and #9).

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. Continuity of care is important and the periodontal, operative and oral surgery needs all should be addressed first. In only one of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided. Periodontal assessment was not provided in any of the records, and in only one of the five

records was a prophylaxis and/or a scaling debridement provided. Because a comprehensive examination was part of only two records and treatment plans were very incomplete, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Recommendations:**
1. A comprehensive examination and well-developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

Inmates access sick call through an inmate request form or via a direct call from a staff member if it is perceived as an emergency. In addition to a "Request Log" that logs inmate request forms, there is an Emergency Log maintained which tracks patients seen as "emergency." These inmates are seen the same day as the request. For 2014 thus far, 12 inmates were seen as an emergency. All were toothaches, abscesses or trauma.

There is no real triage system in place to evaluate urgent care needs (toothaches, pain, swelling) from the request forms. Of the inmates placed in the Request Log, the average wait for appointment was about 12 days. This is for all request forms. Of the requests logged in as toothaches, pain, or swelling, the average wait was approximately six to seven days. These inmates should be seen within 24-48 hours.

In none of the dental records reviewed was the SOAP format being used. As a result, treatment was usually provided with little information or detail preceding it. Sick call record entries often did not include clinical observations or diagnosis to justify provided treatment. Little continuity was established. The use of the SOAP format would insure that a well-developed diagnosis would precede all treatment. In all records, the immediate complaint was addressed. Only emergency care was being provided.

**Recommendations:**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed and a thorough focused examination and diagnosis precedes all treatment.
2. Develop a triage system that insures that inmates with urgent care complaints are seen in a more timely manner, 24 to 48 hours.

## Treatment Provision

There is no real triage system in place. The only triage system at this institution is from the request form itself. All request forms are logged into a "Request Log." Of all of the request

forms place in this log, the average wait for appointment was about 12 days. Of all of the requests forms with complaint of pain, toothache, or swelling, the average wait was six to seven days. This is an unduly amount of time. Of all the request forms, 15% are urgent care complaints (pain, toothaches, swelling). This is only about one per day. These inmates should be seen within 24-48 hours.

Inmates can seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting Stateville CC staff, who will then call the dental clinic with the inmate's complaint. The inmate is seen that day for evaluation. Request form complaints from inmates with urgent care needs (complaint of pain or swelling) are not seen until six to seven days later. Mid-level practitioners are available at all times to address urgent dental complaints. They can provide over-the-counter pain medication or call medical/dental staff if they feel more is needed. However, this is seldom the case.

Inmates who submit request forms for routine care are seen and evaluated in about 14 days. They are placed sequentially on a waiting list. The system seems fair and equitable.

**Recommendations:**
1. That a meaningful triage system be established such that inmates with complaints of pain are identified and prioritized.
2. That inmates with urgent care complaints are provided timely and appropriate evaluation and care. Six to seven days is not acceptable. Seeing that one per day urgent care complaint should be very doable.

## Orientation Handbook

A review of the "Offender Orientation Manual" for Stateville CC and the NRC revealed that dental was well represented and the instructions as it relates to access to care is adequate.

**Recommendations:** None

## Policies and Procedures

A well-developed Policy and Procedures manual insures a dental program that is well understood and run with continuity. It addresses all aspects of the dental program to provide consistency of care and management. The policy and protocol manual for the dental program at Stateville CC addresses only dental personnel and their duties and responsibilities. It only states that the dental program is responsible to provide dental care to the offender population. No specifics were provided on access to care, provision of care, clinic management, dental services provided, infection control, etc. The dental director said that this was developed by administration who thought it was sufficient.

**Recommendations:**
1. Develop a thorough and detailed Policy and Procedures manual that describes and guides all aspects of the dental program at Stateville CC. It should include all of the areas indicated above.

## Failed Appointments

A review of monthly reports and daily work sheets revealed a failed appointment rate that averaged 40%. This is a very high percentage and reflects a serious problem in getting inmates to the clinic for their appointment. I was told that they shared my concern and were frustrated at the lack of success in addressing this problem. I was told that the reasons for failed appointments included the following:

- Inmates do not get their passes
- Inmates go to other programs or appointments
- Inmates go to recreation
- Inmates go to commissary
- Inmates in lockdown

The percentage does reflect lockdown days, which average about two a month. The problem is compensated for by overscheduling every day. As such, a large number of inmates are seen every day, and a large number also fail to show.

I discussed this issue with the administrative staff, including the Warden, and they shared the concern and frustration of the dental staff and want to help them address the problem.

**Recommendations:**
1. Work with the institution administration to develop and implement strategies to address this problem.
2. Utilize a vigorous Continuing Quality Improvement process to address this problem. Use these finding to implement procedures to continually improve this high rate of failed appointments.

## Medically Compromised Patients

A review of six dental records of inmates who were on anticoagulant therapy revealed that three of the records had no health history documentation as part of the dental record. In the other three records, it was documented and red flagged. In all cases of provided dental care to these patients, medical staff was consulted and anticoagulant therapy precautions were addressed and followed.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken on patients with a history of hypertension, especially prior to any surgical procedure.

