IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WENDELL WEAVER #R47387, | ) |
| Plaintiff, | ) No. 15 C 2950 |
| v. | ) Hon. Virginia M. Kendall |
| JACQUELINE MITCHELL, D.D.S, and RANDY PFISTER, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

After a trial, a jury found in favor of Defendants Jacqueline Mitchell, D.D.S. and Stateville Correctional Center Warden Randy Pfister and against Plaintiff Wendell Weaver on his claims of deliberate indifference to his serious medical needs under 42 U.S.C. § 1983 stemming from his receipt of allegedly inadequate dental care. Weaver has moved for a new trial under Federal Rule of Civil Procedure 59(a). (Dkt. 164). The Court denies the Motion for the reasons stated below.

## BACKGROUND

Plaintiff Wendell Weaver filed suit against Stateville Dentist Dr. Mitchell and Warden Pfister, alleging that Dr. Mitchell provided Weaver with constitutionally deficient dental care and that Warden Pfister was responsible for policies and procedures at Stateville connected to the deficient care. *See* (Dkt. 45). Weaver proceeded to trial against both Defendants on claims regarding his first left bicuspid ("#12 tooth"), on which Dr. Mitchell performed a root canal and which later broke and became abscessed. Specifically, Weaver argued that deliberate indifference was shown through Dr. Mitchell's failure to provide proper dental treatment (Count I); Dr. Mitchell's failure to promptly reschedule dental treatment (Count II); Pfister's improper denials of dental treatment through the policies he oversaw (Count III); and Pfister's failure to direct the

1

Stateville Healthcare Unit to promptly reschedule treatment appointments (Count IV). On February 8, 2018, a jury returned a verdict in favor of Defendants Dr. Mitchell and Pfister on all four counts, and judgment was entered. (Dkts. 160, 162).

Now before the Court is Weaver's Motion for a New Trial (Dkt. 164), in which he argues that a new trial is warranted because (1) the jury's verdict was against the manifest weight of the evidence, and (2) Dr. Mitchell gave false testimony at trial.

## LEGAL STANDARD

Rule 59(a) authorizes the Court to order a new trial as to some or all issues that were tried to a jury. *See* Fed. R. Civ. P. 59(a)(1)(A). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014); *see also Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). "The ruling on a motion for a new trial is a matter committed to the district court's discretion." *Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012).

## DISCUSSION

**A.     Weight of the Evidence**

In arguing that the verdict for Defendants is against the manifest weight of the evidence, Weaver contends that he proved each of the four elements of his deliberate-indifference claim "with uncontroverted evidence," and therefore the Court should overturn the verdict. (Dkt. 164) at 3. When considering whether the jury's verdict goes against the manifest weight of the evidence, the Court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011) (citations omitted). "A verdict will be set aside as contrary to the manifest weight of the evidence only if 'no rational jury' could have rendered the verdict." *Moore ex rel.*

2

*Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006)); *accord Flournoy v. City of Chicago*, 829 F.3d 869, 874 (7th Cir. 2016). Federal courts will not "set aside a jury verdict if a reasonable basis exists in the record to support the verdict, viewing the evidence in the light most favorable to the prevailing party, and leaving issue of credibility and weight of the evidence to the jury." *Tuelja*, 546 F.3d at 427; *see also Flournoy*, 829 F.3d at 874. "Jury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Tuelja*, 546 F.3d at 427 (quoting *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)). In the typical case, the judge "does not act as a 13th juror in approving or disapproving the verdict." *Latino*, 58 F.3d at 315 (citations and internal quotations omitted).

To prevail on all four of the claims he brought to trial, Weaver needed to demonstrate that he suffered from an objectively serious medical condition and that the Defendants were deliberately indifferent to a risk of serious harm stemming from that condition. *Karim v. Obaisi*, 2017 WL 4074017, at *4 (N.D. Ill. Sept. 14, 2017) (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)). A medical professional will only be held liable under the deliberate indifference standard if she makes a decision that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (a prison official may be liable for deliberate indifference only if he or she "knows of and disregards an excessive risk to inmate health or safety"). Ultimately, the "decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for

providing, amounts to deliberate indifference." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015).

Here, the jury was required to determine if Dr. Mitchell's treatment of Weaver was constitutionally inadequate in light of what she knew or should have known about the condition of his #12 tooth and if Warden Pfister's policies caused a violation of Weaver's constitutional rights. A total of five witnesses testified at trial. In support of his claims, Weaver presented his own testimony, the testimony of Dr. Glen Scheive (an outside dentist), and the adverse testimony of Dr. Mitchell and Warden Pfister. Dr. Mitchell and Warden Pfister testified in defense of the claims and Sytera Sanders, a corrections counselor, also testified on behalf of the defense.

Weaver contends that Dr. Mitchell knew that (1) the prolonged root canal on his #12 tooth would cause him pain and complications, (2) his root-canaled #12 tooth needed certain restorative elements (a post, core, and crown) to prevent future breakage, and (3) he would develop or had developed an abscess on his #12 tooth. In spite of all of these things, Dr. Mitchell failed to take reasonable measures to provide treatment to Weaver by failing to (1) promptly reschedule his dental appointments; (2) provide him a post, core, and crown; and (3) promptly diagnose and treat his abscess. The gist of Weaver's post-trial argument is that his trial evidence was not directly contradicted by any defense witness. According to Weaver, "the evidence could therefore only support a verdict in favor of Mr. Weaver." (Dkt. 164) at 4. In support of his motion, Weaver points to six pages of his own testimony (regarding the pain he experienced during the root canal, his complaints to Dr. Mitchell about the pain and her responses to the same, and his testimony that Dr. Mitchell said he need a post-core-crown for his #12 tooth), Dr. Sheive's testimony that Weaver suffered bone loss and had an abscess, Dr. Mitchell's testimony regarding abscesses and bone loss

4

generally, and Dr. Mitchell's testimony concerning her prescription of a pain killer and antibiotic for Weaver on January 12, 2012 without bringing him in for an exam.[1] *See id.* at 3–4.

However, a simple review of the record reveals that more than a scintilla of evidence was introduced at trial to refute Weaver's claims. Taking them one by one, as to the prolonged root canal, for context, Dr. Mitchell testified as to how dental appointments were scheduled at Stateville and how they can be requested by inmates by putting a request on their bars, handing them to the nurses that walk the cell houses, handing them to corrections officers, or asking other inmates with appointments to deliver them. (Dkt. 163) ("Tr.") at 166:12–169:7. She also testified as to the reasons why appointments may be cancelled or rescheduled: inmates might not show up for the appointments for reasons in and out of their control, scheduling issues particularly with inmates of different classes (for example, segregated population inmates), lockdowns, staff shortages, equipment failures, and lack of time. Tr. at 190:23–191:22, 197:17–201:11. With regard to Weaver specifically, Dr. Mitchell walked through his dental records at trial. Her testimony was that although Weaver missed some five scheduled appointments between December 7, 2011 (when the root canal therapy was initiated) and May 15, 2012 (when it was completed) on account of lockdowns, staff shortages, and his failure to appear, he was scheduled and seen on eight other occasions during this same time frame. Tr. at 250:13–272:14. Dr. Mitchell further testified that she did not have control over most of the various reasons for the appointment cancellations, with limited exceptions for staff and time shortages. Tr. at 316:16–317:17. For the appointments that

---

[1] At trial, Weaver argued that Dr. Mitchell started the root canal on his #12 tooth without first obtaining his informed consent to do so. This was part of Weaver's deliberate indifference theory, as he argued that Dr. Mitchell knew or should have known (because of her involvement with a root canal on Weaver's #5 tooth) that he would not have agreed to a root canal on his #12 tooth that did not also involve the post-core-crown restoration (as opposed to a conventional crown). In his motion for a new trial, Weaver mentions his "limited right to refuse unwanted medical treatment," but does not otherwise explain how this aspect of his argument entitles him to a new trial. *See* (Dkt. 164) at 4.

5

were kept, Dr. Mitchell testified about the treatment she and other dentists provided, like placing temporary fillings, drilling and sterilizing Weaver's canals after his temporary fillings fell out, and prescribing him pain medication and antibiotics on one instance where he complained of pain during the process or when she observed drainage in his canals while working on them. Finally, Dr. Mitchell testified that the length of time it took to complete Weaver's root canal—more than five months—was not unusual. Tr. at 360:8–11.

As to the restorative elements, Dr. Mitchell testified that she previously had treated Weaver while he was undergoing a root canal on another tooth (his front right bicuspid, or his "# 5 tooth"). She testified that for that particular tooth, she wrote in Weaver's dental records that he was "advised he needs a post and core and crown." Tr. at 245:12–23. She elaborated on her note, testifying that "[h]e apparently had a humongous cavity on that particular tooth when they did Number 5. . . . And so when it was time to restore it, because he had had a humongous hole on that particular tooth, he didn't have a lot of support when they ended up—when they did the root canal." Tr. at 246:9–16; *see also* Tr. at 318:3–14 (testifying that "[b]ecause [Weaver's #5 tooth] had a large cavity, et cetera, it had a lot of unsupported tooth structure, and so that was the basis of my saying that the particular tooth did not have a lot of tooth structure, you know, that supports your cusp left once—when it was ready for the restoration."). However, when asked whether Weaver's #12 tooth was in the same condition as his #5 tooth at the time of the root canal treatment, Dr. Mitchell testified that it was not. She further testified that she did not think a post, core, and crown was necessary for Weaver's #12 tooth because he had a lot of "supporting tooth structure" that remained. Tr. at 319:7–21. Dr. Mitchell also testified that the root-canal treatment she provided to Weaver—a permanent filling, but no crown—met the "community" standard for such treatment.

Tr. at 221:13–224:3. Regarding the root canal, Weaver himself testified that when it was completed, it alleviated his dental pain. Tr. at 81:10–13.

Finally, as to the risk of abscess, Dr. Mitchell testified generally that abscess treatment is first an antibiotic and pain medication, and then, extraction. Tr. at 219:3–23. For Weaver, Dr. Mitchell testified as to numerous instances where Weaver was prescribed antibiotics, both during and after his root canal treatment on his #12 tooth. Dr. Mitchell also testified that she did not have reason to believe that Weaver might have an abscess during the root canal process. Tr. 361:1–6. In the years following the procedure, Dr. Mitchell testified that Weaver's tooth broke and that he was advised that it needed to be extracted in February 2016. Tr. at 379:10–380:16. But the dental records reflected that he did not want the tooth extracted, so when he complained of pain and tingling in the tooth, he was given pain medication and an antibiotic, which Dr. Mitchell testified was appropriate for a patient in Weaver's situation who refuses the recommended extraction. Tr. at 382:1–383:2. He was seen a few more times at Stateville and continued to refuse extraction. Eventually, he saw Dr. Scheive for an issue unrelated to his #12 tooth, and Dr. Sheive diagnosed the abscess, recommended, and performed an extraction of the tooth.

Viewing the evidence in the light most favorable to Defendants, as the prevailing parties, there was enough for a rational jury to have found in their favor.[2] *Tuelja*, 546 F.3d at 427. That is, although Weaver argues that he presented ample, uncontroverted testimony in support of his claims of deliberate indifference to his dental needs, it cannot be said that the jury heard no

---

[2] Weaver does not make any argument regarding his claims against Warden Pfister or specific to the jury's verdict on the two counts against him. But again, the record provides enough evidence for the verdict on Counts III and IV, particularly through the testimony and evidence that, although his appointments often were cancelled, Weaver still was frequently seen by the dentists, especially when he requested appointments, and Stateville's policy of not providing posts, cores, and crowns did not violate Weaver's constitutional rights because the testimony was that he did not need such things for the root canal on his #12 tooth.

7

evidence refuting his allegations. It is for the jury, not the Court, to make credibility determinations and to weigh the evidence. Altogether, it was not unreasonable for the jury to conclude that Dr. Mitchell's treatment of Weaver's #12 tooth did not constitute either a decision to do nothing or a substantial departure from accepted professional judgment, practice, or standards.

**B.     Dr. Mitchell's Testimony**

Weaver's second argument in support of his request for a new trial is that Dr. Mitchell lied on the stand. (Dkt. 164) at 4–5. At trial, among other things, Dr. Mitchell testified that inmates are seen for their dental appointments "99 percent of the time." (Dkt. 164) at 5. Weaver contends that this testimony was "demonstrably and outrageously false" because a Stateville Correctional Center Report from February 2014 found that inmates failed to show up to their appointments 40% of the time, that is that they only made their appointments 60% of the time. *Id.*[3] In addition, Weaver argues that Dr. Mitchell's deposition testimony contradicted her testimony at trial because she acknowledged at her deposition that sometimes inmate patients do not arrive for their scheduled appointments for a whole host of reasons. *Id*.

Under Rule 59(a), a district court may grant an injured party a new trial if the verdict is based on false testimony. *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993).[4] Under this analysis, Weaver "must show that [he] maintained a meritorious claim at

---

[3] Weaver's Reply Brief interprets this figure to mean "that 40% of patients—***nearly half***—miss their appointments." (Dkt. 172) at 5 (emphasis in original). But the Report references the "failed appointment rate" and states that it averaged 40%. (Dkt. 164-3) at 36. Thus, it is less than clear that Weaver's reply interpretation of the rate is correct. As this case amply demonstrates, individual inmates can be scheduled for numerous appointments in a short period of time, which means that the Report's failed appointment rate could indicate that 40% of all scheduled appointments fail, which is different than saying 40% of patients fail to have their appointments.

[4] False testimony can also be considered a form of fraud under Federal Rule of Civil Procedure 60(b)(3), and the standards for 60(b)(3) and 59(a) are not substantively different. *Willis v. Lepine*, 687 F.3d 826, 835-36 (7th Cir. 2012).

8

trial and that because of [Dr. Mitchell]'s fraud or misrepresentation—in this case, the presentation of false testimony—[he was] prevented from fully and fairly presenting that claim." *Othman v. City of Chicago*, 2016 WL 612809, at *2 (N.D. Ill. Feb. 16, 2016) (collecting cases); *see also Venson*, 749 F.3d at 651; *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995). Weaver must prove the falsity through clear and convincing evidence. *Othman*, 2016 WL 612809, at *3; *Ervin v. Wilkinson*, 701 F.2d 59, 61 (7th Cir. 1983).

**1. Weaver Fails to Prove that Dr. Mitchell's Trial Testimony was False**

First, Weaver does not establish that Dr. Mitchell's testimony was false. Weaver attempts to use a "Stateville Correctional Center Report issued in February 2014" (2014 Stateville Report) to prove that some of Dr. Mitchell's trial testimony was false. *See* (Dkt. 164) at 5. However, Weaver unsuccessfully attempted to introduce this same document at trial. Specifically, on direct examination, Dr. Mitchell first testified:

> Q. Thank you. That was my question. Thank you. So going back to the appointments, even if a patient has an appointment, that doesn't necessarily guarantee that they're going to be seen by the dentist; is that correct?
>
> A. 99 percent of the time, we do see the patients. The only time that patients, if they come up —
>
> Q. I'm not talking about just if they come up. Just generally. So let's say they have a patient—they have an appointment—the patient has an appointment. That doesn't necessarily guarantee that they will actually see the dentist.
>
> A. For the most part, it does guarantee they're going to see the patient—I mean see the dentist, with a few exceptions.
>
> Q. Sure. What are the exceptions?
>
> A. Okay. The exceptions are . . . . But 99 percent of the time, that's not what happens. If a person has an appointment, I've allocated time and a staff—I mean, there's time and staff for us to get everybody done.

Tr. at 197:3–198:18. Her direct examination by Weaver continued to a second trial day. At that time, Dr. Mitchell confirmed that she had previously testified that "99 percent of the time when

9

the patients have an appointment they're seen" and "they show up for their appointments 99 percent of the time." Tr. at 205:5–11. When Weaver began to lay the groundwork to impeach Dr. Mitchell with the 2014 Stateville Report, the Court held a sidebar to address the issue.

> MR. STALEY: If I may, I know where this is going. There was a report that was just tendered to us this morning—
>
> MR. MEYER: I just found it.
>
> MR. STALEY: —that he wishes to bring in that criticizes, and also some of it is good, about Stateville's medical facilities and their dental facilities. This is the first time we have ever seen this document. Discovery has been closed for over eight months, and this trial has been continued on plaintiff's own request. There's been more than enough time for them to get this document and have a chance for us to review it and our client to review it. Our client was on the stand. The trial was continued until today. Plaintiff's counsel knows there's no way we can discuss this with her. It's a bombardment. It's an ambush on her—against her because she has no idea what this report even is or what it says or when it was put together.
>
> MR. MEYER: Well, that's not accurate because she just said that she reviews—
>
> THE COURT: What is the report? When did you receive it? What does it conclude?
>
> MR. MEYER: Early this morning—I found it because she mentioned audits yesterday. I thought her testimony about 99 percent couldn't possibly be true, and so I did some searching to see if I could find it, one of the audits—
>
> MR. STALEY: Judge, audits were—
>
> MR. MEYER: And this is it—if I may finish. And, you know, this is the audit that mentioned Dr. Mitchell by name. They interviewed her. They've got a 40 percent failure rate on the appointments.
>
> THE COURT: Absolutely not. This is an expert analysis done for a broader purpose, which back-doors in a 702 expert who has done an audit, for myriad reasons, within the facility, other than whatever she's doing, and comes up with the conclusion that this jury needs to make, which is taking it out of the ken and the decision-making process of the jury by superimposing, not just an individual, but four doctor individuals here, right here—oh, I guess one is a nurse—a dentist, two doctors, and a nurse—who expertly say that she's doing a bad job? Not a chance are you bringing this in. It's not part of discovery. It's not disclosed. And it is back-dooring a 702 expert and taking away the ultimate decision from the jury.
>
> MR. MEYER: I wouldn't try to give this document to the jury. I would just ask her a question.

>THE COURT: No, you may not.

Tr. at 312:14–314:9.

Essentially, then, Weaver's use of this particular document to support his challenge to Dr. Mitchell's testimony is a challenge to the Court's evidentiary ruling excluding its use at trial. A party seeking a new trial based on a district court's alleged erroneous evidentiary rulings bears a "heavy burden." *Alverio v. Sam's Warehouse Club*, 253 F.3d 933, 942 (7th Cir. 2001). The Seventh Circuit reviews "the exclusion of evidence for abuse of discretion and gives considerable deference to the trial judge," and thus, "even if a judge's rulings are found to be erroneous, they may be deemed harmless if the record indicates that the end result of the trial would have remained unchanged." *Id.* (internal citation omitted). In other words, a "new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) (internal citation omitted); *Agushi v. Duerr*, 196 F.3d 754, 759 (7th Cir. 1999); *Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993) ("a new trial will not be ordered unless there was an error that caused some prejudice to the substantial rights of the parties"). A new trial is granted on this type of error only in "extraordinary situations." *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2012). This is not such an extraordinary circumstance for a number of reasons.

First and foremost, the Court did not err in refusing to let Weaver use the 2014 Stateville Report at trial. First, the Report undoubtedly contained expert analysis. The relevant portion is titled "Failed Appointments," and it states that "[a] review of monthly reports and daily work sheets revealed a failed appointment rate that averaged 40%." (Dkt. 164-3) at 36. The Report continues, "[t]his is a very high percentage and reflects a serious problem in getting inmates to the clinic for their appointment." *Id*. This is an opinion that was based on a body of the specialized

knowledge and experience of the two doctors, one dentist, and one nurse involved in generating the report.[5] With the expert quality of the Report established, there is no dispute that it was not properly disclosed during discovery: Weaver's counsel located the Report *during* trial and provided a copy to Defense counsel on the morning of the third trial day. Accordingly, this document—this expert report—was not properly disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2). "Without proper disclosures, a party may miss its opportunity to disqualify the expert, retain rebuttal experts, or hold depositions for an expert not required to provide a report." *Tribble v. Evangelides*, 670 F.3d 753, 759–60 (7th Cir. 2012) (citation omitted). Because of these and other ways a party may be prejudiced by an improperly disclosed expert, Federal Rule of Civil Procedure 37(c)(1) states that the "exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless." *Id.* (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)). Here, Weaver has not put forth any argument (at trial or in his Motion for New Trial) that the non-disclosure was either justified or harmless, and the Court has not located support for either ground in the record. Instead, Weaver's proposed use of the 2014 Stateville Report was an attempt to "sandbag" Defendants with "improperly filed expert evidence," a practice that "[c]ourts must be vigilant in policing." *State Farm Fire & Cas. v. Jarden Corp. d/b/a Holmes Group*, 2010 WL 2541249, at *2 (S.D. Ind. June 16, 2010).

The Report properly was excluded based solely on the manner in which it was disclosed (or not disclosed). The Report was inadmissible for other reasons as well. For example, Weaver never established its relevance to Dr. Mitchell's testimony, either at trial or in his Motion for New Trial. Specifically, the Report was generated as a result of a handful site visits conducted in 2014

---

[5] In fact, the Report was generated by four medical professionals comprising the "Medical Investigation Team"—Federal Rule of Evidence 706 experts—for another case pending in this district, *Lippert v. Godinez*, No. 10 C 4603 (Dkt. 339) (N.D. Ill. May 19, 2015).

and simply said that "[a] review of monthly reports and daily work sheets revealed a failed appointment rate that averaged 40%." (Dkt. 164-3) at 36. There is no indication of the timeframe for this review, and so it is unclear as to whether its findings apply to or otherwise encompassed the time period during which Weaver received the root canal on his #12 tooth: December 2011 to May 2012. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action). At best, Weaver generally argues that the Report was based on "a comprehensive review of medical records during the timeframe in which Mr. Weaver sought treatment for his #12 tooth" (Dkt. 172) at 5, but he offers nothing in support of this broad assertion.

Further, even if the Report's relevance had been established, the danger that the Report would unfairly prejudice Defendants still would have outweighed the probative value of the Report. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). This is partly for the reasons listed above (that is, Defendants were denied the opportunity to opportunity to disqualify the experts, retain rebuttal experts, etc.) and also because the Report directly opines on Count II of Weaver's Amended Complaint, which alleged that Dr. Mitchell was deliberately indifferent to Weaver's serious dental needs because she failed to promptly reschedule his dental treatment. In particular, the Report states that the 40% failure rate "is a very high percentage and reflects a serious problem . . . ." (Dkt. 164-3) at 36. "An expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *Fields v. City of Chicago*, 2018 WL 1652093, at *6 (N.D. Ill. Apr. 5, 2018) (citation omitted). The failed appointment opinion would have invaded the province of the jury, which needed to make a

determination as to whether Defendants promptly rescheduled Weaver's dental treatment on its own assessment of the evidence. *See, e.g.*, *Elorac, Inc. v. Sanofi-Aventis Canada, Inc*., 2017 WL 3592775, at \*17 (N.D. Ill. Aug. 21, 2017) (an expert may not invade the province of the jury by simply telling it whose side to take on disputed issues of fact).

Finally, the exclusion of the Report did not prejudice Weaver's substantial rights. *Lemons*, 985 F.2d at 357. As is discussed more fully in Section B(2) below, Weaver's only argument is that his inability to impeach Dr. Mitchell with the Report gave the jury reason to doubt Weaver's testimony on whether he ever refused to attend a dental appointment. (Dkt. 164) at 5. Even assuming that Weaver's appointment-refusal testimony was critical to the jury's verdict (which is a stretch based on the trial record described above), this argument is hopelessly attenuated and it ignores all of the other points of impeachment Weaver scored with Dr. Mitchell as well as the Defendants' successful points of impeachment of Weaver.

Thus, Weaver's false-testimony argument fails insofar as it is based on the 2014 Stateville Report, because that Report is inadmissible. Even if the Court were to consider that document at this time for purposes of the false-testimony analysis, Weaver's argument still would fail for many of the reasons already mentioned. For instance, the Report does not clearly appear to apply to the specific timeframe relevant to Weaver's claims regarding the root canal on his #12 tooth. Also, although Weaver established Dr. Michell's general awareness of "audits" (it is not apparent whether the expert report at issue is such an audit) and her review of audit reports and recommendations, he did not establish her knowledge of any specific audit report findings, especially not any findings regarding appointment success rates. *See* Tr. at 308:14–310:24.

Weaver's second false-testimony argument is that Dr. Mitchell's trial testimony was inconsistent with her deposition testimony (*see* (Dkt. 164) at 5), but this argument is easily

disposed of. "Merely pointing out an inconsistency in testimony—absent any proof that the trial testimony was actually false—is insufficient to warrant the 'extraordinary remedy' of a new trial." *Othman*, 2016 WL 612809, at *3 (trial testimony that was inconsistent with deposition testimony did not prove falsity); *see also Montaño v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008) (discrepancies between testimony given in deposition and that given at trial bore on the credibility of the witnesses, but on their own fell short of perjury). What is more, Weaver's argument about Dr. Mitchell's deposition testimony does not even point to a true inconsistency in her testimony. Instead, he argues that her deposition testimony identifying "a host of reasons" why inmates do not make their dental appointments means that missed appointments are a "common occurrence." (Dkt. 164) at 5. But the fact that there are many reasons why an inmate may miss a dental appointment does not necessarily mean that Dr. Mitchell's trial testimony about a 99% appointment attendance rate was false or actually inconsistent with her deposition testimony.

Beyond this narrow inquiry, Dr. Mitchell testified consistently at her deposition and at trial about the reasons why inmates may miss their appointments. For example, in her deposition, Dr. Mitchell testified that inmates may miss their dental appointments because of lockdowns, communications failures, staff shortages, equipment failures, time shortages, and other circumstances outside of the control of the inmates as well as visits with friends and family members. *See* (Dkt. 164-4) at 38–41. At trial, Dr. Mitchell similarly generally admitted that inmates miss their appointments when there are lockdowns, when administrative detainees are brought to the clinic, when there are staff shortages, when equipment fails, and when the staff runs out of time. *See* Tr. at 197:1–201:25. With regard to Weaver specifically, Dr. Mitchell acknowledged that he missed scheduled appointments for many of those same reasons. *See id*. at 257:9 ("We ran out of time."), 257:16–17 ("it said patient rescheduled due to staff shortage"),

15

258:14–16 ("Q. But he was cancelled due to a staff shortage, . . . A. January 9th, yes."), 260:23–261:6 (testifying that Weaver's January 12th appointment was cancelled on account of a lockdown), 262:1–5 (January 26th appointment was cancelled because of a lockdown), 273:12–15 ("Q. So he's scheduled to be seen on 6/26, correct? A. Yes. Q. And what happened on 6/26? A. Level 4 lockdown."). In addition, Dr. Mitchell testified that Weaver missed some appointments for other reasons. *See, e.g.*, *id*. at 262:9–19 (testifying that Weaver was a no-show for his February 8th appointment), 273:18–274:10 (testifying that Weaver missed an appointment on 6/31 due to a lockdown and because he was on a visit). Again, in the false-testimony analysis, the alleged falsity must be proven by clear and convincing evidence. Here, the difference between Dr. Mitchell's testimony (99% attendance rate) and the Report (60% attendance rate), particularly when viewed against the record as a whole, does not constitute clear and convincing evidence that Dr. Mitchell's trial testimony was false.

### 2. Weaver Failed to Establish that He Could Not Fully and Fairly Present His Claim

On this element, Weaver argues that "[w]ithout Dr. Mitchell's false testimony, the jury would not have had a reason to doubt Mr. Weaver's testimony that he never refused to go to an appointment that he knew about." (Dkt. 164) at 5; *see also* (Dkt. 172) at 5. However, this argument takes far too simplistic a view of the trial evidence. Weaver appears to claim that the Defendants' case and Weaver's credibility rose and fell on Dr. Mitchell's testimony that appointments are kept 99% of the time, but the hefty trial record suggests otherwise. As just one example, Weaver testified that he never refused dental services (*see* Tr. at 98:11–15), but Dr. Mitchell testified that she wrote in Weaver's dental records on May 25, 2017 that he "wants to hold on treatment because of pending settlement of lawsuit. Will request appointment when his attorney says it's ok." Tr. at 387:10–22.

Further, Weaver's argument that Dr. Mitchell's testimony undermined his credibility does not show that Weaver somehow was prevented from fully or fairly presenting any aspect of his claim. Instead, it complains that the jury was forced to make a credibility determination of Weaver after Defendants put on their case. But that is one of the jury's core functions. *Venson*, 749 F.3d at 649 ("the credibility of the parties' competing accounts was for the jury to assess"); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions").

Last, although Weaver asserts that Dr. Mitchell's trial testimony was a "complete surprise" to him on account of her deposition testimony (*see* (Dkt. 172) at 5), he had the opportunity to impeach her to the extent that he believed that any inconsistences between her deposition and trial testimonies bore on her credibility. *Montaño*, 535 F.3d at 565 (describing numerous testimonial discrepancies that constituted "standard-fare impeachment evidence," not proof of perjury). In fact, his adverse direct examination of Dr. Mitchell continued for more than 100 pages of transcript after she gave her 99% figure, but Weaver did not attempt to directly impeach her with the deposition passages cited in his Motion for New Trial. Regardless, and as explained above, Weaver elicited copious testimony from Dr. Mitchell that was consistent with her deposition testimony regarding the various reasons why inmates miss their dental appointments. What this means is that the jury was made aware of the many reasons why inmates generally and Weaver specifically failed to attend their dental appointments and they were given the opportunity to consider that testimony together with Dr. Mitchell's testimony that inmates are seen 99% of the time. Weaver's complaint ultimately is not that he was unable to present his claim; it's more about his dissatisfaction with the impact of his impeachment of Dr. Mitchell. For all of these reasons,

Weaver has failed to explain how he was prevented from presenting his case to the jury. All in all, new trial is not warranted on his argument that Dr. Mitchell offered false testimony at trial.

## **CONCLUSION**

For the reasons stated above, Weaver's Motion for a New Trial (Dkt. 164) is denied.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: January 16, 2019