## Specialists

Dr. Frederick Craig, oral surgeon, is available on an as-needed basis, usually once a month, sometimes twice. Dr. Craig is also used by several other IDOC institutions for oral surgery. The dental program also utilizes Joliet Oral Surgeons, a local oral surgery group, for more difficult cases and for general anesthesia. Pathology services are the same as for medical pathology. They give the specimen to the appropriate medical person for processing. All radiographs were current and all record entries were adequate. The NRC utilizes these services through Stateville CC.

**Recommendations:** None

## Dental CQI

The dental program contribution to monthly CQI includes a thorough documentation of dental statistics and productivity numbers. There is an ongoing quality improvement report for the dental program that seeks to improve the ability of segregation inmates to get to the dental clinic for their appointments. It is a study that looks at the reasons why they are not getting to the clinic. These finding must be used to develop procedures to improve this problem. Consideration should be given to conduct ongoing studies with the NRC.

**Recommendation:**
1. Because of the number of deficiencies noted in the dental program, a more vigorous CQI program should be implemented to address these deficiencies. From the CQI process, policies and procedures should be established that will continually correct these deficiencies to develop a stronger program.
2. Include the NRC in this invigorated CQI process. Many areas need to be addressed for improvement at that institution.

# Continuous Quality Improvement

There have been no CQI meetings since October and no minutes were available since 7/13/13. The minutes we were shown contained no narrative, no analysis of the data presented and no studies. This can only be characterized as a non-functioning quality improvement program. The health care unit administrator is to be the QI coordinator, but she has been off due to medical leave. With regard to grievances, there is no medical grievance coordinator at either Stateville or NRC. They do report grievances, but despite the fact that the number of grievances for each month is supposed to be listed, it appears that there was a year with no grievances. Also, the grievance process never includes interviewing of the grievant. This is a non-functioning medical grievance process.

# Recommendations

**Leadership and Staffing:**
1. Stateville requires its own Health Care Unit Administrator position.
2. Stateville requires its own staffing allocation specifically to meet the Stateville service demands.
3. Only trained primary care clinicians (Internal Medicine and Family Practice) should be providing primary care to this population.
4. Physicians should be board certified in a primary care field.
5. All health care providers should have access to electronic medical references.

**Clinic Space and Sanitation:**
1. Designated exam rooms should be made available with appropriate equipment in cell houses B, E and F to allow sick call to occur with reduced movement demands.

**Intrasystem Transfer:**
1. The intrasystem transfer process needs to be appropriately addressed to effectively insure continuity of care for patients who enter with prior diagnosed problems. This should be monitored by the QI program.

**Sick Call:**
1. Custody issues should not interfere with the provision of timely health care.
2. There should be no such thing as a "no show" in a prison. Patients may refuse care but should be required to report to the health services area when scheduled.

**Chronic Disease Clinics:**
1. Patients should be scheduled in accordance with their degree of disease control, with more frequent visits when disease control is poor and less frequent visits for those under good control. This is a statewide policy issue which needs to be corrected.
2. For Diabetes Clinic:
   a. Meals should be served on a predictable schedule to facilitate the coordination of insulin administration with food consumption.
   b. Type 1 diabetics should have access to physiologic insulin replacement with 3-4 injections per day if needed.
3. For HIV Clinic:
   a. Patients with HIV infection should be formally enrolled in the chronic care program just as patients with other diseases are.
   b. Facility clinicians should be providing primary care to this population. This would include actively monitoring this high-risk population for medication compliance, side effects, and the primary care complications related to the disease and its treatment, such as hyperlipidemia, diabetes and cardiovascular disease.
   c. The chronic care nurse should be doing medication compliance checks with HIV patients at least monthly.

**Urgent/Emergent Services:**
1. The urgent/emergent program requires review and feedback both with regard to timeliness, appropriateness and continuity of care. This should be done by clinical leadership and the QI program.

**Scheduled Offsite Services-Consultations/Procedures:**
1. Scheduled offsite services need to be improved with regard to timeliness of access to these services as well as follow up after the service is provided.
2. There should be a reliable method of communication between the scheduler and the clinicians to ensure that patients who require specialty consultation are scheduled commensurate with the urgency of their need.

**Infirmary:**
1. Patients should be seen timely according to policy requirements while in the infirmary.
2. If clinicians choose not to treat patients according to currently accepted recommendations and guidelines, the rationale for these decisions should be articulated in the health record.

**Continuous Quality Improvement:**
1. The CQI program, which should have identified many of these programmatic deficiencies must be reinvigorated with leadership that has had appropriate training with regard to quality improvement philosophy and methodology.
2. There should be professional performance reviews with feedback, both for the advanced level clinicians and nurses with regard to the sick call process.
3. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
4. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

## Intrasystem Transfer:

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |

## Provider Sick Call:

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |

## Offsite Service/Emergency:

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |

## Scheduled Offsite Service:

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |

## Chronic Disease Management:

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |

| | | |
|---|---|---|
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |
| Patient #13 | [redacted] | [redacted] |
| Patient #14 | [redacted] | [redacted] |
| Patient #15 | [redacted] | [redacted] |

**Nurse Sick Call:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |
| Patient #8 | | [redacted] |
| Patient #9 | | [redacted] |
| Patient #10 | | [redacted] |

**Infirmary:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |